Book Page 101

**<u>Exhibit A to Disclosure Statement</u>**

**Joint Prepackaged Plan of Reorganization**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
----------------------------------------------------------------x
                                        :
In re                                   :        Chapter 11
                                        :
Panolam Holdings Co., et al.,           :        Case No. 09-_____ (    )
                                        :
                                        :        (Jointly Administered)
              Debtors.                  :
                                        :
----------------------------------------------------------------x
```

**DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF PANOLAM HOLDINGS CO.,**
**PANOLAM HOLDINGS II CO., PANOLAM INDUSTRIES INTERNATIONAL, INC.,**
**PANOLAM INDUSTRIES, INC., PIONEER PLASTICS CORPORATION, NEVAMAR**
**HOLDINGS CORP., NEVAMAR HOLDCO, LLC, AND NEVAMAR COMPANY, LLC**

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

- and -

RICHARDS, LAYTON & FINGER, P.A.
Attorneys for Debtors and
Debtors in Possession
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

Dated: _____ , 2009

# TABLE OF CONTENTS

**Page**

SECTION 1.        DEFINITIONS AND INTERPRETATION................................................1

    A.        Definitions. ..........................................................................................1

    B.        Interpretation, Application of Definitions and Rules of Construction...............................9

SECTION 2.        ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS ................10

    2.1        Administrative Expense Claims...........................................................10

    2.2        Professional Compensation and Reimbursement Claims. ................................10

    2.3        Priority Tax Claims..............................................................................10

SECTION 3.        CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS...................11

SECTION 4.        TREATMENT OF CLAIMS AND EQUITY INTERESTS .................12

    4.1        Priority Non-Tax Claims (Class 1).......................................................12

    4.2        Senior Lender Credit Agreement Revolver Claims (Class 2A)...................12

    4.3        Senior Lender Credit Agreement Term Claims (Class 2B). ..............................13

    4.4        Noteholder Credit Agreement Claims (Class 3). ..............................................13

    4.5        Other Secured Claims (Class 4).............................................................14

    4.6        Senior Subordinated Notes Claims (Class 5)...........................................14

    4.7        General Unsecured Claims (Class 6). ...................................................15

    4.8        Debtor Section 510(b) Claims (Class 7). ..............................................15

    4.9        Intercompany Claims (Class 8).............................................................15

    4.10        Equity Interests in Holdings II, Panolam and the Panolam Subsidiary Debtors (Class 9)..............................................................................15

    4.11        Equity Interests in Holdings (Class 10). ..............................................16

SECTION 5.        MEANS FOR IMPLEMENTATION .................................................16

    5.1        Substantive Consolidation of Debtors for Plan Purposes Only. .................16

    5.2        Corporate Action..................................................................................16

    5.3        Distribution of Amended and Restated First Lien Notes and New Second Lien Term Notes. ..............................................................................17

    5.4        Issuance of New Capital Stock and New Warrants. ..............................18

    5.5        Merger/Dissolution/Consolidation..........................................................18

    5.6        Cancellation of Existing Securities and Agreements....................................18

    5.7        Surrender of Existing Securities. ..........................................................19

    5.8        Agreements with Existing Management. ...............................................19

    5.9        Management Incentive Plan....................................................................19

i

# TABLE OF CONTENTS
## (continued)

Page

5.10    Emergence Bonus Plan. ........................................................................19

5.11    Cancellation of Liens. ..........................................................................20

5.12    Compromise of Controversies. ............................................................20

5.13    Exemption from Securities Laws. .........................................................20

5.14    Exemption From Transfer Taxes. .........................................................20

SECTION 6.        DISTRIBUTIONS.......................................................................20

6.1     Voting of Claims.................................................................................20

6.2     Cramdown and No Unfair Discrimination..........................................21

6.3     Distribution Record Date. ...................................................................21

6.4     Date of Distributions..........................................................................21

6.5     Sources of Cash for Distributions. ......................................................21

6.6     Disbursement Agent. ..........................................................................21

6.7     Rights and Powers of Disbursement Agent. ........................................21

6.8     Expenses of the Disbursement Agent. .................................................22

6.9     Delivery of Distributions. ...................................................................22

6.10    Manner of Payment Under Plan..........................................................23

6.11    No Fractional Shares of New Capital Stock or New Warrants............23

6.12    Setoffs and Recoupment. ....................................................................24

6.13    Distributions After Effective Date. .....................................................24

6.14    Cash Distributions..............................................................................24

6.15    Allocation of Distributions Between Principal and Interest. ...............24

6.16    No Postpetition Interest on Claims. ....................................................24

SECTION 7.        PROCEDURES FOR DISPUTED CLAIMS ...............................24

7.1     Disputed Claims/Process. ...................................................................24

7.2     Objections to Claims...........................................................................25

7.3     Estimation of Claims. .........................................................................25

7.4     No Distributions Pending Allowance. .................................................25

7.5     Distributions after Allowance. ............................................................25

7.6     Preservation of Claims and Rights to Settle Claims. ...........................25

SECTION 8.        EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............26

8.1     Assumption and Rejection of Contracts and Leases.............................26

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 8.2 | Cure of Defaults. | 26 |
| 8.3 | Rejection Claims. | 26 |
| 8.4 | Survival of the Debtors' Indemnification Obligations. | 26 |
| 8.5 | Survival of Other Employment Arrangements. | 27 |
| 8.6 | Insurance Policies. | 27 |
| SECTION 9. | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE | 27 |
| 9.1 | Conditions Precedent to the Effective Date. | 27 |
| 9.2 | Waiver of Conditions Precedent. | 28 |
| 9.3 | Effect of Failure of Conditions. | 28 |
| SECTION 10. | EFFECT OF CONFIRMATION | 28 |
| 10.1 | Vesting of Assets. | 28 |
| 10.2 | Binding Effect. | 29 |
| 10.3 | Discharge of the Debtors. | 29 |
| 10.4 | Exculpation. | 29 |
| 10.5 | Term of Injunctions or Stays. | 29 |
| 10.6 | Injunction Against Interference with Plan. | 30 |
| 10.7 | Releases. | 30 |
| 10.8 | Waiver of Certain Claims. | 30 |
| 10.9 | Preservation of Claims. | 31 |
| 10.10 | Reservation of Rights. | 31 |
| 10.11 | Plan Supplement. | 31 |
| SECTION 11. | RETENTION OF JURISDICTION | 31 |
| SECTION 12. | MISCELLANEOUS PROVISIONS | 32 |
| 12.1 | Payment of Statutory Fees. | 32 |
| 12.2 | Payment of Indenture Trustee Fees. | 33 |
| 12.3 | Dissolution of Statutory Committees and Cessation of Fee and Expense Payment. | 33 |
| 12.4 | Substantial Consummation. | 33 |
| 12.5 | Determination of Tax Filings and Taxes. | 33 |
| 12.6 | Amendments. | 34 |
| 12.7 | Effectuating Documents and Further Transactions. | 34 |
| 12.8 | Revocation or Withdrawal of the Plan. | 35 |

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 12.9 | Severability. | 35 |
| 12.10 | Schedules and Exhibits Incorporated. | 35 |
| 12.11 | Solicitation of the Plan. | 35 |
| 12.12 | Governing Law. | 35 |
| 12.13 | Compliance with Tax Requirements. | 36 |
| 12.14 | Conflict between Plan and, Disclosure Statement, Plan Documents, Plan Term Sheet and Restructuring Support Agreement. | 36 |
| 12.15 | Notices. | 36 |

### Exhibits

| | |
|---|---|
| Plan Term Sheet. | Exhibit "A" |
| New Intercreditor Agreement Term Sheet. | Exhibit "B" |
| Restructuring Support Agreement. | Exhibit "C" |
| Amended and Restated Term Notes Distribution Analysis. | Exhibit "D" |

Panolam Holdings Co., Panolam Holdings II Co., Panolam Industries International, Inc., Panolam Industries, Inc., Pioneer Plastics Corporation, Nevamar Holdings Corp., Nevamar Holdco, LLC, and Nevamar Company, LLC (collectively, the "***Debtors***") propose the following joint prepackaged chapter 11 plan of reorganization pursuant to section 1121(a) of title 11 of the United States Code (the "***Bankruptcy Code***"):

## SECTION 1.    DEFINITIONS AND INTERPRETATION

### A.    **Definitions**.

The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

1.1.    ***10-3/4% Indenture*** means that certain indenture, dated as of September 30, 2005, between Panolam, the guarantors party thereto and the Indenture Trustee, pursuant to which the Senior Subordinated Notes were issued, as amended from time to time.

1.2.    ***Ad Hoc Noteholder Group*** means Apollo and Eaton Vance.

1.3.    ***Ad Hoc Noteholder Group's Professionals*** means Akin Gump Strauss Hauer & Feld LLP, Ashby & Geddes, and Blackstone Advisory Services L.P.

1.4.    ***Administrative Agent*** means Credit Suisse, Cayman Islands Branch, as administrative and collateral agent under the Credit Agreement.

1.5.    ***Administrative Agent's Professionals*** means Sidley Austin LLP, Young Conaway Stargatt & Taylor, LLP, and Conway, Del Genio, Gries & Co., LLC.

1.6.    ***Administrative Expense Claim*** means any right to payment constituting a cost or expense of administration of any of the Reorganization Cases Allowed under and in accordance with, as applicable, sections 330, 364(c)(1), 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' estates or operating the Debtors' businesses, (b) any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Reorganization Cases, (c) any compensation for professional services rendered and reimbursement of expenses incurred by a professional retained by order of the Bankruptcy Court or otherwise allowed pursuant to section 503(b) of the Bankruptcy Code, (d) the Indenture Trustee Fee Claims, (e) all reasonable fees and expenses incurred by the Ad Hoc Noteholder Group's Professionals, pursuant to the terms of their respective prepetition engagement letters, and (f) all reasonable fees and expenses incurred by the Administrative Agent's Professionals, pursuant to their respective prepetition engagement letters.

1.7.    ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.8.    ***Allowed*** means, with reference to any Claim or Equity Interest, (a) any Claim or Equity Interest arising on or before the Effective Date (i) as to which no objection to allowance has been interposed in accordance with Section 7.2 hereof or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Equity Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court or (c) any Claim or Equity Interest expressly Allowed hereunder.

1.9.    ***Amended and Restated Credit Agreement*** means the Amended and Restated Credit Agreement, to be dated as of the Effective Date, by and among Reorganized Panolam, the other Reorganized Debtors (as guarantors), and the holders of Senior Lender Credit Agreement Claims, and the Administrative Agent (as amended or otherwise modified from time to time in accordance with the terms thereof), which will be filed as part of the Plan Supplement and consistent with the terms set forth in the Plan Term Sheet.

1.10.    ***Amended and Restated First Lien Notes*** means the Amended and Restated Revolver Notes and Amended and Restated Term Notes.

1.11.    ***Amended and Restated Revolver Notes*** means those certain amended and restated revolver notes in the aggregate principal amount equal to the lesser of (i) $15 million or (ii) the sum of (a) $5.9 million, which will be drawn on the Effective Date, (b) an amount equal to Excess Cash distributed pursuant to Section 4.2(b)(i) of this Plan, and (c) approximately $4.1 million on account of outstanding and undrawn letters of credit, which shall survive confirmation and remain in place post-Effective Date.  The Amended and Restated Revolver Notes will be issued by Reorganized Panolam pursuant to the Amended and Restated Credit Agreement, as further described in the Disclosure Statement section titled "Description of Amended and Restated Revolver Notes.

1.12.    ***Amended and Restated Term Notes*** means the Amended and Restated Term Notes Distributable to Senior Lender Credit Agreement Revolver Claims and the Amended and Restated Term Notes Distributable to Senior Lender Credit Agreement Term Claims.  The Amended and Restated Term Notes will be issued by Reorganized Panolam pursuant to the Amended and Restated Credit Agreement, as further described in the Disclosure Statement section titled "Description of Amended and Restated Term Notes."

1.13.    ***Amended and Restated Term Notes Distributable to Senior Lender Credit Agreement Revolver Claims*** means those certain amended and restated term notes in the aggregate principal amount equal to the Senior Lender Credit Agreement Revolver Claims <u>minus</u> (a) the aggregate principal amount of the Amended and Restated Revolver Notes distributed pursuant to Section 4.2(b)(ii) of this Plan, (b) Cash distributed pursuant to 4.2(b)(iv) of this Plan, and (c) the Intercreditor Distribution Adjustment.

1.14.    ***Amended and Restated Term Notes Distributable to Senior Lender Credit Agreement Term Claims*** means those certain amended and restated term notes in the aggregate principal amount equal to the Senior Lender Credit Agreement Term Claims <u>minus</u> (a) Cash distributed pursuant to Section 4.3(b)(i) of this Plan and (b) Cash distributed pursuant to 4.3(b)(iii) of this Plan.

1.15.    ***Amended and Restated Security Agreement*** means that certain Amended and Restated Security Agreement to be dated as of the Effective Date, and which will be filed as part of the Plan Supplement.

1.16.    ***Amended and Restated Term Notes Distribution Analysis*** means that certain illustration of hypothetical distribution amounts of Amended and Restated Term Notes attached to this Plan as Exhibit "D."

1.17.    ***Apollo*** means Apollo Capital Management, together with its Affiliates.

1.18.    ***Bankruptcy Code*** has the meaning ascribed to such term in the introduction.

1.19.    ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Reorganization Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Reorganization Cases under section 151 of title 28 of the United States Code.

1.20.    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Reorganization Cases, and any local rules of the Bankruptcy Court.

1.21.    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.22.    ***Cash*** means legal tender of the United States of America.

1.23.    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.24.    ***Class*** means any group of substantially similar Claims or Equity Interests classified by the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.25.    ***Collateral*** means any property or interest in property of the estate of any Debtor subject to a lien, charge or other encumbrance to secure the payment or performance of a Claim, which lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.26.    ***Commencement Date*** means the date on which each of the respective Debtors commenced its Reorganization Case.

1.27.    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.28.    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.29.    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.30.    ***Credit Agreement*** means that certain Credit Agreement, dated as of September 30, 2005, as amended through the date hereof, by and among Holdings II, Panolam, the lenders party thereto and the Administrative Agent (as further amended or otherwise modified from time to time).

1.31.    ***Credit Agreement Claim*** means any Claim arising under the Credit Agreement, including, for the avoidance of doubt, Senior Lender Credit Agreement Claims and Noteholder Credit Agreement Claims.

1.32.    ***Debtors*** has the meaning ascribed to such term in the introduction.

1.33.    ***Debtor Section 510(b) Claim*** means any Claim against any Debtor that is subordinated, pursuant to section 510(b) of the Bankruptcy Code, including Claims arising from rescission of a purchase or sale of a security of any Debtor or any affiliate of any Debtor, for damages

arising from purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

       1.34.    ***Disbursement Agent*** means any entity (including any applicable Debtor if it acts in such capacity) in its capacity as a Disbursement Agent under Sections 6.6, 6.7, and 6.9 hereof.

       1.35.    ***Disclosure Statement*** means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time pursuant to the terms of the Restructuring Support Agreement, as approved by the Bankruptcy Court pursuant to section 1125 and 1126 of the Bankruptcy Code.

       1.36.    ***Disputed Claim*** means any Claim or Equity Interest (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, or (b) for which a proof of claim or interest for payment has been timely filed with the Bankruptcy Court or a written request for payment has been made.

       1.37.    ***Distribution Record Date*** means, except with respect to any publicly traded securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be five (5) Business Days after the Effective Date.

       1.38.    ***Eaton Vance*** means Eaton Vance Management, together with its Affiliates.

       1.39.    ***Effective Date*** means the Business Day on or after the Confirmation Date specified by the Debtors on which (a) no stay of the Confirmation Order is in effect and (b) the conditions to the effectiveness of the Plan specified in Section 9 hereof have been satisfied or waived; *provided*, *however*, that such Business Day shall be no later than 30 days after entry of the Confirmation Order.

       1.40.    ***Emergence Bonus Plan*** means a plan, substantially in the form to be included in the Plan Supplement, adopted by Reorganized Panolam, providing for the issuance of Cash bonuses, as determined by the Chief Executive Officer, of no more than $1 million in the aggregate to officers and key employees of Reorganized Panolam with no more than $500,000 paid to any one individual, which bonuses will be conditioned upon the occurrence of the Effective Date and will be paid on the Effective Date.

       1.41.    ***Equity Interest*** means the interest of any holder of an equity security of any of the Debtors represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in any of the Debtors, whether or not transferable, or any option, warrant or right, contractual or otherwise, to acquire any such interest.

       1.42.    ***Excess Cash*** means the Debtors' Cash on hand in excess of $10 million (and, for the avoidance of doubt, after payment of the Debtors' restructuring costs, including, without limitation, legal, business advisor, and success fees).[1]

---

[1] For the avoidance of doubt, "Excess Cash" shall include, without limitation, the amount of any tax refunds or credits (including interest thereon) with respect to or otherwise relating to any taxes of Panolam Industries, Ltd. or any Debtor for the taxable period commenced January 1, 2008 and ending on December 31, 2008 that are received prior to the Effective Date. Any such tax refunds or credits received after the Effective Date shall be a mandatory prepayment payable promptly after receipt pursuant to the terms of the Amended and Restated Credit Agreement.

1.43.    ***Excess Cash Adjustment*** means $15.0 million <u>minus</u> an amount equal to the aggregate principal amount of the Amended and Restated Revolver Notes.

1.44.    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a stay, new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied, or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for *certiorari* or move for a stay, new trial, reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a "Final Order."

1.45.    ***General Unsecured Claim*** means any Claim against any of the Debtors that (a) is not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Credit Agreement Claim, Other Secured Claim, Senior Subordinated Notes Claim, Intercompany Claim or Debtor Section 510(b) Claim, or (b) is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

1.46.    ***Holdings*** means Panolam Holdings Co.

1.47.    ***Holdings II*** means Panolam Holdings II Co.

1.48.    ***Indenture Trustee*** means Wells Fargo Bank, National Association, and/or its successor, as indenture trustee under the 10-3/4% Indenture.

1.49.    ***Indenture Trustee Fee Claims*** means the reasonable fees, costs, and expenses incurred by the Indenture Trustee in the performance of its duties and as provided under the 10-3/4% Indenture (including the reasonable fees, costs, and expenses incurred by the Indenture Trustee's professionals) prior to the Effective Date (to the extent not paid as of the Effective Date); *provided,* that such fees, costs, and expenses are reimbursable under the terms of the 10-3/4% Indenture.

1.50.    ***Intercompany Claim*** means any Claim held by (i) a Debtor against another Debtor or (ii) a non-Debtor subsidiary against a Debtor.

1.51.    ***Intercreditor Distribution Adjustment*** means an amount equal to the aggregate principal amount of Senior Lender Credit Agreement Revolver Claim less the product of (a) an amount equal to the aggregate principal amount of Amended and Restated First Lien Notes and (b) Intercreditor Adjustment Percentage.

1.52.    ***Intercreditor Adjustment Percentage*** means the quotient of (a) an amount equal to the aggregate principal amount of Senior Lender Credit Agreement Revolver Claim divided by (b) an amount equal to the aggregate principal amount of Senior Lender Credit Agreement Claims.

1.53.    ***Management Incentive Plan*** means the management equity incentive plan, which shall be substantially in the form set forth in the Plan Supplement.

1.54.    ***New Board*** means each board of directors appointed pursuant to Section 5.2(c) of the Plan.

1.55.    ***New Capital Stock*** means the shares of common stock of Reorganized Holdings authorized for issuance in accordance with the terms hereof on the Effective Date and contributed as a capital contribution to, and distributed on behalf of, Reorganized Panolam.

1.56.    ***New Intercreditor Agreement*** means the intercreditor agreement, to be dated as of the Effective Date, by and among the Administrative Agent, Reorganized Panolam, the other Reorganized Debtors, and the agent and collateral agent under the New Second Lien Credit Agreement (as amended or otherwise modified from time to time in accordance with the terms thereof), which shall be consistent with the terms set forth in the Plan Term Sheet and the New Intercreditor Agreement Term Sheet, and filed as part of the Plan Supplement.

1.57.    ***New Intercreditor Agreement Term Sheet*** means the term sheet setting forth the terms and conditions of the New Intercreditor Agreement, which is attached hereto as Exhibit "B" hereto.

1.58.    ***New Second Lien Credit Agreement*** means the second lien credit agreement, to be dated as of the Effective Date, by and among Reorganized Panolam, the other Reorganized Debtors (as guarantors), the holders of Noteholder Credit Agreement Claims, and the Second Lien Administrative Agent (as amended or otherwise modified from time to time), which will be filed as part of the Plan Supplement, and consistent with the terms set forth in the Plan Term Sheet.

1.59.    ***New Second Lien Term Notes*** means those certain new second lien term notes in the aggregate principal amount of $25 million that will be issued by Reorganized Panolam pursuant to the New Second Lien Credit Agreement, as further described in the Disclosure Statement section titled "Description of New Second Lien Term Notes."

1.60.    ***New Warrants*** means those certain warrants to be issued by Reorganized Holdings to purchase New Capital Stock and exercisable only upon a change of control, as further described in the "Description of New Warrants" section in the Disclosure Statement, and substantially in the form to be included in the Plan Supplement.

1.61.    ***Noteholder Credit Agreement Claims*** means $25 million in aggregate principal amount of the Term Loans held by Apollo and Eaton Vance plus all accrued and unpaid interest thereon at the non-default contract rate under the Credit Agreement as of the Effective Date, except to the extent such interest is otherwise provided herein to be paid or satisfied, plus all other Obligations (as defined in the Credit Agreement), except to the extent such Obligations are otherwise provided herein to be paid or satisfied, attributable to such Claims.

1.62.    ***Other Secured Claim*** means a Secured Claim other than a Credit Agreement Claim.

1.63.    ***Panolam*** means Panolam Industries International, Inc.

1.64.    ***Panolam Group*** means (i) the affiliated group of corporations, within the meaning of Section 1504 of the Tax Code, of which Holdings is the common parent, and (ii) any other group of corporations filing consolidated, combined or unitary tax returns for state and local tax purposes that includes Holdings or Holdings II, of which Panolam or any subsidiary of Panolam is also a member (other than any such group of which Panolam or any subsidiary of Panolam is the parent).

1.65.    ***Panolam Subsidiary Debtors*** means Panolam Industries, Inc., Pioneer Plastics Corporation, Nevamar Holdings Corp., Nevamar Holdco, LLC, and Nevamar Company, LLC.

1.66.    ***Person*** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

1.67.    ***Plan*** means this joint prepackaged plan of reorganization, including the exhibits and schedules hereto and contained in the Plan Supplement, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of the Restructuring Support Agreement.

1.68.    ***Plan Documents*** means the documents to be executed, delivered, assumed and/or performed in conjunction with the consummation of the Plan on the Effective Date including, but not limited to, the form of Warrant, the Restated Bylaws, the Restated Certificate of Incorporation, the Amended and Restated Credit Agreement, the Amended and Restated Security Agreement, the New Intercreditor Agreement, the New Second Lien Credit Agreement, and the Registration Rights Agreement.  Except as otherwise provided herein, the Plan Documents must be reasonably acceptable to the Consenting Holders (as defined in the Restructuring Support Agreement).  Each of the Plan Documents to be entered into as of the Effective Date will be filed in draft form in the Plan Supplement.

1.69.    ***Plan Supplement*** means a supplemental appendix to the Plan, to be filed with the Bankruptcy Court prior to the Confirmation Hearing, that will contain the draft forms of the Plan Documents to be entered into as of the Effective Date.

1.70.    ***Plan Term Sheet*** means the Panolam Preliminary Restructuring Proposal Term Sheet (including the Panolam Chart of Provisions appended thereto) annexed hereto as Exhibit "A" (as amended or otherwise modified from time to time in accordance with the terms of the Restructuring Support Agreement).

1.71.    ***Priority Non-Tax Claim*** means any Claim against any of the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.72.    ***Priority Tax Claim*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.73.    ***Registration Rights Agreement*** means the agreement between Reorganized Holdings, Apollo, Eaton Vance, and any other holder of 10% or more of the issued and outstanding shares of the New Capital Stock which shall be filed as part of the Plan Supplement and entered into on the Effective Date and shall provide for each such holder of New Capital Stock to have two separate demand rights to require Reorganized Holdings to register its New Capital Stock and for piggyback registration rights for the other initial holders of the New Capital Stock.

1.74.    ***Released Parties*** means (a) each present and former director, officer, employee, manager, partner, and member of (i) the Debtors, (ii) the holders of the Credit Agreement Claims, (iii) the holders of the Senior Subordinated Notes Claims, (iv) the holders of Equity Interests in Holdings, (v) the Administrative Agent and its Affiliates, (vi) the Indenture Trustee and (vii) Genstar Capital LLC and The Sterling Group, L.P., in their capacity as advisors under that certain Advisory Services Agreement dated as of September 30, 2005, by and between Holdings, Genstar Capital LLC and The Sterling Group, L.P. (as amended, supplemented or otherwise modified), (b) each holder of a Credit Agreement Claim, (c)

each holder of a Senior Subordinated Notes Claim, (d) each holder of an Equity Interest in Holdings, Holdings II, Panolam, or any of the Panolam Subsidiary Debtors, (e) the Administrative Agent and its Affiliates, (f) the Indenture Trustee, and (g) each Advisor of the Debtors, the holders of Credit Agreement Claims, the holders of Senior Subordinated Notes Claims, the holders of Equity Interests in Holdings, the Administrative Agent, and the Indenture Trustee.  For purposes of this definition, "***Advisors***" means each financial advisor, investment banker, professional, accountant and attorney, and each of their respective employees, parent corporations, subsidiaries, affiliates and partners.

1.75.    ***Reorganization Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on [__], 2009, in the United States District Court for the District of Delaware and styled *In re Panolam Holdings Co., et al.,* 09-____ (__) (Jointly Administered).

1.76.    ***Reorganized Debtors*** means all of the Debtors (including any successor corporation or entity by merger), as reorganized as of the Effective Date in accordance with the Plan.

1.77.    ***Reorganized Holdings*** means either Holdings or Holdings II, as shall be determined by the Debtors prior to the Effective Date, as reorganized as of the Effective Date in accordance with the Plan (including any successor corporation by merger).

1.78.    ***Reorganized Panolam*** means Panolam, as reorganized as of the Effective Date in accordance with the Plan (including any successor corporation by merger).

1.79.    ***Required Consenting Holders*** has the meaning set forth for such term in the Restructuring Support Agreement.

1.80.    ***Restated Bylaws*** means the amended and restated bylaws to be adopted by Reorganized Holdings on the Effective Date, which shall be substantially in the form to be included in the Plan Supplement.

1.81.    ***Restated Certificate of Incorporation*** means the amended and restated certificate of incorporation to be adopted by Reorganized Holdings and filed with the Secretary of State of the State of Delaware prior to or on the Effective Date, which shall be substantially in the form to be filed as part of Plan Supplement.

1.82.    ***Restructuring Support Agreement*** means that certain Restructuring Support Agreement, dated as of September 25, 2009, and annexed hereto as Exhibit "C."

1.83.    ***Revolving Loan*** means that certain revolving credit loan memorialized through the revolving notes issued under the Credit Agreement.

1.84.    ***Second Lien Administrative Agent*** means Apollo Laminates Agent, LLC,  as administrative and collateral agent under the New Second Lien Credit Agreement.

1.85.    ***Secured Claim*** means a Claim to the extent (a) secured by a lien on Collateral, to the extent of the value of such Collateral (i) as set forth in the Plan, or (ii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.86.    ***Securities Act*** means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

1.87.    ***Senior Lenders*** means the lenders party to the Credit Agreement.

1.88.    ***Senior Lender Credit Agreement Claims*** means the Senior Lender Credit Agreement Revolver Claims and the Senior Lender Credit Agreement Term Claims.

1.89.    ***Senior Lender Credit Agreement Revolver Claim*** means any Claim arising out of the Revolving Loan governed by the Credit Agreement.

1.90.    ***Senior Lender Credit Agreement Term Claim*** means any Claim arising out of the Term Loan governed by the Credit Agreement other than any Noteholder Credit Agreement Claim.

1.91.    ***Senior Subordinated Notes*** means those certain 10-3/4% Senior Subordinated Notes due 2013, issued by Panolam pursuant to the 10-3/4% Indenture.

1.92.    ***Senior Subordinated Notes Claim*** means any Claim against any Debtor under or in connection with the Senior Subordinated Notes or the 10-3/4% Indenture, other than a Debtor Section 510(b) Claim.

1.93.    ***Shareholders Agreement*** means the agreement between Apollo, Eaton Vance, and Reorganized Holdings, which agreement shall be entered into on the Effective Date and which must be reasonably acceptable to Apollo and Eaton Vance.

1.94.    ***Tax Code*** means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury regulations promulgated thereunder.

1.95.    ***Term Loan*** means that certain term loan memorialized through term notes issued under the Credit Agreement.

**B.    Interpretation, Application of Definitions and Rules of Construction**.

For purposes of the Plan: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) unless otherwise specified, any reference in the Plan to an existing document, schedule, or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (3) any reference to an entity as a holder of a Claim or Equity Interest includes that entity's successors and assigns; (4) unless otherwise specified, all references in the Plan to sections are references to sections of the Plan; (5) unless otherwise specified, all references in the Plan to exhibits are references to exhibits in the Plan Supplement; (6) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (7) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) captions and headings to sections of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise set forth in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) all references to docket numbers of documents filed in the Reorganization Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to

9

statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Reorganization Cases, unless otherwise stated; and (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors after the Effective Date in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## SECTION 2.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

### 2.1    *Administrative Expense Claims*.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or a different treatment is provided for by order of the Bankruptcy Court (including, without limitation, any order governing the use of cash collateral, which shall provide, among other things, for payment of the unpaid fees and expenses of the Administrative Agent's Professionals and the Ad Hoc Noteholder Group's Professionals on a monthly basis in arrears, promptly after the receipt of the applicable invoice) each holder of an Allowed Administrative Expense Claim shall receive payment in full in Cash of the unpaid portion of such Allowed Administrative Expense Claim (a) in the case of professionals retained by the Debtors in the ordinary course of their business, if any, on such terms as are customary between the Debtors and such professionals, or (b) with respect to all other holders of Allowed Administrative Expense Claims, on the later of (i) the Effective Date and (ii) the date on which such payment would be made in the ordinary course of the Debtors' business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions.  Indenture Trustee Fee Claims, the fees and expenses of the Ad Hoc Noteholder Group's Professionals incurred through and not otherwise paid as of the Effective Date, and the unpaid fees and expenses of the Administrative Agent's Professionals incurred through and not otherwise paid as of the Effective Date shall be paid in full in Cash by the Reorganized Debtors on the Effective Date without the need for Bankruptcy Court approval.

### 2.2    *Professional Compensation and Reimbursement Claims*.

All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under section 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, and (b) be paid in full from the Debtors' or Reorganized Debtors' Cash on hand in such amounts as are allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Allowed Claim and the Debtors or, on and after the Effective Date, the Reorganized Debtors.  The Reorganized Debtors are authorized to pay compensation for services rendered and reimbursement of expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.3    *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim, (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date, or (b) to the extent such Claim is not due and owing on the

Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business.

### SECTION 3.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

As set forth more fully below, the Plan is premised upon the substantive consolidation of the Debtors for purposes of the Plan only.  Accordingly, for purposes of the Plan, the assets and liabilities of the Debtors are deemed the assets and liabilities of a single, consolidated entity.

The following table designates the Classes of Claims against, and Equity Interests in, the Debtors, and specifies which of those Classes and Equity Interests are (a) impaired or unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2A | Senior Lender Credit Agreement Revolver Claims | Impaired | Yes |
| 2B | Senior Lender Credit Agreement Term Claims | Impaired | Yes |
| 3 | Noteholder Credit Agreement Claims | Impaired | Yes |
| 4 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 5 | Senior Subordinated Notes Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| 7 | Debtors Section 510(b) Claims | Impaired | No (deemed to reject) |
| 8 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| 9 | Equity Interests in Holdings II, Panolam and Panolam Subsidiary Debtors | Unimpaired | No (deemed to accept) |
| 10 | Equity Interests in Holdings | Impaired | Yes |

## SECTION 4.   TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 4.1   *Priority Non-Tax Claims (Class 1)*.

(a)    <u>Impairment and Voting</u>.  Class 1 is unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b)    <u>Distributions</u>.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a different treatment, each such holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the applicable Debtor and the holder of such Claim.

### 4.2   *Senior Lender Credit Agreement Revolver Claims (Class 2A)*.

(a)    <u>Impairment and Voting</u>.  Class 2A is impaired by the Plan.  The Senior Lender Credit Agreement Revolver Claims shall be Allowed in full and, for the avoidance of doubt, shall not be subject to avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection or any challenges under any applicable law or regulation by any Person, in the aggregate amount of (i) $30 million (which amount includes approximately $4.1 million on account of outstanding and undrawn letters of credit, which shall survive confirmation and remain in place post-Effective Date), <u>plus</u> (ii) all accrued and unpaid interest thereon at the non-default contract rate under the Credit Agreement as of the Effective Date, except to the extent such interest is otherwise provided herein to be paid or satisfied, <u>plus</u> (iii) all other Obligations (as defined in the Credit Agreement), except to the extent that the claims of the Administrative Agent under the Credit Agreement are otherwise provided to be paid or satisfied.  Each holder of an Allowed Senior Lender Credit Agreement Revolver Claim is entitled to vote to accept or reject the Plan.

(b)     *Distributions*.  On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Senior Lender Credit Agreement Revolver Claim shall receive from Reorganized Panolam, as illustrated in the Amended and Restated Term Notes Distribution Analysis attached hereto as Exhibit "D," (i) an amount of Cash equal to the Intercreditor Distribution Adjustment plus its *pro rata* share (based upon the amount of the Allowed Senior Lender Credit Agreement Revolver Claim held by such holder divided by the total amount of all Allowed Senior Lender Credit Agreement Claims) of the Excess Cash (the "***Revolver Claim Paydown***"), (ii) its *pro rata* share of the Amended and Restated Revolver Notes, (iii) its *pro rata* share of the Amended and Restated Term Notes Distributable to Senior Lender Credit Agreement Revolver Claims, and (iv) its *pro rata* share of Cash sufficient to pay that portion of the Allowed Senior Lender Credit Agreement Revolver Claims set forth in Sections 4.2(a)(ii) and 4.2(a)(iii).

**4.3     *Senior Lender Credit Agreement Term Claims (Class 2B)*.**

(a)     <u>Impairment and Voting</u>.  Class 2B is impaired by the Plan.  The Senior Lender Credit Agreement Term Claims shall be Allowed in full and, for the avoidance of doubt, shall not be subject to avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection or any challenges under any applicable law or regulation by any Person, in the aggregate amount of (i) approximately $142.6 million, <u>plus</u> (ii) its *pro rata* share of all accrued and unpaid interest thereon at the non-default contract rate under the Credit Agreement as of the Effective Date, except to the extent such interest is otherwise provided herein to be paid or satisfied, <u>plus</u> (iii) its *pro rata* share of all other Obligations (as defined in the Credit Agreement), except to the extent that the claims of the Administrative Agent under the Credit Agreement are otherwise provided to be paid or satisfied.  Each holder of an Allowed Senior Lender Credit Agreement Term Claim is entitled to vote to accept or reject the Plan.

(b)     <u>Distributions</u>.  On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Senior Lender Credit Agreement Term Claim shall receive from Reorganized Panolam, as illustrated in the Amended and Restated Term Notes Distribution Analysis attached hereto as Exhibit "D," (i) (a) its *pro rata* share (based upon the amount of the Allowed Senior Lender Credit Agreement Term Claim held by such holder divided by the total amount of all Allowed Senior Lender Credit Agreement Claims) of the Excess Cash <u>minus</u> (b) the Excess Cash Adjustment and <u>minus</u> (c) an amount of Cash equal to the Intercreditor Distribution Adjustment (the "***Term Claim Paydown***" and, together with the Revolver Claim Paydown, the "***Senior Lender Credit Agreement Claim Paydown***"), (ii) its *pro rata* share of the Amended and Restated Term Notes Distributable to Senior Lender Credit Agreement Term Claims, and (iii) its *pro rata* share of Cash sufficient to pay that portion of the Allowed Senior Lender Credit Agreement Term Claims set forth in Sections 4.3(a)(ii) and 4.3(a)(iii).

**4.4     *Noteholder Credit Agreement Claims (Class 3)*.**

(a)     <u>Impairment and Voting</u>.  Class 3 is impaired by the Plan.  The Noteholder Credit Agreement Claims shall be Allowed in full and, for the avoidance of doubt, shall not be subject to avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection or any challenges under any applicable law or regulation by any Person in the aggregate amount of (i) $25 million, which Allowed amount represents principal, <u>plus</u> (ii) all accrued and unpaid interest thereon at the non-default contract rate under the Credit Agreement as of the Effective Date, except to the extent such interest is otherwise provided herein to be paid or satisfied, <u>plus</u> (iii) all other Obligations (as defined in the Credit

13

Agreement) attributable to the Noteholder Credit Agreement Claims. Each holder of an Allowed Noteholder Credit Agreement Claim is entitled to vote to accept or reject the Plan.

(b)    Distributions. On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Noteholder Credit Agreement Claim shall receive from Reorganized Panolam (i) its *pro rata* share of the New Second Lien Term Notes and (ii) its *pro rata* share of Cash sufficient to pay that portion of the Allowed Senior Lender Credit Agreement Term Claims set forth in Sections 4.4(a)(ii) and 4.4(a)(iii).

### 4.5    *Other Secured Claims (Class 4)*.

(a)    Impairment and Voting. Class 4 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b)    Distributions. On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, each Allowed Other Secured Claim shall be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default. All Allowed Other Secured Claims that are not due and payable on or before the Effective Date shall, at the Debtors' option, be paid (i) in the ordinary course of business in accordance with the course of practice between the Debtors and such holder with respect to such Claim, or (ii) by transfer of the Collateral to the holder of such Claim.

### 4.6    *Senior Subordinated Notes Claims (Class 5)*.

(a)    Impairment and Voting. Class 5 is impaired by the Plan. The Senior Subordinated Notes Claims shall be Allowed in full and, for avoidance of doubt, shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection or any challenges under any applicable law or regulation by any Person, in the aggregate amount of (i) $151 million, plus (ii) the accrued but unpaid interest at the non-default contract rate under the Senior Subordinated Notes as of the Effective Date, plus (iii) all other Obligations (as defined in the 10-3/4% Indenture), except to the extent that claims of the Indenture Trustee under the Senior Subordinated Notes are otherwise provided to be paid or satisfied. Each holder of an Allowed Senior Subordinated Notes Claim is entitled to vote to accept or reject the Plan.

(b)    Distributions. On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed Senior Subordinated Notes Claim agrees to a different treatment, each holder of an Allowed Senior Subordinated Notes Claim shall exchange with Reorganized Panolam all, and not less than all, of such holder's Senior Subordinated Notes for such holder's *pro rata* share (based upon the principal amount of Senior Subordinated Notes held by such holder) of ninety percent (90%) of the sum of (i) the number of shares of New Capital Stock outstanding on the Effective Date, including New Capital Stock issued to management pursuant to the Management Incentive Plan, plus (ii) the number of shares of New Capital Stock reserved for issuance under the Management Incentive Plan.

**4.7**    *General Unsecured Claims (Class 6)*.

(a)    <u>Impairment and Voting</u>.  Class 6 is unimpaired by the Plan.  Each holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed General Unsecured Claim shall receive payment in full in Cash of the unpaid portion of such Allowed General Unsecured Claim on the latest of (i) the Effective Date (or as soon thereafter as is reasonably practicable), (ii) the date on which such Claim would be paid in the ordinary course of the Debtors' business, or (iii) as otherwise agreed by the Debtors and the holder of such Claim; *provided, however*, that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business.  The Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

**4.8**    *Debtor Section 510(b) Claims (Class 7)*.

(a)    <u>Impairment and Voting</u>.  Class 7 is impaired by the Plan.  Each holder of a Debtor Section 510(b) Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have rejected the Plan.

(b)    <u>Distributions</u>.  On the Effective Date, all Debtor Section 510(b) Claims shall be extinguished with no distribution; *provided, however*, that nothing in this Section 4.10 shall affect or limit the rights and obligations set forth in Section 8.5 hereof.

**4.9**    *Intercompany Claims (Class 8)*.

(a)    <u>Impairment and Voting</u>.  Class 8 is unimpaired by the Plan.  Each holder of an Allowed Intercompany Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b)    <u>Distributions</u>.  On or as soon as practicable after the Effective Date, all Intercompany Claims will either be reinstated to the extent determined to be appropriate by the Debtors or adjusted, continued or capitalized (but not paid in Cash), either directly or indirectly, in whole or in part; *provided*, *however*, that the Intercompany Claims held by any foreign non-Debtor subsidiary of Panolam may be paid in full in Cash.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by equityholders of Reorganized Holdings.

**4.10**    *Equity Interests in Holdings II, Panolam and the Panolam Subsidiary Debtors (Class 9)*.

(a)    <u>Impairment and Voting</u>.  Class 9 is unimpaired by the Plan.  Each holder of an Allowed Equity Interest in Holdings II, Panolam or any Panolam Subsidiary Debtor is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b)    <u>Distributions</u>.  On the Effective Date and subject to Section 5.5 of the Plan, all of the Equity Interests of the Panolam Subsidiary Debtors shall continue to be owned by Panolam or Nevamar Holding Corp., as applicable.  On the Effective Date, all of the Equity Interests of Panolam shall be cancelled and the Equity Interests of Reorganized Panolam shall be owned by Reorganized Holdings.  On the Effective Date, all of the Equity Interests in Holdings II will be cancelled, unless Holdings II is merged into Holdings.

**4.11**    *Equity Interests in Holdings (Class 10)*.

(a)    <u>Impairment and Voting</u>.  Class 10 is impaired by the Plan.  Each holder of an Allowed Equity Interest in Holdings is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  On the Effective Date, or as soon thereafter as is reasonably practicable, all existing Equity Interests in Holdings shall be cancelled, and each holder of an Allowed Equity Interest in Holdings shall be permitted, in full satisfaction of such Equity Interest, to exchange with Holdings all of its Allowed Equity Interests in Holdings for its *pro rata* share of New Warrants.

## SECTION 5.    MEANS FOR IMPLEMENTATION

**5.1**    *Substantive Consolidation of Debtors for Plan Purposes Only*.

The Plan is premised upon the substantive consolidation of the Debtors for purposes of the Plan only.  The Debtors propose procedural substantive consolidation to avoid the inefficiency of proposing, voting on, and making distributions in respect of entity-specific claims.  Accordingly, on the Effective Date, all of the Debtors and their estates shall, for purposes of the Plan only, be deemed merged and (a) all assets and liabilities of the Debtors shall be treated for purposes of the Plan only as though they were merged, (b) all guarantees of Holdings II, Panolam and the Panolam Subsidiary Debtors of payment, performance, or collection of obligations of any other Debtor shall be eliminated and cancelled, (c) all joint obligations of two (2) or more Debtors, and all multiple Claims against such entities on account of such joint obligations, shall be considered a single claim against the Debtors, and (d) any Claim filed in the Reorganization Cases shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated the Debtors on and after the Effective Date.  Unless otherwise set forth herein, such substantive consolidation shall not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and corporate structures of the Debtors (including the corporate ownership of the Panolam Subsidiary Debtors), (ii) any intercompany claims, or (iii) the substantive rights of any creditor.  If any party in interest challenges the proposed limited substantive consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an entity-by-entity basis.

**5.2**    *Corporate Action*.

(a)    <u>General</u>.  Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) adoption or assumption, as applicable, of the new employment agreements with existing members of management (the "***Management Agreements***"), (ii) selection of the directors and officers for the Reorganized Debtors, (iii) issuance of the New Capital Stock and the New Warrants by Reorganized Holdings and the contribution of such New Capital Stock to Reorganized Panolam, (iv) distribution of the Amended and Restated First Lien Notes and the New Second Lien Term Notes, (v) adoption of the Management Incentive Plan, and (vi) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall occur in accordance with the Plan and any governing agreements or transfer documents and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, without limitation, (u) the Shareholders Agreement, (v) the Registration Rights Agreement, (w) the Amended and Restated Credit Agreement and Amended and

Restated Security Agreement, (x) the New Second Lien Credit Agreement, (y) the New Intercreditor Agreement, and (z) any and all other agreements, documents, securities and instruments relating to the foregoing (including without limitation security documents). The authorizations and approvals contemplated by this Section 5.2(a) shall be effective notwithstanding any requirements under non-bankruptcy law.

(b)    Restated Certificate of Incorporation and Restated Bylaws of Reorganized Holdings and the Other Reorganized Debtors.

On the Effective Date, Reorganized Holdings shall adopt the Restated Certificate of Incorporation and the Restated Bylaws and shall file the Restated Certificate of Incorporation with the Secretary of State of the State of Delaware. In addition, on or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the Restated Certificate of Incorporation, the certificates of incorporation of the Debtors that are corporations and the organization documents for the Debtors that are limited liability companies shall also be amended (and as to the corporate Debtors, filed with the Secretary of State of their respective states of incorporation) as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power. On the Effective Date, the boards of directors of each corporate Reorganized Debtor shall be deemed to have adopted the restated certificate of incorporation and restated bylaws for such Reorganized Debtor.

(c)    Boards of Directors of Reorganized Holdings and the Other Reorganized Debtors. On the Effective Date, the operation of Reorganized Holdings shall become the general responsibility of its board of directors, subject to, and in accordance with, the Restated Certificate of Corporation and Restated Bylaws of Reorganized Holdings. On the Effective Date, the operation of each of the other Reorganized Debtors shall become the general responsibility of its respective board of directors or board of managers, as applicable, subject to and in accordance with its respective restated certificates of incorporation and restated bylaws or other organizational documents. The initial boards of directors of Reorganized Holdings and the other Reorganized Debtors shall be disclosed in the Plan Supplement. The initial board of directors of Reorganized Holdings shall consist of five directors, one of whom shall be Robert J. Muller, Chief Executive Officer of Panolam, and the remaining members shall be selected by Apollo and Eaton Vance and their identities shall be disclosed in the Plan Supplement.

(d)    Officers of Reorganized Holdings and the Other Reorganized Debtors. The initial officers of Reorganized Holdings and the other Reorganized Debtors shall be disclosed in the Plan Supplement. The selection of officers of Reorganized Holdings and the other Reorganized Debtors after the Effective Date shall be as provided in the respective restated certificates of incorporation and restated bylaws or other organizational documents of Reorganized Holdings or the applicable Reorganized Debtor.

**5.3    *Distribution of Amended and Restated First Lien Notes and New Second Lien Term Notes*.**

On the Effective Date, the Amended and Restated Credit Agreement and the New Second Lien Credit Agreement shall be executed and delivered, and Reorganized Panolam shall be authorized to distribute the Amended and Restated First Lien Notes and the New Second Lien Term Notes and Reorganized Panolam and the Reorganized Debtors shall be authorized to execute, deliver and enter into, *inter alia*, the Amended and Restated Credit Agreement, the Amended and Restated Security Agreement, the New Second Lien Credit Agreement, and the New Intercreditor Agreement without the need for any further corporate action and without further action by the holders of Claims or Equity Interests. On the

17

Effective Date (a) the Amended and Restated Revolver Notes shall be distributed on behalf of Reorganized Panolam to holders of Allowed Senior Lender Credit Agreement Revolver Claims, as set forth in Section 4.2(b) above, (b) the Amended and Restated Term Notes shall be distributed on behalf of Reorganized Panolam to holders of Allowed Senior Lender Credit Agreement Revolver Claims, as set forth in Section 4.2(b) above and to holders of Allowed Senior Lender Credit Agreement Term Claims, as set forth in Section 4.3(b) above, and (c) the New Second Lien Term Notes shall be distributed, as set forth in Section 4.4(b) above, on behalf of Reorganized Panolam to holders of Allowed Noteholder Credit Agreement Claims. Summaries of the Amended and Restated Credit Agreement, the related security documents, and the New Second Lien Credit Agreement are contained in the Disclosure Statement and a copy of each credit agreement, any related security documents, and the New Intercreditor Agreement will be filed as part of the Plan Supplement.

The Amended and Restated Credit Agreement and Amended and Restated First Lien Notes shall be given in renewal and rearrangement of and in substitution (but not in payment) for, and shall re-evidence the Senior Lender Credit Agreement Claims, less the Senior Lender Credit Agreement Claim Paydown. Such re-evidenced Senior Lender Credit Agreement Claims shall continue to be secured by first priority, perfected, valid and enforceable liens in the collateral pursuant to, and as set forth in the Amended and Restated Security Agreement.

### 5.4    *Issuance of New Capital Stock and New Warrants*.

The issuance of New Capital Stock and New Warrants by Reorganized Holdings shall be authorized without the need for any further corporate action. On the Effective Date, Reorganized Holdings shall issue the New Capital Stock and the New Warrants. Reorganized Holdings shall:

(a)    contribute 90% of the shares of New Capital Stock as a capital contribution to Reorganized Panolam to be distributed pursuant to the Plan to the holders of Allowed Senior Subordinated Notes Claims;

(b)    pursuant to the Management Incentive Plan described in section 5.9 below, distribute 5% of the shares of New Capital Stock to certain officers and key employees of the Reorganized Debtors as determined prior to the Confirmation Hearing subject to the reasonable agreement of Apollo, Eaton Vance and the Debtors (with the remaining 5% of the shares of the New Capital Stock being reserved for the Management Incentive Plan); and

(c)    distribute the New Warrants to holders of Allowed Equity Interests pursuant to Sections IV and V of the Plan.

### 5.5    *Merger/Dissolution/Consolidation.*

On or as of the Effective Date or as soon as practicable thereafter and without further need for any further action, the Reorganized Debtors may (i) cause any or all of the Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, or (iii) engage in any other transaction in furtherance of the Plan. The Debtors may, in their sole discretion, merge Holdings and Holdings II together, or dissolve Holdings or Holdings II (but not both).

### 5.6    *Cancellation of Existing Securities and Agreements*.

Except for purposes of evidencing a right to distributions under the Plan with respect to executory contracts or unexpired leases which have not been assumed by the Debtors or as otherwise

provided hereunder, on the Effective Date, all of the agreements and other documents evidencing (a) the Claims or rights of any holder of a Claim against the Debtors, including all credit agreements, indentures and notes evidencing such Claims, (b) the Equity Interests in Holdings and Holdings II, and (c) any options or warrants to purchase Equity Interests of Holdings, Holdings II, Panolam or any of the Panolam Subsidiary Debtors, or obligating such Debtors to issue, transfer or sell Equity Interests or any other capital stock of such Debtors, shall be amended, restated, substituted for or cancelled, as the case may be.

### 5.7     *Surrender of Existing Securities*.

On the Effective Date, or as soon thereafter as is reasonably practicable, each holder of Senior Subordinated Notes Claims shall surrender its note(s) to the Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, The Depository Trust Company, the Reorganized Debtors shall seek the cooperation of The Depository Trust Company to provide appropriate instructions to the Indenture Trustee.  No distributions under the Plan shall be made for or on behalf of such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from The Depository Trust Company shall be received by the Indenture Trustee, or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee, which satisfaction may require such holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, the Reorganized Debtors, and the Indenture Trustee harmless in respect of such note and any distributions made in respect thereof.  Upon compliance with this Section 5.7 by a holder of any note, such holder shall, for all purposes under the Plan, be deemed to have surrendered such note.  Any holder that fails to surrender such note or satisfactorily explain its non-availability to the Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors and the Reorganized Debtors (or their property) or the Indenture Trustee in respect of such Claim and shall not participate in any distribution under the Plan.  All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtors by the Indenture Trustee and any such security shall be cancelled.  In the event that such note is held in the name of, or by a nominee of The Depository Trust Company, the Debtors shall seek the cooperation of The Depository Trust Company in facilitating distributions.

On the Effective Date, the Equity Interests in Holdings shall be deemed to have been surrendered to Holdings by each holder thereof in exchange for its *pro rata* share of New Warrants.

### 5.8     *Agreements with Existing Management*.

On the Effective Date, Reorganized Panolam shall either enter into new employment agreements with existing members of management who are currently subject to written employment agreements with Panolam, or assume such agreements.

### 5.9     *Management Incentive Plan*.

As of  the Effective Date, Reorganized Holdings shall establish the Management Incentive Plan, which will provide for 5% of the New Capital Stock (in addition to the 5% of New Capital Stock being issued on the Effective Date as described in section 5.4 above) to be available for issuance to the officers and key employees of the Reorganized Debtors and their affiliates as determined by the New Board of Reorganized Holdings after the Effective Date.

### 5.10     *Emergence Bonus Plan.*

On the Effective Date, Reorganized Panolam shall make any payments approved under the Emergence Bonus Plan.

### 5.11    *Cancellation of Liens*.

Except as otherwise provided in the Plan (including without limitation the continuation of the liens securing the Senior Lender Credit Agreement Claims), upon the occurrence of the Effective Date, any lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of any Debtor (including any cash Collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such lien, including the execution, delivery and filing or recording of such releases.

### 5.12    *Compromise of Controversies*.

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

### 5.13    *Exemption from Securities Laws.*

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of the New Capital Stock will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and the Reorganized Debtors will not be subject to the reporting requirements of the Securities Exchange Act of 1934.

### 5.14    *Exemption From Transfer Taxes*.

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Without limiting the foregoing, any issuance, transfer or exchange of a security or any making or delivery of an instrument of transfer pursuant to the Plan shall be exempt from the imposition and payment of any and all transfer taxes (including, without limitation, any and all stamp taxes or similar taxes and any interest, penalties and addition to the tax that may be required to be paid in connection with the consummation of the Plan and the Plan Documents) pursuant to sections 1146(a), 505(a), 106 and 1141 of the Bankruptcy Code.

## SECTION 6.   DISTRIBUTIONS

### 6.1    *Voting of Claims*

Each holder of an Allowed Claim in an impaired class of Claims that is entitled to vote on the Plan pursuant to Articles III and IV of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court approving procedures

with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order of the Bankruptcy Court.

### 6.2    *Cramdown and No Unfair Discrimination*

In the event that any impaired Class of Claims or Prepetition Equity Interests rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to (a) request that the Bankruptcy Court confirm the Plan in accordance with 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, and/or (b) amend the Plan in accordance with Section 12.6 hereof.

### 6.3    *Distribution Record Date*.

Except with respect to any publicly traded securities, as of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims. The Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims occurring on or after the Distribution Record Date. The Debtors, the Reorganized Debtors or any party responsible for making distributions pursuant to this Section 6 shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### 6.4    *Date of Distributions*.

Except as otherwise provided herein, any distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon thereafter as is reasonable practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.5    *Sources of Cash for Distributions*.

Except as otherwise provided herein or in the Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations and Cash on hand.

### 6.6    *Disbursement Agent*.

Unless otherwise specified herein, all distributions under this Plan shall be made by Reorganized Panolam as Disbursement Agent or such other entity designated by Reorganized Panolam as a Disbursement Agent on the Effective Date. No Disbursement Agent hereunder, including, without limitation, the Administrative Agent, shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 6.7    *Rights and Powers of Disbursement Agent*.

Each Disbursement Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its

responsibilities, and (d) exercise such other powers as may be vested in the Disbursement Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by such Disbursement Agent to be necessary and proper to implement the provisions hereof.

**6.8**     *Expenses of the Disbursement Agent*.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by each Disbursement Agent acting in such capacity (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

**6.9**     *Delivery of Distributions*.

(a)     Last Known Address.  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to the address of such holder as set forth in the books and records of the Debtors, unless the applicable Reorganized Debtor has been notified in writing of a change of address, including by the filing of a proof of claim or interest by such holder that contains an address for such holder different from the address reflected on the Debtors' books and records.  In the event that any distribution to any holder is returned as undeliverable, the Disbursement Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursement Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.

(b)     Distributions by Administrative Agent.  The Administrative Agent shall be the Disbursement Agent for the Allowed Senior Lender Credit Agreement Claims.  Distributions under the Plan to holders of such Allowed Senior Lender Credit Agreement Claims shall be made by the Reorganized Debtors to the Administrative Agent, which, in turn, shall make the distributions to the holders of such Allowed Claims.  The Administrative Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to its administration of distributions.  Upon delivery by the Reorganized Debtors of the distributions in conformity with Sections 4.2(b) and 4.3(b) of the Plan to the Administrative Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(c)     Distributions by the Second Lien Administrative Agent.  The Second Lien Administrative Agent shall be the Disbursement Agent for the Allowed Noteholder Credit Agreement Claims.  Distributions under the Plan to holders of Allowed Noteholder Credit Agreement Claims shall be made by the Reorganized Debtors to the Second Lien Administrative Agent which, in turn, shall make the distributions to the holders of such Allowed Noteholder Credit Agreement Claims.  The Second Lien Administrative Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to its administration of any distributions.  Upon delivery by the Reorganized Debtors of the distributions in conformity with Section 4.4(b) of the Plan to the Second Lien Administrative Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(d)     Distributions by Indenture Trustee.  The Indenture Trustee shall be the Disbursement Agent for the Allowed Senior Subordinated Notes Claims.  Distributions under the Plan to

holders of Allowed Senior Subordinated Notes Claims shall be made by Reorganized Panolam to, or at the direction of, the Indenture Trustee, which, in turn, shall make or direct the distributions to the holders of such Allowed Claims and, upon completion thereof, shall be discharged from all of their obligations associated with the Senior Subordinated Notes.  Upon delivery of the distribution set forth in Section 4.6(b) of the Plan to, or at the direction of, the Indenture Trustee, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.  The Indenture Trustee shall not be required to give any bond, surety or other security for the performance of its duties with respect to its administration of distributions.  The 10 3/4% Indenture and Senior Subordinated Notes shall be cancelled as of the Effective Date; *provided, however*, that the provisions of the 10 3/4% Indenture and the Senior Subordinated Notes relating to the following matters shall continue in effect: (i) the Indenture Trustee's rights and obligations relating to the Allowed Senior Subordinated Notes Claims and the holders of the Senior Subordinated Notes, including the right to make distributions to the holders of the Senior Subordinated Notes and to perform such other necessary functions with respect thereto and any right to appear and be heard in the Reorganization Cases and any related appeals, (ii) any and all rights of the Indenture Trustee vis-à-vis the holders of the Senior Subordinated Notes, including any charging lien rights against distributions, all as set forth in the Indenture, and (iii) any right to indemnification, contribution or other claim that the Indenture Trustee may have under the 10 3/4% Indenture.

### 6.10    *Manner of Payment Under Plan*.

(a)    All distributions of Amended and Restated First Lien Notes or New Second Lien Term Notes to the holders of Claims under the Plan shall be made by, or at the direction of, the applicable Disbursement Agent on behalf of Reorganized Panolam.

(b)    All distributions of New Capital Stock to the holders of Claims under the Plan shall be made by the Disbursement Agent on behalf of Reorganized Panolam.

(c)    All distributions of New Warrants to the holders of Equity Interests in Holdings shall be made by the Disbursement Agent on behalf of Reorganized Holdings.

(d)    All distributions of Cash under the Plan shall be made by the applicable Disbursement Agent on behalf of the applicable Debtor.

(e)    All distributions of New Capital Stock to certain officers and key employees made on account of the Management Incentive Plan shall be made by Reorganized Holdings.

(f)    At the option of the applicable Disbursement Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

### 6.11    *No Fractional Shares of New Capital Stock or New Warrants*.

No fractional shares of New Capital Stock or New Warrants shall be issued or distributed under the Plan and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Capital Stock or New Warrants that is not a whole number, the actual distribution of shares of New Capital Stock or New Warrants shall be rounded as follows:  (a) fractions of one-half (½ ) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½ ) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Capital Stock or New Warrants to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

### 6.12 *Setoffs and Recoupment*.

The Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim.

### 6.13 *Distributions After Effective Date*.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.14 *Cash Distributions*.

No payment of Cash of less than $100 shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the appropriate Disbursement Agent.

### 6.15 *Allocation of Distributions Between Principal and Interest*.

In the case of distributions with respect to any Senior Subordinated Note Claim pursuant to this Plan, the fair market value of any New Capital Stock received by the holder of such Claim will be allocable first to the principal amount of such Claim (as determined for federal income tax purposes) and then, to the extent of any excess, the remainder of the Claim.

### 6.16 *No Postpetition Interest on Claims*.

Unless otherwise specifically provided for in this Plan or the Confirmation Order, or as required by applicable bankruptcy law, postpetition interest shall not accrue on or after the Commencement Date on account of any Claim.

## SECTION 7.   PROCEDURES FOR DISPUTED CLAIMS

### 7.1 *Disputed Claims/Process*.

On and after the Effective Date, except as otherwise provided herein, all Claims will be paid in the ordinary course of business of the Reorganized Debtor.  Except insofar as a Claim is Allowed pursuant to the Plan, the Debtors may dispute Claims, and if the Debtors dispute any Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Reorganization Cases had not been commenced and shall survive the Effective Date as if the Reorganizations Cases had not been commenced.  Notwithstanding section 502(a) of the Bankruptcy Code, and considering the unimpaired treatment of all holders of General Unsecured Claims under this Plan, all proofs of claim filed in these Reorganization Cases shall be considered objected to and disputed without further action by the Debtors.  Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn.  The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under this section 7.1 of the Plan to assert their claims in any forum as though the Debtors' cases had not been commenced.

**7.2**     *Objections to Claims*.

Except insofar as a Claim is Allowed under the Plan and notwithstanding section 7.1 above, the Debtors, the Reorganized Debtors or any other party in interest shall be entitled to object to Claims, if necessary.

**7.3**     *Estimation of Claims*.

The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**7.4**     *No Distributions Pending Allowance*.

Notwithstanding any other provision hereof, if any portion of an Administrative Expense Claim or a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of Claim unless and until such Disputed Claim becomes an Allowed Claim.  To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed, and any property withheld pending the resolution of such Claim shall be reallocated *pro rata* to the holders of Allowed Claims in the same Class.

**7.5**     *Distributions after Allowance*.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursement Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

**7.6**     *Preservation of Claims and Rights to Settle Claims*.

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any Person, without the approval of the Bankruptcy Court, subject to the terms of Section 7.2 hereof, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  The Reorganized Debtors or their successor(s) may

pursue such retained claims, rights, causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

## SECTION 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1    *Assumption and Rejection of Contracts and Leases*.

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease (a) was previously assumed or rejected by the Debtors, (b) previously expired or terminated pursuant to its own terms, (c) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date or (d) is set forth in a schedule, as an executory contract or unexpired lease to be rejected, if any, filed by the Debtors as part of the Plan Supplement. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

### 8.2    *Cure of Defaults*.

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors upon assumption thereof or as soon as practicable thereafter. If there is a dispute regarding (a) the nature or amount of any cure, (b) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, any cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

### 8.3    *Rejection Claims*.

All Claims arising out of the rejection of executory contracts and unexpired leases must be served upon the Debtors and their counsel within thirty (30) days after the date of entry of an order of the Bankruptcy Court approving such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their estates, and their property.

### 8.4    *Survival of the Debtors' Indemnification Obligations*.

Any obligations of the Debtors pursuant to their certificates of incorporation and bylaws or organizational documents, as applicable, or any other agreements entered into by any Debtor at any time prior to the Effective Date, to indemnify current and former directors, officers, agents, and/or

employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors, irrespective of whether such indemnification is owed in connection with an event occurring before or after the Commencement Date, shall not be discharged or impaired by confirmation of the Plan. Such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors hereunder and shall continue as obligations of the Reorganized Debtors. Any Claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

        **8.5**     *Survival of Other Employment Arrangements*.

        Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and benefit plans (other than the existing employment agreements to be replaced by any of the Management Agreements or the existing incentive plans to be replaced by the Management Incentive Plan) entered into before or after the Commencement Date and not since terminated shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed pursuant to the Plan. The Debtors' obligations under such plans and programs shall survive confirmation of the Plan, except for (a) executory contracts or employee benefit plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (b) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

        **8.6**     *Insurance Policies*.

        All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect. All other insurance policies shall re-vest in the Reorganized Debtors.

### SECTION 9.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

        **9.1**     *Conditions Precedent to the Effective Date*.

        The occurrence of the Effective Date of the Plan is subject to satisfaction of the following conditions precedent:

        (a)     <u>Confirmation Order</u>. The Confirmation Order in form and substance reasonably acceptable to the Required Consenting Holders shall have been entered and shall be in full force and effect and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

        (b)     <u>Execution and Delivery of Other Documents</u>. All other actions and all agreements, instruments or other documents necessary to implement the Plan, including all documents comprising the Plan Supplement, shall have been (i) effected or (ii) duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived.

        (c)     <u>Regulatory Approvals</u>. The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents necessary to implement the Plan and that are required by law, regulation, or order.

     (d)     _Consents_. All authorizations, consents and approvals determined by the Debtors to be necessary to implement the Plan shall have been obtained.

     (e)     _Corporate Formalities_. The Restated Certificate of Incorporation shall be filed with the Secretary of State of the State of Delaware contemporaneously with the Effective Date.

     (f)     _Minimum Excess Cash_. The Debtors shall have Excess Cash of at least $17 million.

     (g)     _Other Acts_. Any other actions the Debtors determine are necessary to implement the terms of the Plan shall have been taken.

### 9.2 *Waiver of Conditions Precedent*.

     Each of the conditions precedent in Section 9.1 hereof may be waived, in whole or in part, by the Debtors (with the prior consent of the Administrative Agent and the Required Consenting Holders) in writing without notice or order of the Bankruptcy Court.

### 9.3 *Effect of Failure of Conditions*.

     If the conditions specified in Section 9.1 hereof have not been satisfied or waived in the manner provided in Section 9.2 hereof by the date that is thirty (30) days after the Confirmation Date, then: (a) the Confirmation Order shall be of no further force or effect; (b) no distributions under the Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests in the Debtors shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; (d) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors; and (e) the Plan shall be deemed withdrawn.

## SECTION 10. EFFECT OF CONFIRMATION

### 10.1 *Vesting of Assets*.

     On the Effective Date, except as otherwise provided in the Plan (including, without limitation, the continuation of the liens of the Senior Lenders in accordance with, and as evidenced by, the Amended and Restated Security Agreement), pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' estates shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges, and other interests. Except as otherwise provided in the Plan, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal entity with all of the powers available to such legal entity under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law. On and after the Effective Date, the Reorganized Debtors shall be authorized to operate their respective businesses, and to use, acquire or dispose of assets, without supervision or approval by the Bankruptcy Court and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### 10.2    *Binding Effect*.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors, and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

### 10.3    *Discharge of the Debtors*.

Except to the extent otherwise provided in the Plan (including, without limitation, the re-evidencing of the Senior Lender Credit Agreement Claims (less the Senior Lender Credit Agreement Claim Paydown) by the Amended and Restated Credit Agreement and Amended and Restated First Lien Notes), the treatment of all Claims against or Equity Interests in the Debtors under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims against or Equity Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon from and after the Commencement Date, or against their estate or properties or interests in property. Except as otherwise provided in the Plan, upon the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged and released in full exchange for the consideration provided under the Plan. Except as otherwise provided in the Plan, all Persons shall be precluded from asserting against the Debtors, or their respective properties or interests in property any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

### 10.4    *Exculpation*.

Notwithstanding anything provided herein, as of the Effective Date, none of the Released Parties shall have or incur any liability for any claim, cause of action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan, or any other act or omission in connection with the Reorganization Cases, the Plan, or any contract, instrument, indenture, or other agreement or document related thereto or delivered thereunder; *provided, however*, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent that such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

### 10.5    *Term of Injunctions or Stays*.

(a)    **Except as otherwise expressly provided herein, all Persons who have held, hold or may hold Claims against or Equity Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any Reorganized Debtor, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to any such Claim or Equity Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor, or against the property or interests in property of any Reorganized Debtor, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Reorganized Debtor, or against the property or interests in property of any Reorganized Debtor with respect to any such Claim or Equity Interest, and (v) pursuing any Claim released pursuant to Section 10.7 of the Plan.**

(b)    Unless otherwise provided, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.6    *Injunction Against Interference with Plan*.

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

10.7    *Releases*.

(a)    <u>Releases by Debtors</u>.  Except for the right to enforce the Plan, each Debtor shall, effective upon the occurrence of the Effective Date, be deemed to forever release, waive and discharge each of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors, the Reorganization Cases, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganization Cases, or the Plan; *provided, however,* that the foregoing shall not operate as a waiver or release from any causes of action arising out of the willful misconduct or gross negligence of any such Person as determined by a final order entered by a court of competent jurisdiction.

(b)    <u>Releases by Holders of Claims</u>.  Except for the right to enforce the Plan, each Person who votes to accept the Plan, or who, directly or indirectly, is entitled to receive a distribution under the Plan, including Persons entitled to receive a distribution via an attorney, agent, indenture trustee or securities intermediary, shall be deemed to forever release, waive and discharge each of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors, the Reorganization Cases, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganization Cases, or the Plan; *provided, however,* that the foregoing shall not operate as a waiver or release from any causes of action arising out of the willful misconduct or gross negligence of any such Person as determined by a final order entered by a court of competent jurisdiction.

10.8    *Waiver of Certain Claims*.

Any and all Claims asserted or otherwise existing against Holdings by the holders of Equity Interests in Holdings for management fees or otherwise (including rejection damages arising out of the rejection of any agreement among such parties) shall be waived, extinguished and/or disallowed in their entirety.

### 10.9   *Preservation of Claims*.

Except as otherwise provided in the Plan, including Section 10.6 and Section 10.7, as of the Effective Date, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, any action, cause of action, liability, obligation, right, suit, debt, sum of money, damage, judgment, claim and demand whatsoever, whether known or unknown, in law, equity or otherwise, accruing to the Debtors shall become assets of the Reorganized Debtors, and the Reorganized Debtors shall have the authority to commence and prosecute such causes of action for the benefit of the estates of the Debtors.  After the Effective Date, the Reorganized Debtors shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such causes of action without approval of the Bankruptcy Court.

### 10.10   *Reservation of Rights*.

The Plan shall have no force or effect unless and until the Effective Date.  Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

### 10.11   *Plan Supplement*.

A draft form of the Plan Documents to be entered into as of the Effective Date and any other appropriate documents shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court ten days prior to the Confirmation Hearing.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

## SECTION 11.  RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction over all matters arising in, arising under, and related to the Reorganization Cases and the Plan for, among other things, the following purposes:

(a)      To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom.

(b)      To determine any and all motions, adversary proceedings, applications, contested matters, or other litigated matters pending on the Effective Date.

(c)      To ensure that distributions to holders of Allowed Claims are accomplished as provided herein.

(d)      To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated.

(e)      To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court.

(f)       To hear and determine any timely objections to Administrative Expense Claims or to proofs of claim and Equity Interests, including any objections to the classification of any Claim or Equity Interest, and to allow or disallow any Disputed Claim, in whole or in part.

(g)       To consider any amendments to or modifications of the Plan, or remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof.

(h)       To hear and determine all applications of retained professionals under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date.

(i)       To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the documents comprising the Plan Supplement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing.

(j)       To issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation.

(k)       To determine such other matters and for such other purposes as may be provided in the Confirmation Order.

(l)       To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code).

(m)       To hear and determine all disputes involving the existence, scope and nature of the discharges granted under Section 10.3 of the Plan.

(n)       To hear and determine all disputes involving or in any manner implicating the exculpation provisions granted under Section 10.4 of the Plan.

(o)       To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

(p)       To enter a final decree closing the Reorganization Cases.

(q)       To recover all assets of the Debtors and property of the Debtors' estates, wherever located.

## SECTION 12.  MISCELLANEOUS PROVISIONS

### 12.1   *Payment of Statutory Fees*.

On the Effective Date, and thereafter as may be required, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.  Notwithstanding Section 5.1 above, the Debtors shall pay all of the foregoing fees on a per-Debtor basis.

**12.2**     *Payment of Indenture Trustee Fees*.

The Reorganized Debtors shall pay all reasonable fees, costs and expenses incurred by the Indenture Trustee after the Effective Date in connection with the distributions required pursuant to the Plan or the implementation of any provisions of the Plan (including the reasonable fees, costs and expenses incurred by the Indenture Trustee's professionals) in the ordinary course upon presentation of invoices by the Indenture Trustee and without the need for approval by the Bankruptcy Court.

**12.3**     *Dissolution of Statutory Committees and Cessation of Fee and Expense Payment*.

Any statutory committees appointed in the Reorganization Cases shall dissolve on the Effective Date.  Provided that all such fees and expenses payable as of the Effective Date have been paid in full, the Reorganized Debtors shall not be responsible for paying any fees and expenses incurred after the Effective Date by the Administrative Agent's Professionals, the Ad Hoc Noteholder Group's Professionals, and the professionals retained by any statutory committees, unless such fees and expenses are payable under the terms of the Amended and Restated Credit Agreement or the Second Lien Credit Agreement.

**12.4**     *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**12.5**     *Determination of Tax Filings and Taxes*.

(a)     For all taxable periods ending on or prior to, or including, the Effective Date, Panolam shall prepare and file (or cause to be prepared and filed) on behalf of the Panolam Group, all group tax returns, reports, certificates, forms or similar statements or documents (collectively, "***Group Tax Returns***") required to be filed or that Panolam otherwise deems appropriate, including the filing of amended Group Tax Returns or requests for refunds.  If requested by Panolam, Holdings shall promptly execute or cause to be executed and filed any Group Tax Returns of the Panolam Group submitted by Panolam to Holdings for execution or filing.  Neither Holdings nor Holdings II shall file or amend any Group Tax Return for any taxable periods (or portions thereof) described in the preceding sentence without Panolam's written consent.

(b)     Holdings, Holdings II, and Panolam shall cooperate fully with each other regarding the implementation of this Section 12.5 of the Plan (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records and documents relating to taxes governed by this Section 12.5 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals or litigation with respect to such taxes.  Without limiting the generality of the foregoing, Holdings shall execute on or prior to the Effective Date a power of attorney authorizing Panolam to correspond, sign, collect, negotiate, settle and administer tax payments and Group Tax Returns for the taxable periods described in Section 12.5(a).

(c)     The Reorganized Debtors shall have the right to request an expedited determination of their tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

(d)      If Holdings or Holdings II receives written notice from a taxing authority of any pending examination, claim, settlement, proposed adjustment or related matters with respect to taxes that could affect any other member of the Panolam Group (by operation of law or by reason of this Agreement), it shall so notify Panolam in writing within ten (10) business days thereafter.  Panolam shall have the sole right, at its expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of the Panolam Group.  With respect to any such proceeding and with respect to the preparation and filing of any Group Tax Returns of the Panolam Group, Panolam may act in its own self-interest and in the interest of its subsidiaries and affiliates, without regard to any adverse consequences to Holdings or Holdings II.

(e)      If Holdings or Holdings II is dissolved or merged out of existence in a manner that terminates the Panolam Group for applicable tax purposes, Holdings or Holdings II (as applicable) shall designate Panolam as the "substitute agent" (within the meaning of Treasury Regulation Section 1.1502-77) for the Panolam Group in accordance with Treasury Regulation Section 1.1502-77 and Rev. Proc. 2002-43, 2002-28 I.R.B. 99 (July 15, 2002), in either case, as amended or supplemented, and any comparable provision under state and local law, with respect to all taxable periods ending on or before, or including, the Effective Date.

(f)      Panolam shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of the Panolam Group, including for any taxable period ending on or prior to, or including, the Effective Date.  Within five (5) business days after receipt of any such refunds or credits, Holdings or Holdings II (as applicable) shall notify Panolam thereof and shall transfer any refunds to Panolam by wire transfer or otherwise in accordance with written instructions provided by Panolam.  Any such tax refunds and credits for fiscal year 2008, in addition to tax refunds and credits of Panolam Industries Ltd. for the same period that are received prior to the Effective Date shall be subject to the distribution of Excess Cash pursuant to Sections 4.2(b) and 4.3(b).

### 12.6    *Amendments*.

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors (with the prior written consent of the Required Consenting Holders and so long as such alteration, amendment or modification is on identical economic terms, and otherwise in all material respects on the terms, as set forth in the Plan Term Sheet) at any time prior to or after the Confirmation Date, but prior to the Effective Date.  Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification complies with the requirements of this Section 12.6 and does not materially and adversely change the treatment of the Claim of such holder; *provided, however*, that any holders of Claims who were deemed to accept the Plan because such Claims were unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired.

### 12.7    *Effectuating Documents and Further Transactions*.

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**12.8**    *Revocation or Withdrawal of the Plan*.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Debtors take such action, the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in further proceedings involving the Debtors.

**12.9**    *Severability*.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the prior written consent of the Administrative Agent and the Required Consenting Holders), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.10**    *Schedules and Exhibits Incorporated*.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if fully set forth herein.

**12.11**    *Solicitation of the Plan*.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors, the members of the Ad Hoc Noteholder Group, the Administrative Agent, the Senior Lenders, the Indenture Trustee, and holders of Allowed Senior Subordinated Notes Claims, and each of their respective directors, officers, employees, Affiliates, agents, members, managers, partners, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

**12.12**    *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

**12.13**   *Compliance with Tax Requirements*.

In connection with the Plan and all instruments issued in connection herewith and distributed hereunder, any Person issuing any instruments or making any distribution under the Plan, including any Person described in Sections 5.3 and 5.4 hereof, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any Person issuing any instruments or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or distributing Person for payment of any such tax obligations.

**12.14**   *Conflict between Plan and, Disclosure Statement, Plan Documents, Plan Term Sheet and Restructuring Support Agreement*

(a)      In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Disclosure Statement, the terms and provisions of the Plan shall control and govern.

(b)      In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Plan Documents, the terms and provisions of the relevant Plan Document, as applicable, shall control and govern.

(c)      In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Plan Term Sheet and Restructuring Support Agreement, the terms and provisions of the Plan shall control and govern.

**12.15**   *Notices*.

All notices, requests, and demands to or upon the Debtors, Senior Lenders, Administrative Agent, Apollo or Eaton Vance to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)      if to the Debtors, to:

20 Progress Drive
Shelton, Connecticut 06484
Attn:  Jeff Muller, Counsel
Telephone:  (203) 925-1556
Facsimile:  (203) 225-0051
jeffrey_muller@panolam.com

with copies to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:  Gary T. Holtzer, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
gary.holtzer@weil.com

- and –

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attn:  Stephen A. Youngman, Esq.
Telephone:  (214) 746-7700
Facsimile:  (214) 746-7777
stephen.youngman@weil.com

(b)      if to the Administrative Agent, to:

Credit Suisse
Eleven Madison Avenue, 5th Floor
New York, New York  10010
Attn:  Didier Siffer, Managing Director –  Global Recovery Management
Telephone:  (212) 325-7418
Facsimile:  (917) 326-8363
didier.siffer@credit-suisse.com

with a copy to:

Sidley Austin LLP
555 West 5th Street
Los Angeles, California 90013
Attn:  Jennifer C. Hagle, Esq.
Telephone: (213) 896-6000
Facsimile:  (213) 896-6600
jhagle@sidley.com

(c)      if to Apollo and Eaton Vance, to:

Apollo Capital Management
9 West 57th Street, 14th Floor
New York, New York  10019
Attn.: Jason Perri
Facsimile:  (646) 417-6615
jperri@apollocapital.com

Eaton Vance Management
225 State Street
Boston, Massachusetts  02109
Attn: Tom Huggins

37

Book Page 146

Facsimile:  (617) 482-2178
thuggins@eatonvance.com

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York  10036
Attn.: Lisa Beckerman, Esq.
Telephone:  (212) 872-8012
Facsimile:  (212) 872-1002
lbeckerman@akingump.com

[Remainder of Page Intentionally Left Blank]

Dated:  [  ], 2009

Respectfully submitted,

Panolam Holdings Co.
Panolam Holdings II Co.
Panolam Industries International, Inc.
Panolam Industries, Inc.,
Pioneer Plastics Corporation
Nevamar Holdings Corp.
Nevamar Holdco, LLC
Nevamar Company, LLC


By:_____
          Robert J. Muller, Jr.
          Chairman, President and Chief Executive Officer

**EXHIBITS AND SCHEDULES**
**TO THE DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF PANOLAM HOLDINGS CO.,**
**PANOLAM HOLDINGS II CO., PANOLAM INDUSTRIES INTERNATIONAL, INC.,**
**PANOLAM INDUSTRIES, INC., PIONEER PLASTICS CORPORATION, NEVAMAR**
**HOLDINGS CORP., NEVAMAR HOLDCO, LLC, AND NEVAMAR COMPANY, LLC**

**<u>Exhibit A to Plan</u>**

**Plan Term Sheet**

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408/SETTLEMENT DISCUSSIONS

## Panolam Industries International, Inc.

### PRELIMINARY RESTRUCTURING PROPOSAL
### TERM SHEET

### July 23, 2009

This term sheet describes the material terms of a preliminary restructuring proposal (the "*Proposal*") of Panolam Holdings II, Co. ("*Holdings*"), Panolam Industries International, Inc. ("*Panolam*" or "*Borrower*") and Panolam's domestic wholly-owned subsidiaries ("*Domestic Subsidiaries*" and collectively with Holdings and Panolam, the "*Company*"). The Proposal embodies and is premised on a comprehensive compromise and settlement between the Company and certain of its equity and debt constituencies. The transactions contemplated by this term sheet are subject to conditions to be set forth in definitive documents and the information contained herein is strictly confidential. This term sheet does not constitute an offer of securities and is being presented for discussion and settlement purposes only. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

## I.    Parties

| | |
|---|---|
| **Borrower** | Panolam Industries International, Inc. |
| **Guarantors** | Holdings and the Domestic Subsidiaries. |
| **Senior Lenders** | Holders of claims (collectively, the "*Senior Lenders*") arising under that certain Credit Agreement, dated as of September 30, 2005, by and among Holdings, Panolam, the lenders party thereto, and Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent (as amended or otherwise modified from time to time, the "*Credit Agreement*"). |
| | The "*Senior Secured Debt*" consists of (i) revolving credit loans in the aggregate outstanding principal amount of $25.9 million *plus* all accrued and unpaid interest thereon (the "*Revolving Loan*"), (ii) a tranche B term loan in the aggregate principal amount of $167.6 million plus all accrued and unpaid interest thereon (the "*Term Loan*"), and (iii) obligations under any outstanding letters of credit issued under the Credit Agreement (in an amount of approximately $4.1 million). |
| **Noteholders** | Holders of claims (collectively, the "*Noteholders*") arising under that certain Indenture, dated as of September 30, 2005, among Panolam, as Issuer, the guarantors party thereto and Wells Fargo Bank, National Association (the "*Trustee*"), as trustee (as amended or otherwise modified from time to time, the "*Indenture*"). |
| **Equity Holders** | Sterling Group Partners II, L.P. and Genstar Capital Partners IV, L.P. and certain of their respective affiliates and other persons holding capital stock of the parent of Holdings ("*Current Equityholders*"). |

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408/SETTLEMENT DISCUSSIONS

## II.    The Preliminary Proposed Restructuring

The Company will restructure its debt and equity interests pursuant to the Restructuring as described below.  Unless otherwise indicated, all transactions will take place on the date the Restructuring becomes effective (the "***Effective Date***").

| | |
|---|---|
| **Treatment of Senior Secured Debt (other than Cross-over Senior Lenders)** | The Senior Secured Debt other than $25.0 million held by cross-over Senior Lenders will be satisfied with a package of cash paydown and new 1st Lien Loan (as described below).  In full satisfaction of their Senior Secured Debt, the non-cross-over Senior Lenders will receive the following on the Effective Date: |
| **Paydown & Fee** | Cash on hand in excess of $10 million, on a pro forma basis, estimated as set forth on <u>Exhibit A</u> attached hereto, which paydown will be applied pro rata as between the Revolving Loan and the Term Loan.  A restructuring fee of $1.0 million shall be payable to the non-cross-over Senior Lenders. |
| **New Revolving Loan** | L/C Facility and Revolver Facility in the total aggregate amount of $15 million with availability as set forth below ("***New Revolving Loan***"). |

- *Agent*.  Credit Suisse, Cayman Islands Branch ("CS") will be the administrative agent. Agent fees shall be as discussed below.

- *Maximum Availability under L/C Facility*. Cap of $5 million.

- *Maximum Borrowings under Revolver Facility*. Cap of $10 million.

- *Maturity*.  June 30, 2013.

- *Interest Rate*.  Eurodollar Rate Loan, bearing cash-pay interest at the sum of Eurodollar Rate *plus* 6.00%, with a Eurodollar Rate floor of 2.5%, payable quarterly.  Default rate of 2.00% above the rate otherwise applicable to the New Revolving Loan and then-outstanding L/Cs, which rate would be applicable upon any Event of Default and payable on the then outstanding principal amount.

- *Collateral and Covenants*. Consistent with the 1st Lien Term Loan (described below).

- *Guarantees*. Consistent with the 1st Lien Term Loan.

- *Unused Commitment Fee*. 1%.

- *Voluntary prepayments*.  Voluntary prepayments of the New Revolving Loan would not reduce the commitment.

| | |
|---|---|
| **1st Lien Loan** | A first lien term loan  in the aggregate principal amount of $140.5[1] million (the "***1st Lien Term Loan***" and together with the New Revolving |

---

[1] Total new senior cash pay debt as of the Effective Date will equal $146.4 million ($140.5 million of 1st Lien Loan and $5.9 drawn under the New Revolving Loan).

2

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408/SETTLEMENT DISCUSSIONS

Loan, the "*1st Lien Loan*"), the material terms of which are as set forth below.

- *Agent*. CS will be the administrative agent under the 1st Lien Loan. A one-time restructuring fee equal to $500,000 will be payable upon consummation of the restructuring. An annual agency fee equal to $75,000 for the 1st Lien Loan shall be payable to the Agent on a quarterly basis.

- *Maturity*. December 31, 2013.

- *Amortization*. None in 2009 and the first two quarters of 2010. $500,000 per six months (with the first payment due December 31, 2010 for the six month period then ended).

- *Interest Rate*. Eurodollar Rate Loan, bearing cash-pay interest at the sum of the Eurodollar Rate *plus* 6.00%, with a Eurodollar Rate floor of 2.5%, payable quarterly. Default rate of 2.00% above the rate otherwise applicable to the 1st Lien Loan, which rate would be applicable upon any Event of Default and payable on the then outstanding principal amount.

- *Guarantees*. The 1st Lien Loan will be fully and unconditionally guaranteed on a joint and several basis by each of the Domestic Subsidiaries and Holdings.

- *Collateral*. Substantially similar to the Credit Agreement, plus cash, cash equivalents, deposit accounts and securities accounts, with exceptions for payroll accounts, employee benefits accounts, and other accounts containing Trust Funds (with a provision for the release of Trust Funds in each case), all under terms to be set forth in the definitive documentation.

  For purposes of this Term Sheet, "Trust Funds" shall mean all funds held by the Company as a fiduciary, all taxes required to be collected or withheld (including, without limitation, federal and state withholding taxes), other funds and taxes for which the Company or its directors, officers or employees may have criminal or personal liability, and accrued and unpaid employee compensation.

- *Financial Covenants*. Minimum Cash Interest Coverage Ratio and Maximum 1st Lien Leverage Ratio will be set based on a 20% cushion to management's long-term business plan (the "*Plan*"). First financial covenant test will occur at the end of the second fiscal quarter of 2010. Maximum Consolidated Capital Expenditures covenant will be revised based on a 10% cushion to the Plan. Definitions used in the financial covenants shall be acceptable to the Senior Lenders and the Company.[2]

- *Voluntary prepayments*. Voluntary prepayments of the 1st Lien Loan permitted at any time without premium or penalty. All voluntary

---

[2] Note that the EBITDA add-back for restructuring charges would not be unlimited.

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408/SETTLEMENT DISCUSSIONS

prepayments to be applied as directed by Borrower.

- *Additional/Modified Covenants.*

  o <u>Negative Covenants</u>.  No general basket for restricted payments.  Equity issuances (other than in connection with the Equity Cure Rights described below) permitted so long as they are not consummated during the two weeks prior to the end of each fiscal quarter and (ii) proceeds are applied to reduce the 1st Lien Loan in accordance with the mandatory prepayments discussed below.  Limited baskets for additional indebtedness, liens, investments, contingent liabilities, asset sales and acquisitions to be negotiated.

  o <u>Management Fees</u>.  No cash-pay fees payable to equity holders or their respective Affiliates of the type described in Section 7.9(x) of the Credit Agreement (including, without limitation, board fees for directors employed by Apollo and Eaton Vance or any of their respective Affiliates).

  o <u>Reporting</u>.  Borrower to provide consolidated financial reporting on a quarterly basis and (for so long as the 1st Lien Loan leverage ratio is greater than 4.0x) on a monthly basis, in both cases including year-to-date reporting and a comparison to budget and to schedule a telephone conference with the 1st Lien Loan lenders quarterly.  Annual audited financials to be provided.  Company's preliminary budget for each fiscal year shall be delivered 30 days prior to the end of prior fiscal year and a final budget delivered 60 days after the beginning of the applicable fiscal year.

  o <u>Equity Cure Rights</u>.  Exercisable no more than three times in total (and no more than twice in any four consecutive quarters), limited to an aggregate maximum cap of $15 million (with a per cure limit of the amount necessary to cure the applicable default), and proceeds to be applied as a mandatory prepayment of 1st Lien Loan.

  o <u>Other</u>.  Moody's and S&P ratings to be obtained and maintained until the 1st Lien Loan is paid in full.

- *Mandatory prepayments.*  Mandatory prepayments required in circumstances substantially similar to the Credit Agreement (including full reinvestment rights with respect to Net Asset Sale Proceeds for Asset Sales within the $5M basket), in all cases to be applied to reduce, on a pro rata basis, the 1st Lien Loan.  Notwithstanding the foregoing, prepayments in respect of (i) equity issuances in respect of Equity Cure Rights,[3] (ii) US and Canadian tax refunds for fiscal year 2008 (the "***Unrecognized Tax Benefit***")[4] to the extent received after 12/31/09, and (iii) asset sales and change of

---

[3] Prepayments of the proceeds of equity issuances (other than in respect of Equity Cure Rights) set at 50% if secured debt leverage ratio exceeds 2.75x, 25% if between 2.75x and 1.75x and 0% if less than 1.75x.

[4] The amounts of which are approximately US$1.8M and Canadian$3.2M, and are expected to be refunded to the Company prior to 12/31/09.

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408/SETTLEMENT DISCUSSIONS

control transactions to be set, in each case, at 100% of the proceeds (subject to the Net Asset Sale Proceeds reinvestment right discussed above).

- *Excess Cash Sweep & Anti-hoarding*. Commencing FYE 2010, annual excess cash flow sweep, with calculation mechanism *TBD*, applied to reduce amounts outstanding under the 1st Lien Loan based on the following grid:

| 1st Lien Leverage Ratio | Cash Flow Sweep Percentage |
| --- | --- |
| Greater than 5.0x | 100% |
| 5.0x – 4.0x | 75% |
| Lower than 4.0x | 50% |

  o *Anti-hoarding*.  A one-time sweep of the cash (including any portion of the Unrecognized Tax Benefit received on or prior to 12/31/09) on the Company's balance sheet (as of 12/31/09) in excess of $20 million in liquidity (cash plus availability under the New Revolving Loan) applied to reduce amounts outstanding under the 1st Lien Loan.

- *Voting*.  Releases of Liens with respect to all or substantially all of the Collateral and releases of Holdings from its guaranty or all or substantially all of the Subsidiary Guarantors from their obligations under the Subsidiary Guaranty will require 95% lender consent.

- *Eligible Assignees*.  The New Equityholders (defined below) will be Eligible Assignees.

**Treatment of Senior Secured Debt held by Cross-over Senior Lenders**

In full satisfaction of $25.0 million of their Senior Secured Debt, on the Effective Date, cross-over Senior Lenders will receive a 2nd lien promissory note in the aggregate principal amount of $25.0 million (the "***2nd Lien Note***"), the material terms of which are as set forth below.

- *Agent*. *TBD*.

- *Maturity*.  June 30, 2014 (the "***2nd Lien Note Maturity Date***").

- *Payment of Principal*. On the 2nd Lien Note Maturity Date.

- *Amortization*.  None.

- *Interest Payment*.  Cash interest at 2.0% *plus* 10% PIK interest or, at the Company's option, but only if at the time of payment the 1st Lien Loan leverage ratio is less than 4.0x and the Company's liquidity (cash *plus* availability under the New Revolving Loan) is greater than $7.5 million (both leverage and minimum liquidity to be calculated after giving effect to the payment of 2nd Lien Note cash interest), cash interest at 10.0%.  Any cash pay interest shall be payable quarterly.

- *Guarantees*.  The 2nd Lien Loans will be fully guaranteed on a joint and several basis by each of the Domestic Subsidiaries and Holdings.

5

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408/SETTLEMENT DISCUSSIONS

- *Collateral*.  The 2nd Lien Note will be secured by liens junior to the liens of the 1st Lien Loan lenders on all of the Collateral.  There will be an intercreditor agreement which provides for lien subordination and for the payment subordination described in the terms of the 1st Lien Loans set forth herein and includes 120 day standstill, turn-over obligations and any other restrictions on 2nd Lien Note holders' rights which are mutually agreed upon.  The terms of the intercreditor agreement will be negotiated by CS, Eaton Vance and Apollo.

- *Covenants*.  Same as 1st Lien Loan, with an additional 10% cushion.

- *Prepayments*.  None unless and until the 1st Lien Loan is paid in full.

- *Fee*.  Restructuring fee payable to the 2nd Lien Note holders of $2.0 million.

- *Cross Default/Acceleration*.[5]  The 2nd Lien Loans will have a cross-default with respect to a payment Event of Default under the 1st Lien Loans and a cross-acceleration if the 1st Lien Loans are accelerated or the 1st Lien Loan lenders sweep cash or terminate the New Revolving Loan commitment.

| | |
|---|---|
| **Senior Notes** | In full satisfaction of the Noteholders' debt and in exchange for their notes issued under the Indenture, on the Effective Date, the Noteholders will be issued on a pro rata basis all of the equity interests in Holdings as reorganized ("***Reorganized Holdings***") less such amounts to be distributed to the Current Equityholders (as described below) and pursuant to a management incentive plan (as described below), and all such Noteholder claims will be expunged (the Noteholders' receiving such equity interests, the "***New Equityholders***"). |
| **Treatment of Current Equityholders' Interests** | In full satisfaction of the Current Equityholders' interests, the Current Equityholders will exchange all of their current equity interests for penny warrants for 2.5% of the equity of Reorganized Holdings exercisable only upon a change of control, and all such claims of the Current Equityholders will be expunged. |
| **Trade and other General Unsecured Claims** | All trade and general unsecured claims will remain current and unimpaired. |

---

[5] Cross-payment default allowed if subject to 120-day standstill/turn-over/other restrictions.

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408/SETTLEMENT DISCUSSIONS

### III.    Other Material Terms

**Management Incentive Plan**   Market-based incentive plan to be determined.

**Governance**   The initial board of directors of Reorganized Holdings after the Effective Date will consist of 5 members; one member of which will be Robert Muller, the Chairman and CEO of Panolam, and the remainder of which will be designated by Apollo and Eaton Vance.

Holders of more than 10% of the equity of Reorganized Holdings shall receive two demand registration rights, and all other initial holders of equity of Reorganized Holdings shall receive piggyback registration rights, in each case subject to standard exceptions, and qualifications.

**Releases and Exculpation**   The Company will release the Senior Lenders, the Agent under the Credit Agreement, and their respective officers, directors, advisors and professionals from all claims arising on or before the Effective Date, other than for claims based on gross negligence or willful misconduct as determined by a final order entered by a court of competent jurisdiction.

The Company will release the Noteholders and the Trustee under the Indenture, and their respective officers, directors, advisors and professionals from all claims arising on or before the Effective Date, other than for claims based on gross negligence or willful misconduct as determined by a final order entered by a court of competent jurisdiction.

The Company will release the Current Equityholders and their respective officers, directors, advisors and professionals from all claims arising on or before the Effective Date, other than for claims based on gross negligence or willful misconduct as determined by a final order entered by a court of competent jurisdiction.

The Senior Lenders, the Current Equityholders and the Noteholders will release the Company, and their respective current officers, directors, advisors, and professionals from all claims arising on or before the Effective Date, other than for claims based on gross negligence or willful misconduct as determined by a final order entered by a court of competent jurisdiction.

**Indemnification of Prepetition Officers and Directors**   Under the Restructuring, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, or employment contracts) for the current and former directors, officers, employees, attorneys, other professionals and agents of the Company and such current and former directors and officers' respective affiliates will be assumed and will survive effectiveness of the Restructuring for claims related to or in connection with any actions, omissions or transactions occurring prior to the Effective Date.

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408/SETTLEMENT DISCUSSIONS

**Definitive Documentation**  The Company, the Senior Lenders, the Agent, the Noteholders, the Current Equityholders and, if applicable, the Trustee, will negotiate in good faith definitive documentation for the restructuring consistent with the terms hereof.

**Implementation & Restructuring Milestones**  The parties will agree on an appropriate process to implement the Restructuring, including the execution of appropriate forbearance and lock-up agreements ("***Restructuring Support Agreements***") for accepting parties and the commencement of chapter 11 proceedings.

Appropriate milestones *TBD* for definitive documentation and implementation of restructuring via prepackaged bankruptcy plan.

**Payments**  Upon execution of the Restructuring Support Agreements and until the commencement of chapter 11 proceedings, Company to pay monthly interest payments to the Senior Lenders (including all interest then accrued and unpaid) and reimburse all legal fees and expenses of Sidley Austin LLP, as the Agent's counsel, and Conway Del Genio, as Agent's financial advisor, in accordance with the terms of their respective engagement letters.

**FOR DISCUSSION PURPOSES ONLY**
**PRIVILEGED AND CONFIDENTIAL**
**SUBJECT TO FRE 408/SETTLEMENT DISCUSSIONS**

## EXHIBIT A

## ESTIMATED CASH PAYDOWN

| Cash Available for Debt Paydown | |
|---|---:|
| Q2 Beginning Cash Balance | $42,354 |
| Q2 Change in Cash, Net of Fees | 3,400 |
| **Cash Balance Prior to Fees** | **$45,754** |
| Restructuring & Financing Fees | (10,100) |
| Minimum Cash | (10,000) |
| Restructuring Fees | (3,500) |
| **Cash Available for Debt Paydown**[1] | **$22,154** |

[1] To be paid pro rata as between the Revolving Loan and the Term Loan.

9

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408/SETTLEMENT DISCUSSIONS

EXHIBIT B

ESTIMATED SOURCES AND USES

| Sources | | Uses | |
|---|---|---|---|
| New Revolver - Drawn | $5,900 | Pre-Reorg Revolver | $25,928 |
| Excess Cash for Senior Secured Debt Paydown | 22,154 | | |
| New First Lien Term Loan | 140,460 | Pre-Reorg Term Loan | 167,586 |
| New Second Lien Note | 25,000 | | |
| | | Pre-Reorg Sr. Sub Notes | 150,410 |
| Cancellation of Indebtedness Income | 155,480 | Accrued Interest on Sr. Sub Notes | 12,127 |
| | | Cancellation of Historical Debt Acquisition Costs | (7,057) |
| **Total Sources** | **$348,994** | **Total Uses** | **$348,994** |
| **Note: Total New Senior Cash Pay Debt** | **$146,360**[1] | | |

[1] $4.1 million in letters of credit would be outstanding on the Effective Date.

**Panolam Chart of Provisions**

| Section in Current Credit Agreement | Description of Provision | Term in Current Credit Agreement | Term for A&R Credit Agreement |
|---|---|---|---|
| 2.1A.(iii) | Swing Line Loan | Orig. amount of $3 million | Parties agree there will not be a Swing Line facility |
| 2.1A.(iv) | Increase in Term Loan Commitments | Orig. approx. $80 million | Parties agree to delete |
| 2.2A.(ii) | Base Rate Parameters | Base Rate Margin on grid, with highest margin at 1.25% and is 1.00% below Eurodollar Rate Margin (i.e. 2.25%) | Parties agree on concept that the Base Rate will be the highest of (a) Prime, (b) Fed Funds Effective Rate 50bps and (c) the Eurodollar Rate |
| 7.1(iii) | Baskets for Capital Leases and Purchase Money Obligations | $15 million at any one time outstanding | Parties agree to $3M at any one time outstanding |
| 7.1(viii) | Indebtedness for Foreign Subsidiaries (other than the Canadian Subsidiaries) | Original amount of $5 million | Parties agree to $5M |
| 7.1(xv) | Subordinated Indebtedness to finance Permitted Acquisitions | $100 million in the aggregate | Parties agree to $7.5M in the aggregate and that such sub-debt will be non-cash pay |
| 7.1(xvii) | Canadian Subsidiaries Indebtedness | $15 million at any one time outstanding | Parties agree to $7.5M at any one time outstanding |
| 7.1(xix) | Debt Basket | $7.5 million at any one time outstanding | Parties agree to $5M at any one time outstanding (up to $2.5M of which can be secured, per the General Lien Basket) |

| Section in Current Credit Agreement | Description of Provision | Term in Current Credit Agreement | Term for A&R Credit Agreement |
|---|---|---|---|
| 7.2(xxii) | General Lien Basket | $2.5 million at any one time outstanding | Parties agree to $2.5M at any one time outstanding |
| 7.3(ii)* | Investments in subsidiaries that are not Loan Parties | $7.5 million at any one time outstanding | $5M at any one time outstanding<br><br>Parties agree that 65% of the stock of any new 1st tier foreign subsidiary will be pledged by the parent of such 1st tier subsidiary.* |
| 7.3(xv)* | General Acquisition Basket | $125 million in the aggregate | Parties agree to $15M in the aggregate, with pro forma covenant compliance. No more than $7.5M in the aggregate of cash from operations to be used for Permitted Acquisitions. |
| 7.3(xvi)* | General Investment Basket | $5 million at any time | Parties agree to $5M at any time* |
| 7.4(xii) | General Contingent Debt Basket | $7.5 million (when combined with Debt Basket) | Parties agree to $5 million (when combined with Debt Basket) |
| 7.5(v) | Restricted Payments to Holdings for overhead, admin costs, etc. | • $1 million/FY for Holding overhead, and gen'l admin costs;<br>• $2 million/FY for repurchase of Capital Stock with carry over of up to $4 million | Parties agree to:<br>• $1 million/FY for Holding overhead, and gen'l admin costs;<br>• $2 million/FY for repurchase of Capital Stock with carry over of up to $2 million |
| 7.6 | Financial Covenants | Maximum Leverage Ratio | See attached ratios |
| 7.7B(iv) | De Minimis Asset | $1 million per transaction | Parties agree to $1 million per transaction or series of related |

2

| Section in Current Credit Agreement | Description of Provision | Term in Current Credit Agreement | Term for A&R Credit Agreement |
|---|---|---|---|
| | Sales | or series of related transactions | transactions with an aggregate cap of $5M |
| 7.7B(vi) | General Asset Sale Basket | $5 million/FY | Parties agree to $5 per fiscal year |
| 7.7B(xviii) | Sale Lease Back | FMV of all property subject to SLB since Closing Date not to exceed $5 million | Parties agree to FMV of all property subject to SLB since Closing Date not to exceed $5 million |
| 7.7B(x) | Basket for sales of Foreign Subsidiary A/R to Company or Domestic Subsidiaries | $6 million of aggregate uncollected face amount at any one time outstanding | No change from term in current Credit Agreement |
| 7.9(ii) | Reasonable and Customary Fees paid to directors and members of Holdings | limited to "reasonable and customary fees" | Parties agree to "reasonable and customary fees" for independent directors |
| 7.9(iv) | Management Fees under Management Agreement | Allowed to be paid unless payment or bankruptcy default | Parties agree to delete. |
| 7.9(v) | Transactions with Shareholders and Affiliates -- Equity Issuances | Allowed if permitted under the Credit Agreement | Parties agree that equity issuances to Shareholders & Affiliates are allowed if otherwise permitted under the Credit Agreement |
| 7.9(x) | Affiliate Management/Sponsor Advisory Fees | Allowed to be paid unless payment or bankruptcy EOD | Parties agree to delete |
| 8.2 | Defaults in Other Agreements | Failure by Holdings, Company or any | Parties agree to a cross-default upon failure to pay principal, interest or Contingent Obligations in the individual or aggregate |

3

| Section in Current Credit Agreement | Description of Provision | Term in Current Credit Agreement | Term for A&R Credit Agreement |
|---|---|---|---|
| | | Subsidiaries to pay when due any P or I of Indebtedness or Contingent Obligations in the principal amount of $7.5 million | principal amount of at least $5M |
| 8.8 | Defaults for Judgments and Attachments | $7.5 million to the extent not covered by insurance | Parties agree to $5 million to the extent not covered by insurance |
| 8.12 | Default in Lien on Collateral pledged to 1st Lien | $1 million | Parties agree to $1M |

\* Carve-outs to be given effect beginning 1/1/10 (other than Investments permitted under the Credit Agreement currently in place).

4

| Fiscal Quarter Ending | Consolidated Senior Leverage Ratio (net) | Consolidated Interest Coverage Ratio | Maximum LTM Capital Expenditures |
|---|---|---|---|
| December 31, 2009 | None | None | None |
| March 31, 2010 | None | None | None |
| June 30, 2010 | 7.17 : 1.0 | 1.42 : 1.0 | $4,675,000 |
| September 30, 2010 | 7.17 : 1.0 | 1.42 : 1.0 | $4,813,000 |
| December 31, 2010 | 6.69 : 1.0 | 1.50 : 1.0 | $4,950,000 |
| March 31, 2011 | 6.69 : 1.0 | 1.50 : 1.0 | $5,088,000 |
| June 30, 2011 | 5.96 : 1.0 | 1.74 : 1.0 | $5,225,000 |
| September 30, 2011 | 5.32 : 1.0 | 1.89 : 1.0 | $5,363,000 |
| December 31, 2011 | 4.79 : 1.0 | 2.00 : 1.0 | $5,500,000 |
| March 31, 2012 | 4.79 : 1.0 | 2.00 : 1.0 | $5,638,000 |
| June 30, 2012 | 4.24 : 1.0 | 2.00 : 1.0 | $5,775,000 |
| September 30, 2012 | 3.71 : 1.0 | 2.00 : 1.0 | $5,913,000 |
| December 31, 2012 | 3.26 : 1.0 | 2.00 : 1.0 | $6,050,000 |
| March 31, 2013 | 3.26 : 1.0 | 2.00 : 1.0 | $6,188,000 |
| June 30, 2013 | 2.82 : 1.0 | 2.00 : 1.0 | $6,325,000 |
| September 30, 2013 | 2.40 : 1.0 | 2.00 : 1.0 | $6,463,000 |
| December 31, 2013 | 1.97 : 1.0 | 2.00 : 1.0 | $6,600,000 |

Book Page 168

**<u>Exhibit B to Plan</u>**

**New Intercreditor Agreement Term Sheet**

**Panolam Industries International, Inc.**

**New Intercreditor Term Sheet**

**September 25, 2009**

This term sheet describes the material terms of the Intercreditor Agreement to be entered into as of the Effective Date, by and among Reorganized Panolam, the other Reorganized Debtors (collectively, the "***Debtors***"), the Administrative Agent, and the agent under the New Second Lien Credit Agreement (the "***Second Lien Agent***") (as amended or otherwise modified from time to time in accordance with the terms thereof, the "***Intercreditor Agreement***"). Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan, or if not defined therein, in the Credit Agreement.

**I.      Subordination**

    **A.  Lien Subordination**. So long as any Obligations under the Credit Agreement (the "***First Lien Obligations***") remain outstanding, all Liens (including, without limitation, judgment liens, the "***Second Priority Liens***") securing the payment of the New Second Lien Term Notes (the "***Second Lien Obligations***") shall be junior and subordinate in right and priority to the Liens securing the First Lien Obligations (the "***First Priority Liens***").

    **B.  Payment Subordination**. So long as any First Lien Obligations remain outstanding, no payments shall be made to the holders of the Noteholder Credit Agreement Claims (the "***Junior Lenders***" and together with the Second Lien Agent, the "***Second Lien Secured Parties***") on account of the Second Lien Obligations; provided, however, that, subject to the Payment Blockage and Turnover provisions described below, (i) payments pursuant to the expense reimbursement and indemnity provisions in the New Second Lien Credit Agreement will be permitted (unless the payment of any such expense or indemnity amount shall cause or result in an Event of Default under the Credit Agreement), and (ii) cash interest payments payable quarterly will be permitted as described in "Treatment of Senior Secured Debt held by Cross-over Senior Lenders: Interest Payment" in the Plan Term Sheet (such cash interest payments, collectively, "***Cash Interest Payments***" and each, a "***Cash Interest Payment***").

**II.      Payment Blockage**.

    **A.**  If (i) an Event of Default under Section 8.1 (Failure to Make Payments When Due) of the Credit Agreement occurs and is continuing, (ii) an Event of Default under Section 7.6A (Minimum Interest Coverage Ratio) or Section 7.6B (Maximum Leverage Ratio) of the Credit Agreement occurs and is continuing for two consecutive fiscal quarters,[1] or (iii) the Second Lien Agent receives payment of cash interest in excess of the Cash Interest Payment permitted for the applicable period and the Second Lien Agent has received a payment blockage notice from the Administrative Agent (as distinct from the

---

[1] For the sake of clarity, if there is a default described in Section II.A(ii) resulting from the failure to meet the required covenant ratio as of both (i) the last day of Q2 and (ii) the last day of Q3, the Administrative Agent shall be entitled to deliver a Blockage Notice with respect thereto on or after the last day of Q3.

Standstill Notice described below, a "**Blockage Notice**"), then no Cash Interest Payments on account of the Second Lien Obligations or cash payments pursuant to the expense reimbursement and indemnity provisions in the New Second Lien Credit Agreement shall be made during the period commencing on the date such Blockage Notice was delivered and ending on the date on which such Event of Default is waived or otherwise cured in accordance with the terms of the Credit Agreement; provided, however, that in the case of a payment blockage pursuant to subclause (iii) of this Section II.A, Cash Interest Payments and cash payments pursuant to the expense reimbursement and indemnity provisions in the New Second Lien Credit Agreement may resume earlier upon the turnover of the excess amount of the Cash Interest Payment in accordance with Section IX.

**B.**  If any Event of Default, other than any such Event of Default referred to in Section II.A. hereof, occurs and is continuing under the Credit Agreement, and the Second Lien Agent has received a Blockage Notice, then no interest payments on account of the Second Lien Obligations or cash payments pursuant to the expense reimbursement and indemnity provisions in the New Second Lien Credit Agreement shall be made during the period commencing on the date such Blockage Notice was delivered and ending on the 121st day thereafter, unless such Event of Default is waived or otherwise cured in accordance with the terms of the Credit Agreement prior to the expiration of such 120 day period.

**III.   No New Liens.**  So long as any First Lien Obligations remain outstanding, no Debtor shall grant any additional Liens on any asset to secure (a) any Second Lien Obligations unless such Debtor has granted a Lien on such asset to secure the First Lien Obligations, or (b) any First Lien Obligations unless such Debtor concurrently grants, a Lien on such asset to secure the Second Lien Obligations.

**IV.   Prohibition on Contesting Liens**.  The Junior Lenders agree that they will not (whether or not any insolvency or liquidation proceeding has been commenced) contest the priority, validity or enforceability of any First Priority Lien.

**V.   Enforcement Rights**.  So long as any First Lien Obligations remain outstanding, Administrative Agent and the Senior Lenders (together, the "**First Lien Secured Parties**") shall have the exclusive right to enforce rights and exercise remedies with respect to the Collateral (including, without limitation, foreclosure or other disposition), without any consultation or consent of the Second Lien Secured Parties and no Second Lien Secured Party may contest or otherwise hinder Administrative Agent's ability to enforce remedies, including, without limitation, in an insolvency or liquidation proceeding; provided, that, notwithstanding the foregoing, (a) in an insolvency or liquidation proceeding, the Second Lien Agent may file a proof of claim/statement of interest with respect to the Second Lien Obligations, (b) the Second Lien Agent may take action to preserve or protect the validity or enforceability of the Second Priority Liens, so long as no such action taken could be inconsistent with the Intercreditor Agreement, (c) the Second Lien Secured Parties may file any responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Secured Parties, to the extent not inconsistent with the Intercreditor Agreement, (d) the Second Lien Secured Parties may exercise rights and remedies as unsecured creditors, as described below, (e)

the Second Lien Secured Parties may enforce their rights and exercise remedies with respect to the Collateral after the termination of the Standstill Period (only if and to the extent that Administrative Agent is not diligently enforcing its rights) and (f) the Second Lien Secured Parties may take any action in respect of any sale, transfer or other disposition of any Collateral free and clear of any Lien or other claim pursuant to the terms and conditions of section 363 of the Bankruptcy Code.

> **A. Junior Lenders as Unsecured Creditors**. The Junior Lenders shall reserve the right to file pleadings, objections, motions or agreements which assert rights available to unsecured creditors and may exercise remedies available to unsecured creditors in accordance with applicable law.

**VI.    Standstill Period**. The Second Lien Agent agrees not to seek to enforce any rights or remedies with respect to Collateral (including, without limitation, the filing of an involuntary petition against Debtors) or join with any other person or vote in favor of any action with respect to such rights and remedies, until after the passage of 120 days after the date on which Administrative Agent has delivered to the Second Lien Agent written notice ("***Standstill Notice***") of an Event of Default under the Credit Agreement (the "***Standstill Period***").  The Administrative Agent shall give notice to the Second Lien Agent prior to taking any enforcement action against Collateral, which notice shall constitute requisite notice under the UCC. Notwithstanding the expiration of the Standstill Period, if Administrative Agent is diligently pursuing the exercise of remedies with respect to Collateral at such time, the Second Lien Agent shall be prohibited from exercising remedies with respect to Collateral; provided, however, that during the Standstill Period, enforcement of rights or remedies with respect to the Collateral will not shift to the Second Lien Agent even if the Administrative Agent does not commence enforcement action against all or substantially all of the Collateral. If, upon the expiration of the Standstill Period, the Administrative Agent has not commenced, or is not diligently pursuing, the exercise of remedies against Collateral, the Second Lien Agent shall give notice to Administrative Agent prior to taking any enforcement action against Collateral.

**VII.    Collateral Disposition/Release of Liens.**  Prior to an insolvency or liquidation proceeding, the Second Priority Liens will be automatically released if (a) the Senior Lenders release the First Priority Liens in connection with the exercise of remedies, or (b) the Senior Lenders release the First Priority Liens in connection with any sale or disposition of Collateral permitted under the terms of the Credit Agreement (as in effect on the effective date thereof or otherwise agreed to by the Junior Lenders (including without limitation by means of an amendment to the New Second Lien Credit Agreement)).

**VIII.    Application of Proceeds**.  So long as any First Lien Obligations remain outstanding, any Collateral or proceeds thereof received by Administrative Agent in connection with the enforcement or exercise of any remedy or right shall be applied first to the First Lien Obligations. Upon payment in full (in cash) of the First Lien Obligations, Administrative Agent shall deliver to the Second Lien Agent any remaining Collateral and any proceeds thereof for application to the Second Lien Obligations.

**IX.    Turnover of Payments**. So long as any First Lien Obligations remain outstanding, any payments or proceeds of Collateral received by the Second Lien Secured Parties (whether from any Debtor, another party on behalf of the Debtors, or otherwise), other than Cash Interest

Payments (including without limitation, any cash payment of interest in excess of the Cash Interest Payment permitted for the applicable period) and cash payments pursuant to the expense reimbursement and indemnity provisions in the New Second Lien Credit Agreement (in each case as allowed hereunder), shall be held in trust for the First Lien Secured Parties and must be turned over to Administrative Agent until such time that the First Lien Obligations are paid in full (in cash).

**X.    Unenforceable Liens.**  If in any insolvency or liquidation proceeding any Lien encumbering any Collateral is deemed to be unenforceable, then the Second Lien Secured Parties agree that any distribution, proceeds or recovery they may receive with respect to such Collateral shall (so long as any First Lien Obligations remain outstanding) be segregated, held in trust and paid over to Administrative Agent in the same form as received without recourse, representation or warranty.

**XI.    Bailment for Perfection of Certain Security Interests.**  To the extent Administrative Agent holds any Collateral that is perfected by possession or control ("***Pledged Collateral***"), Administrative Agent shall hold such Pledged Collateral as a bailee for the Second Lien Agent for the purpose of perfecting the Second Priority Liens.  No fiduciary relationship shall be created by this bailment arrangement and, so long as any First Lien Obligations remain outstanding, Administrative Agent shall be entitled to deal with the Pledged Collateral in its sole discretion, without notice to the Second Lien Secured Parties.  Upon discharge of the First Lien Obligations, Administrative Agent shall upon request deliver the Pledged Collateral to the Second Lien Agent.

**XII.        Insolvency/Liquidation Proceedings**.[2]

    **A.  DIP Financing**.  No Second Lien Secured Party shall oppose or object to (i) any post-petition financing for which any Debtor has filed a motion seeking the approval thereof under section 364 of the Bankruptcy Code, which financing is provided solely by one or more of the First Lien Secured Parties ("***DIP Financing***") or (ii) the Liens securing such financing (the "***DIP Liens***") and, to the extent that the DIP Liens are senior to or rank *pari passu* with the First Priority Liens, the Second Lien Agent agrees to subordinate the Second Priority Liens to such DIP Liens; provided that the foregoing shall not prevent any Second Lien Secured Party from objecting to any DIP Financing (or any DIP Liens) (i) that purports to govern or control the timing, provisions or content of a plan of reorganization, (ii) that purports to govern or control the timing or provisions of any sale of Collateral (other than a customary asset sale covenant) or assets of any Debtor, including, without limitation, any requirement for any Debtor to sell assets under section 363 of the Bankruptcy Code, (iii) if the amount of such DIP Financing exceeds $25,000,000, or (iv) that contains a roll-up of pre-petition debt provided by the First Lien Secured Parties.

    **B.  363 Sales**.  No restrictions on the ability of any First Lien Secured Party or any Second Lien Secured Party to oppose, object or take any other action in respect of any

---

[2] For the sake of clarity, Section V hereof shall not restrict the ability of the Second Lien Secured Parties to take any action in respect of a DIP Financing, cash collateral/adequate protection or plan of reorganization otherwise permitted hereunder.

sale, transfer or other disposition of any Collateral free and clear of the First Priority Liens or Second Priority Liens or other claims under section 363 of Bankruptcy Code.

**C.  Cash Collateral/Adequate Protection Rights**. The Second Lien Agent waives the right to contest Administrative Agent's request for adequate protection or any objection made by Administrative Agent based on a claim of lack of adequate protection for the Senior Lenders.  If, in connection with any DIP Financing or use of cash collateral, any First Lien Secured Party is granted adequate protection in the form of a Lien on additional collateral and/or a superpriority claim, the Second Lien Agent may seek or request adequate protection (and the Administrative Agent shall not contest such request for adequate protection or any objection made by Second Lien Agent based on a claim of lack of adequate protection for the Junior Lenders) solely in the form of a replacement Lien on such additional collateral and/or superpriority claim (which replacement Lien and/or claim will continue to be subordinated to the First Priority Lien and/or claim, and, if applicable, the DIP Liens).  In connection with any DIP Financing or use of cash collateral, the Second Lien Agent may seek or request adequate protection in the form of cash payments, including without limitation, payment of professional fees and/or current payment of post-petition interest, provided, however, that the First Lien Secured Parties may contest any such request for adequate protection.

**D.  Relief from Automatic Stay**. The Second Lien Secured Parties agree that, for so long as any First Lien Obligations remain outstanding, no Second Lien Secured Party shall seek or request relief from or modification of the automatic stay.  Further, the Second Lien Secured Parties agree not to oppose any motion made by Administrative Agent to lift the automatic stay.

**E.  Post-Petition Interest**.  No Second Lien Secured Party shall oppose or seek to challenge any claim by the First Lien Secured Parties for allowance in any insolvency or liquidation proceeding of post-petition interest, fees or expenses to the extent of the value of the First Priority Liens (such value to be determined without regard to the existence of the Second Priority Liens on the Collateral). The First Lien Secured Parties shall not oppose or seek to challenge any claim by the Second Lien Secured Parties for allowance in any insolvency or liquidation proceeding of post-petition interest, fees or expenses to the extent of the value of the Second Priority Liens (such value to be determined taking account the First Priority Liens on the Collateral).

**F.  Plan Participation/Right to Vote**.  The Second Lien Secured Parties will agree not to propose or support a plan of reorganization that does not result in the satisfaction of the First Lien Obligations in full.

**G.  Application of Intercreditor Terms**.

1.  If, in an insolvency or liquidation proceeding, debt obligations of the Debtors are distributed pursuant to a plan of reorganization on account of both the First Lien Obligations and the Second Lien Obligations, then such debt obligations shall have the same relative priorities as the existing First Lien Obligations and Second Lien Obligations.

2. The First Lien Obligations shall continue to be treated as First Lien Obligations and the provisions of the Intercreditor Agreement shall continue to govern the relative rights and priorities of the Senior Lenders and the Junior Lenders even if all or part of the First Lien Obligations or the First Priority Liens are subordinated, set aside, avoided, invalidated or disallowed in connection with any insolvency or liquidation proceeding, and the Intercreditor Agreement shall be reinstated if at any time any payment of the First Lien Obligations is rescinded or must otherwise be returned by any First Lien Secured Party.

**XIII.  Limitations on Amendments to the Credit Agreement.**  (a) The Senior Lenders may at any time, without the consent of (but with notice to) the Junior Lenders, amend, restate, amend and restate, supplement or otherwise modify the Credit Agreement; provided, however, that the Senior Lenders shall not, without the consent of the Junior Lenders, agree to any amendment, restatement, amendment and restatement, supplement or modification that would (i) increase the interest rate margin or similar component by more than two percent (2%) above the then-existing interest rate margin or similar component (excluding increases resulting from the accrual of interest at the default rate provided in the Credit Agreement); (ii) shorten the maturity or weighted average life to maturity of the First Lien Obligations except with respect to an amendment executed as a result of an Event of Default; (iii) change the final maturity date of the First Lien Obligations to a date later than the original scheduled maturity date of the Second Lien Obligations; (iv) increase the principal amount of First Lien Obligations by more than $15 million or (v) otherwise be in contravention of the Intercreditor Agreement or the Credit Agreement.  (b) In the event that any amendment, modification, waiver or consent is entered into with respect to any first lien Collateral Documents (other than any such amendment, modification, waiver or consent that narrows the definition or scope of Collateral in a manner not otherwise contemplated by Section VII) then such amendment, modification, waiver or consent shall apply automatically to any comparable provision of the applicable comparable second lien collateral document.

**XIV.  Limitations on Amendments to New Second Lien Credit Agreement**.  The Junior Lenders may at any time, without the consent of (but with notice to) the Senior Lenders, amend, restate, amend and restate, supplement or otherwise modify the New Second Lien Credit Agreement; provided, however, that the Junior Lenders shall not, without the consent of First Lien Secured Parties, agree to any amendment, restatement, amendment and restatement, supplement or modification that would (a) increase the interest rate margin or similar component (excluding increases resulting from the accrual of interest at the default rate provided in the New Second Lien Credit Agreement) or change the cash/PIK toggle mechanism applicable to the Second Lien Obligations; provided, that the interest rate margin or similar component of any PIK interest may be increased by no more than 2%, (b) increase the principal amount of Second Lien Obligations (except by the issuance of PIK notes, as contemplated by the Plan Term Sheet) by more than $12.5 million,[3] (c) shorten the maturity or weighted average life to maturity of the Second Lien Obligations, (d) change the prepayment or defeasance provisions in a manner adverse to the First Lien Secured Parties, (e) add or modify covenants or events of defaults in a manner adverse to the First Lien Secured Parties in any material respect, except to the extent added or modified in accordance with the terms of the Credit Agreement, (f) add to the Collateral

---

[3] Such amount to apply against (and was calculated from) the acquisition finance basket ($7.5M) and debt basket ($5M) in the Credit Agreement.

other than as specifically provided by the Intercreditor Agreement, or (g) otherwise be in contravention of the Intercreditor Agreement or the Credit Agreement.

**XV.    Effect of Refinancing of Indebtedness under Credit Agreement**. If, substantially contemporaneously with the discharge of the First Lien Obligations, the Debtors refinance the First Lien Obligations with Permitted Refinancing Indebtedness (as defined below), then (a) the discharge of the First Lien Obligations shall be automatically deemed not to have occurred for purposes of the Intercreditor Agreement, (b) the refinanced Indebtedness and related obligations shall automatically be treated as First Lien Obligations for purposes of Lien priorities, right in Collateral and otherwise, under the Intercreditor Agreement, (c) the credit agreement and other loan documents evidencing the refinanced Indebtedness shall be treated as the Credit Agreement, Collateral Documents and Loan Documents for purposes of the Intercreditor Agreement, and (d) the collateral agent with respect to the refinanced Indebtedness shall be deemed to be the Administrative Agent for purposes of the Intercreditor Agreement; <u>provided</u>, that the Debtors give the Second Lien Agent 10 days prior notice of their intention to apply the terms of this section of the Intercreditor Agreement to such refinanced Indebtedness.

"***Permitted Refinancing Indebtedness***" shall mean any indebtedness issued in exchange for, or the net proceeds of which are used to refinance the First Lien Obligations; <u>provided</u> that (in each case as of the effective date of such refinancing): (a) such indebtedness is incurred pursuant to a loan agreement or a credit agreement providing for revolving credit loans, term loans and/or letters of credit, (b) the principal amount (or accreted value, if applicable) of such indebtedness does not exceed the principal amount (or accreted value, if applicable) of the First Lien Obligations being refinanced (plus unpaid accrued interest, fees, commissions, expenses and undrawn commitment thereunder); (c) the interest rate of such indebtedness does not exceed the interest rate of the First Lien Obligations being refinanced by more than 2%, (d) the maturity or weighted average life to maturity of such indebtedness is not shorter than that of the First Lien Obligations being refinanced, (e) the final maturity of such indebtedness is not later than the original scheduled maturity date of the Second Lien Obligations, (f) the terms and covenants of such indebtedness taken as a whole shall not be more restrictive in any material respect than the terms and covenants of the First Lien Obligations being refinanced taken as a whole, and (g) such indebtedness shall not have (1) any obligor that is not an obligor under the First Lien Obligations being refinanced, except to the extent such person becomes an obligor of the Second Lien Obligations or (2) greater guaranty or security than the First Lien Obligations being refinanced, except to the extent such guaranty or security is provided to the holders of the Second Lien Obligations.

**XVI.    Transfers**. The Junior Lenders agree not to assign, transfer, pledge or grant a security interest in all or any part of the Second Lien Obligations unless (a) such assignment, transfer, pledge or grant is made expressly subject to the terms of the Intercreditor Agreement, and (b) the Junior Lender's assignee, transferee, pledgee or grantee expressly agrees in writing to be bound by the Intercreditor Agreement and assume the Junior Lender's obligations thereunder.

**XVII. Subrogation**. The Second Lien Secured Parties waive any rights of subrogation they may acquire as a result of any payment under the Intercreditor Agreement until the discharge of the First Lien Obligations has occurred; <u>provided</u>, that any payment that is paid over to the Administrative Agent pursuant to the Intercreditor Agreement shall not reduce the Second Lien

Obligations unless and until the discharge of the First Lien Obligations have occurred and the Administrative Agent delivers any such payment to the Second Lien Agent.

**<u>Exhibit C to Plan</u>**

**Restructuring Support Agreement**

[See Exhibit "E" to the Disclosure Statement]

Book Page 182

**<u>Exhibit D to Plan</u>**

**Amended and Restated Term Notes Distribution Analysis**

**EXHIBIT D**

## ILLUSTRATIVE CALCULATION OF CERTAIN DEFINED TERMS

**1.11 Amended and Restated Revolver Notes**

| | |
|---|---|
| Amended and Restated Revolver Notes drawn pursuant to Section 1.11(i)(a) | $5,900,000 |
| Amended and Restated Revolver Notes outstanding as LCs pursuant to Section 1.11(i)(c) | 4,072,000 |
| Total drawn Amended and Restated Revolver Notes and outstanding L/Cs | $9,972,000 |
| Plus: | |
| Excess Cash[1] | $22,154,000 |
| Pro rata share pursuant to Section 4.2(b)(i) | 17.383% |
| Excess Cash distributed pursuant to Section 4.2(b)(i) | $3,850,939 |
| **Amended and Restated Revolver Notes[2]** | **$13,822,939** |

**1.52 Intercreditor Adjustment Percentage**

| | |
|---|---|
| Senior Lender Credit Agreement Revolver Claim | $30,000,000 |
| Divided By: Senior Lender Credit Agreement Claims | 172,586,498 |
| **Intercreditor Distribution Adjustment** | **17.383%** |

**1.51 Intercreditor Distribution Adjustment**

| | |
|---|---|
| Senior Lender Credit Agreement Revolver Claims | $30,000,000 |
| Less: | |
| Amended and Restated First Lien Notes | $155,460,498 |
| Intercreditor Adjustment Percentage | 17.383% |
| Sub-total | $27,023,058 |
| **Intercreditor Distribution Adjustment** | **$2,976,942** |

**1.13 Amended and Restated Term Notes Distrib. to Sr. Lender Agmt. Revolver Claims**

| | |
|---|---|
| Senior Lender Credit Agreement Revolver Claims | $30,000,000 |
| Less: Amended and Restated Revolver Notes[2] | (13,822,939) |
| Less: Intercreditor Distribution Adjustment | (2,976,942) |
| **Amended and Restated Term Notes Distrib. to Sr. Lender Agmt. Revolver Claims** | **$13,200,119** |

**1.14 Amended and Restated Term Notes Distrib. To Sr. Lender Agmt. Term Claims**

| | |
|---|---|
| Claims arising out of the Term Loan governed by the Credit Agreement | $167,586,498 |
| Less: Noteholder Credit Agreement Claim | (25,000,000) |
| Senior Lender Credit Agreement Term Claim | $142,586,498 |
| Less: | |
| Excess Cash[1] | $22,154,000 |
| Pro rata share pursuant to Section 4.3(b)(i) | 82.617% |
| Sub-total | $18,303,061 |
| Less: Excess Cash Adjustment[3] | (1,177,061) |
| Less: Cash Equal to the Intercreditor Distribution Adjustment | (2,976,942) |
| Cash distributed pursuant to Section 4.3(b)(i) | $14,149,058 |
| **Amended and Restated Term Notes Distrib. to Sr. Lender Agmt. Term Claims** | **$128,437,440** |

**1.10 Amended and Restated First Lien Notes**

| | |
|---|---|
| Amended and Restated Revolver Notes[2] | $13,822,939 |
| Amended and Restated Term Notes Distrib. to Sr. Lender Agmt. Revolver Claims | 13,200,119 |
| Amended and Restated Term Notes Distrib. to Sr. Lender Agmt. Term Claims | 128,437,440 |
| **Amended and Restated First Lien Notes** | **$155,460,498** |

**1.43 Excess Cash Adjustment**

| | |
|---|---|
| New Revolving Loan pursuant to the Plan Term Sheet | $15,000,000 |
| Less: Amended and Restated Revolver Notes[2] | (13,822,939) |
| **Excess Cash Adjustment[3]** | **$1,177,061** |

## ILLUSTRATIVE SUMMARY DISTRIBUTIONS

**4.2 Treatment of Senior Lender Credit Agreement Revolver Claim**

| | | |
|---|---|---|
| Amended and Restated Revolver Notes[2] | $13,822,939 | 46.1% |
| Excess Cash distributed pursuant to Section 4.2(b)(i) | 3,850,939 | 12.8% |
| Cash Equal to the Intercreditor Distribution Adjustment | 2,976,942 | 9.9% |
| Amended and Restated Term Notes Distrib. to Sr. Lender Agmt. Revolver Claims | 13,200,119 | 44.0% |
| **Total Distributions** | **$33,850,939** | **100.0%** |
| Less: Amended and Restated Revolver Notes available pursuant to Section 1.11(i)(b) | (3,850,939) | (12.8%) |
| **Total For Purposes of Recovery** | **$30,000,000** | **100.0%** |
| *Senior Lender Credit Agreement Revolver Claim* | *$30,000,000* | |
| *% Recovery* | | *100.0%* |

**4.3 Treatment of Senior Lender Credit Agreement Term Claim**

| | | |
|---|---|---|
| Amended and Restated Term Notes Distrib. to Sr. Lender Agmt. Term Claim | $128,437,440 | 90.1% |
| Cash distributed pursuant to Section 4.3(b)(i) | 14,149,058 | 9.9% |
| **Total Distributions** | **$142,586,498** | **100.0%** |
| *Senior Lender Credit Agreement Term Claim* | *$142,586,498* | |
| *% Recovery* | | *100.0%* |

**Note:** All calculations and estimated distributions are based upon estimated claim, L/C, and cash balances as of the Effective Date. Calculations and estimated distributions are for illustrative purposes only and do not represent a forecast of, or the actual, amounts that will be distributed at the Effective Date.

(1) The amount of the Excess Cash available for pay down is subject to change. Pursuant to Section 9.1(f) of the Plan, the Debtors shall have Excess Cash of at least $17,000,000 as a condition precedent to the Effective Date.

(2) The Amended and Restated Revolving Notes commitment may be less than $15,000,000 and, in that event, the Excess Cash Adjustment would be retained by the Reorganized Debtors to offset the lower revolving commitment.

(3) The Excess Cash Adjustment shall increase Reorganized Panolam's minimum cash-on-hand from $10,000,000, such that, in the illustrative example above, minimum cash-on-hand would be $11,177,061. Total initial liquidity is projected to be $15,028,000, in the illustrative example above, this amount is comprised of $11,177,061 cash-on-hand and $3,850,939 available under the Amended and Restated Revolver Notes.

**Exhibit B to Disclosure Statement**

**Panolam's Form 10-K for the year ended December 31, 2008, filed with the SEC on March 31, 2009**

Book Page 188

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the fiscal year ended December 31, 2008

#### or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### Commission file number 333-78569

# PANOLAM INDUSTRIES INTERNATIONAL, INC.
### (Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **52-2064043** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **20 Progress Drive, Shelton, Connecticut** | **06484** |
| (Address of Principal Executive Offices) | (Zip Code) |

#### (203) 925-1556
Registrant's Telephone Number, Including Area Code:

Securities registered pursuant to Section 12(b) of the Act:

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| None | None |

Securities registered pursuant to Section 12(g) of the Act: None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule-405 of the Securities Act. ☐ Yes    ☒ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Act. ☐ Yes    ☒ No

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes    ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐        Accelerated filer ☐        Non-accelerated filer ☒        Smaller reporting company ☐
                                                         (Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes    ☒ No

As of June 30, 2008, there was no established public trading market for the shares of the registrant's common stock and no shares of common stock were held by non-affiliates of the registrant.

The number of shares outstanding of the registrant's common stock as of March 31, 2009, was 200.

### DOCUMENTS INCORPORATED BY REFERENCE
None.

# PANOLAM INDUSTRIES INTERNATIONAL, INC.

## FORM 10-K

### TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **FORWARD-LOOKING STATEMENTS** | | 1 |
| **PART I** | | **2** |
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 20 |
| Item 2. | Properties | 20 |
| Item 3. | Legal Proceedings | 21 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 22 |
| **PART II** | | **22** |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 22 |
| Item 6. | Selected Financial Data | 22 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 41 |
| Item 8. | Financial Statements and Supplementary Data | 43 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 43 |
| Item 9A(T). | Controls and Procedures | 43 |
| Item 9B. | Other Information | 44 |
| **PART III** | | **44** |
| Item 10. | Directors, Executive Officers and Corporate Governance | 44 |
| Item 11. | Executive Compensation | 47 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholders Matters | 58 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 60 |
| Item 14. | Principal Accountant Fees and Services | 62 |
| **PART IV** | | **64** |
| Item 15. | Exhibits and Financial Statement Schedules | 64 |
| | Signatures | 69 |

# FORWARD-LOOKING STATEMENTS

This annual report on Form 10-K contains forward-looking statements, including, without limitation, statements concerning the conditions in our industry and our operations, economic performance and financial condition, including, in particular, statements relating to our business and strategy. The words "may," "might," "should," "estimate," "project," "plan," "anticipate," "expect," "intend," "outlook," "believe" and other similar expressions are intended to identify forward-looking statements and information although not all forward-looking statements include these identifying words. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of their dates. These forward-looking statements are based on estimates and assumptions by our management that, although we believe to be reasonable, are inherently uncertain and subject to a number of risks and uncertainties.

In particular, our business might be affected by uncertainties affecting the decorative overlay industry and construction industry generally as well as the following, among other factors:

- general economic, financial and political conditions, including downturns affecting the decorative overlay or construction industries or the residential housing and credit markets;

- changes in consumer preferences and discretionary spending;

- increases in raw material costs, including oil prices, which in some instances may not be passed on to customers;

- availability of raw materials and other commodities used to produce our products;

- competitive pressures, including new product developments or changes in competitors' pricing;

- our ability to manage our growth and expansion, including recent acquisitions and any acquisitions we might undertake in the future;

- our ability to develop innovative new products;

- our ability to generate cash flows to service our substantial indebtedness and invest in the operation of our business;

- our ability to comply with financial covenants contained in our credit facility, our ability to obtain waivers to cure any noncompliance and our ability to refinance or replace our credit facility (or other indebtedness) on favorable terms or at all;

- our ability to obtain necessary financing to continue operations;

- limitations and restrictions on the operation of our business contained in the documents governing our indebtedness;

- our dependence upon our key executives and other key employees;

- possible environmental liabilities resulting from our use of toxic or hazardous materials in connection with our manufacturing operations;

- our ability to protect our intellectual property rights, brands and proprietary technology;

- fluctuations in exchange rates between the United States and Canada; and

- our ability to effectively and efficiently maintain internal control procedures that are compliant with Section 404 of the Sarbanes Oxley Act of 2002 in a timely fashion and the possibility of increased operating costs associated with making any necessary changes.

Additional factors that might cause future events, achievements or results to differ materially from those expressed or implied by our forward-looking statements include those discussed under "Item 1A—Risk Factors." All forward-looking statements are based upon information available to us on the date of this Form 10-K, and we undertake no obligation to update or revise any forward-looking statements to reflect new information, future events or otherwise.

# PART I

**Item 1.    Business**

**General**

Panolam Industries International, Inc., a Delaware corporation organized in 1997 ("Panolam," the "Company," "we," "us" and/or "our"), is a leading designer, manufacturer and distributor of decorative laminates in the United States and Canada. Our products, which are marketed under the Panolam, Pluswood, Nevamar and Pionite brand names, are used in a wide variety of commercial and residential indoor surfacing applications, including kitchen and bath cabinets, furniture, store fixtures and displays, and other specialty applications. Our decorative laminate product offerings also include a fiber reinforced laminate product ("FRL"). In addition to decorative laminates, we manufacture and distribute industrial laminate products, including Conolite and Panolam FRP, a fiber reinforced product ("FRP"). We produce and market a selection of specialty resins for industrial uses, such as powdered paint, adhesives and melamine resins for decorative laminate production, custom treated and chemically prepared decorative overlay papers for high pressure laminates, or HPL, and thermally-fused melamine, or TFM, and a variety of other industrial laminate products such as aircraft cargo liners and bowling lanes.

We are the only vertically integrated North American manufacturer of both HPL, and TFM (with the exception of particle board production in our TFM business where we purchase approximately 50% of our needs), and we design, manufacture and distribute our products throughout our principal markets. For the years ended December 31, 2008 and 2007 we generated net sales of $366.7 million and $424.4 million, respectively. During these periods, our decorative laminates products comprised approximately 87% and 89% of our net sales, respectively.

We offer an array of decorative and industrial laminate products from premium to commodity grades at a broad range of prices. HPL, TFM, FRL, Leatherlam, FRP, and our engineered laminates are utilized as durable and economical look-alike substitutes for natural surfacing materials such as wood, stone, leather and ceramic tile. HPL is used in surfacing applications requiring greater surface wear and impact resistance than applications using TFM. FRL, a proprietary product, is used in surfacing applications requiring greater surface wear, impact resistance and fire prevention than applications using HPL. FRP is used in the building, trucking and recreational vehicle, or RV, markets. A typical customer or end user of decorative overlays might utilize HPL, TFM, FRL, FRP or Leatherlam for different surfaces of the same project. Our TFM products consist of a standard palette of over 150 colors, patterns and wood grains. Our HPL products consist of a standard palette of approximately 500 colors, patterns and wood grains.

We market and distribute our decorative laminate products through a geographically diverse network of approximately 300 independently owned and operated distributors. For many of our distributors, we are their exclusive supplier of HPL, TFM or other decorative laminates. In addition, we sell to approximately 700 national and regional original equipment manufacturers, or OEMs, who buy proprietary designs and customized versions of our products directly. Our products are supported by a dedicated in-house sales force and customer service team.

We are wholly owned by Panolam Holdings II Co., or Holdings II. The parent of Holdings II, Panolam Holdings Co., or Panolam Holdings, is controlled by Genstar Capital LLC, or Genstar Capital, and the Sterling Group, whom we refer to collectively as the Sponsors. The Sponsors acquired us on September 30, 2005. We refer to our acquisition by the Sponsors as the 2005 Acquisition. We manufacture and sell our products through our wholly owned subsidiaries Panolam Industries, Ltd., Panolam Industries, Inc., Pioneer Plastics Corporation, Nevamar Holding Corp., Nevamar Holdco, LLC, and Nevamar Company LLC. We acquired Nevamar Holdco, LLC and Nevamar Company, LLC on March 1, 2006. For additional information regarding the Nevamar acquisition, see

2

"Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation—The Acquisition of Nevamar."

Financing for the 2005 Acquisition consisted of the following:

• We entered into a new senior credit facility, or Credit Facility, for a total amount of $155.0 million. The Credit Facility had a term loan tranche of $135.0 million and a revolving loan tranche of $20.0 million for general corporate purposes. $2.5 million of the revolving loan was drawn at the consummation of the acquisition to fund any cash on the balance sheet at closing, which was repaid in October 2005. Obligations under the Credit Facility are secured by all of our assets.

• We issued $151.0 million of our 10¾% Senior Subordinated Notes due 2013 (the "Notes").

• The Sponsors, together with our chief executive officer and certain other members of management, contributed $80.0 million in equity to Panolam Holdings, which was subsequently contributed to our capital.

We refer to the 2005 Acquisition and the financing transactions described above as the 2005 Transactions. For additional information regarding the 2005 Transactions, see "Item 6. Selected Financial Data—Factors Affecting Comparability of Results—The 2005 Transactions."

In connection with our acquisition of Nevamar in March 2006, we amended our Credit Facility to increase the term loan tranche to $215.0 million and to increase the revolving loan tranche to $30.0 million.

We suffered a net loss for 2008 of approximately $121.7 million, which is principally attributable to impairment charges related to fixed assets, goodwill and other indefinite lived intangible assets and to insufficient revenue to cover our relatively high percentage of fixed costs, including the interest costs on our debt and our depreciation expense. We also had a stockholder's deficit of $27.9 million as of December 31, 2008. During the fourth quarter of 2008, in light of the weakening economy and our concerns about the troubled credit markets, we borrowed the full amount available under the revolver tranche of the Credit Facility. As a result, we had approximately $43.5 million in cash and cash equivalents and approximately $193.5 million in principal and interest outstanding under the Credit Facility as of December 31, 2008.

On February 27, 2009, we received a notice of default from the agent for the lenders under our Credit Facility due to our failure to comply with certain financial and reporting covenants. On March 31, 2009, we entered into a forbearance agreement (the "Forbearance Agreement") with our lenders pursuant to which they have agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate our payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The terms of the Forbearance Agreement prohibit us from, among other things, paying the April 1, 2009 interest payment on the Notes. Failure to make such interest payment is a default under the indenture governing the Notes and entitles the holders of the Notes (after a thirty day grace period) to accelerate our obligations under the Notes. In addition, if we are unable to restructure or refinance the Credit Facility, our lenders could accelerate our payment obligations under the Credit Facility and, because of cross default provisions, the holders of our Notes would have the right to accelerate our obligations under the Notes. Based on these acceleration rights, we have reclassified approximately $343.9 million from long-term debt to current debt as of December 31, 2008.

In the event that most or all of our obligations under the Credit Facility and Notes become due and payable, we would be unable to fund our payment obligations. We believe that the consummation of a successful restructuring is critical to our continued viability, and we are in active discussions with

our lenders to restructure our debt obligations; however, given the current negative conditions in the economy generally and the credit markets in particular, we cannot give any assurance that we will be successful in restructuring our debt or finding alternative financing arrangements. We have engaged financial and legal advisors to assist us in these discussions, but if we are unable to find a timely solution, we may be compelled to file for bankruptcy protection.

**Our Products**

We primarily design, manufacture, market and distribute decorative laminate products. Our other product offerings, consisting of specialty resins, decorative overlay papers and industrial laminates, complement our core decorative laminate product lines. We have two reportable segments, decorative laminates and other. Decorative laminates manufactures and distributes decorative laminates, primarily HPL and TFM, for use in a wide variety of residential and commercial indoor surfacing applications. Our other segment includes the production and marketing of a variety of specialty resins for industrial uses, custom treated and chemically prepared decorative overlay papers and a variety of other industrial laminates, including Conolite and Panolam FRP. Our products are manufactured and primarily sold in North America. For information regarding our reportable segments and sales by geographic area, see Note 17, "Segment Information," to our consolidated financial statements for the years ended December 31, 2008, 2007 and 2006. The following table presents the percentage of net sales represented by each of our segments for the periods presented:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2008 | 2007 | 2006 |
| Decorative laminates ................................. | 87% | 89% | 89% |
| Other, net of eliminations ............................. | 13% | 11% | 11% |
| Total .......................................... | 100% | 100% | 100% |

We estimate that our backlog of unfilled orders was $9.8 million and $20.7 million at December 31, 2008 and 2007, respectively. Orders typically fluctuate from quarter to quarter based on customer demand and general business conditions. Unfilled orders may be cancelled prior to shipment of goods. It is expected that all or a substantial portion of the backlog will be filled within the next three months. Our business includes sales to distributors, which generally have short lead times and therefore, backlog may not be indicative of future demand for our products.

*Decorative Laminates*

We design, manufacture and distribute decorative laminates in the United States and Canada. Our manufacturing process for HPL and TFM incorporates several distinct steps that require coordination in order to ensure flexibility and short lead times, match product standards and achieve high throughput.

*High-Pressure Laminates*

HPL is produced by impregnating papers with melamine and phenolic resins, which are then placed between stainless steel plates in a multi-opening press and cured under pressure and heat. The number of paper laminations per sheet of laminate varies with the specific type of HPL product being produced, but all have melamine resin on the surface to create a hard, durable surface. Surface textures can range from very high gloss, smooth surfaces to deeply textured surfaces and surfaces with other special design and performance features. The HPL product is sold as a laminate, which is then bonded by the customer to a substrate. Other adhesive based overlays consist of a single layer of vinyl, foil or low basis weight paper that is bonded to a substrate. HPL provides significantly greater surface wear and impact resistance than TFM, but costs approximately twice as much to produce and install.

Although adhesive based overlays are cheaper than HPL and TFM, we believe they offer significantly lower performance. HPL is used in commercial and residential indoor surfacing applications, including countertops and cabinetry, furniture, fixtures and flooring.

We offer our HPL products in a variety of grades including: (i) standard grade, which is the thickest and most durable HPL product and is used in applications requiring the highest impact resistance, such as countertops; (ii) post-forming grade, which is thinner than the standard grade and is generally used in applications calling for rounded edges or contoured surfaces; and (iii) vertical grade, which is our thinnest HPL product and is used in vertical surfaces such as cabinet side panels and other applications that do not require the high impact resistance offered by thicker HPL. Key applications for horizontal grades include countertops, store fixtures, desks and other furniture. Postforming grades are the next thickest, also designed for horizontal applications but their thinner composition is more suitable for postforming processes. Vertical grade laminates are thinnest and least expensive but do not have a high level of impact resistance. Primary applications include wall panels, elevator cabs, and sides of case goods and other furniture. We also offer numerous engineered decorative laminates that are designed to meet specific physical performance or unusual design requirements such as bowling lanes, chemical and low electrical resistant work surfaces, silk screening for applications such as signage and game boards and digital printing for table and countertops, as well as aesthetic features such as seamless and pearlescent laminates. Our HPL product lines are available in a standard palette of over 500 colors, patterns and wood grains and are offered in a variety of thicknesses and texture finishes.

Our HPL product line is marketed under the Pionite and Nevamar brand names. The Nevamar product line has a variety of surface laminate options including: (i) Nevamar ARP Surface (surface protection laminate); (ii) Chemarmor (chemical resistant laminate); and (iii) fire retardant protection. The Pionite product line has various surface laminate options including: (i) ChemGard (chemical resistant laminate); (ii) DecoCor (structural stability laminate); and (iii) Hi-wear (scuff and abrasion protection laminate).

Growth in demand for HPL is driven by its increased use in fixture, furniture and cabinet applications in various industries and commercial settings such as hospitals and schools. HPL exhibits features such as enhanced durability and impact resistance, which are attractive attributes for furniture applications. The availability of HPL in various textures such as ceramic, wood and stone is complemented by the lower cost of HPL as compared to authentic materials. Moreover, HPL is easier to maintain than its wood alternatives. In addition, digital printing usage in the manufacture of decorative laminates enables laminate manufacturers to provide more realistic and vivid patterned laminates to end-users.

*Thermally-Fused Melamine*

TFM, also known as low-pressure laminate, is produced by thermally fusing a melamine impregnated decorative paper overlay to an engineered wood substrate such as particleboard or, if rounded or shaped edges are required, medium density fiber-board. Our TFM panels are generally laminated on both sides of the substrate. TFM has significantly better pricing and performance characteristics than adhesive based overlays which, although marginally cheaper, are significantly poorer in terms of quality, finish, wear and durability. TFM is used as a durable and economical substitute for natural surfacing materials such as wood, stone and ceramic. The product lines consist of a standard palette of over 150 colors. In addition we offer hundreds of customized colors, patterns and wood grains (which are offered in a variety of panel thicknesses) and texture finishes. TFM is sold as premium or commodity grade. The premium grade consists of a variety of matching wood grains, stone patterns, abstract designs and pseudo-metallic in varying thicknesses. The commodity grade consists primarily of panels sold in approximately 50 shades of whites, almonds and grays in thicknesses of ⅝" and ¾". In 2008, approximately 67% of our TFM sales were premium grade products, which are priced

5

higher than the commodity grades. TFM is used in a wide variety of commercial and residential indoor surfacing applications, including kitchen and bath cabinetry, furniture, fixtures, displays and other specialty applications. TFM is significantly less expensive than HPL while offering comparable appearance characteristics.

Growth in demand for TFM is driven by the trend of pairing thermally fused melamine panels (for vertical surfaces and areas requiring less impact resistance) with high pressure laminates (for horizontal surfaces). Other factors driving growth are technological developments and consumers upgrading to TFM as the relative cost of foils has increased.

### Fiber Reinforced Laminates

FRL, which is a fiber reinforced laminate product, was specifically engineered for wall use. FRL comes in a variety of customized colors, patterns, and wood grains and is offered in a variety of thicknesses and textured finishes. FRL features a Class A fire rating for flame spread and smoke development, is extremely durable with high impact strength and is easy to clean and maintain. These features make it attractive for architects, designers and contractors when specifying material for high-traffic, high-impact commercial installations. Typical environments for FRL include washrooms, supermarkets, fast food restaurants, mass transit facilities, kitchens, hallways and lobbies in facilities such as schools, hospitals and airports. FRL is available in approximately 600 colors and patterns to coordinate with our Panolam, Nevamar, Pionite and Pluswood product lines. Given FRL's Class A rating for low smoke emissions, we are also currently working to certify FRL for cruise ships and airplane applications.

### Industrial Laminates

We manufacture a variety of industrial laminate product lines. Our current principal industrial laminate product is Conolite; a thin lightweight laminate currently used for aircraft cargo liners. Conolite is designed to incorporate a combination of impact resistance, low weight, flame resistance, edge bearing strength and consistent surface characteristics. Continuous laminates are also used for picture frames. Industrial and other specialty laminates excluding fiberglass reinforced plastics, or FRP, accounted for approximately 3.0% of our sales in 2008.

### Fiberglass Reinforced Plastics

We commenced production of fiberglass reinforced plastics, or FRP, in our Morristown, Tennessee facility in the fourth quarter of 2007. FRP is an all-composite product that can resist extreme changes in temperature and humidity without compromising the structure or finish of the product. It is typically manufactured in standard building product sizes and can be installed on the most common substrates. FRP is available in a range of colors and fits with many interior styles. These products have the ability to be used both on exterior products such as recreational vehicles and truck trailers as well as on interior products in hospitals, schools and restaurants. Fiberglass Reinforced Plastics accounted for approximately 2.0% of our sales in 2008.

Our decorative laminates and industrial laminate products are used in a wide variety of residential and commercial indoor surfacing applications where cost, durability, design, construction versatility and ease of maintenance are important factors. These applications include kitchen and bath cabinets and

6

countertops, furniture, store fixtures and displays and other specialty products. The following table sets forth frequently used applications:

| | Examples of Applications | | | |
| --- | --- | --- | --- | --- |
| Brands . . . . . . . . . | **HPL Applications**<br>PANOLAM<br>THE FIRST NAME IN THERMOFUSED PANELS<br><br>Pluswood | **TFM Applications**<br>Pionite<br>Decorative Surfaces<br><br>NEVAMAR<br>DECORATIVE SURFACES | **FRL Applications**<br>Panolam FRL<br>Fiber<br>Reinforced<br>Laminate | **FRP Applications**<br>Panolam FRP<br>Fiberglass<br>Reinforced<br>Plastic |
| Kitchen and Bath  . . | Countertops<br>Cabinets | Countertops | | |
| Commercial<br>   Furniture  . . . . . . | Laboratory tops<br>Game tables<br>Buffet countertops<br>Bartops<br>Salad bars<br>Cabinets<br>Workstations | Office and computer<br>   furniture<br>Hotel and motel<br>   furniture<br>Dormitory furniture<br>Restaurant furniture<br>Lockers<br>Work surfaces<br>Library shelving and<br>   study carrels | | |
| Store Fixtures . . . . . | Store fixtures and<br>   displays<br>Flame-retardant<br>   fixtures<br>Dressing room<br>   partitions | Restaurant serving<br>   stations<br>Store fixtures and<br>   displays<br>Bookcases<br>Shelving | | |
| Specialty Products . . | Bowling lane floors<br>Mobile home<br>   interiors<br>Doors<br>Windowsills<br>Moldings<br>Closets | Speaker cabinets<br>Gaming cabinets<br>Jukeboxes<br>Picture frames<br>Trade show exhibits<br>Cabinets and stands<br>Closets | Washrooms<br>Supermarkets<br>Fast food restaurants<br>Mass transit facilities<br>Kitchens<br>Hallways<br>Lobbies in schools,<br>   hospitals and<br>   airports | Recreational vehicles<br>Truck trailers<br>Interior products in<br>   hospitals, schools<br>   and restaurants |
| Residential<br>   Furniture  . . . . . . | Tabletops<br>Bedroom suites<br>Entertainment<br>   centers<br>Home office furniture<br>Night stands | Ready-to-assemble<br>   furniture<br>Entertainment<br>   centers<br>Bookcases<br>Wardrobes<br>Bed frames and<br>   headboards | | |

7

### Specialty Resins

We manufacture specialty resins for our own decorative laminate divisions and for sale to customers for industrial uses such as powdered paint, adhesives and melamine resins for HPL and TFM production. For 2008, external sales of specialty resins accounted for approximately 5.4% of our total sales.

### Decorative Overlay Papers

We supply custom saturated decorative overlay papers under the brand name Resopreg to TFM producers and also treat papers provided to us by our customers. We also manufacture Resopreg saturated decorative overlay papers for internal use in our HPL and TFM production. Sales of decorative overlay papers to outside users accounted for less than 1.0% of our sales in 2008.

## Raw Materials

In 2008, raw material costs accounted for approximately 53% of our cost of goods sold. Three major raw materials are used in our operations: papers, resins (and the chemicals used to make resins) and raw particleboard. Papers are primarily used in HPL manufacturing and constitute approximately 65% of the total raw materials used in HPL production. We use papers that are available worldwide from several major sources and many small producers. Our management team has successfully negotiated with our suppliers to keep our paper prices low over the last four years. Resins consist of three primary raw materials: melamine, phenol and formaldehyde. Most of these items are petroleum based and prices are therefore tied to oil prices. Since we also sell resin to external parties, resin price increases have both positive and negative effects on us. Purchased raw particleboard is primarily used for TFM and comprises approximately 70-75% of the product cost. We do not rely on any single supplier for any raw material needs and have experienced no significant raw material supply problems.

During 2008, we experienced rising raw material costs that may continue to increase in the future. However, price increases have helped to partially offset those increased costs. While we generally attempt to pass along increased raw material prices to our customers in the form of price increases, there may be a time delay between the increased raw material prices and our ability to increase the selling prices of our products, or we may be unable to increase the prices of our products due to pricing pressure, decreased demand or other factors, particularly in our TFM product line where we have been unable to pass all of the price increases through to our customers for competitive reasons.

## Sales, Marketing and Distribution

Our sales force and customer service network includes 64 employees who market our existing decorative laminate products. This sales force includes a team of marketing specification representatives who target furniture designers, architects, cabinet manufacturers, chain store and hotel designers, manufactured home builders and custom product designers to meet their specifications. Our sales managers market specialty resins, decorative paper and specialty laminate products in conjunction with outside manufacturer representatives.

In addition, we market and distribute our products through a geographically diverse network of approximately 300 independently owned and operated distributors (most of which are exclusive distributors of our various products) that service most major market product lines and geographic regions in the United States and Canada. We also sell products directly to over approximately 700 national and regional OEM customers. We have a large direct sales force consisting of sales representatives and dedicated in-house customer service employees supporting distributor and regional OEM sales efforts, as well as sales and regional product managers targeting direct sales to national OEMs.

8

Our ability to offer matching decorative laminate products is one of our core value propositions. Approximately 38% of our sales for the twelve months ended December 31, 2008 were generated through 50 distributors that carry both of our HPL and TFM brand product lines. We offer decorative laminate products through one combined sales force, conveniently providing customers with one interface.

## Customers

We do not depend on any single customer or a particular group of customers. No single customer individually accounted for more than 10% of our 2008 consolidated revenues. We service a number of diverse, high quality accounts. Our retail customers include CVS, Saks Fifth Avenue and Kohl's. Furniture customers include Herman Miller, Kitchen Craft Cabinetry, Bush Industries and Steelcase. We maintain strong relationships with other high quality accounts, including The Boeing Company, Brunswick Corporation, QubicaAMF Worldwide LLC and United Parcel Service of America, Inc.

## Competition

The decorative overlay industry is highly competitive. Purchasing decisions are typically based on product quality, price, lead-time, product line breadth, design leadership, customer service and distribution coverage. The key quality requirements are visual and color consistency and designs that are responsive to fashion trends. Decorative overlay products also compete on price and performance characteristics with other surfacing products, including low-cost artificial adhesive based overlays such as vinyls, foils and low-basis weight papers and high-cost natural surfaces such as wood, stone and ceramic tile.

Broad geographic scope, scale and distribution strength are competitive advantages in the decorative laminate TFM market. While regional, non-integrated manufacturers are able to compete in the TFM market because shipping is a principal cost component of TFM panels, the largest manufacturers are integrated producers of decorative overlay papers and engineered wood substrate. Over the past several years, some of our competitors have closed facilities, taking capacity out of the market. We believe that several factors contribute to our strong TFM market position, including the integrated nature of our manufacturing process and facilities, our broad line of products and the strength of our sales, customer service and distribution resources.

Some of our competitors have significantly larger and substantially greater financial and other resources than we do. In addition, several of our competitors are fully integrated producers of decorative overlay papers and raw particleboard, which generally provides them with lower costs for producing their decorative laminate products and makes them less vulnerable to increases in the price of raw materials. Our products may not continue to compete successfully with the products of our competitors.

New competitors could enter our markets. It is possible that foreign-based competitors could seek to establish a presence in the United States market. If we cannot compete successfully, our sales and operating results could be materially and adversely affected.

## Intellectual Property

We rely on a combination of patent, trade name, trademark and copyright laws in the United States and other jurisdictions, as well as employee and third party non-disclosure agreements, license arrangements and domain name registrations, and on unpatented proprietary know-how and other trade secrets, to protect our products, components, processes and applications. We consider our proprietary information, including the Panolam, Nevamar, Pionite and Pluswood brand names, to be important, especially in maintaining a competitive position in our markets. Therefore, we take actions to protect our intellectual property rights. With the exception of the brand names Panolam, Nevamar,

Pionite and Pluswood, we do not believe any single patent, trademark or trade name is material to our business as a whole. Any issued patents that cover our proprietary technology and any of our other intellectual property rights may not provide us with adequate protection or be commercially beneficial to us and, if applied for, may not be issued. The issuance of a patent is not conclusive as to its validity or its enforceability. Competitors may also be able to design around our patents. If we are unable to protect our patented technologies, our competitors could commercialize technologies or products which are substantially similar to ours.

With respect to proprietary know-how, we rely on trade secret laws in the United States and other jurisdictions and confidentiality agreements. Monitoring the unauthorized use of our technology is difficult and the steps we have taken may not prevent unauthorized use of our technology. The disclosure or misappropriation of our intellectual property could harm our ability to protect our rights and our competitive position.

Our registered trademarks include: Panolam, Pionite, Conolite, Resopreg, Leatherlam, Nevamar, Pluswood, FRL, Melcor II, DecoCor, Chemarmor and Meluminum.

**Research and Development and Product Engineering**

We closely integrate new product development with marketing, manufacturing and product engineering to meet the needs of our customers. We have five employees who work to enhance our existing products and develop new product applications for our growing base of customers who require custom solutions. We believe these capabilities provide a significant competitive advantage in the development of decorative laminate products. Our product engineering employees focus on:

- lowering the cost of manufacturing our existing products;

- redesigning existing product lines to increase their efficiency or enhance their performance; and

- developing new product applications.

**Employees**

As of December 31, 2008, we employed 1,042 persons (242 salaried and 800 hourly). At our Hampton, South Carolina facility, 220 hourly employees are represented by the Carpenters East Coast Industrial Council Local Union No. 3130 pursuant to a collective bargaining agreement dated October 1, 2003, which expires on October 1, 2009.

On August 18, 2008, the National Labor Relations Board certified the International Brotherhood of Teamsters, Local 340, as the exclusive collective-bargaining representative for 248 full time and regular part time production and maintenance employees employed at our Auburn, Maine facility, but excluding all other employees, personnel employed by an outside agency, office clerical employees, professional employees, guards and supervisors as defined in the National Labor Relations Act. We will negotiate in good faith with the Local 340 until a collective bargaining agreement is reached.

We believe that we have a good relationship with our unionized and non-unionized employees.

**Environmental and Health and Safety Matters**

We are subject to a variety of federal, state, local, foreign and provincial environmental laws and regulations, including those governing the discharge of pollutants into the air or water, the management and disposal of hazardous substances and wastes and the responsibility to investigate and clean up contaminated sites that are or were owned, leased, operated or used by us or our predecessors. Many of our operations require environmental permits and controls to prevent and limit air and water pollution. These permits contain terms and conditions that impose limitations on our manufacturing activities, production levels and associated activities and periodically may be subject to modification,

renewal and revocation by issuing authorities. We may face material liability if we fail to comply with environmental laws and regulations. We may also be required to make large capital expenditures to maintain compliance. From time to time our operations may not be in full compliance with the terms and conditions of our permits. We are also subject to the federal Occupational Health and Safety Act and similar state and foreign laws which impose requirements and standards of conduct on our operations for the health and safety of our workers. We periodically review our procedures and policies for compliance with environmental and health and safety requirements. We believe that our operations are generally in compliance with applicable environmental regulatory requirements or that any non-compliance will not result in a material liability or cost to achieve compliance.

Certain environmental laws and regulations in the United States, such as the federal Superfund law and similar state laws, impose liability for the entire cost of investigation or remediation of contaminated sites upon the current site owners, the site owners and operators at the time the contamination occurred, and upon parties who generated wastes or transported or sent those wastes to an off-site facility for treatment or disposal, regardless of whether the owner owned the site at the time of the release of the hazardous substances or the lawfulness of the original waste disposal activity. As a practical matter, however, the costs of investigation and remediation are generally allocated among the viable responsible parties. There is or could be contamination at some of our current or formerly owned or operated facilities, primarily related to historical operations at those sites, for which we could be liable under applicable environmental laws. To the extent we believe there may be a material risk to human health, safety or the environment, we or other parties who have liability for the environmental conditions at those sites are addressing, or have plans to address, environmental conditions at certain of those facilities in accordance with applicable environmental laws and regulations. Our costs or liability in connection with one of those sites cannot be predicted at this time because the potential existence of contamination has not been investigated or not enough is known about the environmental conditions or likely remedial requirements.

Our Auburn, Maine facility is subject to a Compliance Order by Consent, or COC, dated May 5, 1993, issued by the State of Maine Department of Environmental Protection, or DEP, with regard to unauthorized discharges of hazardous substances into the environment. We, along with the previous owners, who are named in the COC, are required to investigate and, as necessary, remediate the environmental contamination at the site. Because the unauthorized discharges occurred during the previous ownership, the previous owners have agreed to be responsible for compliance with the COC. The previous owners have completed and submitted a risk assessment to the state for its review. The financial obligation of the previous owners to investigate and/or remediate is unlimited except with regard to a portion of the land at our Auburn, Maine facility, which is capped at $10.0 million. We have recorded a liability of $0.7 million at December 31, 2008 and 2007, for site remediation costs in excess of costs assumed by the previous owners. We could incur additional obligations in excess of the amount accrued and our recorded estimate may change over time. We expect this environmental issue to be resolved within the next five to ten years.

**Item 1A.   Risk Factors**

Investors should carefully consider the risk factors set forth below as well as all of the other information contained in this Form 10-K. If any of the risks occur, our business, financial condition or results of operation could be materially affected.

***There is substantial doubt about our ability to continue as a going concern.***

As discussed in "Item 1. Business—General," based on our significant loss in 2008, stockholder's deficit, and our debt covenant violations there is substantial doubt about our ability to continue as a going concern. Our independent registered public accounting firm has included an explanatory

paragraph with respect to our ability to continue as a going concern in its report on our consolidated financial statements for the year ended December 31, 2008.

***We may be unable to successfully negotiate the restructuring or refinancing of our existing indebtedness, which could have a negative impact on our ability to continue as a going concern.***

We are in violation of certain of our financial covenants under the Credit Facility, which constitutes a default under the Credit Facility. On February 27, 2009, we received a notice of default from the agent for the lenders under our Credit Facility due to our failure to comply with certain financial and reporting covenants. On March 31, 2009, we entered into a forbearance agreement with our lenders pursuant to which they have agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate our payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The terms of the Forbearance Agreement prohibit us from, among other things, paying the April 1, 2009 interest payment on the Notes. Failure to make such interest payment is a default under the indenture governing the Notes and entitles the holders of the Notes (after a thirty day grace period) to accelerate our obligations under the Notes. In addition, if we are unable to restructure or refinance the Credit Facility, our lenders could accelerate our payment obligations under the Credit Facility and, because of cross default provisions, the holders of our Notes would have the right to accelerate our obligations under the Notes.

In the event that most or all of our obligations under the Credit Facility and Notes were to become due and payable, we would be unable to fund our payment obligations. We are in active discussions with our lenders to restructure our debt obligations; however, given the current negative conditions in our industry and the economy generally and the credit markets in particular, we cannot give any assurance that we will be successful in restructuring our debt or finding alternative financing arrangements. We believe that the consummation of a successful restructuring is critical to our continued viability. If we are unsuccessful in restructuring our current debt or securing alternative financing arrangements, our liquidity would be adversely impacted and we may elect to file for bankruptcy protection.

***Prolonged economic downturns affecting the general economy, industries we target, or our customers have materially and adversely affected, and could continue to adversely affect, our business, liquidity and results of operations.***

In the United States, decorative laminate sales have historically correlated closely with commercial and residential construction activity. A significant portion of our net sales is to companies that manufacture cabinetry, store fixtures and furniture for use by the construction industry and, in particular, the residential housing market and retail industry. Spending on new construction and renovation in both the commercial and residential markets depends, in large part, upon the overall strength of business and consumer spending, which is linked to the availability of financing for construction activity, which is further linked to the overall health of the economy and the availability of financing (including for home buyers). Reductions in construction activity, generally, materially reduce the demand for decorative laminates and adversely affect our business. The recent significant downturn in the construction industry has resulted in a material reduction in demand for decorative laminates which in turn has adversely affected our business. As deterioration in the construction industry and these markets has continued, our results of operations have suffered. We are currently experiencing, among other things, (i) lower sales volume, (ii) higher product costs, (iii) reduced margins and (iv) increased pricing pressure from our competitors. We initially felt the effects of deteriorating conditions when demand for our TFM products softened. As conditions have worsened, we are now

also experiencing lower demand for our HPL products. TFM and HPL are part of our decorative overlay segment, which historically has accounted for nearly 90% of our revenues.

We believe that the slowdown in demand for our HPL and TFM products is due primarily to weaknesses in the commercial and residential markets, respectively. Over the past year, many residential homebuilders have reported decreases in new home orders, a trend that is exacerbated by the substantial nationwide inventory of homes on the housing market, a growing wave of residential home foreclosures and limited availability of financing for developers and home buyers alike, and we cannot predict how long these trends will continue. In response to these widespread and continuing adverse conditions, we may be forced to lower prices and cut costs and improve spending efficiency in an effort to mitigate deterioration in our results of operations and financial condition. We may not be able to succeed in these efforts in the event of similar downturns in the future, which would have an adverse impact on our revenues, profitability, cash flows and financial condition. Further, the creditworthiness of our customers may deteriorate. Although to date the commercial construction sector has not experienced the same level of weakness as the residential sector, the slower economy and tighter lending conditions may cause commercial projects to be increasingly cancelled or deferred. Decreases in overall spending for new construction or renovation in any geographic region in which we do a substantial amount of business are having and could continue to have a material adverse effect on our financial condition and results of operations and deterioration in the creditworthiness of our customers could have a material adverse impact on future revenue and liquidity.

***If we are able to restructure our indebtedness and continue operations, we will likely require a significant amount of cash to service our indebtedness. Our ability to generate cash depends on many factors beyond our control, and any failure to meet our debt service obligations could harm our business, financial condition and results of operations.***

Even though we prepaid $2.0 million of debt during 2008, $20.0 million of debt during 2007, and $24.5 million during 2006, and met our interest payment obligations throughout those periods, our ability to pay the interest on our substantial indebtedness will depend upon our future operating performance. As a result, prevailing economic conditions and financial, business and other factors, many of which are beyond our control, will affect our ability to make these payments.

If we do not generate sufficient cash flow from operations to satisfy our debt service obligations, we may have to undertake alternative financing plans, such as selling assets, reducing or delaying capital investments or seeking to raise additional capital. Our ability to restructure or refinance our indebtedness will depend on the capital markets and our financial condition at that time. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations. In addition, the terms of existing or future debt instruments, including our Credit Facility and the indenture governing our Notes, may restrict us from adopting some of these alternatives. Our inability to generate sufficient cash flow to satisfy our debt service obligations, or to refinance our obligations on commercially reasonable terms, would have an adverse effect, which could be material on our business, financial condition and results of operations.

***Repayment of our indebtedness is dependent in part on cash flow generated by our subsidiaries.***

We conduct a significant portion of our operations through our subsidiaries. Accordingly, repayment of our indebtedness is dependent in part on our subsidiaries' ability to generate cash flow and their ability to make that cash available to us, by dividend, debt repayment or otherwise. Our subsidiaries may not be able to, or be permitted to, make distributions that enable us to make payments in respect of our indebtedness, including any replacement of our current indebtedness. Each of our subsidiaries is a distinct legal entity and, under certain circumstances, legal and contractual restrictions may limit our ability to obtain cash from our subsidiaries. In the event that we do not

receive distributions from our subsidiaries, we may be unable to make required principal and interest payments on our indebtedness.

***Any replacement financing we secure will likely contain operating and financial covenants that may restrict our business and financing activities.***

The covenants in our current and any future financing agreements may adversely affect our ability to finance future operations, meet our capital needs or engage in business activities. Our current debt agreements, including our forbearance agreement, contain covenants that restrict our ability to:

- incur or guarantee additional indebtedness and issue or sell preferred stock;

- create or permit certain liens;

- incur commitments for capital expenditures;

- pay dividends on, or redeem or repurchase, our capital stock;

- incur restrictions on the ability of our subsidiaries to pay dividends or make other distributions;

- make certain investments or acquisitions;

- consolidate or merge with or into, or sell substantially all of our assets to, another person;

- incur layered debt;

- transfer or sell assets; and

- engage in transactions with affiliates.

We are currently in violation of our consolidated leverage and interest coverage covenants under our existing Credit Facility.

***We operate in a competitive industry and many of our competitors have greater resources than we do, which could permit them to spend more on marketing and research and development or make them less vulnerable to increases in raw material costs.***

The decorative overlay industry is highly competitive. Many of our competitors are owned by larger enterprises and have greater financial and other resources than us, which could give them a competitive advantage by allowing them to spend more money on marketing and research and development. In addition, because of ongoing consolidation in our industry, many of our competitors have become larger, and this trend may continue in the future. Some of our competitors have less indebtedness than we do and, therefore, more of their cash will be available for business purposes other than debt service and they may be more capable of withstanding sustained adverse market conditions. As a result, we may be unable to compete with other companies in the market during the various stages of the business cycle and particularly during any downturns. There is also no guarantee that our products will continue to compete successfully with the products of our competitors and, therefore, we may not be able to improve or maintain profit margins or increase sales and market share.

Competition in the decorative laminate industry has expanded in recent years, particularly with respect to TFM products due, in large part, to the acquisition by certain of our competitors of the particle board manufacturing businesses of several of our suppliers. As a result, a number of our TFM competitors are more fully vertically integrated than we are in that they are able to produce all or a majority of their raw particle board requirements, while we are forced to purchase approximately half of our particle board requirements from a decreasing number of suppliers. This generally provides them with lower costs for producing their competing products and makes them less vulnerable to increases in the price of raw materials. These competitors may also be able to enjoy greater

manufacturing economies of scale, greater energy self-sufficiency and/or lower operating costs than our company.

New competitors could enter our markets. In addition, existing competitors may decide to increase their marketing efforts to our customers by broadening their product offerings or competing more aggressively on price. For example, due to the current downturn in the home repair and remodeling and new home construction sectors of the economy, we have recently experienced increased pricing competition in the commercial customer side of our business from companies that have historically competed with us more heavily on the residential customer side of our business. It is also possible that foreign-based competitors could seek to establish a presence in the United States market by acquisition or otherwise. If we cannot compete successfully, our sales and operating results could be materially and adversely affected.

***Our business may be affected by changes in customer preferences and discretionary spending.***

A portion of our end customers include commercial customers renovating or upgrading office or interior store space and consumers refacing or replacing kitchen and bathroom countertops and cabinets. Purchasing decisions by both commercial and residential customers are heavily influenced by budgetary considerations or the availability of financing in the credit markets. Factors affecting such availability include interest rates, demographics, consumer confidence and economic factors generally, all of which are outside our control. We believe that the combination of challenging conditions in the current housing and credit markets has caused and will continue to cause many customers to cancel, postpone or downsize previously planned remodeling, expansion and other projects.

Other factors that strongly affect customer purchasing decisions include product quality, price, lead-time, product line breadth, design leadership, customer service and distribution coverage. Decorative overlay products also compete on price and performance characteristics with other surfacing products, including low-cost artificial adhesive based overlays such as vinyls, foils and low-basis weight papers and high-cost natural surfaces such as wood, stone and ceramic tile. If we are unable to anticipate or react quickly to changes in consumer preferences in these areas, we may lose market share and our results of operations may suffer.

We also focus on developing new products to support our sales growth. We cannot assure you that any of our new products will be successful, or that they will not erode market share currently enjoyed by our other products. We will need to devote significant resources to developing and launching new products, and we may not achieve an acceptable return on our investment. If we are unsuccessful in our efforts to develop new products, we could lose future sales and market share, which would have an adverse impact on our revenues, profitability and cash flows.

***We have recently been adversely affected by increased costs of raw materials and purchased energy. Further increases in these costs could continue to adversely affect us.***

During 2008, raw materials comprised approximately 53% of our cost of goods sold. Paper, raw particleboard and resin purchases accounted for nearly all of our raw material spending in 2008. Prices for raw particleboard and chemicals required to make resins increased in 2008 as compared to 2007 due to increased utility costs and limited production capacities at certain of our suppliers. As the cost of each of these materials increases, we must raise our prices to consumers or cut other costs in order to mitigate the impact of higher costs on our margins. While we generally attempt to pass along increased raw material prices to our customers in the form of price increases, there may be a time delay between the increased raw material prices and our ability to increase the prices of our products, or we may be unable to increase the prices of our products due to pricing pressure or other factors. Recently, we have been largely unable to pass through price increases across certain of our product lines for competitive reasons.

15

TFM and HPL decorative overlays are produced from a few basic raw materials. TFM production uses wood substrate, papers and melamine resins, each of which constitutes approximately one-third of the required raw materials. Papers constitute approximately 65% of the total raw materials used in HPL production. Resins, including melamine and phenolic resin, constitute the remaining HPL raw materials. Because resins are petroleum based, their prices are tied to oil prices. As the price of petroleum fluctuated dramatically during the past two years, the price of resins did as well, and we were unable to adjust the price of our HPL decorative overlay products to protect our margins at the same rate. Accordingly, our margins were negatively affected during 2007 and 2008. The price and availability of our raw materials are generally subject to market conditions affecting supply and demand. Recently, however, price and availability of certain of our raw materials, including particle board, have also been affected by consolidation amongst our suppliers, including with certain of our competitors, which has resulted in reduced availability and increased pricing pressure in the market for particle board. We believe that all of our raw materials are available at current market prices in sufficient quantities and of adequate quality. However, a substantial increase in raw material prices that we are unable to pass through to our customers or a substantial decrease in raw material supply or quality could continue to have a material adverse effect on our profitability and cash flow.

Energy is also one of our most significant costs, and it accounted for approximately 7% of the aggregate amount of our cost of goods sold in 2008. Energy prices, particularly for electricity, natural gas, and fuel oil, have been volatile in recent years and currently exceed historical averages. These fluctuations impact our manufacturing costs and contribute to earnings volatility. Increased demand for these fuels (which could be driven by cold weather) or further supply constraints could drive prices higher. The electricity rates charged to us are impacted by the fluctuation in natural gas prices, although the degree of impact depends on each utility's mix of energy resources and the relevant regulatory situation. Historically, we have been able to successfully manage increases in the cost of energy by increasing HPL and TFM prices to offset the increased costs and by improving efficiencies in our plants. Due to the volatility of energy costs during the past year, however, we have been unable to fully pass on these energy costs, resulting in reduced margins on our products. In the event that energy costs increase again and we are unable to pass all of these costs through to our customers, it could continue to have a material adverse effect on our profitability and cash flow.

***We do not generally have any contracts with the ultimate end users of our products or OEMs and they could cease their business relationship with us at any time without notice.***

Although we have contracts with a number of key commercial end-users of our products, a significant number of our end-users are retail institutions with multiple locations across the United States and Canada who purchase our products from our distributors. We do not have purchase agreements with most of these end-users. Additionally, we sell our products to OEMs and distributors who generally do not have long-term purchase commitments with us. Although many of our distributors have arrangements with us whereby we are their exclusive or preferred provider, they are not contractually bound to purchase our products and following the expiration of a notice period are free to switch their allegiance to another supplier. Accordingly, we have no control over our distributors' purchase decisions and they may switch to and from our products from time to time, and have done so in the past. Similarly, a significant number of the end users of our products and the OEMs to whom we sell our products directly can freely engage our competitors and slow, cancel or alter expansion and remodeling projects. Moreover, if a number of our larger end users or OEMs ceased or significantly curtailed operations, it would have a material adverse effect on our business.

16

***We might encounter difficulties and barriers that impede our ability to manage our acquisitions throughout diverse geographical markets, which might result in disruptions to our business and additional expense.***

Our long term strategy includes acquisitions, and we may undertake acquisitions with the goal of broadening our product offerings, operations and distribution base. The integration efforts required in connection with any acquisition we complete, together with our continuing efforts to increase profitability and market share by, among other things, increasing sales to existing and new distributors, are substantial and might cause disruptions in our operations. These efforts might divert management's attention away from day-to-day operations, which could cause us to lose or to be delayed in pursuing business opportunities or activities or could impair our relationships with our current customers, distributors and employees. Also, we could incur unanticipated expenses in connection with these integration activities. Specific risks to our ongoing operations posed by acquisitions we have completed or that we might complete in the future include:

- we might not achieve the expected operating efficiencies, value-creation potential, economies of scale or other benefits of those transactions;

- we might not have adequate personnel and financial and other resources to successfully handle substantially increased operations;

- we might experience problems and incur unforeseen expenses in connection with upgrading and expanding our systems and processes; and

- we might incur unexpected liabilities in connection with the assets and businesses we have acquired.

***Our manufacturing operations involve the use, handling, storage, treatment and disposal of materials and waste products that may be toxic or hazardous, and as a result, we may face environmental liabilities.***

As an industrial manufacturer of laminates and surfacing materials, we are subject to numerous federal, state, provincial and local environmental and occupational health and safety laws and regulations. Our operations are subject to environmental laws and regulations governing waste disposal, air and water emissions, the handling of hazardous substances, workplace exposure and other matters. Stringent environmental laws and regulations govern the handling and disposal of chemicals and substances, such as solvents and lubricants, commonly used in some of our manufacturing operations. In addition, certain of our facilities operate, or have operated, above ground and underground storage tanks for fuels and chemical storage which are subject to a variety of environmental laws and regulations. Failure to comply with environmental laws and regulations may result in a material liability to us in the form of administrative, civil or criminal enforcement by government agencies or other parties or third party lawsuits. For example, our facility in Hampton, South Carolina, which we acquired in connection with the Nevamar acquisition, has been the subject of asbestos-related litigation and workers' compensation claims. See "Item 3. Legal Proceedings." Environmental laws and regulations also may require us to make material capital expenditures to maintain compliance. See "Item 1. Business—Environmental and Health and Safety Matters."

While we believe that we are in compliance with current environmental laws and regulations and that our reserves are sufficient to cover any known environmental claims related to our properties, these judgments are based on currently available facts and our historical experience and could prove to be wrong. In addition, future events, such as the adoption of new laws and regulations, changes in existing laws and regulations or their interpretation, stricter enforcement of existing laws and regulations or governmental or private claims for damage to persons, property or the environment resulting from our current or former operations, may give rise to additional compliance costs or liabilities that could have a material adverse effect on our business.

In addition, releases to the environment of hazardous or toxic wastes or substances, whether at facilities currently or formerly owned or operated by us or at off-site locations in the United States where we have arranged for disposal of such substances, also may subject us to liability for cleaning up contamination which results from any releases. In some cases, liability may be imposed without regard to fault or the lawfulness of the original activity that resulted in the contamination. We also may incur liability under the Comprehensive Environmental Response, Compensation and Liability Act, or CERCLA, for off-site waste disposal.

***A material disruption at one of our manufacturing facilities could prevent us from meeting customer demand, reduce our sales, and/or negatively impact our net income.***

Any of our manufacturing facilities, or any of our machines within an otherwise operational facility, could cease operations unexpectedly due to a number of events, including:

- maintenance outages;

- prolonged power failures;

- an equipment failure;

- disruption in the supply of raw materials, such as particle board, energy or chemicals;

- a chemical spill or release;

- closure because of environmental-related concerns;

- disruptions in the transportation infrastructure, including roads, bridges, railroad tracks, and tunnels;

- fires, floods, earthquakes, hurricanes, or other catastrophes;

- terrorism or threats of terrorism;

- labor difficulties; or

- other operational problems.

Future events may cause shutdowns, which may result in downtime and/or cause damage to our facilities. Any such downtime or facility damage could prevent us from meeting customer demand for our products and/or require us to make unplanned capital expenditures. While we maintain insurance covering our facilities, including business interruption insurance, a catastrophic loss of the use of all or a portion of one of our manufacturing facilities our ability to meet our production capacity targets and satisfy customer requirements would be impaired, resulting in lower sales and net income.

***We are dependent upon our Chief Executive Officer and other key employees.***

Our success depends upon the continued service of our chairman, president and chief executive officer, Robert J. Muller, and other key employees. We cannot assure you that we will retain our officers and key employees. If Mr. Muller or one or more of our other key employees were to become unavailable to us, this would have an adverse effect on our business operations and financial condition. We do not presently maintain a "key man" life insurance policy on Mr. Muller. See "Item 11. Executive Compensation"—"Employment Agreements" and "Potential Payments Upon Termination or Change of Control," for a description of the employment agreement that we entered into with Mr. Muller.

Our future success depends on our continuing ability to hire and keep highly qualified technical and managerial personnel. Competition for qualified personnel in our industry with relevant experience is intense, and attracting and retaining such personnel could be difficult.

*Genstar Capital and The Sterling Group control our company and their interests may conflict with those of other investors.*

Genstar Capital, The Sterling Group and their respective affiliates, or the Sponsors, can control the election of our directors, the appointment of members of management and the approval of all actions requiring the approval of the holders of our common stock, including adopting amendments to our certificate of incorporation and approving mergers, acquisitions or sales of all or substantially all of our assets. The interests of the Sponsors could conflict with the interests of the holders of the notes. For example, as we encounter financial difficulties or if we are unable to pay our debts as they become due, the interests of the Sponsors as our ultimate controlling stockholders might conflict with the interests of the holders of the notes. The Sponsors may also have interests in pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investment, even though such transactions might involve risks to holders of the notes.

*Our results may fluctuate based on exchange rates between U.S. and Canadian dollars.*

We incur certain costs in Canadian dollars relating to our Canadian manufacturing subsidiary which could result in various factors, including fluctuations in currency exchange rates, having an adverse effect on our results of operations. On a consolidated basis, our TFM net sales tend to be evenly split between U.S. and Canadian customers but may shift depending on market demand. However, a significant amount of raw materials purchases made by our Canadian subsidiary are in Canadian dollars. We also incur labor and other operating costs at our Canadian subsidiary in Canadian dollars and make sales to Canadian customers in Canadian dollars. The net assets, net sales and cash flows from our wholly owned Canadian subsidiary are based on the U.S. dollar equivalent of such amounts measured in Canadian dollars. As a result, our Canadian subsidiary has the potential to impact our financial position due to fluctuations in the Canadian dollar arising from the process of re-measuring the local functional currency in the U.S. dollar. Any increase in the value of the U.S. dollar in relation to the Canadian dollar will adversely affect our revenues from our Canadian subsidiary when translated into U.S. dollars. We currently do not enter into any derivative financial instruments to reduce our exposure to foreign currency exchange rate risk. There can be no assurances that the foreign exchange rate with Canada will not fluctuate adversely in the future and the potential risk for translation losses is not quantifiable.

Our Canadian customers may also be affected by the impact of currency fluctuations to the extent that they purchase our products in Canadian dollars and then sell into the United States. In such a case, an increase in the value of the Canadian dollar in relation to the U.S. dollar will adversely affect their financial results by decreasing their revenues when translated into Canadian dollars in comparison to their cost of goods, and could cause them to delay or reduce the size of their purchases of our products, which could adversely affect our results of operations.

*We may not be able to protect our intellectual property rights, brands or proprietary technology effectively.*

We rely on a combination of patent, trademark, domain name registration, copyright and trade secret laws in the United States and other jurisdictions, as well as third party nondisclosure, employee and consultant assignment and other agreements in order to protect our proprietary technology and rights. Our Panolam, Pionite, Nevamar and Pluswood trademarks and trade names are an integral part of our business model.

We cannot assure you that any of our applications for protection of our intellectual property rights will be approved and, if issued, maintained, that others will not infringe upon or challenge our intellectual property rights or that any such challenges will not be successful. We also rely on unpatented proprietary technology. It is possible that others will independently develop the same or similar technology or otherwise obtain access to our unpatented technology. In addition, in the ordinary

19

course of our operations, from time to time, we pursue potential claims relating to the protection of certain products and intellectual property rights, including with respect to some of our more profitable products. These claims could be time consuming, expensive and divert resources. If we are unable to maintain the proprietary nature of our technologies or proprietary protection of our brands, our ability to market or be competitive with respect to some or all of our products may be affected, which could reduce our sales and profitability.

### Item 1B.   Unresolved Staff Comments

Not applicable.

### Item 2.   Properties

We produce TFM at four of our manufacturing facilities. HPL, FRL and Leatherlam are produced at two manufacturing facilities. We currently are operating below 50% capacity due to the downturn in sales related to current economic conditions. In 2008, capital spending comprised less than 1% of our sales.

HPL can be shipped nationwide readily and at lower cost than TFM, because HPL overlays weigh significantly less, as they are adhesive bonded to the substrate by the customer after delivery. We serve the HPL market from our Hampton, South Carolina and Auburn, Maine manufacturing facilities and through our distribution centers in Elkhart, Indiana, Rancho Cucamonga, California, Conyers, Georgia, Shelton, Connecticut and Dallas, Texas. Our TFM manufacturing facilities are located near raw material supply sources and are well positioned to service their respective geographic markets, which include southeastern and south central Canada and the northeastern and north central United States (Huntsville, Ontario and Oshkosh, Wisconsin facilities), the southeastern United States (Norcross, Georgia facility) and the western United States and Canada (Albany, Oregon facility).

The following table lists all of our active facilities as of December 31, 2008 and indicates the location, principal use, square footage and whether the facilities are owned or leased. Obligations under our Credit Facility are secured by all of our assets, including our owned properties.

| Location | Owned/ Leased | Principal Use | Square Feet |
|---|---|---|---|
| Shelton, Connecticut | Leased | Corporate headquarters | 19,000 |
| Huntsville, Ontario | Owned | TFM manufacturing (integrated) | 400,000 |
| Oshkosh, Wisconsin | Owned | TFM manufacturing | 360,000 |
| Albany, Oregon | Owned | TFM manufacturing | 170,000 |
| Norcross, Georgia | Leased | TFM manufacturing | 106,000 |
| Auburn, Maine | Owned | HPL, FRL, Leatherlam, specialty resin and treated paper | 620,000 |
| Hampton, South Carolina | Owned | HPL manufacturing | 825,000 |
| Morristown, Tennessee | Owned | Manufacturing of industrial laminate, Conolite and FRP | 185,000 |
| Rancho Cucamonga, California | Leased | Re-distribution | 97,000 |
| Shelton, Connecticut | Leased | Re-distribution | 79,000 |
| Conyers, Georgia | Leased | Re-distribution | 110,000 |
| Elkhart, Indiana | Leased | Re-distribution | 156,800 |
| Dallas, Texas | Leased | Re-distribution | 58,000 |
| Montevideo, Minnesota | Owned | Distribution center | 30,000 |

The following table lists the operations that have been shut down and/or consolidated into other manufacturing and re-distribution locations during 2007 and 2008 and the current status of the location.

| Location | Owned/ Leased | Principal Use | Current Status | Square Feet |
|---|---|---|---|---|
| Chino, California . . . . . . . | Leased | TFM manufacturing | Plant closed in 2007 and the lease expires on June 30, 2011. The property is currently being sublet. | 97,000 |
| Elkhart, Indiana . . . . . . . . | Leased | Re-distribution | Distribution center was consolidated into a new Elkhart distribution center in 2007. The lease expires March 31, 2010 and the property is currently being sublet. | 54,000 |
| Aurora, Illinois . . . . . . . . . | Leased | Re-distribution | Distribution center was consolidated into a new Elkhart distribution center in 2007. The lease expired August 30, 2007. | 97,000 |
| Reno, Nevada . . . . . . . . . | Leased | Re-distribution | Distribution center was consolidated into the Rancho Cucamonga distribution center in 2007. The lease expired September 30, 2008. | 22,000 |
| Dallas, Texas . . . . . . . . . . | Leased | Re-distribution | Distribution center was consolidated into a new Dallas distribution center in 2007. The lease expired February 29, 2008. | 31,000 |
| Westampton, New Jersey . . | Leased | Re-distribution | Distribution center was consolidated into a new Shelton, CT distribution center in August 2008. The lease expired August 31, 2008. | 80,000 |

**Item 3.   Legal Proceedings**

On November 21, 2008, we entered into a settlement agreement with International Paper Company to settle all of these workers' compensation claims related to a suit involving Nevamar Company LLC, which we described in our Annual Report on Form 10-K for the year ended December 31, 2007. The workers' compensation claims covered by this settlement agreement include any related claims that are filed by any person who was previously employed, is currently employed or becomes employed by Nevamar on or before December 31, 2008. Employees hired by Nevamar after December 31, 2008 and who file claims related to alleged exposure to asbestos are not covered by the settlement agreement. On November 24, 2008 we paid the lump sum settlement amount, which we had fully reserved.

We are party to other litigation matters involving ordinary and routine claims incidental to our business. We cannot estimate with certainty our ultimate legal and financial liability with respect to such pending litigation matters. However, we believe, based on our examination of such matters, our ultimate costs with respect to such matters, if any, will not have a material adverse effect on our business, financial condition, results of operations or cash flows.

## Item 4.    Submission of Matters to a Vote of Security Holders

No matters were submitted to a vote of our security holders during the last quarter of the year ended December 31, 2008.

## PART II

## Item 5.    Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

As of March 31, 2009, Panolam Holdings II Co. was the holder of record of all the shares of common stock, par value, $.01 per share of Panolam Industries International, Inc. (the "Panolam Industries International, Inc. Common Stock"). Also as of March 31, 2009, Panolam Holdings Co. was the holder of record of all the shares of common stock, par value, $.01 per share, of Panolam Holdings II Co. (the "Panolam Holdings II Co. Common Stock"). There is no established trading market for the Panolam Industries International, Inc. Common Stock or the Panolam Holdings II Co. Common Stock. Panolam Industries International, Inc. has never paid or declared a cash dividend on the Panolam Industries International, Inc. Common Stock, and Panolam Holdings II Co. has never paid or declared a cash dividend on Panolam Holdings II Co. Common Stock. Furthermore, Panolam Industries International, Inc. is restricted from paying dividends under the covenants of the Credit Facility and the indenture governing the Notes. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources." Panolam Industries International, Inc. does not have any compensation plans under which its equity securities are authorized for issuance.

As of March 31, 2009, Panolam Holdings Co. was authorized by its Certificate of Incorporation to issue 180,000 shares of common stock, par value $.01 per share (the "Panolam Holdings Co. Common Stock") of which 159,900 shares were outstanding. A group of investors led by the Sponsors and certain current members of our management, totaling 13 holders, own substantially all of the Panolam Holdings Co. Common Stock. There is no established trading market for the Panolam Holdings Co. Common Stock.

## Item 6.    Selected Financial Data

Our predecessor company for the period from January 1, 2004 to September 30, 2005 is the business as it existed before the 2005 Transactions. We completed the 2005 Transactions as of September 30, 2005, and as a result of adjustments to the carrying value of assets and liabilities resulting from the 2005 Transactions, the financial position and results of operations for periods subsequent to the 2005 Transactions may not be comparable to those of our predecessor company.

The following table sets forth selected historical and other consolidated financial and other operating data for Panolam and its consolidated subsidiaries. Dollar figures presented in the table are in thousands. The statement of operations and other operating data as of the year ended December 31, 2004 and for the nine months ended September 30, 2005 has been derived from the audited financial statements of our predecessor company. The statement of operations and other operating data, for, and as of, the period October 1, 2005 to December 31, 2005 and for the years ended December 31, 2006, December 31, 2007 and December 31, 2008, have been derived from the audited consolidated financial statements of our successor company for those periods. The information set forth below should be read

in conjunction with the information under "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and related notes and other financial information included elsewhere in this Annual Report on Form 10-K.

| | Predecessor | | Successor | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2004 | Nine Months Ended September 30, 2005 | Period October 1, 2005 to December 31, 2005 | Year Ended December 31, 2006 | Year Ended December 31, 2007 | Year Ended December 31, 2008 |
| **Statement of Operations Data** | | | | | | |
| Net sales . . . . . . . . . . . . . . . | $280,662 | $219,856 | $68,371 | $460,078 | $424,397 | $ 366,709 |
| Cost of goods sold . . . . . . . . | 215,245 | 168,350 | 55,413 | 357,494 | 333,529 | 305,017 |
| Fixed asset impairment charge(1) . . . . . . . . . . . . . | — | — | — | — | — | 5,165 |
| Gross profit . . . . . . . . . . . . | 65,417 | 51,506 | 12,958 | 102,584 | 90,868 | 56,527 |
| Selling, general and administrative expenses . . . | 28,927 | 25,827 | 8,429 | 52,783 | 51,271 | 48,943 |
| Goodwill and other indefinite lived intangible impairment charges(2) . . . . . . . . . . . . . | — | — | — | — | — | 121,612 |
| Other, net(3) . . . . . . . . . . . | 11,532 | — | — | — | — | — |
| Transaction expenses(4) . . . . . | — | 6,685 | 263 | — | — | — |
| Income (loss) from operations . | 24,958 | 18,994 | 4,266 | 49,801 | 39,597 | (114,028) |
| Interest expense(5) . . . . . . . . | 14,688 | 20,693 | 6,918 | 35,577 | 34,891 | 29,438 |
| Interest income . . . . . . . . . . | (87) | (140) | (68) | (628) | (612) | (485) |
| Income (loss) before income tax (benefit) expense . . . . . | 10,357 | (1,559) | (2,584) | 14,852 | 5,318 | (142,981) |
| Income tax (benefit) expense . | 4,282 | 996 | (589) | 3,959 | (3,006) | (21,325) |
| Net income (loss) . . . . . . . . | $ 6,075 | $ (2,555) | $(1,995) | $ 10,893 | $ 8,324 | $(121,656) |

| | Predecessor | Successor | | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2004 | Period October 1, 2005 to December 31, 2005 | Year Ended December 31, 2006 | Year Ended December 31, 2007 | Year Ended December 31, 2008 |
| **Balance Sheet Data (at period end):** | | | | | |
| Cash and cash equivalents . . . . . . . . . . . | $ 2,443 | $ 6,873 | $ 10,849 | $ 10,744 | $ 43,452 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . | 294,276 | 480,656 | 571,742 | 566,359 | 412,283 |
| Total debt . . . . . . . . . . . . . . . . . . . . . . . | 209,185 | 284,787 | 339,814 | 319,941 | 343,950 |
| Stockholder's equity (deficit) . . . . . . . . . | 46,182 | 77,755 | 88,941 | 115,962 | (27,879) |

| | Predecessor | | Successor | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2004 | Nine Months Ended September 30, 2005 | Period October 1, 2005 to December 31, 2005 | Year Ended December 31, 2006 | Year Ended December 31, 2007 | Year Ended December 31, 2008 |
| **Other Financial Data:** | | | | | | |
| Capital expenditures . . . . . . . | $ 3,981 | $ 3,567 | $ 5,174 | $ 12,619 | $ 8,838 | $ 3,407 |
| Ratio of earnings to fixed charges(6) . . . . . . . . . . . . | 1.7x | 0.9x | 0.6x | 1.4x | 1.1x | (3.7)x |
| Earnings to fixed charges deficiency . . . . . . . . . . . . . | — | $ 1,559 | $ 2,584 | — | — | $ 142,981 |

(1) In 2008, the successor company incurred a fixed asset impairment charge of $5,165 related to its Norcross, Georgia facility which produces thermally-fused melamine.

(2) In 2008, the successor company incurred $96,691 and $24,921 of impairment charges related to goodwill and other indefinite lived intangible assets, respectively.

(3) In 2004, the predecessor company incurred $17,282 of expenses related to the settlement of an antitrust lawsuit filed in 2000, and the predecessor company also entered into a settlement and release agreement with a previous owner, for which $(5,750) of income was recorded.

(4) In the nine months ended September 30, 2005, the predecessor company incurred $6,685 of expenses related to the 2005 Transactions. An additional $263 of expenses was incurred in the period from October 1, 2005 to December 31, 2005 related to the 2005 Transactions.

(5) In connection with the 2005 Transactions and a refinancing in 2004, the predecessor company wrote off debt financing costs of $6,211, $2,914 and $2,100 for the nine months ended September 30, 2005 and the year ended December 31, 2004, respectively.

(6) The ratio of earnings to fixed charges has been computed by dividing earnings available for fixed charges (income (loss) before income taxes (benefits) plus fixed charges) by fixed charges (interest expense, plus 33% of rent expense).

### Factors Affecting Comparability of Results

#### *The 2005 Transactions*

On September 30, 2005, through a series of mergers and related transactions, Panolam Holdings Co. acquired the business formerly conducted by Panolam Industries Holdings, Inc. (which was controlled by affiliates of The Carlyle Group) for aggregate cash consideration of $347.5 million, less funded debt at closing and certain expenses of the transaction. The 2005 Acquisition was accounted for using the purchase method of accounting.

Panolam Holdings Co. is controlled by the Sponsors.

Financing for the 2005 Acquisition consisted of the following:

- We borrowed $135.0 million under a seven-year term loan as part of our Credit Facility with Credit Suisse as joint lead arranger and administrative agent and Jefferies Babson Finance LLC, an affiliate of Jefferies & Company, Inc., as joint lead arranger. The Credit Facility also included a $20.0 million revolving loan for general corporate purposes from which we drew $2.5 million at the consummation of the 2005 Acquisition to fund the payment for any cash that remained on our balance sheet at closing. We repaid the revolving loan borrowing in October 2005.

- We issued $151.0 million of our Notes.

- The Sponsors, together with our chief executive officer and certain other members of management, contributed $80.0 million in equity to Panolam Holdings, which was subsequently contributed to our capital.

At September 30, 2005, the total capitalized debt acquisition costs related to the 2005 Transactions were $11.5 million, of which $5.2 million related to the issuance of our Notes and $6.3 million related to the Credit Facility. During the period October 1, 2005 through December 31, 2005, we capitalized an additional $0.3 million of financing costs, $0.2 million related to our Notes and $0.1 million related to the Credit Facility. In addition, as of September 30, 2005, we incurred expenses related to the 2005 Transactions of $19.4 million. Of that amount, $5.0 million was included in selling, general and administrative expenses as compensation expense, $1.5 million of early payment penalty fees on the previous credit facility and the write-off of capitalized financing costs of $6.2 million were included in interest expense and the remaining $6.7 million was included on the statement of operations as transaction expenses. During the period October 1, 2005 through December 31, 2005, we incurred an additional $0.3 million of transaction expenses. The capitalized portions related to the financing will be amortized over the life of our Notes or Credit Facility, as appropriate.

In connection with the 2005 Acquisition and change of control, purchase accounting was applied, and all assets were revalued and goodwill recorded, based on valuations and other studies. As such, the value of intangibles (both definite and indefinite lived), goodwill and property, plant and equipment increased significantly. The increase in the valuation of the definite lived intangible asset and the property, plant and equipment, as well as the increase in debt acquisition costs, will increase the depreciation and amortization expense and cost of sales considerably as compared to prior periods.

For a discussion of certain other factors affecting our results, see "Item 7. Management's Discussion and Analysis of Financial Condition—Factors Affecting our Results."

### Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations

*This discussion and analysis should be read in conjunction with our audited consolidated financial statements for the fiscal years ended December 31, 2008, 2007 and 2006 and the notes to those consolidated financial statements included elsewhere in this Annual Report on Form 10-K. The statements in the discussion and analysis regarding our expectations for the performance of our business, our liquidity and capital resources and the other non-historical statements in the discussion and analysis are forward-looking statements. Our actual results may differ from those contained in or implied by the forward-looking statements. All references in this Management's Discussion and Analysis of Financial Condition and Results of Operations to "fiscal year" are to the twelve months ended December 31 of the year referenced.*

### Overview

We are a leading designer, manufacturer and distributor of decorative laminates in the United States and Canada. Our products, which are marketed under the Panolam, Pluswood, Nevamar and Pionite brand names, are used in a wide variety of commercial and residential indoor surfacing applications, including kitchen and bath cabinets, furniture, store fixtures and displays, and other specialty applications. Our decorative laminate product offerings also include a fiber reinforced laminate product ("FRL"). In addition to decorative laminates, we manufacture and distribute industrial laminate products, including Conolite and Panolam FRP, a fiber reinforced product ("FRP"). We produce and market a selection of specialty resins for industrial uses, such as powdered paint, adhesives and melamine resins for decorative laminate production, custom treated and chemically prepared decorative overlay papers for high pressure laminates, or HPL, and thermally-fused melamine, or TFM, and a variety of other industrial laminate products such as aircraft cargo liners and bowling lanes.

We are the only vertically integrated North American manufacturer of both HPL and TFM (with the exception of particle board production in our TFM business where we purchase approximately 50%

25

of our needs), and we design, manufacture and distribute our products throughout our principal markets. For the years ended December 31, 2008 and 2007, we generated net sales of $366.7 million and $424.4 million, respectively. During these periods, our decorative laminates products comprised approximately 87% and 89% of our net sales, respectively.

We offer an array of decorative and industrial laminate products from premium to commodity grades at a broad range of prices. HPL, TFM, FRL, Leatherlam, fiber reinforced plastic, or FRP, and our engineered laminates are utilized as durable and economical look-alike substitutes for natural surfacing materials such as wood, stone, leather and ceramic tile. HPL is used in surfacing applications requiring greater surface wear and impact resistance than applications using TFM. FRL, a proprietary product, is used in surfacing applications requiring greater surface wear, impact resistance and fire prevention than applications using HPL. FRP is used in the building, trucking and recreational vehicle, or RV, markets. A typical customer or end user of decorative overlays might utilize HPL, TFM, FRL, FRP or Leatherlam for different surfaces of the same project. Our TFM products consist of a standard palette of over 150 colors, patterns and wood grains. Our HPL products consist of a standard palette of approximately 500 colors, patterns and wood grains.

We market and distribute our decorative laminate products through a geographically diverse network of approximately 300 independently owned and operated distributors. For many of our distributors, we are their exclusive supplier of HPL, TFM or other decorative laminates. In addition, we sell to approximately 700 national and regional original equipment manufacturers, or OEMs, who buy proprietary designs and customized versions of our products directly. Our products are supported by a dedicated in-house sales force and customer service team.

For additional background on certain general economic factors impacting our results, see the discussion of risk factors relating to economic downturns, disruptions in the capital and credit markets, and fluctuations in the cost of raw materials in "Item 1A. Risk Factors—Risks Relating to Our Business."

**Deteriorating Market Conditions and Impact on Financial Condition**

In the United States, decorative laminate sales have historically correlated closely with commercial and residential construction activity. A significant portion of our net sales is to companies that manufacture cabinetry, store fixtures and furniture for use by the construction industry and, in particular, the residential housing market and retail industry. Spending on new construction and renovation in both the commercial and residential markets depends, in large part, upon the overall strength of business and consumer spending, which is linked to the availability of financing for construction activity, which is further linked to the overall health of the economy and the availability of financing (including for home buyers). Reductions in construction activity, generally, materially reduce the demand for decorative laminates and adversely affect our business. The recent significant downturn in the construction industry has resulted in a material reduction in demand for decorative laminates which in turn has adversely affected our business. As deterioration in the construction industry and these markets has continued, our results of operations have suffered. We are currently experiencing, among other things, (i) lower sales volume, (ii) higher product costs, (iii) reduced margins and (iv) increased pricing pressure from our competitors. We initially experienced the effects of deteriorating conditions when demand for our TFM products softened. As conditions have worsened, we are now also experiencing lower demand for our HPL products.

We believe that the slowdown in demand for our HPL and TFM products is due primarily to weaknesses in the commercial and residential markets, respectively. Over the past year, many residential homebuilders have reported decreases in new home orders, a trend that is exacerbated by the substantial nationwide inventory of homes on the housing market, a growing wave of residential home foreclosures and limited availability of financing for developers and home buyers alike. We

cannot predict how long these trends will continue. In response to these widespread and continuing adverse conditions, we may be forced to lower prices and cut costs and improve spending efficiency in an effort to mitigate deterioration in our results of operations and financial condition.

During the fourth quarter of 2008, in light of the weakening economy and our concerns about the troubled credit markets, we borrowed the full amount available under the revolver tranche of our Credit Facility. As a result, we had approximately $43.5 million in cash and cash equivalents and approximately $193.5 million in principal and interest outstanding under our Credit Facility as of December 31, 2008.

On February 27, 2009, we received a notice of default from the agent for the lenders under our Credit Facility due to our failure to comply with certain financial and reporting covenants. On March 31, 2009, we entered into a forbearance agreement with our lenders pursuant to which they have agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate our payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The terms of the Forbearance Agreement prohibit us from, among other things, paying the April 1, 2009 interest payment on the Notes. Failure to make such interest payment is a default under the indenture governing the Notes and entitles the holders of the Notes (after a thirty day grace period) to accelerate our obligations under the Notes. In addition, if we are unable to restructure or refinance the Credit Facility, our lenders could accelerate our payment obligations under the Credit Facility and, because of cross default provisions, the holders of our Notes would have the right to accelerate our obligations under the Notes. Based on these acceleration rights, we have reclassified approximately $343.9 million from long-term debt to current debt as of December 31, 2008.

In the event that most or all of our obligations under our Credit Facility and Notes become due and payable, we would be unable to fund our payment obligations. The failure to meet those obligations would have a material adverse effect on our operations and the interests of our creditors and stockholders. We believe that the consummation of a successful restructuring is critical to our continued viability, and we are in active discussions with our lenders to restructure our debt obligations; however given the current negative conditions in the economy generally and the credit markets in particular, we cannot give any assurance that we will be successful in restructuring our debt or finding alternative financing arrangements. We have engaged financial and legal advisors to assist us in these discussions, but if we are unable to find a timely solution, we may be compelled to file for bankruptcy protection.

Please see Note 11 to our consolidated financial statements for additional information with respect to our Credit Facility and Notes.

## Factors Affecting Our Results

### Revenue

We generate our revenue primarily from the sale of our decorative laminates and, to a lesser extent, specialty resins, industrial laminates and decorative overlay papers in the United States and Canada. In recent periods, consistent with our continuing strategy, we have concentrated on selling finished laminated end products for their proprietary designs rather than marketing treated papers that could ultimately be used to compete against our own finished laminated products. Our focus is on high-end premium grades, such as abstract and wood grain patterned laminates that command higher prices and generate higher profit margins. For the year ended December 31, 2008, approximately 92% of our HPL sales and 67% of our TFM sales were premium grade.

We have historically experienced higher sales in the second and third quarters of each year compared with the first and fourth quarters due primarily to seasonal fluctuations in demand. However, second, third and fourth quarter sales were lower than the first quarter this year due primarily to soft market conditions resulting from the deteriorating general economy. From time to time, we have curtailed manufacturing operations to make necessary repairs and to maintain efficiencies during slowdowns in order flow.

Changes in our revenues from sales of our decorative laminates and industrial laminate products from period to period are affected by the following, among other factors:

- changes in general economic conditions and the availability of financing that affect the construction industry, since reductions in construction activity can materially reduce the demand for decorative laminates as it has in recent quarters;

- changes in the design preferences and the discretionary spending power of commercial and residential consumers who ultimately purchase our products primarily in connection with renovations, expansions and upgrades;

- changes in prices, including those resulting from cost increases, which may be on a delayed basis following any cost increases, and those changes implemented for competitive reasons; and

- our ability to successfully develop and launch new designs and products.

### Cost of Goods Sold

Our cost of goods sold consists primarily of raw materials, most of which is paper, raw particle board and resin, and energy costs for oil, natural gas and electricity, which generally are variable, and to a lesser extent, direct labor and overhead. Our costs of sales are directly affected by changes in prices for these raw materials, as well as by changes in energy costs and oil prices which affect the price of the petroleum based products that we use to manufacture resins. Recently, the prices of these raw materials have increased and may continue to increase in the future. While we generally attempt to pass along increased raw material prices to our customers in the form of price increases, there may be a time delay between the increased raw material prices and our ability to increase the selling prices of our products, or we may be unable to increase the prices of our products due to pricing pressure, decreased demand or other factors, particularly in our TFM product line where we have been unable to pass all of the price increases through to our customers for competitive reasons. Similarly, we have instituted certain surcharges on our customers from time to time to reflect increases in our transportation or distribution costs.

### Gross Profit

Our gross profit for the year ended December 31, 2008 decreased in comparison to the twelve months ended December 31, 2007. The decrease in gross profit is primarily the result of the decreased sales volume experienced in 2008 as a result of deteriorating economic conditions coupled with rising energy costs as well as higher raw material costs especially those which are chemical and petroleum based. In addition, we incurred a fixed asset impairment charge of approximately $5.2 million relating to our Norcross, Georgia plant that also negatively impacted our 2008 gross profit margin. We include certain costs such as distribution costs in our selling, general and administrative expenses. Accordingly, our gross profit may not be comparable to other companies that include such costs in their cost of goods sold.

### *Selling, General and Administrative Expenses*

Selling, general and administrative expenses consist of all costs incurred in connection with the sales and marketing of our products, including distribution and warehousing costs and all administrative costs. The major items included in sales and marketing expenses are:

- costs associated with employees in our sales, marketing and customer service departments, including both fixed salaries and bonuses typically based on agreed targets;

- advertising costs; and

- warehousing costs related to our distribution centers.

Changes in sales and marketing expenses as a percentage of our revenue may be affected by a number of factors, including changes in sales prices and /or volumes, as higher sales prices and/or volumes enable us to spread the fixed portion of our sales and marketing expenses over higher sales revenue. Sales and marketing expenses may increase from time to time due to advertising or marketing expenses associated with new product or enhanced product introductions and promotions and higher commissions paid to our sales force for achieving certain targets.

Administrative expenses include management salary, payroll and benefits costs, stock-based compensation expense, rent, legal and environmental compliance fees and other administrative and overhead costs. We also incurred significant additional administrative related costs in both 2008 and 2007 in connection with the preparation of a registration statement related to our Notes in October 2007 and the related ongoing auditing and Sarbanes-Oxley 404 compliance costs associated with being a public reporting company. Administrative expenses also include management fees accrued and paid to the Sponsors.

### *Depreciation and Amortization*

Depreciation costs relate to the depreciation of property, plant and equipment. For financial reporting purposes, we calculate depreciation on a straight-line basis over the expected useful life of each class of asset. Depreciation expense related to our manufacturing processes and administrative functions is included in the consolidated statement of operations in cost of goods sold and selling, general and administrative expenses, respectively.

Amortization costs relate to the amortization of intangible assets, which consist primarily of key customer lists, patents and trademarks. We calculate amortization on a straight-line basis over the expected useful life of the asset, with each identifiable asset assessed individually. Key customer lists, patents and trademarks are amortized over their respective estimated useful lives to their estimated residual values. These useful lives generally range from 3 to 15 years.

### *Interest Expense/Interest Income*

Interest expense consists of interest on our outstanding indebtedness and the amortization of debt acquisition costs and other financial income and expenses. Interest income consists primarily of interest earned on cash balances in our bank accounts.

### *Income Tax Expense (Benefit)*

Income tax (benefit) expense is incurred at the U.S. federal, and state level as well as the Canadian federal and provincial level. Our effective tax rates for the years ended December 31, 2008, 2007 and 2006 were approximately 15%, (57)% and 27%, respectively.

### The Acquisition of Nevamar

On March 1, 2006, Panolam Industries International, Inc. acquired all of the outstanding equity securities of Nevamar Holdco, LLC, the parent of Nevamar Company, LLC, a manufacturer of decorative surface products. Nevamar is included in our results beginning on March 1, 2006. The Nevamar acquisition was accounted for using the purchase method of accounting. Nevamar designs and sells decorative laminates and other surfacing materials used in the commercial and residential furniture, fixtures and cabinet markets, as well as the graphic arts industry. The total consideration paid for Nevamar was $80.0 million, consisting of $75.0 million in cash and the issuance by Panolam Holdings Co. to the sellers of $5.0 million of junior subordinated notes. At the time of closing, $1.0 million of the purchase price was put into an escrow account, which was ultimately returned to us in the form of a working capital adjustment pursuant to the acquisition agreement. In addition, we incurred $3.9 million in closing costs related to the Nevamar acquisition. At closing we issued junior subordinated notes to the sellers against which it could offset certain amounts that would be added to it in the event we asserted a claim for indemnification under the acquisition agreement. At December 31, 2007, we had offset approximately $0.1 million in claims against the junior subordinated notes. In January 2008, we settled the junior subordinated notes with the sellers for approximately $2.4 million, and as part of the settlement agreement, we are no longer indemnified by the sellers for certain claims. As a result of the settlement, the intercompany payable to our parent, Panolam Holdings Co., was no longer outstanding as of December 31, 2008 and we recorded liabilities in accrued liabilities and other liabilities in anticipation of such unindemnified claims. In addition, we incurred $0.1 million in legal and bank fees related to this settlement. In connection with the Nevamar acquisition, we expanded our Credit Facility and borrowed an additional $80.0 million of long-term debt. Debt acquisition costs related to the $80.0 million term loan totaled $2.8 million. See Note 9, "Debt Acquisition Costs" to our consolidated financial statements for a discussion of the amortization of our debt acquisition costs.

## Critical Accounting Policies

Critical accounting policies are those that require the application of management's most difficult, subjective, or complex judgments, often because of the need to make estimates about the effect of matters that are inherently uncertain and that may change in subsequent periods. The preparation of our condensed consolidated financial statements require us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, and expenses, and related disclosures at the date of our condensed consolidated financial statements. Management bases its estimates and judgments on historical experience and current market conditions and on various other factors that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Estimates, however, routinely require adjustment based on changing circumstances and the receipt of new or better information, and actual results may differ from these estimates under different assumptions or conditions. Management considers the Company's policies on revenue recognition, adjustments for slow moving and obsolete inventories, potentially uncollectible accounts receivable, accruals for customer rebates, income taxes, goodwill, intangible assets and long-lived assets and stock options to be critical accounting policies due to estimates, assumptions, and application of judgment involved in each.

Actual results may differ from management's estimates. In addition, other companies may utilize different estimates, which may impact the comparability of our results of operations to those of companies in similar businesses.

### Revenue Recognition

We recognize revenues upon shipment of products to customers, at which time, the price is fixed and determinable, collectibility is reasonably assured and all the provisions agreed to in the

arrangement necessary for customer acceptance have been fulfilled. The date of shipment corresponds to the date upon which the customer takes ownership of the product. Sales, including shipping charges, are recorded net of applicable provisions for discounts and allowances including customer rebates.

### Inventory Obsolescence

We provide adjustments for excess, slow-moving and obsolete raw materials and finished goods based on estimates of future projections and current conditions. Such adjustments are subsequently modified only when the inventory is physically disposed.

### Allowance for Uncollectible Accounts; Discounts and Allowances (Rebates)

Management reviews its trade accounts receivable balances for collectibility on a regular basis and whenever events and circumstances indicate that the carrying amount may not be collectible and provides currently for any unrealizable amounts. In making such determinations, management uses its industry experience, customer history and current economic factors.

We provide allowances for cash discounts based on average annual expected discounts. We also provide for rebates based on experience by customer and the current period's rebatable sales projections.

### Income Taxes

Deferred income taxes are provided on net operating loss carryovers and on the future income tax consequences associated with temporary differences between the carrying amounts of assets and liabilities for tax and financial reporting purposes. Deferred income tax assets and liabilities are measured using tax rates expected to apply in the years in which those temporary differences are expected to reverse. The effect of changes in income tax rates is recognized in earnings in the period in which the change occurs. We adopted FASB Interpretation No. 48 (FIN 48) on January 1, 2007 and did not result in a material change in our liability for unrecognized tax benefits as a result of implementing FIN 48. We file a consolidated federal income tax return except for our Canadian subsidiary, which files in its local jurisdiction.

### Goodwill, Intangible Assets and Long-Lived Assets

Goodwill and intangible assets with indefinite useful lives are not amortized, but are tested for impairment at least annually and more frequently when a triggering event occurs. Intangible assets with estimable useful lives are amortized over their respective estimated useful lives to their estimated residual values. Our management makes determinations of the useful lives of our intangible assets, including intellectual property. These determinations are based on the usefulness of the specific intangible asset, as determined by management using its industry experience and employing our company strategy.

During 2008, our business was adversely impacted by weakness in the U.S. economy and the credit markets generally and the sharp slowdown in residential and commercial construction, particularly in residential housing. Goodwill and intangible assets with indefinite useful lives are tested for impairment at least annually, or whenever circumstances indicate that impairment may have occurred. We perform our required impairment tests of goodwill and other indefinite lived intangible assets as of December 31 of each year. We performed our required impairment tests of goodwill and other indefinite lived intangible assets as of December 31, 2008 and recorded impairment charges of $96.7 million and $24.9 million for goodwill and other indefinite lived intangible assets, respectively.

Long-lived assets, including property, plant and equipment and other finite life intangible assets, are reviewed for impairment whenever events or changes in circumstances indicate that their respective

31

carrying amounts may not be recoverable. Assessment for possible impairment is based on our ability to recover the carrying value of the long-lived asset from the expected future pre-tax cash flows (undiscounted and without interest charges). If the expected future cash flows are less than the carrying value of such assets, an impairment loss is recognized for the difference between estimated fair value and carrying value. We recorded a fixed asset impairment charge during the year ended December 31, 2008 of approximately $5.2 million related to our Norcross, Georgia plant which produces thermally-fused melamine.

### Share-Based Payments

We recognize compensation expense resulting from all share-based payment transactions in accordance with Statement of Financial Accounting Standards No. 123(R), "Share-Based Payment" ("FAS 123(R)"). FAS 123(R) establishes fair value as the measurement objective in accounting for share-based payment arrangements and requires all companies to apply a fair-value based measurement in accounting generally for all share-based payment transactions with employees. This method includes estimates and judgments pertaining to term, volatility, risk-free interest rates, and dividend yield and forfeiture rates.

## Results of Operations

The following tables set forth summary results of operations data, including the components of net income (loss) as a percentage of net sales, for the years ended December 31, 2006, 2007 and 2008.

| (in thousands) | 2006 | 2007 | 2008 |
|---|---|---|---|
| **Statement of Operations Data:** | | | |
| Net sales | $460,078 | $424,397 | $ 366,709 |
| Cost of goods sold | 357,494 | 333,529 | 305,017 |
| Fixed asset impairment charge | — | — | 5,165 |
| Gross profit | 102,584 | 90,868 | 56,527 |
| Selling, general and administrative expenses | 52,783 | 51,271 | 48,943 |
| Goodwill and other indefinite lived intangible asset impairment charges | — | — | 121,612 |
| Income (loss) from operations | 49,801 | 39,597 | (114,028) |
| Interest expense | 35,577 | 34,891 | 29,438 |
| Interest income | (628) | (612) | (485) |
| Income (loss) before income tax (benefit) expense | 14,852 | 5,318 | (142,981) |
| Income tax (benefit) expense | 3,959 | (3,006) | (21,325) |
| Net income (loss) | $ 10,893 | $  8,324 | $(121,656) |

| | 2006 | 2007 | 2008 |
|---|---|---|---|
| **Statement of Operations Data:** | | | |
| Net sales | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 77.7 | 78.6 | 83.2 |
| Fixed asset impairment charge | — | — | 1.4 |
| Gross profit | 22.3 | 21.4 | 15.4 |
| Selling, general and administrative expenses | 11.5 | 12.1 | 13.3 |
| Goodwill and other indefinite lived intangible asset impairment charges | — | — | 33.2 |
| Income (loss) from operations | 10.8 | 9.3 | (31.1) |
| Interest expense | 7.7 | 8.2 | 8.0 |
| Interest income | (0.1) | (0.2) | (0.1) |
| Income (loss) before income tax (benefit) expense | 3.2 | 1.3 | (39.0) |
| Income tax (benefit) expense | 0.8 | (0.7) | (5.8) |
| Net income (loss) | 2.4% | 2.0% | (33.2)% |

### The Year Ended December 31, 2008 compared to the Year Ended December 31, 2007

#### Net Sales

Net sales were $366.7 million for the year ended December 31, 2008 compared to $424.4 million for the year ended December 31, 2007, a decrease of approximately 14%. In local currencies, net sales for the year ended December 31, 2008 also declined approximately 14%. The decrease in sales for the year ended December 31, 2008 as compared to the year ended December 31, 2007 was primarily attributable to lower high pressure laminate, or HPL, sales which declined approximately 11% during the year ended December 31, 2008 and thermally-fused melamine, or TFM, sales which declined approximately 20% during the year ended December 31, 2008. The sales declines in both HPL and TFM for the twelve months ended December 31, 2008 were partially offset by a $7.4 million increase in industrial laminate sales related to our new fiber reinforced plastic, or FRP, products. Due to the

33

appreciation of the Canadian dollar against the U.S. dollar, currency translation as it relates to our Canadian operation had the effect of increasing sales in the twelve months ended December 31, 2008 by approximately $2.1 million when compared to foreign exchange translations for the comparable 2007 period.

Sales of decorative laminates were $317.9 million for the year ended December 31, 2008 compared to $375.6 million for the same period in 2007. Sales of decorative laminates, which includes both TFM and HPL (approximately 87% of net sales in 2008), decreased approximately 15% in the twelve months ended December 31, 2008 as compared to 2007.

Sales of other products, net of the intercompany sales eliminations, principally specialty resins, decorative overlay papers and industrial laminates including FRP, were $48.8 million in both the twelve months ended December 31, 2008 and 2007. Other product sales (approximately 13% of net sales in 2008) remained relatively flat for the year ended December 31, 2008 as compared to the same period in 2007. For the year ended December 31, 2008, specialty resins accounted for approximately 5.4% of our total sales, while industrial and other specialty laminates including FRP, and decorative overlay papers accounted for approximately 5% and less than 1% of our sales, respectively.

Our net sales for the year ended December 31, 2008 were adversely impacted by weakness in the U.S. economy generally and by the sharp slowdown in residential and commercial construction, particularly the residential housing and credit markets. As the construction and housing industries slow, we experience less demand for our products, which are incorporated into new buildings and homes, as well as buildings and homes being refurnished or remodeled. Our HPL and TFM products are most affected by these adverse market conditions. We believe that economic conditions will remain extremely challenging in the near term, and that demand for our products will likely continue to decline as a result, which could negatively impact our net sales, profitability and cash flows as well as our ability to comply with the covenants set forth in our Credit Facility. In addition to decreases in demand, we have experienced increased pressure on pricing from our competitors, particularly our more vertically integrated TFM competitors. If this trend continues, our net sales and profitability could continue to decline.

*Gross Profit*

The gross profit margin as a percentage of net sales declined to approximately 15% in the year ended December 31, 2008 from approximately 21% in the year ended December 31, 2007. The decline in our gross profit margin for the year ended December 31, 2008 was primarily attributable to lower margins on certain of our HPL and TFM products and to fluctuating costs related to energy and raw materials, especially those raw materials that are chemicals and those that are petroleum based. Our energy and raw material costs increased significantly in 2008 as compared to 2007 and we were not able to increase the selling prices of all our products to pass these higher costs through. In addition, we incurred a fixed asset impairment charge of approximately $5.2 million relating to our Norcross, Georgia plant that also negatively impacted our 2008 gross profit margin. We include certain costs such as distribution costs in our selling, general and administrative expenses. Accordingly, our gross profit may not be comparable to other companies that include such costs in their cost of goods sold.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses, which primarily consist of sales and marketing expenses, were $48.9 million in the year ended December 31, 2008 compared to $51.3 million for the year ended December 31, 2007. The decrease in selling, general and administrative expenses in the year ended December 31, 2008 is primarily attributable to aggressive cost containment including headcount reductions, and consolidation of the sales and marketing functions and other synergies realized through the consolidation of the operations of Panolam and Nevamar, offset in part by additional costs associated with being a public reporting company following the consummation of the exchange offer for

our Notes in October 2007. As a percentage of net sales, selling, general and administrative expenses were approximately 13% in the year ended December 31, 2008 compared to approximately 12% in the year ended December 31, 2007. The increase in this percentage in the year ended December 31, 2008 was primarily attributable to the lower sales volume in the period.

*Interest Expense*

Interest expense, which includes the amortization of debt acquisition costs, was $29.4 million for the year ended December 31, 2008 compared to $34.9 million for the same period in 2007. The decrease in interest expense in the year ended December 31, 2008 as compared to the same period in 2007 was primarily attributable to lower average debt levels resulting from the term debt prepayments of $20.0 million made in 2007 and $2.0 million made in 2008 and to a lesser extent lower average interest rates. In 2007, we also incurred approximately $1.3 million of additional penalty interest on the Notes because we did not file a registration statement with the Securities and Exchange Commission for an exchange offer involving the Notes within the time required under the registration rights agreement that we entered into with the initial purchasers of the Notes.

*Income Taxes*

Income tax provision for the year ended December 31, 2008 was a benefit of $21.3 million as compared to a benefit of $3.0 million for the year ended December 31, 2007. The effective tax rate for the year ended December 31, 2008 was 14.9% compared to (56.5)% for the year ended December 31, 2007. The decrease in the effective tax rate for the twelve months of 2008 as compared to the rate for the twelve months of 2007 was primarily attributable to the overall income tax benefit for the twelve months of 2008 being reduced by the goodwill impairment charge. The overall income tax benefit for 2008 also included a reduction of the Canadian income tax rate. For more information, please see Note 13, "Income Taxes" to our consolidated financial statements included in Item 8 to this Annual Report on Form 10-K.

*Net Income (Loss)*

Net loss for the year ended December 31, 2008 was $121.7 million compared to net income of $8.3 million for the year ended December 31, 2007, a decrease of approximately $130.0 million. The decrease in net income is primarily attributable to the 2008 impairment charges recorded for fixed assets, goodwill and other indefinite lived intangible assets. In addition, lower net sales in the year ended December 31, 2008 compared to the year ended December 31, 2007 contributed to the decline in net income, which were partially offset by decreases in the total cost of goods sold due to lower sales volume, as well as decreases in selling, general and administrative expenses, interest expense and income taxes in the twelve months ended December 31, 2008.

**The Year Ended December 31, 2007 compared to the Year Ended December 31, 2006**

*Net Sales*

Net sales were $424.4 million for the year ended December 31, 2007 compared to $460.1 million for the year ended December 31, 2006, a decrease of approximately 8%. Sales for the year ended December 31, 2007 reflect Nevamar sales for the entire twelve-month period; whereas for the year ended December 31, 2006, the operating results for Nevamar, which was acquired on March 1, 2006, are included for the post-acquisition period only. Including the Nevamar sales in 2006 through March 1, 2006 with our 2006 sales would result in a number $68.8 million, or approximately 14%, higher than our sales for the year ended December 31, 2007. The decrease in sales is primarily attributable to lower TFM sales resulting from the slowdown in the residential housing market and the closing of two Nevamar TFM manufacturing facilities in Chino, California in June 2006 and a TFM manufacturing facility in Tarboro, North Carolina in February 2007. These decreases were partially

offset by increased HPL sales. In addition, in 2007 we experienced increased pricing pressure with respect to our TFM products.

Sales of decorative laminates were $375.6 million for the year ended December 31, 2007 compared to $411.6 million for the year ended December 31, 2006. Sales of decorative laminates, which include both TFM and HPL (approximately 89% of net sales) decreased approximately 9% compared to the year ended December 31, 2006. However, increasing our 2006 sales by the amount of Nevamar sales for January and February 2006 would indicate that sales of decorative laminates declined by approximately 16% in the year ended December 31, 2007 compared to the year ended December 31, 2006.

Sales of other products, net of the intercompany sales eliminations, principally specialty resins, decorative overlay papers and industrial laminates, were $48.8 million for the year ended December 31, 2007 compared to $48.5 million for the year ended December 31, 2006. Other product sales (approximately 11% of net sales) remained relatively flat in 2007 as compared to 2006. For the year ended December 31, 2007, specialty resins accounted for approximately 5% of our total sales, while industrial and other specialty laminates, and decorative overlay papers accounted for approximately 3% and 1% of our sales, respectively.

The adverse sales environment in 2007 was largely the result of the slowdown in residential construction, both for new construction and renovations of existing construction, and to a lesser extent increasing softness in our commercial business. We expect the current environment to continue, or perhaps become more challenging, at least for the duration of 2009.

*Gross Profit*

The gross profit margin as a percentage of net sales decreased to 21.4% in the year ended December 31, 2007 from 22.3% in the year ended December 31, 2006. The reduction in our gross profit margin for the year ended December 31, 2007 was primarily attributable to rising costs related to energy and raw materials and higher depreciation expense which were partially offset by cost reduction initiatives related to the restructuring of Nevamar, many of which were implemented in 2006. These cost savings included headcount reductions, consolidation of manufacturing operations and other synergies realized through the consolidation of the operations of Panolam and Nevamar.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses, which primarily consist of sales and marketing expenses, were $51.3 million for the year ended December 31, 2007 compared to $52.8 million for the same period in 2006, a decrease of approximately 3%. Including Nevamar's selling, general and administrative expenses in 2006 through March 1, 2006 with our 2006 selling, general and administrative expenses would result in a number $6.6 million, or approximately 11%, higher than our selling, general and administrative expenses for the year ended December 31, 2007. The decrease in selling, general and administrative expenses in 2007 is primarily attributable to the cost savings related to the restructuring of Nevamar which included headcount reduction, consolidation of the sales and marketing functions and other synergies realized through the consolidation of the operations of Panolam and Nevamar. As a percentage of net sales, selling, general and administrative expenses were 12% for the year ended December 31, 2007 and approximately 11% for the year ended December 31, 2006.

*Interest Expense*

Interest expense, which includes the amortization of debt acquisition costs, was $34.9 million for the year ended December 31, 2007 compared to $35.6 million for the same period in 2006, a decrease of approximately 2%. The decrease in interest expense in 2007 is primarily attributable to lower average debt levels resulting from prepayments of our term debt in an aggregate amount of

$24.5 million and $20.0 million in 2006 and 2007, respectively, and to a lesser extent lower interest rates.

*Income Taxes*

Income tax benefit for the year ended December 31, 2007 was $3.0 million as compared to a $4.0 million tax provision for the same period in 2006. The effective tax rate for the year ended December 31, 2007 was (57%) compared to 27% for the year ended December 31, 2006. The significant decrease in the effective tax rate for the year ended December 31, 2007 as compared to the rate for the year ended December 31, 2006 is primarily attributable to a cumulative tax effect resulting from the Canadian statutory rate decrease being phased in through 2012.

*Net Income*

Net income for the year ended December 31, 2007 was $8.3 million compared to $10.9 million for the year ended December 31, 2006, a decrease of approximately 24%. The decrease in net income is primarily attributable to lower net sales in the year ended December 31, 2007 compared to the year ended December 31, 2006, which were partially offset by decreases in the cost of goods sold, selling general and administrative expenses, interest expense and income taxes in the year ended December 31, 2007.

**Liquidity and Capital Resources**

We require working capital to reinvest in our business and to repay or continue prepaying our indebtedness. Our total capital expenditures were approximately $3.4 million in 2008 and assuming we can restructure our indebtedness and continue operations, we anticipate total capital expenditures to approximate $4.0 million in 2009.

The principal sources of cash to fund our liquidity needs are cash provided by operating activities and cash provided by borrowings under our Credit Facility. Restrictive covenants in our debt agreements restrict our ability to pay dividends and make other distributions. Specifically, the Credit Facility restricts us from making payments of dividends or distributions, including to Panolam Holdings, subject to certain exceptions. Under certain circumstances we are permitted to pay dividends or distributions from our consolidated excess cash flow provided that, after giving effect to the dividend or distribution, we have a consolidated leverage ratio (calculated as a ratio of consolidated total debt to consolidated adjusted EBITDA (as defined in the Credit Facility) as of the last day of any fiscal quarter) not exceeding 3.75 to 1.00. Our Credit Facility also requires us to maintain a maximum consolidated leverage ratio (5.00 to 1.00 as of December 31, 2008 and 4.50 to 1.00 as of the end of each quarter ending during fiscal year 2009) that decreases over time and to limit the amount of our capital expenditures in any fiscal year. As of December 31, 2008, our consolidated leverage ratio was in excess of the permitted maximum amount at 6.47 to 1.00. The Credit Facility further requires us to maintain a minimum interest coverage ratio (2.00 to 1.00 as of December 31, 2008 and 2.25 to 1.00 as of the end of each quarter during fiscal year 2009) that increases over time. As of December 31, 2008, our minimum interest coverage ratio was below the required minimum at 1.71 to 1.00. For a discussion of the potential acceleration and restructuring of our indebtedness, see "Deteriorating Market Conditions and Impact on Financial Condition."

The indenture governing our Notes also restricts us from making payments of dividends or distributions, subject to certain exceptions, unless, among other things, all such payments are less than 50% of our consolidated net income for the period from October 1, 2005 to the most recently ended fiscal quarter at the time of the payment. On March 30, 2009, the agent for the lenders under the Credit Agreement provided us with a "blockage notice" directing us not to make an April 1, 2009 interest payment on the Notes.

When cash generated from our operations is sufficient, we may apply portions of our excess cash towards the repayment of our long-term debt. In the years ended December 31, 2008 and 2007, we prepaid long-term debt of approximately $2.0 million and $20.0 million, respectively.

### Analysis of Cash Flows and Working Capital

Cash provided by operating activities was $15.5 million for the year ended December 31, 2008 compared to $28.1 million for the year ended December 31, 2007. The decrease of $12.6 million in cash flow for 2008 as compared to 2007 related primarily to a decrease in net income of $130.0 million and a net increase in non-cash expenses of $108.5 million including depreciation and amortization, fixed asset impairment charge, goodwill and other intangible asset impairment charges, amortization of debt acquisition costs, stock based compensation expense and deferred taxes, all of which was partially offset by a net reduction in the amount of non-cash components of working capital used in 2008 as compared to 2007 of $8.9 million. The net reduction in non-cash components of working capital resulted primarily from year-over-year decreases of $1.6 million in accounts receivable, $3.6 million in inventory and $2.0 million in other current assets, reductions of $6.8 million in income taxes payable, all of which was partially offset by an increase of $5.4 million in accounts payable and accrued liabilities. Cash provided by operating activities was $28.1 million and $42.3 million for 2007 and 2006, respectively. The decrease in cash flow in 2007 related primarily to a decrease in net income and a higher increase in the non-cash components of working capital compared to 2006, all of which was partially offset by an increase in non-cash expenses including depreciation and amortization and deferred taxes.

Cash used by investing activities was $3.4 million for the year ended December 31, 2008 compared to $8.8 million for the year ended December 31, 2007. The decrease in cash used by investing activities in 2008 as compared to 2007 is primarily related to a decrease in capital spending of $5.4 million for year ended December 31, 2008 as compared to the year ended December 31, 2007. Cash used by investing activities was $8.8 million for the year ended December 31, 2007 compared to $90.4 million for the year ended December 31, 2006. The decrease in cash used by investing activities in 2007 as compared to 2006 is primarily related to cash expended for the Nevamar acquisition of $77.8 million in 2006 and by decreased capital spending of $3.8 million for year ended December 31, 2007 as compared to the year ended December 31, 2006.

Cash provided by financing activities was $21.4 million for the year ended December 31, 2008 compared to a cash outflow of $20.4 million for the year ended December 31, 2007. During the year ended December 31, 2008, the net cash provided by financing activities resulted primarily from $25.9 million draw down under our revolving loan which was partially offset by $2.0 million in term debt prepayments and the settlement of the subordinated notes with the former owners of Nevamar for $2.5 million, which included approximately $0.1 million in legal and bank fees. Cash used by financing activities was $20.4 million for the year ended December 31, 2007 compared to a cash inflow of $52.1 million in the year ended December 31, 2006. During the year ended December 31, 2007, the cash used by financing activities resulted primarily from $20.0 million in term debt prepayments and $0.4 million in costs associated with the preparation of the registration statement for our Notes. During the year ended December 31, 2006, cash provided by financing activities resulted primarily from the additional term debt borrowings of $80.0 million, which we used to fund the Nevamar acquisition. For the year ended December 31, 2006, the cash from the additional term debt borrowings was offset in part by debt acquisition cost of $2.8 million and term debt repayments of $25.1 million.

We require working capital to reinvest in our business and to repay our indebtedness. If we are able to restructure our indebtedness and continue operations, we anticipate total capital expenditures of approximately $4.0 million in 2009. Currently, the principal sources of cash to fund our liquidity needs are cash provided by operating activities and cash provided by borrowings under our Credit Facility. Restrictive covenants in our debt agreements restrict our ability to pay dividends and make other distributions. Specifically, the Credit Facility and the indenture governing our Notes restrict us

from making payments of dividends or distributions, including to Panolam Holdings, subject to certain exceptions. Our Credit Facility also requires us to maintain a maximum consolidated leverage ratio (4.50 to 1.00 as of the end of each quarter ending during fiscal year 2009) that decreases over time and to limit the amount of our capital expenditures in any fiscal year. As of December 31, 2007 our consolidated leverage ratio was 4.32 to 1.00 and as of December 31, 2008 our consolidated leverage ratio was 6.47 to 1.00, thus exceeding the maximum limit. The Credit Facility further requires us to maintain a minimum interest coverage ratio (2.00 to 1.00 as of December 31, 2008 and 2.25 to 1.00 as of the end of each quarter during fiscal year 2009) that increases over time. As of December 31, 2008, our minimum interest coverage ratio was below the required minimum at 1.71 to 1.00.

Our Credit Facility, which became effective in connection with the 2005 Transactions on September 30, 2005, initially consisted of a $135.0 million senior secured single draw seven-year term loan, and a $20.0 million senior secured five-year revolving loan. In March 2006, the term loan was increased to $215.0 million and the revolving loan was increased to $30.0 million. In the past, when cash generated from our operations was sufficient, we applied portions of our excess cash towards the repayment of our long-term debt. We prepaid $2.0 million, $20.0 million and $24.5 million of the term loan in 2008, 2007 and 2006, respectively. We had no revolver borrowings at December 31, 2007 and $25.9 million outstanding under the revolving loan at December 31, 2008. Our outstanding revolver borrowings as of December 31, 2008 reflect a decision to borrow our remaining availability under the revolving loan tranche of our Credit Facility due to the weakening economy and our concerns about the troubled credit markets. At December 31, 2008, the interest rate on the revolver borrowings was at an annual rate of 4.50%. In addition, we had letters of credit issued in respect of workers' compensation claims in an aggregate amount of $4.1 million, which also reduces our availability under the revolving loan.

Borrowings under our Credit Facility bear interest at our option at adjusted LIBOR plus an applicable margin or the alternate base rate plus an applicable margin. The interest rates on borrowings under our revolving loan are subject to adjustment based on our leverage. At December 31, 2008 and December 31, 2007, the interest rate on the term loan facility was at annual rates of 3.22% and 7.59%, respectively. Our Credit Facility requires us to meet a maximum total leverage ratio of 5.00, a minimum interest coverage ratio of 2.00 and an annual maximum capital expenditures limitation of $8.0 million, all as of December 31, 2008. The Credit Facility also contains certain customary events of default, which in some instances are subject to grace periods.

As of December 31, 2008, we were not in compliance with all of our financial covenants under our Credit Facility, which constitutes a default. As a result, the lenders have the ability to accelerate our payment obligations and, in the event there was availability under the revolver, we would not be permitted to borrow funds until our noncompliance is cured or waived by the lenders. On March 31, 2009, we entered into a forbearance agreement with our lenders pursuant to which they have agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility.

The indenture governing our Notes also contains a number of covenants that restrict our ability to incur or guarantee additional indebtedness or issue disqualified or preferred stock, pay dividends or make other equity distributions, repurchase or redeem capital stock, make investments or other restricted payments, sell assets, engage in transactions with affiliates, create liens or consolidate or merge with or into other companies, and the ability of our restricted subsidiaries to make dividends or distributions to us. On March 30, 2009, the agent for the lenders under the Credit Agreement provided us with a "blockage notice" directing us not to make an April 1, 2009 interest payment on the Notes.

### *Contractual Obligations*

The following table summarizes our financial commitments as of December 31, 2008 and assuming our long-term debt is not accelerated:

| | Total | 2009 | 2010 | 2011 | 2012 | 2013 | Thereafter |
|---|---|---|---|---|---|---|---|
| | | | | **Payments by Period** | | | |
| | | | | (in thousands) | | | |
| Term loan . . . . . . . . . . . . . . . . . . . . | $167,586 | $ — | $ — | $ — | $167,586 | — | $ — |
| Senior subordinated notes . . . . . . . . | 151,000 | — | — | — | — | 151,000 | — |
| Revolving loan . . . . . . . . . . . . . . . . . | 25,928 | — | 25,928 | — | — | — | — |
| Capital lease obligations . . . . . . . . . . | 26 | 13 | 13 | — | — | — | — |
| Operating lease obligations . . . . . . . . | 18,847 | 3,260 | 3,221 | 3,217 | 2,868 | 2,035 | 4,246 |
| Purchase obligations(1) . . . . . . . . . . . | 13,044 | 13,044 | — | — | — | — | — |
| Income tax obligation . . . . . . . . . . . . | 3,954 | 3,954 | — | — | — | — | — |
| Benefit plan obligations(2) . . . . . . . . | 3,246 | 191 | 239 | 255 | 275 | 314 | 1,972 |
| Annual management fee(3) . . . . . . . . | 9,000 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Fixed interest charges—revolving loan(4) . . . . . . . . . . . . . . . . . . . . . . | 2,156 | 1,232 | 924 | — | — | — | — |
| Fixed interest charges—term loan(4) . | 17,595 | 5,396 | 5,396 | 5,396 | 4,047 | — | — |
| Fixed interest charges—senior subordinated notes(4) . . . . . . . . . . | 77,102 | 16,232 | 16,232 | 16,232 | 16,232 | 12,174 | — |
| Total contractual obligations . . . . . . . | $492,124 | $44,822 | $53,453 | $26,600 | $192,508 | $167,023 | $7,718 |

(1) Consists of obligations for the purchase of raw materials, other goods and services and capital purchases of plant improvements and machinery and equipment.

(2) Consists of estimated benefit payments scheduled to be paid over the next ten years. The accrual for pension and post-retirement benefit costs is included in the balance sheet line item labeled other liabilities.

(3) Amount for the column labeled "Thereafter" reflects only one year of additional payments. Each subsequent year would require a payment of $1,500.

(4) Amount reflects the total interest expected to be paid through September 30, 2012 for the term loan facility computed using the interest rate in effect at December 31, 2008 of 3.22%. For the Notes, the amount reflects the total interest expected to be paid through September 30, 2013 computed using the fixed interest rate of 10.75%. For the revolving debt, the amount reflects the total interest expected to be paid through September 30, 2010 computed using the fixed interest rate of 4.50%.

The capital leases referred to above are for forklifts in our Elkhart, Indiana distribution center. The operating leases referred to in the above table include our manufacturing facilities in Huntsville, Ontario; Oshkosh, Wisconsin; Albany, Oregon; Norcross, Georgia; Auburn, Maine; Hampton, South Carolina; and Morristown, Tennessee; our corporate headquarters in Shelton, Connecticut, our distribution centers in Elkhart, Indiana; Conyers, Georgia; Rancho Cucamonga, California; Dallas, Texas; Shelton, Connecticut; and Montevideo, Minnesota, and to the extent applicable, our closed manufacturing and distribution facilities. Leases include buildings, machinery, office equipment and vehicles.

In April 2005, we contracted to build an addition to our Morristown, Tennessee facility for an expansion of our industrial and engineered laminates line. Construction began in the third quarter of 2005 and the project was completed in the fourth quarter of 2007. Total capital expenditures for this

project were approximately $5.6 million in combined 2005, $8.6 million in 2006, $4.9 million in 2007 and $0.5 million in 2008.

**Off Balance Sheet Obligations**

We have no off-balance-sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that are material to investors.

**Regulatory Compliance**

We are subject to federal, state, local and foreign (Canadian) laws, regulations and ordinances pertaining, among other things, to the quality and the protection of the environment and human health and safety and that require us to devote substantial time and resources in an effort to maintain continued compliance. There can be no assurance that judicial or administrative proceedings seeking penalties or injunctive relief will not be brought against us for alleged non-compliance with applicable environmental laws and regulations relating to matters as to which we are currently unaware. In addition, changes to such regulations or the enactment of new regulations in the future could require us to undertake capital improvement projects or to cease or curtail certain operations or could otherwise substantially increase the capital requirements, operating expenses and other costs associated with compliance. We believe we have adequately provided for costs related to our ongoing obligations with respect to known environmental liabilities. Expenditures related to environmental liabilities during the year ended December 31, 2008 did not have a material effect on our financial condition or cash flows. Such expenditures are related to the costs to maintain general compliance at our facilities. The majority of the costs include staffing and training expenses, permitting and emission based fees, testing and analytical fees and waste disposal fees.

Our Auburn, Maine facility is subject to a Compliance Order by Consent, or COC, dated May 5, 1993, issued by the State of Maine Department of Environmental Protection, or DEP, with regard to unauthorized discharges of hazardous substances into the environment. We, along with the previous owners, named in the COC, are required to investigate and, as necessary, remediate the environmental contamination at the site. Because the unauthorized discharges occurred during the previous ownership, the previous owners have agreed to be responsible for compliance with the COC. The previous owners have completed and submitted a risk assessment to the State for its review. The financial obligation of the previous owners to investigate and/or remediate is unlimited except with regard to a portion of the land at our Auburn, Maine facility, which is capped at $10.0 million. We have recorded a liability of $0.7 million at December 31, 2008 and 2007, for site remediation costs in excess of costs assumed by the previous owners. We could incur additional obligations in excess of the amount accrued and our recorded estimate may change over time. We expect this environmental issue to be resolved within the next five to ten years.

**Item 7A.   Quantitative and Qualitative Disclosures About Market Risk**

Market risks relating to our operations result primarily from changes in general economic conditions and interest rate fluctuations. In the normal course of business, we also have foreign currency risks associated with our Canadian operations. There is also risk related to commodity price changes for items such as particleboard, medium density fiber-board, or MDF, and raw paper. In addition, we have exposure to changes in energy related costs for natural gas, heating oil and electricity. Many of the resins and chemicals used to produce our resins are petroleum based and therefore subject to the same market fluctuations as energy costs. We are also subject to surcharges by trucking companies due to the increased fuel costs. We employ established purchasing policies and procedures to manage our exposure to these risks. We do not utilize derivative financial instruments for trading, speculative or other purposes.

### Interest Rate Risk

Our interest rate risk management objective is to limit the impact of interest rate changes on net income and cash flow and to lower overall borrowing cost.

Amounts outstanding under our Credit Facility bear interest at LIBOR plus an applicable margin or at an alternate base rate plus an applicable margin. These interest rates can fluctuate based on market rates. Based on the outstanding amount of our variable rate indebtedness at December 31, 2008, a 10% change in the interest rates at December 31, 2008 would have the effect of increasing or decreasing interest expense by approximately $0.6 million. Potential interest rate impact would also be affected by utilization of the revolving loan.

The net amounts paid or received and net amounts accrued through the end of the accounting period are included in interest expense. Interest expense also includes the amortization of debt acquisition costs.

### Foreign Currency Exchange Risk

We have a Canadian subsidiary, Panolam Industries, Ltd., that has a manufacturing facility in Canada that sells to both Canadian and U.S. customers and purchases from both Canadian and U.S. suppliers. Our Canadian subsidiary operates within its local economic environment and utilizes its own operating cash flow to fund its operations. The Canadian subsidiary's sales tend to be evenly split between U.S. and Canadian customers but shift depending on market demand; however, a greater percentage of raw materials purchases are in local currency. As a result, when the Canadian dollar strengthens, expenses increase as a percent of sales when reported in U.S. dollars. Conversely, when the Canadian dollar weakens it has the opposite effect. At the same time the Canadian foreign exchange rate fluctuations require revaluation of the Canadian subsidiary's balance sheet resulting in foreign currency translation exchange gains or losses being charged or credited to other comprehensive income or (loss) on the balance sheet. We have not entered into any derivative financial instruments to reduce our exposure to foreign currency exchange rate risk.

During the year ended December 31, 2008, we recorded $0.9 million in income related to net foreign exchange transaction and revaluation adjustments, compared to foreign exchange expense of approximately $1.3 million during the year ended December 31, 2007. At December 31, 2008, we had approximately $5.1 million of unfavorable foreign currency translation adjustments and at December 31, 2007 we had approximately $17.6 million of favorable foreign currency translation adjustments included in stockholder's equity. There can be no assurances that the Canadian foreign exchange rate will not fluctuate adversely in the future and the potential risk for translation losses is not quantifiable.

### Commodity Price Risk

We purchase commodities for our products such as paper, resins (and the chemicals used in making resins), wood furnish (used in the production of particleboard), raw particleboard and medium density fiberboard (MDF). We also purchase other commodities, such as natural gas, heating oil and electricity. These commodities are generally purchased pursuant to contracts or at market prices established with the vendor, and we are subject to risks on the pricing of these commodities. We do not engage in hedging activities for these commodities.

### Credit Concentration Risk

We sell HPLs and TFMs to various distributors and OEMs; and we extend credit to our customers based on an evaluation of their financial condition. We review our trade accounts receivable balances for collectibility whenever events and circumstances indicate that the carrying amount may not be collectible and provide currently for any unrealizable amounts.

We had uncollateralized accounts receivable from five nonaffiliated customers approximating 14% and 11% of total gross accounts receivable balances at December 31, 2008 and 2007, respectively. Sales to these five nonaffiliated customers were 8%, 7% and 9% of consolidated net sales for the years ended December 31, 2008, 2007 and 2006, respectively. No single customer represented over 10% of sales or accounts receivable.

## Item 8.    Financial Statements and Supplementary Data

Our consolidated balance sheets as of December 31, 2008 and 2007, and the related consolidated statements of operations, stockholder's equity and cash flows for the years ended December 31, 2008, 2007 and 2006, and the notes thereto, the report of our independent registered public accounting firm thereon, and the financial statement schedule begin on page F-1 of this report and are incorporated herein by reference.

## Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A(T).    Controls and Procedures

(a)  Disclosure controls and procedures.

Our management, with the participation of our Chief Executive Officer and Vice President and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of December 31, 2008. Based on this evaluation, our Chief Executive Officer and Vice President and Chief Financial Officer concluded that, as of December 31, 2008, our disclosure controls and procedures were effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in reports that it files or submits under the Securities Exchange Act of 1934.

(b)  *Management's Annual Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control systems were designed to provide reasonable assurance to our management and our Board of Directors regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and include those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect our transactions and disposition of assets;

- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with the authorizations of our management and directors; and

- Provide reasonable assurance regarding the prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2008. In making this assessment, it used the control criteria framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") published in its report entitled "Internal Control-Integrated Framework." Based on our assessment, management has

determined that as of December 31, 2008, our internal control over financial reporting is effective based on those criteria. The Company believes that a system of controls, no matter how well designed and operated, cannot provide assurance that the objectives of the controls are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company can be detected.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to the rules of the Securities and Exchange Commission that permit the Company to provide only management's report in this annual report.

(c)  Changes in internal controls over financial reporting.

The Company continually seeks ways to improve the effectiveness and efficiency of its internal controls over financial reporting, resulting in frequent process refinement. However, there have been no changes in our internal control over financial reporting that occurred during our last fiscal period to which this Annual Report on Form 10-K relates that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B.   Other Information

On March 31, 2009, we entered into a forbearance agreement with the lenders under our Credit Facility pursuant to which they have agreed to forbear exercising any rights and remedies under the Credit Facility relating to our failure to comply with certain financial and reporting covenants, including their right to accelerate our payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility.

## PART III

## Item 10.   Directors, Executive Officers and Corporate Governance

## MANAGEMENT

Under the terms of a stockholders agreement entered into among Panolam Holdings, the Sponsors, Robert J. Muller and certain other members of our management team who invested in Panolam Holdings, each of the Sponsors has the right to elect three of our directors and is obligated to elect our Chief Executive Officer as an additional director. The following table sets forth the name, age and position of our directors and executive officers as of December 31, 2008.

| Name | Age | Position |
| --- | --- | --- |
| Robert J. Muller . . . . . . . . | 62 | Chairman, President and Chief Executive Officer |
| Vincent S. Miceli . . . . . . . | 51 | Vice President and Chief Financial Officer |
| Jeffrey M. Muller . . . . . . . | 35 | Vice President, Human Resources, General Counsel, and Secretary |
| Jean-Pierre L. Conte . . . . . | 45 | Director |
| Darren J. Gold . . . . . . . . . | 38 | Director |
| J. Ryan Clark . . . . . . . . . . | 34 | Director |
| William C. Oehmig . . . . . . | 59 | Director |
| Hunter Nelson . . . . . . . . . | 56 | Director |
| Kent Wallace  . . . . . . . . . . | 38 | Director |
| Richard H. Gesseck  . . . . . | 63 | Director |

44

Robert J. Muller has been our President and Chief Executive Officer since 1998 and our Chairman since 2000. Before joining us, Mr. Muller was Executive Vice President of Crane Co. for 13 years with responsibility for various industrial and supply businesses. Mr. Muller received a B.Ch.E from Manhattan College, an M.S. from the University of Massachusetts and an M.B.A. from the University of Delaware.

Vincent S. Miceli is our Vice President and Chief Financial Officer and joined us in May 2006. Before that, Mr. Miceli served as Vice President of Finance for OptiCare Health Systems, Inc., an integrated eye care service company, from May 2005 after first joining the company as Director of External Reporting in 2004. From 1994 to 2004, Mr. Miceli was Assistant Corporate Controller of Amphenol Corporation, a manufacturer of interconnect products. Mr. Miceli holds an M.B.A. with a concentration in finance from the University of Hartford and a B.S. in Accounting from Quinnipiac College. Mr. Miceli is also an affiliate member of both the American Institute of Certified Public Accountants and the Connecticut Society of Certified Public Accountants.

Jeffrey M. Muller is our Vice President, Human Resources, General Counsel, and Secretary and has been with us since 2000. Before joining us, Mr. Muller was a patent attorney with Ohlandt, Greeley, Ruggiero and Perle, LLP in Stamford, Connecticut. Prior to that, Mr. Muller was a mechanical engineer with Emcore Corporation, a provider of compound semiconductor-based components and subsystems, and was responsible for the design of Metal Organic Compound Vapor Deposition equipment. Mr. Muller received a B.S. in mechanical engineering from Manhattan College, a J.D. from Albany Law School of Union University and is admitted to practice in New York, Connecticut and the U.S. Patent and Trademark Office. Mr. Muller is the son of Robert J. Muller, our Chairman, President and Chief Executive Officer.

Jean-Pierre L. Conte became one of our directors following consummation of the 2005 Transactions. Mr. Conte is currently Chairman and Managing Director of Genstar Capital. Mr. Conte joined Genstar Capital in 1995. Prior to leading Genstar Capital, Mr. Conte was a principal at the NTC Group, Inc., a private equity firm. He began his career at Chase Manhattan Bank in 1985. He is a director of PRA International, Inc., Harlan Laboratories, Inc., TravelCLICK, Inc. and Confie Seguros. Mr. Conte holds a B.A. from Colgate University and an M.B.A. from Harvard University.

Darren J. Gold became one of our directors following consummation of the 2005 Transactions. Mr. Gold joined Genstar Capital in 2000 and is currently a Managing Director. Before joining Genstar Capital, Mr. Gold was an engagement manager with McKinsey & Company, a management consulting firm. He serves as a director of ConvergeOne, Voice Construction, Woods Equipment Company and International Aluminum. Mr. Gold holds a B.A. in Political Science and History from the University of California, Los Angeles and a J.D. from the University of Michigan.

J. Ryan Clark became one of our directors following consummation of the 2005 Transactions. Mr. Clark is a Principal at Genstar Capital. Prior to joining Genstar Capital, Mr. Clark was an associate at Hellman & Friedman LLC, a private equity investment firm in San Francisco. Previously, he worked in the Mergers, Acquisitions and Restructuring Department at Morgan Stanley in New York. Mr. Clark currently serves as a director and Chairman of the Board for Confie Seguros, and a director of Fort Dearborn Company, 21st Services, LLC, MidCap Financial, LLC, Woods Equipment Company and PRA International, Inc. Mr. Clark holds an M.B.A. from Harvard University and an A.B. in Environmental Science and Public Policy from Harvard College.

William C. Oehmig became one of our directors following consummation of the 2005 Transactions. Mr. Oehmig has been a principal with The Sterling Group since 1984, having worked previously in banking, mergers and acquisitions, and as Chief Executive Officer and Vice President and Chief Financial Officer of several private companies. Before joining The Sterling Group, Mr. Oehmig represented foreign investors in purchasing and managing U.S. companies in the oil field service, manufacturing, distribution, heavy equipment and real estate industries. He began his career in

45

Houston with Texas Commerce Bank in 1974. He currently serves on the boards of Propex, North American Energy Partners and Universal Fiber Systems. In addition, Mr. Oehmig served as chairman of Royster-Clark, Purina Mills and Exopack, and served as a director of Sterling Diagnostic Imaging. Mr. Oehmig received his B.S. in economics from Transylvania University and an M.B.A. from the Owen Graduate School of Management at Vanderbilt University. Mr. Oehmig resigned from our Board effective January 28, 2009 and to date a replacement for Mr. Oehmig has not been selected.

Hunter Nelson became one of our directors following consummation of the 2005 Transactions. He has been a principal with The Sterling Group since 1989, following the sale of Fiber Industries, Inc., a manufacturer of PET fiber and bottle resin, where he served as Vice President of Administration and General Counsel from its formation in 1988. Before joining Fiber Industries, Mr. Nelson was a partner in the law firm of Andrews & Kurth L.L.P., which he joined in 1979. At Andrews & Kurth, Mr. Nelson specialized in mergers and acquisitions, securities and corporate finance and general corporate law. Mr. Nelson currently serves as a director of Propex and Roofing Supply Group and served on the boards of Sterling Diagnostic Imaging and Sterling Chemicals. Mr. Nelson received a B.B.A. in accounting and a J.D. with honors from the University of Texas at Austin.

Kent Wallace became one of our directors following consummation of the 2005 Transactions. Mr. Wallace joined The Sterling Group in 2001 and is currently a Managing Director of The Sterling Group. Previously he was an Associate with Rocky Mountain Capital Partners and an Assistant Vice President at Long-Term Credit Bank. Mr. Wallace began his career at Coopers & Lybrand. Mr. Wallace previously served as a director of Hudson Products Holdings Inc. and currently serves as a director of Universal Fibers. He received a B.B.A. and an M.P.A. in accounting from the University of Texas and his M.B.A. with honors from the Graduate School of Business at the University of Chicago.

Richard H. Gesseck, CPA joined our board of directors on January 18, 2006. Mr. Gesseck began his career with Ernst & Young LLP in September 1969 and served publicly and privately held manufacturing and distribution entities as an audit partner for over 20 years. Mr. Gesseck retired from Ernst & Young LLP in January 2004. Currently, Mr. Gesseck serves on the Connecticut State Board of Accountancy and chairs our Audit Committee. He also teaches Securities and Exchange Commission reporting and other accounting and auditing courses for the American Institute of CPAs. Mr. Gesseck holds a B.S. in Business Administration from the University of New Haven. Mr. Gesseck is a partner with UHY LLP and a managing director and principal of UHY Advisors, Inc. He is also a board member of Nutmeg Financial, MHC and Briarwood College.

### Board Committees

Our board of directors has established an audit committee, compensation committee and nominating and governance committee. The members of our audit committee are J. Ryan Clark, Kent Wallace and Richard H. Gesseck. The members of our compensation, and nominating and governance committees are Robert J. Muller, Darren J. Gold and Hunter Nelson. Our board of directors has determined that Richard H. Gesseck is an audit committee financial expert. There are no listing standards applicable to the Company by which our board of directors may determine whether Mr. Gesseck is "independent."

### Code of Ethics

We have not yet adopted a code of ethics applicable to our principal executive officer, principal financial officer, principal accounting officer and persons performing similar functions. We have not yet adopted a code of ethics because we are under no legal obligation to adopt a code of ethics and we are not a member of any self-regulatory organization that requires us to adopt a code of ethics. If and when we adopt a code of ethics, we will file a copy of the code of ethics with the Securities and

Exchange Commission and will provide a copy, without charge, to any person that submits a written request to us at our principal offices.

**Item 11.    Executive Compensation**

**Compensation Discussion & Analysis**

### Overview

The compensation committee (the "Committee") of the board of directors is primarily responsible for setting the compensation for the Company's named executive officers. The objectives of the Company's executive compensation program are to attract, motivate and retain key executives and to reward executives for value creation. The Committee seeks to foster a performance-oriented environment by tying a portion of each executive's cash compensation to the achievement of performance goals based primarily on the Company's adjusted EBITDA as defined in the Credit Facility, but without using incentives that encourage risky short-term behavior.

The Company's executive compensation program has three elements: base salary, a cash bonus plan called the Bonus Plan, which was adopted in February 2007 by the Committee, and stock options granted under the Company's 2005 Equity Incentive Plan. While the Committee believes that the named executive officers' compensation should contain an appropriate mix of salary, cash incentive compensation and equity compensation, the Committee has not established a formula for allocating executive compensation among the various elements.

Robert J. Muller, the Company's Chief Executive Officer, has an employment agreement with the Company, which is described under "Employment Agreements" below. The employment agreement establishes Mr. Muller's base salary and bonus opportunity. Vincent S. Miceli, Vice President and Chief Financial Officer, and Jeffrey M. Muller, Vice President, Human Resources and General Counsel, also are party to employment agreements with the Company. The employment agreements for Messrs. Miceli and Muller are terminable by the Company or the executive at any time and do not establish the terms of their compensation. See "Employment Agreements." For these named executive officers, the Committee establishes a total cash compensation target based on the committee's knowledge of the industry and its experience with companies similarly situated to the Company. The Committee also considers management compensation of the Company's competitors, which include Formica and Wilsonart. Based on this information, the Committee was able to establish a benchmark for assessing the competitiveness of the Company's compensation and the appropriate allocation of compensation between cash and equity.

The Committee also considers the contributions of each named executive officer to the Company's performance and the responsibilities of each named executive officer in connection with the Company's business plan. The Chief Executive Officer is a member of the Committee and provides input with respect to the contribution of each named executive officer (other than the Chief Executive Officer) to the Company's performance, particularly in connection with establishing performance targets and potential bonus payouts under the Bonus Plan. The Committee reviewed the Chief Executive Officer's recommendations in connection with making its final determination of each named executive officer's salary and bonus opportunity (other than with respect to the Chief Executive Officer). Targets under the Bonus Plan are set at the discretion of the Chief Executive Officer and the Chief Executive Officer is entitled to adjust the bonus payout of participants (other than the Chief Executive Officer) in the Bonus Plan to reflect that participant's contribution to the Company's performance.

Except as described above, the Committee retains final decision-making power with respect to all elements of executive compensation for all named executive officers other than the Chief Executive Officer. The Committee makes recommendations regarding compensation for the Chief Executive Officer to the full Board of Directors (other than the Chief Executive Officer), which then acts on the

47

Committee's recommendations. The Chief Executive Officer does not retain the ability to call meetings of the Committee, but the Chief Executive Officer is a member of the Committee and participates regularly in its scheduled meetings.

As a matter of best practice, beginning in 2009, the Committee will review the relationship between our risk management policies and practices and the incentive compensation we provide the named executive officers to confirm that our executive compensation does not encourage unnecessary and excessive risks.

### Base Salary

The Committee sets or recommends base salaries for each named executive officer at levels intended so that the Company remains competitive in the market for executive talent in which it competes and to provide each named executive officer with a predictable income that appropriately compensates the named executive officer for his contributions to the Company's performance.

Each named executive officer's base salary is established based on the Committee's industry knowledge and peer group data as described above and is adjusted based on the named executive officer's individual performance and experience. The Committee believes that executive officers with a greater level of responsibility within the Company should receive a greater percentage of their compensation based on the Company's performance. Base salaries for the named executive officers (other than the Chief Executive Officer) in 2008 were increased by approximately 11%.

Given the limited use of equity compensation in the Company's compensation program, the Company has not to date adjusted base salaries or bonus opportunities based on any amounts realized through prior equity compensation awards.

### Cash Incentive Compensation

Each named executive officer is eligible to receive a cash bonus equal to a percentage of his salary. The cash bonus opportunity is based upon the Company's achievement of adjusted EBITDA targets set prior to the beginning of the year. EBITDA is the Company's earnings before taking into account interest, taxes, depreciation and amortization. The Company's EBITDA may be adjusted in the sole discretion of the Committee to exclude extraordinary events and acquisitions or dispositions that occur during the year. Adjusted EBITDA is determined by adding the management fee paid to the Sponsors, non-cash compensation expense related to stock options granted to employees and certain other items to the Company's EBITDA. Adjusted EBITDA under the Bonus Plan is the same measurement used to determine compliance with financial covenants under the Company's Credit Facility.

Cash incentive bonus payments are calculated by the Company's achieving budgeted adjusted EBITDA goals for the year, though bonus payouts can be adjusted by the Chairman and Chief Executive Officer to reflect individual performance. The Committee believes that this approach is the most useful measure of management's effectiveness in creating value for the shareholders of the Company. The Company measures adjusted EBITDA annually and pays annual bonus payments under the Bonus Plan if the Company has achieved the objectives set by the Committee.

For 2008, the Committee initially set the target for adjusted EBITDA at $72.6 million. The Committee believes that at the time the target was selected there was a moderate chance that the target would be achieved. If the target was achieved, Robert J. Muller was entitled to a bonus equal to 75% of his base salary while each other named executive officer was entitled to a bonus payout of 40% of his base salary. Bonus payouts were increased or decreased based on the amount by which the Company exceeded or fell short of the adjusted EBITDA target. Cash incentive payouts for the Chief Executive Officer under the Bonus Plan ranged from 58% to 137% of his base salary depending on the adjusted EBITDA level achieved. Cash incentive payouts for the other named executive officers under

the Bonus Plan ranged from 25% to 70% of the named executive officer's base salary depending on the adjusted EBITDA level achieved. No bonuses could be earned by any executive officer if the Company's adjusted EBITDA was less than $62.0 million. In fiscal 2008, officers earned no Bonus Plan payments, as adjusted EBITDA was significantly below the 2008 target.

**Equity Incentive**

The Company's executive officers are eligible to receive equity based awards under the Panolam Holdings Co. 2005 Equity Incentive Plan. To date, the Committee has only granted options to purchase shares of Panolam Holdings common stock under the Plan. Options are awarded at the discretion of the Committee and generally vest in equal annual installments over a five-year period. In determining the size of the option award granted to each named executive officer, the Committee considers equity awards received by similar officers at comparable companies and the Chief Executive Officer's views regarding the past and/or future contribution of the named executive officer to the Company's performance. The exercise price of all stock options is the per share fair market value of Panolam Holdings common stock on the date of grant. To determine the per share fair market value, the Company engaged an outside consultant to provide a valuation of the Company. In making its determination, the consultant considered the fair value based methodology of accounting for employee stock options as described in FAS 123(R).

Newly hired executive officers typically receive grants following their hire dates, if approved by the Committee. In addition, the Committee may, in its discretion, issue additional equity incentive awards to executive officers if the Committee determines that the awards promote retention. To date, the Committee has only awarded options to named executive officers upon the closing of the 2005 Transactions (for named executive officers then employed by the Company) and to Vincent S. Miceli on May 9, 2006, his initial hiring date, and on March 5, 2007.

The Committee believes that the use of options that vest over an extended period of time promotes the retention of named executive officers as well as the Company's interest in producing shareholder value over the long term. 2005 and 2006 were transitional years for the Company. Following the 2005 Transactions and the 2006 acquisition of Nevamar the Company experienced turnover among its employees, particularly in the executive ranks. As a result, the Committee determined that the opportunity for equity ownership in the form of options to acquire common stock would provide the Company with the needed stability among its executive officers and make it more attractive for recruiting executive talent.

Given the size of the equity awards granted to each named executive officer upon consummation of the 2005 Transactions or the date of hire, as applicable, and the size of each named executive officer's cash compensation, the Committee determined not to grant option awards to the named executive officers in 2006, 2007 or 2008 (other than the grants to Mr. Miceli in 2006 and 2007).

**Other Compensation**

The Company does not provide its executive officers with significant perquisites. The amounts shown in the Summary Compensation Table under the heading "Other Compensation" represent the value of Company matching contributions to the named executive officers' 401(k) accounts and the taxable value of certain life insurance benefits. Named executive officers did not receive any other perquisites or other personal benefits.

**Chief Executive Officer Compensation**

The Chief Executive Officer's base salary and bonus opportunity are set forth in his employment agreement. See "Employment Agreements" below. The Sponsors believe that it was exceedingly

important to retain the Chief Executive Officer in connection with their acquisition of the Company and negotiated the employment agreement as part of their acquisition of the Company.

Total compensation paid to the Company's Chief Executive Officer in 2008 was significantly higher than that of the other named executive officers. The Committee and the Board of Directors believe that the Chief Executive Officer's pay is appropriate given his job experience, responsibilities and length of service with the Company. The Committee uses the same factors in recommending the compensation of the Chief Executive Officer as it does for the other participants in the Bonus Plan though the targets for the Chief Executive Officer were initially set forth in his employment agreement. Those targets were adjusted by the Committee and the Board of Directors in 2006 due to the Company's acquisition of Nevamar. The Chief Executive Officer's base salary for 2008 was $650,000. The Chief Executive Officer did not receive a cash incentive payment for fiscal 2008 under the Bonus Plan.

**Recoupment Policy**

The Company has not established a policy for the recoupment of performance based compensation in the event of a restatement of its financial statements.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis with the management of Panolam Industries International, Inc. Based on the Compensation Committee's review and discussion of the Compensation Discussion and Analysis with management, the Compensation Committee recommended to the Board of Directors of Panolam Industries International, Inc. that the Compensation Discussion and Analysis be included in this Annual Report on Form 10-K.

SUBMITTED BY THE COMPENSATION
COMMITTEE OF THE BOARD OF
DIRECTORS

Darren J. Gold, Chair
Hunter Nelson
Robert J. Muller

**Summary Compensation Table**

| Name and Position | Year | Salary ($) | Option Awards(1) | Non-Equity Incentive Plan Compensation(2) | All Other Compensation ($)(3) | Total ($) |
|---|---|---|---|---|---|---|
| Robert J. Muller . . . . . . . . . . . | 2008 | $650,000 | $269,319 | — | $ 7,750 | $ 927,069 |
| Chairman, President and | 2007 | $650,000 | $269,319 | $377,845 | $ 6,396 | $1,303,560 |
| Chief Executive Officer | 2006 | $633,333 | $269,319 | $965,000 | $ 7,500 | $1,875,152 |
| Vincent S. Miceli(4) . . . . . . . . . | 2008 | $198,333 | $ 74,882 | — | $ 4,100 | $ 277,315 |
| Vice President and | 2007 | $185,000 | $ 69,345 | $ 47,500 | $ 2,625 | $ 304,470 |
| Chief Financial Officer | 2006 | $112,500 | $ 26,897 | $ 95,500 | — | $ 234,897 |
| Stephen C. Feuring(5) . . . . . . . | 2008 | $189,583 | $ 53,870 | — | $163,559 | $ 407,012 |
| Vice President, Sales | 2007 | $185,000 | $ 53,870 | $ 47,500 | $ 6,150 | $ 292,520 |
| and Marketing | 2006 | $168,333 | $ 53,870 | $142,523 | $ 4,500 | $ 369,226 |
| Jeffrey M. Muller . . . . . . . . . . | 2008 | $189,583 | $ 53,870 | — | $ 7,000 | $ 250,453 |
| Vice President, Human | 2007 | $170,000 | $ 53,870 | $ 43,750 | $ 6,750 | $ 274,370 |
| Resources and General Counsel | 2006 | $153,333 | $ 53,870 | $130,646 | $ 6,067 | $ 343,916 |

(1) The amounts shown in the Option Awards column represent the dollar amounts recognized in 2007 and 2006 for financial statement reporting purposes, as computed in accordance with Statement of Financial Accounting Standards No. 123(R), "Share-Based Payment" ("FAS 123(R)"). For information regarding significant factors, assumptions and methodologies used in our computations pursuant to FAS 123(R) with respect to awards of stock options, see Note 15, "Stock Options," to the Company's consolidated financial statements for the year ended December 31, 2008 included in this report.

(2) Represent amounts paid resulting from the achievement of EBITDA goals established by the Company's compensation committee.

(3) The amounts shown in the "All Other Compensation" column represent matching contributions under the Company's 401(k) plan and the taxable value of certain life insurance benefits.

(4) Mr. Miceli joined the Company on May 9, 2006. Mr. Miceli's payout under the Company's non-equity incentive compensation plan was based on his pro rated 2006 salary.

(5) Mr. Feuring's employment was terminated by the Company on December 11, 2008. Included in "All Other Compensation" was $143,000 of termination compensation in accordance with his employment agreement, $8,750 of severance compensation, $6,150 of 401(k) plan company contributions, and $5,659 of unused vacation compensation. As part of Mr. Feuring's severance compensation and in accordance with his employment agreement, he will receive an additional $96,250 through June 2009.

**Grants of Plan-Based Awards**

There were no options granted to our named executive officers during the year ended December 31, 2008.

51

## Employment Agreements

### Robert J. Muller

Panolam Industries International, Inc. and Panolam Holdings entered into a Second Amended and Restated Employment Agreement with Robert J. Muller to serve as our Chief Executive Officer effective upon the closing of the 2005 Acquisition. The agreement has an initial term ending on December 31, 2010 and, after such date, Mr. Muller will continue to serve for additional one-year terms, unless either party terminates the agreement in accordance with its provisions.

Mr. Muller's base salary was set at $550,000 per year and may be increased upon the Company's achievement of certain levels of earnings before interest, taxes, depreciation and amortization, or EBITDA, in any year. On April 1, 2006, Mr. Muller's base salary was set at $650,000. Once increased, Mr. Muller's base salary may not be decreased. Mr. Muller is also entitled to an annual bonus the amount of which is determined by the adjusted EBITDA of the Company in any calendar year and the amount by which adjusted EBITDA trails adjusted EBITDA targets for that year as established by the Board of Directors of Panolam Holdings. Under the employment agreement, Mr. Muller is also entitled to participate in all employee benefit programs, fringe benefits and perquisites available to senior executives of the Company and Panolam Holdings.

In accordance with Mr. Muller's employment agreement, Mr. Muller acquired, in connection with the 2005 Acquisition, shares of common stock of Panolam Holdings having an initial agreed upon value of $2,000,000 pursuant to a tax-free exchange of the shares of common stock of the prior holding company of Panolam Industries International, Inc. owned by him for that of Panolam Holdings in accordance with a stock purchase agreement. As of the closing of the 2005 Acquisition, Mr. Muller also received options to purchase 8,889 shares of Panolam Holdings' common stock. The options were granted pursuant to the 2005 Equity Incentive Plan and vest in five equal annual installments on each anniversary of the grant date. In addition, the options vest in full upon the occurrence of any approved sale that occurs during the term of Mr. Muller's employment and any approved sale that takes place within one year following Mr. Muller's involuntary termination by the Company without cause.

### Vincent S. Miceli and Jeffrey M. Muller

Panolam Industries International, Inc. has entered into an employment agreement with each of Vincent S. Miceli and Jeffrey M. Muller. These employment agreements are terminable by either party at any time. These employment agreements provide that each of the named executive officers will be entitled to certain payments and benefits in the event that their employment is terminated without cause. See "Potential Payments Upon Termination or Change of Control."

### Stephen C. Feuring

The Company terminated the employment of Stephen C. Feuring on December 11, 2008. Under the terms of Mr. Feuring's employment agreement with the Company, his employment was terminable by either party at any time. The employment agreement provided that Mr. Feuring would be entitled to receive certain payments and benefits in the event that the Company terminated his employment without cause. Those payments and benefits are substantially the same as those to which Mr. Miceli or Mr. Jeffrey Muller would be entitled. See "Potential Payments Upon Termination or Change of Control," for a description. In connection with Mr. Feuring's termination, he has received and will receive those payments and benefits described in Note (5) to the Summary Compensation Table.

## Employee Benefit Plans

In connection with the 2005 Acquisition, Panolam Holdings adopted its 2005 Equity Incentive Plan that permits the grant of restricted stock, stock units, stock appreciation rights, cash and stock options,

including non-qualified stock options and incentive stock options, to purchase shares of common stock of Panolam Holdings. The 2005 Equity Incentive Plan is administered by the compensation committee of Panolam Holdings. 17,778 shares of the common stock of Panolam Holdings may be issued under the 2005 Equity Incentive Plan. Upon a change of control (as defined in the agreement), the compensation committee may provide at any time prior to such change of control that all then unvested stock options will immediately vest and become exercisable and all stock appreciation rights, stock units and unvested cash awards will immediately vest and any restrictions upon restricted stock awards or stock units will immediately lapse. The committee may also provide that the awards will remain exercisable for the remainder of their terms, notwithstanding any subsequent termination of a participant's service. All options granted to date vest ratably over a five-year period beginning on the first anniversary of the date of grant.

## Outstanding Equity Awards

The following table shows information regarding outstanding options to acquire stock of Panolam Holdings held by our named executive officers as of December 31, 2008:

| Name | Date of Grant | Number of Securities Underlying Unexercised Options (#) Exercisable(1) | Number of Securities Underlying Unexercised Options (#) Unexercisable(1) | Option Exercise Price | Option Expiration Date |
|------|---------------|----|----|----|----|
| Robert J. Muller  . . . . . . | September 30, 2005 | 5,333 | 3,556 | $500.00 | September 30, 2015 |
| Vincent S. Miceli . . . . . . | May 9, 2006 | 200 | 300 | $500.00 | May 9, 2016 |
|  | March 5, 2007 | 100 | 400 | $750.00 | May 9, 2017 |
| Stephen C. Feuring(2)  . . | September 30, 2005 | 1,067 | 711 | $500.00 | September 30, 2015 |
| Jeffrey M. Muller . . . . . . | September 30, 2005 | 1,067 | 711 | $500.00 | September 30, 2015 |

(1)  The options vest ratably over a five-year period on each annual anniversary of the grant date.

(2)  Mr. Feuring's employment was terminated by the Company on December 11, 2008. In accordance with the option agreement, Mr. Feuring had 30 days from his termination date in which to exercise 1,067 of vested options. Mr. Feuring did not exercise his vested options and on January 11, 2009, all of Mr. Feuring's vested and nonvested options were cancelled.

## Potential Payments Upon Termination or Change of Control

### Robert J. Muller

Following is a summary of the arrangements that provide for payment to Robert J. Muller at, following or in connection with any termination, including resignation, severance, retirement or constructive termination or in connection with a change of control.

*Termination by Us Other than for Cause, Death or Disability.*   Under our employment agreement with Mr. Muller, if we terminate Mr. Muller's employment agreement for a reason other than for death, disability or "Cause," which is defined to include, among other things, theft or embezzlement of a not insignificant amount of the property (tangible or intangible) of Panolam Holdings or the Company in circumstances that would render him, in the judgment of a reasonable person, manifestly unfit to continue as Chief Executive Officer and President of the Company or Panolam Holdings; engaging in conduct that constitutes willful gross neglect or willful gross misconduct and that (x) results in significant economic harm to the Company or Panolam Holdings or (y) results, and reasonably should be expected to result, in acute public embarrassment to the Company or Panolam Holdings; willful and unjustified failure of Mr. Muller to act in accordance with any material, reasonable and lawful written instruction given to him by the Panolam Holdings Board of Directors concerning

material aspects of his duties for the Company or Panolam Holdings and excluding matters outside of his direct personal control; and his conviction for a felony, then:

- we will pay him:

  - a pro rata portion of his annual bonus for the year in which his employment terminates;

  - a cash payment equal to (A) the sum of (x) his then-current base salary plus (y) the annual bonus earned for the year prior to the year in which the termination occurs times (B) the lesser of (x) 1,095 and (y) the number of days in the period that begins on the date of termination and ends on December 31, 2010 (but in no event less than 730) divided by (C) 365;

- he and his family members will continue to receive medical benefits and life insurance coverage for three years to the extent that they were receiving such benefits at the time of such termination; and

- any unvested stock options that vest solely based on time and not based on the achievement of performance criteria will vest to the extent provided in the agreement granting the stock options, but only to the extent that the stock options would have vested within six months of the termination date if no termination had occurred, and shall remain exercisable for the term provided in the stock option agreement.

*Termination by Us for Cause or Voluntary Termination by Mr. Muller.*    Under our employment agreement with Mr. Muller, if we terminate Mr. Muller's employment for Cause, then:

- we will pay him all earned but unpaid amounts under the employment agreement;

- any stock options exercisable as of the termination date will remain exercisable until 30 days following the termination date, any stock options that later become exercisable will expire 30 days after they become exercisable and all other stock options shall expire upon termination of Mr. Muller's employment;

- we will pay him a lump-sum payment in respect of accrued but unused vacation days at the rate of his base salary in effect on the termination date; and

- he will receive other or additional benefits, if any, in accordance with the plans, programs or arrangements of the Company, Panolam Holdings and their affiliates.

*Death.*    Under our employment agreement with Mr. Muller, if he dies during the term of his employment agreement, then:

- we will pay to his estate or his beneficiaries his base salary for a period of 90 days following his death;

- we will pay to his estate or his beneficiaries a pro rata annual bonus for the year in which his death occurs;

- any unvested stock options will vest to the extent set forth in the agreement granting the stock options, provided that any stock options that would have become exercisable within six months following Mr. Muller's death had Mr. Muller not died will automatically become exercisable; and

- any stock options that are or become exercisable will remain exercisable as provided in the agreement granting the option, but must be exercised within two years following Mr. Muller's death.

*Disability.*   Under our employment agreement with Mr. Muller, if Mr. Muller becomes disabled during the term of his employment, then:

- we will pay him to age 65, 60% of his base salary in effect at the time of the termination of his employment less the amount of any disability benefits provided under a disability insurance plan of the Company, Panolam Holdings or any of their affiliates;

- we will pay him a pro rata annual bonus for the year in which the termination of his employment because of disability occurs;

- any unvested stock options will vest to the extent set forth in the stock option agreement granting the options, provided that any stock options that would have become exercisable within six months following the termination of Mr. Muller's employment had Mr. Muller's employment not been terminated will automatically become exercisable;

- any stock options that are or become exercisable shall remain exercisable as provided in the agreement granting the stock option, but must be exercised within two years following the termination of Mr. Muller's employment; and

- he and his family members will continue to receive medical benefits and life insurance coverage for a period of three years to the extent that they were receiving such benefits at the time of termination.

*Change of Control.*   Under our employment agreement with Mr. Muller, in the event that a change of control occurs during the term of Mr. Muller's employment or within one year after the termination of Mr. Muller's employment without cause or by expiration of the term of Mr. Muller's employment pursuant to a notice of non-extension from the Company, then all stock options then held by Mr. Muller will become fully exercisable. Options vesting upon a notice of non-renewal delivered within one year of a change of control will remain exercisable for two years from the termination of Mr. Muller's employment. Options vesting in connection with a change of control that do not involve a notice of non-renewal will remain exercisable for two years from the date of the change of control.

Assuming Mr. Muller's employment was terminated under each of these circumstances on December 31, 2008, such payments and benefits would have had an estimated value of:

| | Base Salary ($) | Bonus ($) | Accelerated Stock Options (#) | Other ($) | Total ($) |
|---|---|---|---|---|---|
| With Cause or Voluntary Termination by Mr. Muller . . . . . . . . . . . . . . . . . . . . . | — | $377,845 | — | — | $ 377,845 |
| Without Cause Not Associated With a Change of Control . . . . . . . . . . . . . . . | $ 650,000 | $377,845 | — | $1,277,203 | $2,305,048 |
| Without Cause Associated With a Change of Control . . . . . . . . . . . . . . . | $ 650,000 | $377,845 | 5,333(1) | $1,277,203 | $2,305,048 |
| Death . . . . . . . . . . . . . . . . . . . . . . . . | $ 162,500 | $377,845 | — | — | $ 540,345 |
| Disability . . . . . . . . . . . . . . . . . . . . . | $1,560,000 | $377,845 | — | — | $1,937,845 |

(1) The Company received an independent valuation to determine the fair value of its common stock on each date that options are granted under the 2005 Equity Incentive Plan. No valuation was conducted as of December 31, 2008 and therefore the Company is not able to determine the value of the accelerated options as of such date. The fair value of the Company's common stock on March 5, 2007 was $750 per share and therefore, the approximate value of the shares of common stock net of the exercise price of the options that could be acquired as a result of the accelerated options set forth in this column on such date was $1,333,250.

*Vincent S. Miceli and Jeffrey M. Muller*

If we terminate the employment of Vincent S. Miceli or Jeffrey M. Muller (the "executives") Without Cause, we are obligated to make certain payments to them and provide them with certain post-termination benefits per the terms of their employment agreements. For these purposes, "Without Cause" is defined to mean any termination other than a termination for Cause or as a result of the executive's resignation, retirement, death or disability. Under the employment agreements, "Cause" is defined to mean (i) conviction of or entering a plea of guilty or nolo contendere to a felony, a crime of moral turpitude, dishonesty, breach of trust or unethical business conduct, or any crime involving the business of the Company or its affiliates; (ii) willful misconduct, willful or gross neglect, fraud, misappropriation, embezzlement, or theft in the performance of the executive's duties, or otherwise to the detriment of the Company or any of its affiliates; (iii) willful failure to adhere to the policies and practices of the Company or to devote substantially all of the executive's business time and effort to the affairs of the Company; (iv) breach of the employment agreement in any material respect; (v) the commission of any theft, embezzlement, fraud or other intentional act of dishonesty involving any other person; or (vi) willful violation of the Company's Protecting Confidential Information Policy, Conflicts of Interest Policy, or Business Ethics Policy. Without Cause also includes executive's termination of his employment on 30 days' written notice to the Company following the occurrence of any of the following events without the executive's prior written consent provided that the Company has not cured all grounds for such termination within 20 days after receipt of the executive's written notice: (i) any reduction in the executive's base salary or target annual bonus or any material reduction in any employee benefit or perquisite enjoyed by the executive, (ii) any material dimunition in the executive's duties or responsibilities, or (iii) the relocation of the Company's or the executive's principal office to a location more than 50 miles from Shelton, Connecticut.

In the event that the executive's employment is terminated Without Cause, the Company will:

- pay six months of the executive's annual salary from the date of termination in equal installments according to the Company's normal payroll schedule;

- pay the executive a lump sum equal to the largest annual bonus payment paid to the executive within the last three years prior to his termination; and

- permit the executive to continue to participate for six months after the termination date in all medical, dental, vision, hospitalization and life insurance coverages and in all other employee welfare benefit plans, programs and arrangements in which he or his family members were participating on the termination date, on terms and conditions that are no less favorable than those that applied on such date, provided that the executive's entitlements to such coverages and benefits shall expire to the extent that equivalent coverages and benefits (determined on a coverage-by-coverage and benefit-by-benefit basis) are provided under the plans, programs or arrangements of a subsequent employer.

The receipt of these payments and benefits by an executive is conditioned upon his compliance with the non-solicitation and non-competition provisions contained in the employment agreement during the period that the executive is receiving such payments or benefits.

Assuming Vincent S. Miceli's employment was terminated Without Cause on December 31, 2008, such payments and benefits would have had an estimated value of $209,188. Assuming Jeffrey M. Muller's employment was terminated Without Cause on December 31, 2008, such payments and benefits would have had an estimated value of $224,334.

In addition to the foregoing, any options granted to an executive and vested before the date of termination of executive's employment shall remain exercisable until the earliest of:

- the expiration date of the option as set forth in the notice of stock option grant;

- the date that is three months following the date of termination in the event of a termination of the executive's employment for any reason other than Cause, death or disability;

- the date that is six months following the date of termination in the event of a termination due to disability or retirement pursuant to any formal retirement policy of the Company;

- the date that is 12 months after the death of the executive; or

- the date of termination if such termination is for Cause or if Cause exists on such date.

**Director Compensation**

All members of our board of directors are reimbursed for their usual and customary expenses incurred in connection with attending all board and other committee meetings. In addition, Mr. Gesseck receives one annual retainer of $40,000 for all of his services to the board of directors and any board committees on which he serves. In March 2007, Mr. Gesseck also received a grant of options to purchase 50 shares of common stock of Panolam Holdings. No options were granted to Mr. Gesseck in 2008.

The following table summarizes the fees and other compensation earned by our directors for their service on our Board of Directors and any committees of the Board of Directors during 2008.

| Name | Fees Earned or Paid in Cash ($) | Option Awards ($)(3) | Total ($) |
|---|---|---|---|
| Jean-Pierre L. Conte(1) | — | — | — |
| Darren J. Gold(1) | — | — | — |
| J. Ryan Clark(1) | — | — | — |
| William C. Oehmig(2) | — | — | — |
| Hunter Nelson(2) | — | — | — |
| Kent Wallace(2) | — | — | — |
| Richard H. Gesseck | $40,000 | $8,554 | $48,554 |

(1) Jean-Pierre L. Conte, Darren J. Gold and J. Ryan Clark, who are employees of Genstar Capital, did not directly receive fees from us for their service as directors. However, we paid Genstar Capital fees of $937,500 in 2008 related, among other things, to the service of those individuals on our board of directors. $187,500 of such fees was paid with respect to services provided during 2007.

(2) William C. Oehmig, Hunter Nelson and Kent Wallace, who are employees of The Sterling Group, did not directly receive fees from us for their service as directors. However, we paid The Sterling Group fees of $937,500 in 2008 related, among other things, to the service of those individuals on our board of directors. $187,500 of such fees was paid with respect to services provided during 2007. Mr. Oehmig resigned from our Board effective January 28, 2009 and to date a replacement for Mr. Oehmig has not been selected.

(3) The amounts shown in the Option Awards column represent the dollar amounts recognized in 2008 for financial statement reporting purposes, as computed in accordance with Statement of Financial Accounting Standards No. 123(R), "Share-Based Payment" ("FAS 123(R)"). Such amounts are deemed the grant date fair value of the Option Awards. For information regarding significant factors, assumptions and methodologies used in our computations pursuant to

57

FAS 123(R) with respect to awards of stock options, see Note 15, "Stock Options," to the Company's consolidated financial statements for the year ended December 31, 2008 included in this report.

**Compensation Committee Interlocks and Insider Participation**

The members of our compensation committee are Robert J. Muller, Darren J. Gold and Hunter Nelson. Other than Robert J. Muller, no member of our compensation committee is or was during 2008 an employee, or is or ever has been an officer, of the Company. No executive officer of the Company served as a director or a member of the compensation committee of another company, one of whose executive officers serves as a member of our board of directors or compensation committee.

The Sponsors and their affiliates, own over 92% of the beneficial common stock of our ultimate parent company, Panolam Holdings Co. Representatives of the Sponsors hold six of the eight seats on our board of directors. Darren J. Gold is a member of our compensation committee and a Managing Director of Genstar Capital. Hunter Nelson is a member of our compensation committee and partner with The Sterling Group. We have entered into certain transactions with the Sponsors relating to the management of the Company, their ownership of Panolam Holdings Co. common stock and certain related matters. For a description of these transactions, see "Item 13.—Certain Relationships and Related Transactions, and Director Independence—Relationships and Related Party Transactions between the Company and the Sponsors and their Affiliates."

**Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

All of our outstanding common stock is owned by Panolam Holdings II Co., 20 Progress Drive, Shelton, Connecticut 06484. All of the outstanding common stock of Panolam Holdings II Co. is owned by Panolam Holdings Co., 20 Progress Drive, Shelton, Connecticut 06484.

The following table gives information as of March 15, 2009 about the beneficial ownership of Panolam Holdings Co. common stock, which is its only outstanding class of stock, by:

- each stockholder that we know beneficially owns more than 5% of the Panolam Holdings Co. common stock;

- each member of our board of directors; and

- each of our executive officers.

Except as otherwise indicated, beneficial ownership is based on sole voting and investment power.

| Name And Address of Beneficial Owner | Number of Shares | Percent Of Class |
|---|---|---|
| Genstar Capital Partners IV, L.P.(a)(1) | 74,198 | 46.4% |
| Stargen IV, L.P.(a)(1) | 3,157 | 2.0% |
| Sterling Group Partners II, L.P.(b)(2) | 60,921 | 38.1% |
| Sterling Group Partners II (Parallel), L.P.(b)(2) | 16,434 | 10.3% |
| Robert J. Muller, Jr.(c)(3) | 9,333 | 5.6% |
| Stephen C. Feuring(c)(4) | 200 | * |
| Jeffrey M. Muller(c)(5) | 1,267 | * |
| Vincent S. Miceli(c)(6) | 500 | * |
| Jean-Pierre L. Conte(a)(7) | 77,355 | 48.4% |
| Darren J. Gold(a) | — | * |
| J. Ryan Clark(a) | — | * |
| William C. Oehmig(b)(2)(8)(10) | 77,355 | 48.4% |
| Hunter Nelson(b)(2)(8) | 77,355 | 48.4% |
| Kent Wallace(b) | 40 | * |
| Richard H. Gesseck(c)(9) | 20 | * |
| All directors and executive officers as a group(1)(2)(3)(5)(6)(9) | 165,870 | 99.4% |

---

\*    less than 1%

(a)    The address of this person is c/o Genstar Capital LLC, Four Embarcadero Center, Suite 1900, San Francisco, CA 94111.

(b)    The address of this person is c/o The Sterling Group, 8 Greenway Plaza, Suite 702, Houston, TX 77046.

(c)    The address of this person is c/o Panolam Industries International, Inc., 20 Progress Drive, Shelton, CT 06484.

(1)    Genstar Capital LLC ("Genstar Capital"), the manager of Genstar Capital Partners IV, L.P. ("Genstar IV"), exercises investment discretion and control over the shares held by Genstar IV. Genstar Capital exercises investment discretion and control over the shares held by Stargen IV, L.P.

(2)    Sterling Group Partners II GP, L.P. is the sole general partner of Sterling Group Partners II, L.P. and Sterling Group Partners II (Parallel), L.P. Sterling Group Partners II GP, L.P. has six general partners, each of which is wholly-owned by one of Frank J. Hevrdejs, William C. Oehmig, Hunter Nelson, John D. Hawkins, Gary R. Rosenthal and C. Kevin Garland. Each of these individuals disclaims beneficial ownership of the shares owned by Sterling Group Partners II, L.P. and Sterling Group Partners II (Parallel), L.P.

(3)    Includes 5,333 shares of common stock subject to options exercisable within 60 days of March 15, 2009.

(4)    Represents 200 shares of common stock owned by Mr. Feuring. Mr. Feuring was terminated by the Company on December 11, 2008 and all of his vested, unexercised options have since expired.

(5)    Includes 1,067 shares of common stock subject to options exercisable within 60 days of March 15, 2009.

(6)    Includes 500 shares of common stock subject to options exercisable within 60 days of March 15, 2009.

59

(7) Includes the 74,198 shares owned by Genstar IV and the 3,157 shares owned by Stargen IV, L.P., as to which Mr. Conte may be deemed to have investment and voting power because of his position with Genstar Capital. Mr. Conte disclaims beneficial ownership of these shares except to the extent of his pecuniary interest therein.

(8) Includes the 60,921 shares owned by Sterling Group Partners II, L.P. and the 16,434 shares owned by Sterling Group Partners II (Parallel), L.P.

(9) Includes 20 shares of common stock subject to options exercisable within 60 days of March 15, 2009.

(10) Mr. Oehmig resigned from the board of directors effective January 28, 2009.

**Equity Compensation Plan**

Panolam Holdings Co. adopted the 2005 Equity Incentive Plan ("Option Plan") to provide for the granting of non-qualified stock options to certain key employees and/or directors of the Company. The following table sets forth information regarding the Panolam Holdings Co. equity compensation plan as of December 31, 2008. Panolam Holdings Co.'s stockholder-approved Option Plan is described further in Note 15, "Stock Options," to the consolidated financial statements contained in of this report. See also "Item 11. Executive Compensation—Compensation Discussion & Analysis—Equity Incentive."

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders . . . . . . . . . . . . . . . . . . . . | 13,945 | $513 | 3,833 |
| Equity compensation plans not approved by security holders . . . . . . . . . . . . . . . . . . . . | None | Not applicable | Not applicable |
| | 13,945 | $513 | 3,833 |

## Item 13.    Certain Relationships and Related Transactions, and Director Independence

**Relationships and Related Party Transactions between the Company and the Sponsors and their Affiliates**

The Company has not adopted a formal, written policy for the review and approval of transactions with related persons. The Board of Directors of the Company is responsible for reviewing and approving all transactions and proposed transactions between the Company and its directors, executive officers and 5% stockholders and their immediate family members (each a "related person") where the amount involved exceeds $120,000 and where the related persons have a direct or indirect material interest in the transaction. Since the acquisition of the Company by the Sponsors in 2005, the only transactions entered into between the Company or its affiliates and any related person (other than ordinary course employment arrangements) are described below. Each of these transactions was approved by the Board of Directors of the Company or our ultimate parent company, Panolam Holdings Co.

*Stockholders Agreement*

In connection with the 2005 Acquisition, Panolam Holdings entered into a stockholders agreement with Genstar Capital (and certain of its related parties), The Sterling Group (and certain of its related

parties), Robert J. Muller and certain other members of our management team (and their spouses, if applicable), to whom we refer collectively as the Holders. The stockholders agreement:

- imposes restrictions on the transfer of Panolam Holdings' shares by the Holders;

- grants Panolam Holdings and certain Holders certain rights of first refusal and the Holders certain co-sale rights with respect to sales of Panolam Holdings' shares by any Holder;

- grants certain Holders the right to participate in any issuance or sale of shares by Panolam Holdings on a pro-rata basis;

- provides that three directors shall be designated by each of the Sponsors and that Panolam Holdings' Chief Executive Officer shall be elected as a director; and

- places restrictions on certain significant actions of Panolam Holdings without the consent of two-thirds of the Holders, including certain issuances of securities, acquisitions or similar transactions outside the ordinary course of business and certain significant capital expenditures.

### *Registration Rights Agreement*

In connection with the 2005 Acquisition, Panolam Holdings entered into a registration rights agreement with the Holders. The registration rights agreement includes the following provisions:

- Piggyback Registrations. After an initial public offering (or in an initial public offering if Panolam Holdings elects to permit the secondary sale of shares in the initial public offering), if Panolam Holdings proposes to register any of its common shares, other than pursuant to a demand registration, the Holders have the right to request that Panolam Holdings register all shares that the Holders request to be included in the qualified registration.

- Demand Registrations. Subject to specified restrictions, after an initial public offering, and upon written request, certain Holders can demand registration of their shares if the shares to be included in such registration have, in the good faith opinion of Panolam Holdings, an aggregate fair market value of at least $5.0 million.

The registration rights agreement also contains customary provisions with respect to registration procedures, indemnification and contribution rights.

### *Advisory Services Agreement*

In connection with the 2005 Acquisition, Panolam Holdings and the Sponsors entered into an advisory services agreement whereby the Sponsors agreed to provide management, business strategy, consulting, advisory and financial services with respect to the organization of Panolam Holdings and its subsidiaries, the structuring of the 2005 Acquisition, employee benefit and compensation arrangements and other matters. The agreement also provides that Panolam Holdings and its subsidiaries, jointly and severally, will indemnify the Sponsors against liabilities relating to their services. For these services, Panolam Holdings paid the Sponsors, at the closing of the 2005 Acquisition, a one-time closing fee of $7.0 million and reimbursed the Sponsors for their expenses. In addition, Panolam Holdings will pay the Sponsors, in addition to expenses, an annual consulting fee of $1.5 million in the aggregate, payable pro rata, on a quarterly basis and an advisory fee equal to 2.0% of the aggregate consideration in the event Panolam Holdings consummates an acquisition or disposition in the future. For the years ended December 31, 2008 and 2007, we paid consulting fees to the Sponsors of approximately $1.9 million and $1.3 million, respectively. Genstar Capital received approximately $1.0 million and $0.6 million of the consulting fee paid to the Sponsors for the years ended December 31, 2008 and 2007, respectively. The Sterling Group received approximately $0.9 million and $0.7 million of the consulting fee paid to the Sponsors for the years ended December 31, 2008 and 2007, respectively.

### Agreement with Sterling

In connection with the 2005 Acquisition, Panolam Holdings and The Sterling Group entered into a letter agreement that permits The Sterling Group, in connection with its direct or indirect acquisitions of equity interests of Panolam Holdings, to, among other things: (i) obtain documentation and financial data relating to the company and its subsidiaries; (ii) consult with and advise the Company's and its subsidiaries' management regarding the operation of the Company and its subsidiaries, (iii) discuss with the Company and its subsidiaries, their affairs, finances and accounts and (iv) to visit and inspect the Company's and its subsidiaries' properties and facilities. Panolam Holdings must also provide certain financial statements and prepare certain periodic reports to The Sterling Group.

### Director Independence

Panolam does not have securities listed on a national securities exchange or quoted on an inter-dealer quotation system that has requirements that a majority of its board of directors be independent. Richard H. Gesseck meets the independence requirements of The Nasdaq Stock Market LLC. No other member of Panolam's board of directors meets those requirements.

### Item 14.   Principal Accountant Fees and Services

In addition to retaining Deloitte & Touche LLP ("D&T") to audit the consolidated financial statements of Panolam for 2008, Panolam retained D&T to provide other auditing and advisory services in 2008. Panolam understands the need for D&T to maintain objectivity and independence in its audit of Panolam's financial statements. To minimize relationships that could appear to impair the objectivity of D&T, Panolam's Audit Committee is required to pre-approve all non-audit work performed by D&T.

The aggregate fees billed for professional services by D&T in 2008 and 2007 for these various services were:

| Type of Fees | 2008 | 2007 |
|---|---|---|
| Audit Fees | $1,203,615 | $1,211,121 |
| Audit-Related Fees | — | 66,675 |
| Tax Fees | 1,194 | 12,500 |
| Total | $1,204,809 | $1,290,296 |

In the table above, in accordance with the Securities and Exchange Commission's definitions and rules, "audit fees" are fees Panolam paid D&T for professional services for the audit of Panolam's consolidated financial statements included in Panolam's Form 10-K, Registration Statement on Form S-4, review of financial statements included in Panolam's Form 10-Q and for services that are normally provided by the accountant in connection with the review of other filings and consents; "audit-related fees" are fees for audits and reviews of financial statements to satisfy lender agreement requirements for comfort letter and pension audits; and "tax fees" are fees for tax compliance and other tax consultation related to transactions consummated by Panolam during 2008 and 2007.

### Pre-Approval of Audit and Non-Audit Services

Our Audit Committee is responsible for appointing our independent auditor and approving the terms of the independent auditor's services. The Audit Committee has established a policy for the pre-approval of all audit and permissible non-audit services to be provided by the independent auditor, as described below, and must pre-approve any internal control related service, including any changes in the nature, scope or extent of such services.

*Audit Services*

Under the policy, the Audit Committee is to approve the engagement of our independent auditor each fiscal year and pre-approve each audit and audit-related service to be performed by such independent auditor, including, but not limited to, the audit of our financial statements and the provision of an attestation report on management's evaluation of our internal controls over financial reporting. As noted above, the Audit Committee must specifically approve, in advance, any proposed change in the nature, scope or extent of any internal control related service.

*Non-Audit Services*

In accordance with the pre-approval policy, the Audit Committee must pre-approve non-audit services that may be performed by the independent auditor during the fiscal year. The Audit Committee will approve the provision of only those non-audit services deemed permissible under the federal securities laws and regulations. The Audit Committee may delegate to the Chair of the Audit Committee the authority to approve additional permissible non-audit services to be performed by the independent auditor, provided that the full Audit Committee shall be informed of such approval at its next scheduled meeting.

All services performed by D&T in fiscal 2008 were pre-approved by the Audit Committee pursuant to the foregoing pre-approval policy.

**PART IV**

**Item 15.   Exhibits and Financial Statement Schedules**

**(a)(1) Consolidated Financial Statements**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Statements of Operations for the years ended December 31, 2008, 2007 and 2006 | F-2 |
| Consolidated Balance Sheets as of December 31, 2008 and 2007 | F-3 |
| Consolidated Statements of Stockholder's (Deficit) Equity for the years ended December 31, 2008, 2007 and 2006 | F-4 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2008, 2007 and 2006 | F-5 |
| Notes to Consolidated Financial Statements | F-6 |

**(a)(2) Financial Statement Schedules for the Three Years Ended December 31, 2008**

**Report of Independent Registered Public Accounting Firm on Schedules**

**Schedule II—VALUATION AND QUALIFYING ACCOUNTS**

Schedules other than those reflected below have been omitted because they are either not applicable or the required information has been disclosed in the consolidated financial statements or notes thereto.

## SCHEDULE II
## PANOLAM INDUSTRIES INTERNATIONAL, INC.
## VALUATION AND QUALIFYING ACCOUNTS
### Years ended December 31, 2008, 2007 and 2006
### (In thousands)

| | Balance at beginning of period | Charged (Credited) to cost and expenses | Acquisition | Deductions/Other | Balance at end of period |
|---|---|---|---|---|---|
| 2008 allowance for doubtful accounts . . . . . . | $7,048 | $ (610) | — | $(460) | $5,978 |
| 2007 allowance for doubtful accounts . . . . . . | $7,252 | $ (212) | — | $   8 | $7,048 |
| 2006 allowance for doubtful accounts . . . . . . | $1,908 | $2,392 | $2,568 | $ 384 | $7,252 |

## (a)(3) Exhibits

| EXHIBIT NUMBER | EXHIBIT TITLE |
|---|---|
| 2.1 | Agreement and Plan of Merger dated as of July 16, 2005 by and among GS Holdings Co., PIH Acquisition Co., Panolam Industries Holdings, Inc. and TC Group, L.L.C.* |
| 2.2 | First Amendment to Agreement and Plan of Merger, dated as of July 16, 2005, by and among Panolam Holdings II Co. (formerly GS Holdings Co.), PIH Acquisition Co., Panolam Industries Holdings, Inc., and TC Group, L.L.C. entered into effective as of September 30, 2005.* |
| 2.3 | Acquisition Agreement among Nevamar Holdco, LLC, Nevamar Company, LLC, Nevamar TE S Preferred Corp., Nevamar Offshore S. Preferred Corp., Nevamar Offshore Common Corp., certain holders of interests in Nevamar Holdco, LLC, Kohlberg Management IV, L.L.C., as Seller's Representative, and Panolam Industries International, Inc. dated as of January 18, 2006.* |
| 2.4 | Amendment No. 1 to Acquisition Agreement entered into as of February 28, 2006 among Kohlberg Management IV, L.L.C., as representative for the Sellers and Panolam Industries International, Inc.* |
| 3.1 | Certificate of Incorporation of Panolam Industries International, Inc. (previously named PII Third, Inc.).* |
| 3.2 | Amendment to Certificate of Incorporation of Panolam Industries International, Inc. (previously named PII Third, Inc.) dated December 18, 1997.* |
| 3.3 | Amendment to Certificate of Incorporation of Panolam Industries International, Inc. (previously named PII Third, Inc.) dated December 22, 1998.* |
| 3.4 | Certificate of Incorporation of Panolam Industries, Inc. (previously named Pan Acquisition, Inc.).* |
| 3.5 | Amendment to Certificate of Incorporation of Panolam Industries, Inc. (previously named Pan Acquisition, Inc.).* |
| 3.6 | Certificate of Incorporation of Pioneer Plastics Corporation (previously named PPC Acquisition Corporation).* |
| 3.7 | Amendment to Certificate of Incorporation of Pioneer Plastics Corporation (previously named PPC Acquisition Corporation).* |

65

| EXHIBIT NUMBER | EXHIBIT TITLE |
|---|---|
| 3.8 | By-Laws of Panolam Industries International, Inc. (previously named PII Third, Inc.).* |
| 3.9 | By-Laws of Panolam Industries, Inc. (previously named Pan Acquisition, Inc.).* |
| 3.10 | By-Laws of Pioneer Plastics Corporation (previously named PPC Acquisition Corporation).* |
| 3.11 | Certificate of Incorporation of Nevamar Holding Corp.* |
| 3.12 | By-Laws of Nevamar Holding Corp.* |
| 3.13 | Certificate of Formation of Nevamar Holdco, LLC.* |
| 3.14 | Amended and Restated Limited Liability Company Agreement of Nevamar Holdco, LLC.* |
| 3.15 | Certificate of Formation of Nevamar Company, LLC (previously named KNDP Acquisition Company, LLC).* |
| 3.16 | Amendment to Certificate of Formation of Nevamar Company, LLC (previously named KNDP Acquisition Company, LLC).* |
| 3.17 | Fifth Amended and Restated Limited Liability Company Agreement of Nevamar Company, LLC.* |
| 4.1 | Indenture dated September 30, 2005 among PIH Acquisition Co., Panolam Industries International, Inc., the Guarantors and Wells Fargo Bank, National Association.* |
| 4.2 | First Supplemental Indenture dated April 3, 2006 among Panolam Industries International, Inc., Nevamar Holding Corp., Nevamar Holdco, LLC, Nevamar Company, LLC and Wells Fargo Bank, National Association.* |
| 4.3 | Registration Rights Agreement for $151,000,000 10¾% Senior Subordinated Notes Due 2013 dated September 30, 2005 among PIH Acquisition Co., Credit Suisse First Boston LLC and Jefferies & Company, Inc.* |
| 4.4 | Purchase Agreement for $151,000,000 10¾% Senior Subordinated Notes Due 2013 dated September 16, 2005 among PIH Acquisition Co., Credit Suisse First Boston LLC and Jefferies & Company, Inc.* |
| 4.5 | Registration Rights Agreement by and among Panolam Holdings Co. and the holders of the Qualified Registrable Securities.* |
| 4.6 | Form of New Note (included as Appendix A to Exhibit 4.1).* |
| 10.1 | Credit Agreement dated as of September 30, 2005 among PIH Acquisition Co., Panolam Industries International, Inc., Panolam Holdings II Co., the Lenders, Credit Suisse and Jefferies & Company, Inc.* |
| 10.2 | First Amendment to Credit Agreement, dated as of March 1, 2006, by and among Panolam Industries International, Inc., Panola Holdings II, Co., the financial institutions listed on the signature pages thereof, Credit Suisse, Cayman Islands Branch, as administrative agent, and the Credit Support Parties listed on the signature pages thereof.* |

| EXHIBIT NUMBER | EXHIBIT TITLE |
| --- | --- |
| 10.3 | Second Amendment to Credit Agreement, dated as of March 1, 2006, by and among Panolam Industries International, Inc., Panola Holdings II, Co., Credit Suisse, Cayman Islands Branch, as administrative agent, and the Credit Support Parties listed on the signature pages thereof.* |
| 10.4 | Third Amendment to Credit Agreement and Limited Waiver dated as of March 30, 2007 by and among Panolam Industries International, Inc., Panolam Holdings II, Co., Credit Suisse, Cayman Islands Branch, as administrative agent, and the Credit Support Parties listed on the signature pages thereof.* |
| 10.5 | Security Agreement dated September 30, 2005 by and among Panolam Industries International, Inc. and Credit Suisse.* |
| 10.6 | Holdings Guaranty dated September 30, 2005 by Panolam Holdings II Co. in favor of Credit Suisse.* |
| 10.7 | Subsidiary Guaranty dated September 30, 2005 by Panolam Industries, Inc. and Pioneer Plastics Corporation in favor of Credit Suisse.* |
| 10.8 | Panolam Holdings Co. 2005 Equity Incentive Plan.* |
| 10.9 | Form of Panolam Holdings Co. 2005 Equity Incentive Plan Employee Non Statutory Stock Option Agreement.* |
| 10.10 | Panolam Holdings Co. 2005 Equity Incentive Plan Employee Non Statutory Stock Option Agreement with Robert J. Muller, Jr.* |
| 10.11 | Second Amended and Restated Employment Agreement dated September 6, 2005 by and among Panolam Industries International, Inc., Panolam Industries Holdings, Inc., and Robert J. Muller, Jr.* |
| 10.12 | Advisory Services Agreement dated September 30, 2005 between Panolam Holdings Co. and Genstar Capital LLC and The Sterling Group, L.P.* |
| 10.13 | Management Rights Letter from Panolam Holdings Co. to Sterling Group Partners II, L.P. and Sterling Group II (Parallel), L.P.* |
| 10.14 | Stockholders Agreement between Panolam Holdings Co. and the Holders.* |
| 10.15 | Employment Agreement dated September 19, 2007 between Panolam Industries International, Inc. and Vincent S. Miceli.* |
| 10.16 | Employment Agreement dated September 19, 2007 between Panolam Industries International, Inc. and Stephen C. Feuring.* |
| 10.17 | Employment Agreement dated September 19, 2007 between Panolam Industries International, Inc. and Jeffrey M. Muller.* |
| 10.18 | 2008 Panolam Industries International, Inc. Bonus Plan (incorporated herein by reference to Exhibit 10.18 of Panolam Industries International, Inc.'s Annual Report on Form 10-K filed March 31, 2008). |
| 12.1 | Statement regarding ratio of earnings to fixed charges. |
| 21.1 | Subsidiaries of the Registrant. |
| 31.1 | Certification pursuant to Exchange Act Rules 13a-14 and 15d-14; as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |

| EXHIBIT NUMBER | EXHIBIT TITLE |
|---|---|
| 31.2 | Certification pursuant to Exchange Act Rules 13a-14 and 15d-14; as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of Sarbanes-Oxley Act of 2002. |

\* Incorporated herein by reference to Panolam Industries International, Inc. Registration Statement on Form S-4 filed on October 1, 2007.

## Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized in the Town of Shelton, State of Connecticut on the 31st day of March 2009.

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

By:      /s/  ROBERT J. MULLER

Robert J. Muller
*Chairman, President and Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities indicated, on the 31st day of March 2009.

| Signature | Title |
| --- | --- |
| /s/  ROBERT J. MULLER, JR.<br>Robert J. Muller, Jr. | Chairman, President and Chief Executive Officer (Principal Executive Officer); Director |
| /s/  VINCENT S. MICELI<br>Vincent S. Miceli | Vice President and Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) |
| /s/  JEAN-PIERRE L. CONTE<br>Jean-Pierre L. Conte | Director |
| /s/  DARREN J. GOLD<br>Darren J. Gold | Director |
| /s/  J. RYAN CLARK<br>J. Ryan Clark | Director |
| /s/  HUNTER NELSON<br>Hunter Nelson | Director |
| /s/  KENT WALLACE<br>Kent Wallace | Director |
| /s/  RICHARD H. GESSECK<br>Richard H. Gesseck | Director |

**Supplemental Information to be Furnished With Reports Filed Pursuant to Section 15(d) of the Act by Registrants Which Have Not Registered Securities Pursuant to Section 12 of the Act.**

The Registrant has not sent an annual report or proxy material to security holders.

(This page has been left blank intentionally.)

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholder of
Panolam Industries International, Inc.
Shelton, Connecticut

We have audited the accompanying consolidated balance sheets of Panolam Industries International, Inc. and subsidiaries (the "Company") as of December 31, 2008 and 2007, and the related consolidated statements of operations, stockholder's (deficit) equity, and cash flows for each of the three years in the period ended December 31, 2008. Our audits also included the financial statement schedule listed in the Index at Item 15. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the consolidated financial position of the Company at December 31, 2008 and 2007, and the consolidated results of its operations and its consolidated cash flows for each of the three years in the period ended December 31, 2008, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Company's significant loss, stockholder's deficit, and the Company's debt covenant violations raise substantial doubt about its ability to continue as a going concern. Management's plans concerning these matters are also discussed in Note 1 to the consolidated financial statements. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

As discussed in Note 13 to the consolidated financial statements, on January 1, 2007 the Company adopted Financial Accounting Standards Board Interpretation No. 48, Accounting for Uncertainty in Income Taxes.

/s/ DELOITTE & TOUCHE LLP

Hartford, Connecticut
March 31, 2009

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**
**(In thousands)**

|  | Year Ended December 31, 2008 | Year Ended December 31, 2007 | Year Ended December 31, 2006 |
|---|---|---|---|
| NET SALES | $ 366,709 | $424,397 | $460,078 |
| COST OF GOODS SOLD | 305,017 | 333,529 | 357,494 |
| FIXED ASSET IMPAIRMENT CHARGE | 5,165 | — | — |
| GROSS PROFIT | 56,527 | 90,868 | 102,584 |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 48,943 | 51,271 | 52,783 |
| GOODWILL AND OTHER INDEFINITE LIVED INTANGIBLE ASSET IMPAIRMENT CHARGES | 121,612 | — | — |
| (LOSS) INCOME FROM OPERATIONS | (114,028) | 39,597 | 49,801 |
| INTEREST EXPENSE | 29,438 | 34,891 | 35,577 |
| INTEREST INCOME | (485) | (612) | (628) |
| (LOSS) INCOME BEFORE INCOME TAX (BENEFIT) EXPENSE | (142,981) | 5,318 | 14,852 |
| INCOME TAX (BENEFIT) EXPENSE | (21,325) | (3,006) | 3,959 |
| NET (LOSS) INCOME | $(121,656) | $   8,324 | $  10,893 |

See notes to consolidated financial statements.

F-2

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**CONSOLIDATED BALANCE SHEETS**
**DECEMBER 31, 2008 AND 2007**
**(In thousands, except share data)**

| | Dec. 31, 2008 | Dec. 31, 2007 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 43,452 | $ 10,744 |
| Accounts receivable, less allowances of $5,978 in 2008 and $7,048 in 2007 | 14,193 | 19,269 |
| Inventories | 55,136 | 58,151 |
| Other current assets | 18,575 | 18,920 |
| Total current assets | 131,356 | 107,084 |
| PROPERTY, PLANT AND EQUIPMENT—Net | 218,330 | 265,045 |
| GOODWILL | — | 102,460 |
| INTANGIBLE ASSETS—Net | 52,083 | 82,921 |
| DEBT ACQUISITION COSTS—Net | 7,057 | 8,814 |
| OTHER ASSETS | 3,457 | 35 |
| TOTAL | $ 412,283 | $566,359 |
| **LIABILITIES AND STOCKHOLDER'S (DEFICIT) EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $ 6,913 | $ 11,780 |
| Accrued liabilities | 19,585 | 25,667 |
| Current portion of long-term debt | 343,937 | 47 |
| Other current liabilities | — | 1,313 |
| Total current liabilities | 370,435 | 38,807 |
| LONG-TERM DEBT, LESS CURRENT PORTION | 13 | 319,894 |
| DEFERRED INCOME TAXES | 61,498 | 81,229 |
| DUE TO PANOLAM HOLDINGS CO. | — | 5,619 |
| OTHER LIABILITIES | 8,216 | 4,848 |
| Total liabilities | 440,162 | 450,397 |
| COMMITMENTS AND CONTINGENCIES (Note 16) | | |
| **STOCKHOLDER'S (DEFICIT) EQUITY:** | | |
| Common stock, $.01 par value—200 shares authorized, 200 shares outstanding | — | — |
| Additional paid-in capital | 81,528 | 81,038 |
| Accumulated (deficit) earnings | (104,434) | 17,222 |
| Accumulated other comprehensive (loss) income | (4,973) | 17,702 |
| Total stockholder's (deficit) equity | (27,879) | 115,962 |
| TOTAL | $ 412,283 | $566,359 |

See notes to consolidated financial statements.

F-3

## PANOLAM INDUSTRIES INTERNATIONAL, INC.
### CONSOLIDATED STATEMENTS OF STOCKHOLDER'S (DEFICIT) EQUITY
### YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006
#### (In thousands, except share data)

| | Common Stock | | Additional Paid-in Capital | Accumulated Earnings (Deficit) | Accumulated Other Comprehensive Income (Loss) | Total Stockholder's (Deficit) Equity | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| BALANCE—December 31, 2005 . . | 200 | $ — | $80,118 | $ (1,995) | $ (368) | $ 77,755 | |
| Net income for the year ended December 31, 2006 . . . . . . . . . | | | | 10,893 | | 10,893 | $ 10,893 |
| Stock option expense . . . . . . . . . | | | 487 | | | 487 | |
| Repurchase and cancellation of common stock . . . . . . . . . . . . . | | | (50) | | | (50) | |
| Other comprehensive income (loss): | | | | | | | |
| Foreign currency translation adjustment . . . . . . . . . . . . . . | | | | | 28 | 28 | 28 |
| Minimum pension liability—net of income taxes of $65 . . . . . . | | | | | (172) | (172) | (172) |
| Comprehensive income . . . . . . . . . | | | | | | | $ 10,749 |
| BALANCE—December 31, 2006 . . | 200 | — | 80,555 | 8,898 | (512) | 88,941 | |
| Net income for the year ended December 31, 2007 . . . . . . . . . . | | | | 8,324 | | 8,324 | $ 8,324 |
| Stock option expense . . . . . . . . . | | | 483 | | | 483 | |
| Adjustment to initially apply FAS 158, net of tax . . . . . . . . . . | | | | | 217 | 217 | |
| Other comprehensive income: | | | | | | | |
| Foreign currency translation adjustment . . . . . . . . . . . . . . | | | | | 17,650 | 17,650 | 17,650 |
| Minimum pension liability—net of income taxes of $174 . . . . . | | | | | 347 | 347 | 347 |
| Comprehensive income . . . . . . . . . | | | | | | | $ 26,321 |
| BALANCE—December 31, 2007 . . | 200 | — | 81,038 | 17,222 | 17,702 | 115,962 | |
| Net loss for the year ended December 31, 2008 . . . . . . . . . . | | | | (121,656) | | (121,656) | (121,656) |
| Stock option expense . . . . . . . . . | | | 490 | | | 490 | |
| Other comprehensive (loss): | | | | | | | |
| Foreign currency translation adjustment . . . . . . . . . . . . . . | | | | | (22,373) | (22,373) | (22,373) |
| Amortization of pension costs . . | | | | | (302) | (302) | (302) |
| Comprehensive loss . . . . . . . . . . . | | | | | | | $(144,331) |
| BALANCE—December 31, 2008 . . | 200 | $ — | $81,528 | $(104,434) | $ (4,973) | $ (27,879) | |

See notes to consolidated financial statements.

F-4

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**
**(In thousands)**

| | Year Ended December 31, 2008 | Year Ended December 31, 2007 | Year Ended December 31, 2006 |
|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net (loss) income | $(121,656) | $ 8,324 | $ 10,893 |
| Adjustments to reconcile net (loss) income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 31,305 | 30,230 | 25,408 |
| Fixed asset impairment charge | 5,165 | — | — |
| Goodwill and other indefinite lived intangible asset impairment charges | 121,612 | — | — |
| Deferred income tax benefit | (19,775) | (492) | (5,143) |
| Amortization of debt acquisition costs | 1,757 | 2,341 | 3,247 |
| Stock based compensation expense | 490 | 483 | 487 |
| Other | 499 | (2) | 181 |
| Changes in operating assets and liabilities, net of acquisitions: | | | |
| Accounts receivable | 4,659 | 3,091 | 13,263 |
| Inventories | 1,838 | (1,765) | 5,512 |
| Other current assets | 1,063 | (909) | (1,851) |
| Accounts payable and accrued liabilities | (12,552) | (7,111) | (13,151) |
| Income taxes payable/receivable | 1,812 | (5,011) | 4,264 |
| Other | (714) | (1,094) | (802) |
| Net cash provided by operating activities | 15,503 | 28,085 | 42,308 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Purchases of property, plant and equipment | (3,407) | (8,838) | (12,619) |
| Acquisition, net of acquired cash | — | — | (77,801) |
| Net cash used in investing activities | (3,407) | (8,838) | (90,420) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Repayment of long-term debt | (2,043) | (20,000) | (25,098) |
| Settlement of amount due to Panolam Holdings Co. | (2,482) | — | — |
| Proceeds from long-term debt | — | 3 | 80,000 |
| Borrowings under revolving credit facility | 25,928 | — | 5,000 |
| Payment of debt acquisition costs | — | (405) | (2,764) |
| Repurchase and cancellation of common stock | — | — | (50) |
| Repayment of borrowings under revolving credit facility | — | — | (5,000) |
| Net cash provided by (used in) financing activities | 21,403 | (20,402) | 52,088 |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | (791) | 1,050 | — |
| NET CHANGE IN CASH AND CASH EQUIVALENTS | 32,708 | (105) | 3,976 |
| CASH AND CASH EQUIVALENT—Beginning of period | 10,744 | 10,849 | 6,873 |
| CASH AND CASH EQUIVALENTS—End of period | $ 43,452 | $ 10,744 | $ 10,849 |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION: | | | |
| Cash payments for interest | $ 27,777 | $ 32,873 | $ 32,032 |
| Cash payments for income taxes, net of refunds | $ (4,286) | $ 2,497 | $ 4,726 |

See notes to consolidated financial statements.

F-5

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**
**(In thousands, except share data)**

## 1. BUSINESS AND BASIS OF PRESENTATION

Panolam Industries International, Inc. (the "Company") designs, manufactures and distributes decorative overlay products, primarily thermally fused melamine panels ("TFMs") and high-pressure laminate sheets ("HPLs"), throughout the United States and Canada. The Company markets its products through independent distributors and directly to kitchen and bathroom cabinet, furniture, and store fixture original equipment manufacturers ("OEMs"). The Company wholly-owns, the following companies:

- Panolam Industries, Ltd.

- Panolam Industries, Inc.

- Pioneer Plastics Corporation ("Pioneer")

- Nevamar Holding Corp. (see Note 3)

The Company's consolidated financial statements include the accounts of Panolam Industries International, Inc. and its subsidiaries and have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these consolidated financial statements requires the Company to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, and expenses, and related disclosures at the date of the Company's consolidated financial statements. On an on-going basis, management evaluates its estimates and judgments, including those related to bad debts, discounts and rebates, inventories, income taxes, long-lived assets, and share-based payments. Management bases its estimates and judgments on historical experience and current market conditions and on various other factors that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions. Management considers the Company's policies on revenue recognition, adjustments for slow moving and obsolete inventories, potentially uncollectible accounts receivable, accruals for customer rebates, income taxes, goodwill, intangible assets and long-lived assets and stock options to be critical accounting policies due to estimates, assumptions, and application of judgment involved in each. See Note 4, "Summary of Significant Accounting Policies" for additional discussion of the Company's policies.

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern and do not include any adjustments that might result from the outcome of the going concern uncertainty. This assumes a continuation of operations and the realization of assets and liabilities in the ordinary course of business. The Company had a net loss of $121,656 for the year ended December 31, 2008. The net loss is principally attributable to $96,691 of goodwill impairment and $24,921 of trade name impairments taken during the year as well as insufficient revenue to cover the Company's high percentage of fixed costs, including the interest costs on its debt and depreciation expense. The Company also had a stockholder's deficit of $27,879 at December 31, 2008. As discussed in Note 11, "Debt and Capital Lease Obligations," as of December 31, 2008, the Company was not in compliance with all of its financial and reporting covenants under the Credit Facility, which constitutes a default. As a result, the lenders have the ability to accelerate the payment obligations and, in the event there was availability under the revolver, the Company would not be permitted to borrow funds until its noncompliance is cured or waived by the lenders. The Company does not expect to be in compliance with the financial covenants as of March 31, 2009, the next compliance measurement date.

F-6

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 1. BUSINESS AND BASIS OF PRESENTATION (Continued)

On February 27, 2009, the Company received a notice of default from the agent for the lenders under its Credit Facility due to the Company's failure to comply with certain financial and reporting covenants. On March 31, 2009, the Company entered into a forbearance agreement with its lenders pursuant to which they have agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate the Company's payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The terms of the Forbearance Agreement prohibit the Company from, among other things, paying the April 1, 2009 interest payment on the Notes. Failure to make such interest payment is a default under the indenture governing the Notes and entitles the holders of the Notes (after a thirty day grace period) to accelerate the Company's obligations under the Notes. In addition, if the Company is unable to restructure or refinance the Credit Facility, its lenders could accelerate its payment obligations under the Credit Facility and, because of cross default provisions, the holders of the Notes would have the right to accelerate the Company's obligations under the Notes. Based on these acceleration rights, the Company has reclassified approximately $343.9 million from long-term debt to current debt as of December 31, 2008.

In the event that most or all of the Company's obligations under the Credit Facility and Notes become due and payable, the Company would be unable to fund its payment obligations. The Company is in active discussions with its lenders to restructure its debt obligations; however, given the current negative conditions in its industry and the economy generally and the credit markets in particular, the Company cannot give any assurance that it will be successful in restructuring its debt or finding alternative financing arrangements. The Company has engaged financial and legal advisors to assist them in these discussions, but if the Company is not able to find a timely solution, it may be compelled to file for bankruptcy protection.

As a result of the these factors, there is substantial doubt about the Company's ability to continue as a going concern.

## 2. THE TRANSACTION

On July 16, 2005, Panolam Industries Holdings, Inc. ("Old Holdings") (which at the time was controlled by affiliates of The Carlyle Group), entered into an agreement and plan of merger (the "Merger Agreement") providing for the merger of PIH Acquisition Co. ("PIH"), a subsidiary of Panolam Holdings II Co. ("Holdings II"), into Old Holdings for aggregate cash consideration of $347,500 less funded debt at closing and certain expenses of the transaction.

In addition, $4,000 of the merger consideration was paid into escrow pending determination of any working capital adjustment following calculation of the working capital on the Closing Date, pursuant to terms and conditions specified in the Merger Agreement. On September 30, 2005 (the "Closing Date"), pursuant to the terms of the merger agreement, PIH was merged with and into Old Holdings. Immediately following the merger on the Closing Date, Old Holdings was merged through a series of transactions with and into Panolam Industries International, Inc. The Company refers to these merger transactions as the Merger or Transaction. The Merger was accounted for using the purchase method of accounting.

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**
**(In thousands, except share data)**

## 2. THE TRANSACTION (Continued)

The parent of Holdings II, Panolam Holdings Co. ("Panolam Holdings"), is controlled by Genstar Capital LLC ("Genstar Capital") and The Sterling Group (collectively the "Sponsors").

Financing for the acquisition consisted of the following (see Note 11):

- The Company entered into a new senior credit facility, or Credit Facility, for a total amount of $155,000. The Credit Facility has a term loan tranche of $135,000 and a revolving loan tranche for $20,000 for general corporate purposes. $2,500 of the revolving loan was drawn at the consummation of the acquisition to fund any cash on the balance sheet at closing, which was repaid in October 2005.

- The Company issued $151,000 of its 10¾% Senior Subordinated Notes due 2013 (the "Notes").

- The Sponsors, together with the chief executive officer and certain other members of management, contributed $80,000 in equity to Panolam Holdings, which was subsequently contributed to the capital of the Company.

## 3. THE ACQUISITION OF NEVAMAR

On March 1, 2006, Panolam Industries International, Inc. acquired all of the outstanding equity securities of Nevamar Holdco, LLC, the parent of Nevamar Company, LLC ("Nevamar") a leading manufacturer of decorative surface products. Nevamar is included in the results of the Company beginning on March 1, 2006. Nevamar designs and sells decorative laminates and other surfacing materials used in the commercial and residential furniture, fixtures and cabinet markets, as well as the graphic arts industry. The total consideration paid for Nevamar was $80,000, consisting of $75,000 in cash and the issuance by Panolam to the sellers of $5,000 of junior subordinated notes. At the time of closing, $1,000 of the purchase price was put into an escrow account, which was ultimately returned to the Company in the form of a working capital adjustment pursuant to the acquisition agreement. In addition, the Company incurred $3,863 in closing costs related to the Nevamar acquisition. Certain indemnity claims Panolam may have under the acquisition agreement may be offset against the subordinated notes issued to the sellers. At December 31, 2007, the Company offset approximately $138 in claims against the junior subordinated notes. In January 2008, the Company settled the junior subordinated notes with the sellers for $2,377 and as part of the settlement agreement, the Company will no longer be indemnified by the sellers for certain claims. As a result of the settlement, the intercompany payable to the Company's parent, Panolam Holdings Co., was no longer outstanding as of December 31, 2008 and the Company recorded liabilities in accrued liabilities and other liabilities in anticipation of such unindemnified claims. In addition, the Company incurred $105 in legal and bank fees related to this settlement. In connection with the Nevamar acquisition, the Company expanded its Credit Facility and borrowed an additional $80,000 of long-term debt. Debt acquisition costs related to the $80,000 loan totaled $2,764. See Note 9.

In connection with this acquisition, purchase accounting was applied and completed, and all assets were revalued based on valuations and other studies. No goodwill resulted from this acquisition because the fair value of assets acquired was in excess of the cost of this acquisition. Such excess fair value was used to reduce the allocated costs of the assets acquired. Of the $9,164 of acquired intangible assets, $6,138 was assigned to key customer lists, $2,753 to trademarks and patents and other assets of $273. The acquired intangibles assets have a total weighted-average useful life of approximately 13 years.

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

### 3. THE ACQUISITION OF NEVAMAR (Continued)

The following unaudited pro forma consolidated financial statements have been prepared from the statement of operations for the year ended December 31, 2006 to give effect to our acquisition of Nevamar. The acquisition occurred on March 1, 2006 and the following pro forma statement gives effect as if the acquisition had occurred on January 1, 2006. The assumptions underlying the pro forma adjustments are described in the accompanying notes, which should be read in conjunction with the unaudited pro forma consolidated financial data.

The unaudited pro forma adjustments are based upon available information and certain assumptions that the Company believes are reasonable under the circumstances. The unaudited pro forma consolidated financial data do not purport to represent what the results of operations or financial condition would have been had the Nevamar acquisition actually occurred on the date indicated, nor do they purport to project the results of the operations or financial condition for any future period or as of any future date.

**Panolam Industries International, Inc.**
**Unaudited Pro Forma Consolidated Statement of Operations**
**Year Ended December 31, 2006**
**(in thousands)**

|  | Successor Historical | Nevamar Adjustments (1) | Purchase Accounting Adjustments | Pro Forma |
|---|---|---|---|---|
| Net sales | $460,078 | $33,109 | $   — | $493,187 |
| Cost of goods sold(4) | 357,494 | 27,117 | 532 (2) | 385,143 |
| Gross profit (loss) | 102,584 | 5,992 | (532) | 108,044 |
| Selling, general and administrative expenses | 52,783 | 5,109 | 127 (2) | 58,019 |
| Income (loss) from operations | 49,801 | 883 | (659) | 50,025 |
| Interest expense | 35,577 | 281 | 807 (3) | 36,665 |
| Interest income | (628) | (12) | — | (640) |
| Income (loss) before income taxes (benefit) | 14,852 | 614 | (1,466) | 14,000 |
| Income taxes (benefit) | 3,959 | — | (328)(5) | 3,631 |
| Net income (loss) | $ 10,893 | $    614 | $ (1,138) | $ 10,369 |

(1) Reflects Nevamar's pre-acquisition operating results for January and February 2006.

(2) Includes additional depreciation and amortization expense for the two months of $659 resulting from the Nevamar step-up in fixed assets and other intangible assets related to the purchase price allocation as part of the acquisition.

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

### 3. THE ACQUISITION OF NEVAMAR (Continued)

(3)  Includes additional interest expense for the two months resulting from the Nevamar acquisition, which is calculated as follows:

| | |
|---|---:|
| Interest on new borrowings(a) | $ 954 |
| Increase in amortization of debt acquisition cost | 68 |
| Interest on new borrowings(b) | 66 |
| Nevamar interest expense(c) | (281) |
| | $ 807 |

   (a)  Represents pro forma interest expense calculated using an interest rate of 7.28% on the $80,000 of additional draw down under the Company's Credit Facility, which was the applicable interest rate at the time of the borrowing.

   (b)  Represents pro forma interest expense calculated using the fixed interest rate of 8.0% on the intercompany payable of $5,000 to Panolam Holdings related to the issuance of junior subordinated notes to the former owners of Nevamar.

   (c)  Represents pro forma interest expense adjustment relating to Nevamar's long-term debt for January and February 2006 that was settled at the date of acquisition and not assumed by Panolam Industries International, Inc.

(4)  The Successor historical statement of operations includes all of the purchase accounting fair value adjustment related to inventory of $2,498 in cost of goods sold.

(5)  Reflects tax effect of Nevamar and purchase accounting adjustments at a blended rate of 38.5%.

### 4. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Use of Estimates—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from these estimates.

Principles of Consolidation—The consolidated financial statements include the accounts of the Company and its subsidiaries. All intercompany accounts and transactions have been eliminated.

Revenue Recognition—Revenues are recognized upon shipment of products to customers, at which time, the price is fixed and determinable, collectibility is reasonably assured and all the provisions agreed to in the arrangement necessary for customer acceptance have been fulfilled. The date of shipment corresponds to the date upon which the customer takes ownership of the product. Sales, including shipping charges, are recorded net of applicable provisions for discounts and allowances including customer rebates.

Cash and Cash Equivalents—Cash and cash equivalents include short-term, highly liquid investments with original maturities of three months or less when purchased. The majority of our money market funds at December 31, 2008 were maintained with one financial institution. We maintain our cash deposits and cash equivalents with well-known and stable financial institutions. However, we

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 4. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

have significant amounts of cash and cash equivalents at these financial institutions that are in excess of federally insured limits. This represents a concentration of credit risk. With the current financial environment and the instability of financial institutions we cannot be assured that we will not experience losses on our deposits, however, we have not experienced any losses on our deposits of cash and cash equivalents to date.

Allowance for Uncollectible Accounts; Discounts and Rebates—The Company reviews its trade accounts receivable balances for collectibility on a regular basis and whenever events and circumstances indicate that the carrying amount may not be collectible and provides for any unrealizable amounts. In making such determinations, the Company uses its industry experience, customer history and current economic factors. In addition, the Company provides allowances for cash discounts based on the average annual expected discounts and also provides for rebates based on experience by customer and the current period's rebatable sales projections.

Inventories—Inventories are stated at the lower of cost using the first-in first-out method or market.

Inventory Adjustments—The Company provides adjustments for excess, slow-moving and obsolete raw materials and finished goods based on estimates of future projections and current conditions.

Property, Plant and Equipment—Property, plant and equipment is stated at cost. Significant additions, major renewals and improvements are capitalized and depreciated while expenditures for maintenance and repairs are charged to operations as incurred. Long-lived assets are reviewed for impairment whenever facts and circumstances indicate that the carrying amount may not be fully recoverable. Depreciation is computed using the straight-line method for financial reporting purposes. Estimated useful lives for financial reporting purposes are as follows:

| | |
|---|---|
| Buildings and improvements | 20 to 40 years |
| Machinery and equipment | 3 to 20 years |

Goodwill and Indefinite-Lived Intangible Assets—Goodwill and intangible assets with indefinite useful lives are tested for impairment at least annually, or whenever circumstances indicate that impairment may have occurred. The Company performs its required impairment tests of goodwill and other indefinite lived intangible assets as of each December 31. The Company performed its required impairment tests of goodwill and other indefinite lived intangible assets as of December 31, 2008 and recorded impairment charges of $96,691 and $24,921 for goodwill and other indefinite lived intangible assets, respectively. No impairment was required to be recognized in 2007 or 2006.

Investments—The Company maintained no investments at December 31, 2008 and 2007.

Impairment of Long-Lived Assets and Other Finite Life Intangibles—Long-lived assets, including property, plant and equipment and other finite life intangible assets, are reviewed for impairment whenever events or changes in circumstances indicate that their respective carrying amounts may not be recoverable by applying a recoverability test based on projections of undiscounted future cash flows. If estimates of future undiscounted cash flows are insufficient to recover the carrying value of the long-lived asset group, the Company compares the fair value of the asset group to the net book value to determine if the carrying value is impaired. As a result of testing during the fourth quarter, the Company recorded $5,165 in impairment of fixed assets.

F-11

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**
**(In thousands, except share data)**

## 4. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Foreign Currency Translation—The local currency is the functional currency for the Company's Canadian operation. Assets and liabilities denominated in Canadian dollars are translated at the exchange rate in effect at the balance sheet date. Statement of operations amounts are translated using the average exchange rate for the year. The gains and losses resulting from the changes in the exchange rates from year to year are reported in other comprehensive income (loss) as a separate component of stockholder's (deficit) equity.

Shipping and Handling Costs—Shipping and handling costs of $19,947, $22,337 and $26,721 for the years ended December 31, 2008, 2007 and 2006, respectively, are recorded in cost of goods sold in the consolidated statements of operations.

Advertising Expense—The cost of advertising is expensed as incurred. The Company incurred $4,110, $2,656 and $2,776 in advertising costs during the years ended December 31, 2008, 2007 and 2006, respectively.

Research and Development Expense—The cost of research and development is expensed as incurred. The Company incurred $698, $813 and $633 in research and development costs during the years ended December 31, 2008, 2007 and 2006, respectively.

Debt Acquisition Costs—Debt acquisition costs are amortized over the term of the associated debt as interest expense. These costs are amortized using the interest method.

Pension Expenses—The cost of pension benefits earned by the employees covered by defined benefit plans is actuarially determined using the projected benefit method (prorated on service), and management's best estimate of expected plan investment performance, salary escalation, terminations and retirement ages of plan members.

Income Taxes—Deferred income taxes are provided on net operating loss carryovers and on the future income tax consequences associated with temporary differences between the carrying amounts of assets and liabilities for tax and financial reporting purposes. Deferred income tax assets and liabilities are measured using tax rates expected to apply in the years in which those temporary differences are expected to reverse. The effect of changes in income tax rates is recognized in earnings in the period in which the change occurs. The Company files a consolidated federal income tax return except for its foreign subsidiary, which files in its local jurisdiction.

Stock Options—Effective October 1, 2005, the Company adopted Statement of Financial Accounting Standards ("SFAS") No. 123(R), Share-Based Payments. SFAS No. 123(R) requires that the cost resulting from all share-based payment transactions be recognized in the financial statements. SFAS No. 123(R) establishes fair value as the measurement objective in accounting for share-based payment arrangements and requires all companies to apply a fair-value based measurement in accounting generally for all share-based payment transactions with employees. This method includes estimates and judgments pertaining to term, volatility, risk-free interest rates, dividend yields and forfeiture rates.

Segments—The Company has two reportable segments, decorative laminates and other. Decorative laminates manufactures and distributes decorative laminates, primarily TFM and HPL, for use in a wide variety of residential and commercial indoor surfacing applications. The Company's other segment includes the production and marketing of a variety of specialty resins for industrial uses, custom treated and chemically prepared decorative overlay papers and a variety of other industrial laminates.

F-12

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

### 4. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Significant Customers and Concentration of Credit Risk—The Company primarily sells HPLs and TFMs to various distributors and OEM customers. The Company extends credit to its customers based on an evaluation of their financial condition. The Company reviews its trade accounts receivable balances for collectibility whenever events and circumstances indicate that the carrying amount may not be collectible and provides currently for any unrealizable amounts.

The Company had uncollateralized accounts receivable from five nonaffiliated customers approximating 14% and 11% of total gross accounts receivable balances at December 31, 2008 and 2007, respectively. Sales to these five nonaffiliated customers were 8%, 7%, and 9% of consolidated net sales for the years ended December 31, 2008, 2007 and 2006, respectively. No single customer represented more than 10% of sales or accounts receivable at December 31, 2008 and 2007.

New Accounting Pronouncements—In March 2008, the Financial Accounting Standards Board ("FASB") issued SFAS No. 161, Disclosures about Derivative Instruments and Hedging Activities—an amendment of FASB Statement No. 133, Accounting for Derivative Instruments and Hedging Activities. SFAS No. 161 expands the current disclosure requirements of SFAS No. 133, such that entities must now provide enhanced disclosures on a quarterly basis regarding how and why the entity uses derivatives; how derivatives and related hedged items are accounted for under SFAS No. 133 and how derivatives and related hedged items affect the entity's financial position, performance and cash flow. Pursuant to the transition provisions of this statement, the Company will adopt SFAS No. 161 in fiscal year 2009 and will present the required disclosures in the prescribed format on a prospective basis. This statement is not likely to impact the Company's consolidated financial statements.

In December 2007, the FASB issued SFAS No. 160, Noncontrolling Interests in Consolidated Financial Statements including an amendment of Accounting Research Bulletin ("ARB") No. 51, which establishes accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. This statement is effective for financial statements issued for fiscal years beginning after December 15, 2008. It is not expected to have a material impact on the Company's consolidated financial statements.

In December 2007, the FASB issued SFAS No. 141(R), Business Combinations, which addresses the information that a reporting entity provides in its financial reports about a business combination and its effects. To accomplish this, this Statement establishes principles and requirements for how the acquirer recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, any noncontrolling interest in the acquiree, the goodwill acquired in the business combination or a gain from a bargain purchase and how the acquirer determines what information to disclose to enable users of the financial statements to evaluate the nature and financial effects of the business combination. This statement is effective for financial statements issued for fiscal years beginning after December 15, 2008. It is not expected to have a material impact on the Company's consolidated financial statements.

In February 2007, the FASB issued SFAS No. 159, The Fair Value Option for Financial Assets and Financial Liabilities—Including an amendment of FASB Statement No. 115, which became effective in 2008. SFAS No. 159 permits entities to measure eligible financial assets, financial liabilities and firm commitments at fair value, on an instrument-by-instrument basis, that are otherwise not permitted to be accounted for at fair value under other generally accepted accounting principles. The fair value measurement election is irrevocable and subsequent changes in fair value must be recorded in earnings.

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 4. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

The Company adopted this statement in 2008 and elected not to adopt the fair value option for any of its eligible financial instruments and other items.

In September 2006, the FASB issued SFAS No. 157, Fair Value Measurements. SFAS No. 157 defines fair value, establishes a framework for measuring fair value in accordance with generally accepted accounting principles, and expands disclosures about fair value measurements. On February 12, 2008, the FASB issued FASB Staff Position 157-2 ("FSP 157-2") that partially deferred the effective date of SFAS No. 157 for one year for non-financial assets and non-financial liabilities that are recognized or disclosed at fair value in the financial statements on a nonrecurring basis. Other than this deferred portion, the Company adopted SFAS No. 157 in 2008 and it did not have a material impact on its consolidated financial statements. The Company adopted the deferral of FSP 157-2 on January 1, 2009, and such adoption did not have a material impact on its consolidated financial statements.

## 5. INVENTORIES

Inventories consist of:

|  | December 31, | |
| --- | --- | --- |
|  | **2008** | **2007** |
| Raw materials | $23,798 | $25,029 |
| Work in process | 5,557 | 5,877 |
| Finished goods | 25,781 | 27,245 |
|  | $55,136 | $58,151 |

## 6. OTHER CURRENT ASSETS

Other current assets consist of:

|  | December 31, | |
| --- | --- | --- |
|  | **2008** | **2007** |
| Income taxes receivable | $ 5,327 | $ 5,176 |
| Deferred income taxes—current (see Note 13) | 4,728 | 3,206 |
| Prepaid insurance | 2,557 | 2,887 |
| Other current assets | 5,963 | 7,651 |
|  | $18,575 | $18,920 |

F-14

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 7. PROPERTY, PLANT AND EQUIPMENT, NET

Property, plant and equipment, net consists of:

|  | December 31, | |
|---|---|---|
|  | **2008** | **2007** |
| Land | $ 4,896 | $ 5,096 |
| Buildings and improvements | 61,552 | 66,766 |
| Machinery and equipment | 226,087 | 242,269 |
| Construction in process | 2,334 | 3,855 |
|  | 294,869 | 317,986 |
| Accumulated depreciation | (76,539) | (52,941) |
|  | $218,330 | $265,045 |

Depreciation expense was $27,291, $26,069 and $21,152 for the years ended December 31, 2008, 2007 and 2006, respectively. Depreciation expense related to the Company's manufacturing processes and administrative functions is included in the consolidated statement of operations in cost of goods sold and selling, general and administrative expenses, respectively. Capitalized interest expense was zero, $655 and $439 for the years ended December 31, 2008, 2007 and 2006. Capital leases of $15 and $69 at December 31, 2008 and 2007, respectively, are included in machinery and equipment. As described in Note 4, as a result of testing for recoverability during the fourth quarter, the Company recorded an impairment charge related to its fixed assets of $5,165.

## 8. GOODWILL AND INTANGIBLE ASSETS, NET

The Company adopted SFAS No. 142, "Goodwill and Other Intangible Assets", ("SFAS No. 142") on January 1, 2002. SFAS No. 142 requires that goodwill and other indefinite-lived intangible assets be tested for impairment at least on an annual basis. The Company performs an annual impairment test at December 31, or more frequently should conditions that could affect fair value change significantly.

The Company has two reporting units, as defined under SFAS No. 142: Decorative Laminates and Other. A reporting unit is defined as an operating segment or one level below an operating segment. The Company's reporting units are equivalent to its operating segments, as there is no discrete financial information available for the separate components of the segment, or all of the components of the segment have similar economic characteristics. Prior to recording the goodwill impairment charge, $93,772 in recorded goodwill resided under the Company's Decorative Laminate reporting unit and $2,919 resided under the Other reporting unit.

During the fourth quarter of 2008, there was continued deterioration in the U.S. economy and the credit markets generally, and particularly in residential and commercial construction, which resulted in further sales declines. This deterioration had a significant impact on the Company's business and management therefore revised its forward-looking business projections downward, and used the updated projections to perform the Company's annual test for goodwill impairment on December 31. The first step in the goodwill impairment test compares the fair value of the reporting unit to its carrying value. If the carrying value of the reporting unit exceeds its fair value, the second step of the impairment test is performed to measure the impairment. Based on this testing, management determined that the fair value of both of the reporting units determined under step 1 was less than the carrying value of its reporting units. Accordingly, management performed a step 2 analysis to determine

## PANOLAM INDUSTRIES INTERNATIONAL, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
### YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006
#### (In thousands, except share data)

### 8. GOODWILL AND INTANGIBLE ASSETS, NET (Continued)

the extent of the goodwill impairment. In the second step, the fair value of the reporting unit is allocated to all of the assets and liabilities of the reporting unit to determine an implied goodwill value. This allocation is similar to a purchase price allocation performed in purchase accounting. If the carrying amount of the reporting unit goodwill exceeds the implied goodwill value, an impairment loss should be recognized in an amount equal to that excess. Based on the results of step 2, the Company concluded that the carrying value of the goodwill of both reporting units was fully impaired. This resulted in a non-cash impairment charge of $96,691. There was no such goodwill impairment charge in 2007 or 2006.

The Company additionally performed impairment testing related to its indefinite lived intangible assets in accordance with SFAS No. 142. This involves comparing the fair value to the recorded carrying value of the assets. As a result of this analysis, the Company recorded an impairment charge of $24,921 related to indefinite lived intangible assets. In 2007 and 2006, the Company did not record any impairment charges related to indefinite lived intangible assets.

The Company accounts for finite-lived intangible assets under SFAS No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets. These assets are grouped with other long-lived assets and are reviewed for impairment whenever events or changes in circumstances indicate that their respective carrying amounts may not be recoverable. Assessment for possible impairment is based on the Company's ability to recover the carrying value of the long-lived asset group from the expected future pre-tax cash flows (undiscounted and without interest charges). If the expected future cash flows are less than the carrying value of such assets, an impairment loss is recognized for the difference between estimated fair value and carrying value. No impairment charges related to finite lived intangible assets were recorded in 2008, 2007 or 2006.

Intangible assets, net include the following:

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2008** | | | **2007** | | |
| | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) |
| Patents and trademarks . . . . . . | $ 9,407 | $ 2,829 | 3, 12, 14 | $ 9,134 | $1,853 | 3, 12, 14 |
| Key customer list . . . . . . . . . . | 43,574 | 9,270 | 15 | 43,574 | 6,365 | 15 |
| Other . . . . . . . . . . . . . . . . . . | 1,220 | 1,220 | 3, 10 | 1,602 | 1,195 | 3, 10 |
| Trademarks and tradenames with indefinite useful lives . . | 11,201 | — | — | 38,024 | — | — |
| | $65,402 | $13,319 | | $92,334 | $9,413 | |

Amortization expense was $4,014, $4,161 and $4,130 for the years ended December 31, 2008, 2007 and 2006, respectively. Expected amortization expense for 2009 through 2013 follows:

| | |
|---|---|
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,688 |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,660 |
| 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,660 |
| 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,660 |
| 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,660 |

PANOLAM INDUSTRIES INTERNATIONAL, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006

(In thousands, except share data)

## 9. DEBT ACQUISITION COSTS

At December 31, 2008 and 2007, the debt acquisition costs and accumulated amortization was as follows:

| | December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2008 | | | 2007 | | |
| | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) |
| Debt Acquisition Costs . . . . . . | $14,967 | $7,910 | 7 | $14,967 | $6,153 | 7 |

Amortization of debt acquisition costs for the years ended December 31, 2008, 2007 and 2006, was $1,757, $2,341 and $3,247, respectively. Amortization expense related to debt acquisition costs is included in interest expense. During 2007, the Company incurred $405 of additional debt acquisition costs associated with the registration of the Notes with the Securities and Exchange Commission.

## 10. ACCRUED LIABILITIES

Accrued liabilities consist of:

| | December 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| Salaries, wages and employee benefits . . . . . . . . . . . . . . . . . . . | $ 5,635 | $ 9,383 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,058 | 4,297 |
| Customer rebates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,240 | 2,383 |
| Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,026 | 2,336 |
| Freight  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 827 | 1,590 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,799 | 5,678 |
| | $19,585 | $25,667 |

## 11. DEBT AND CAPITAL LEASE OBLIGATIONS

Long-term debt consists of:

| | December 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| Senior Subordinated Notes, due 2013, face amount $151,000 less discount of $590 in 2008 and $714 in 2007, bearing interest at 10.75% . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 150,410 | $150,286 |
| Senior Secured Term Loan, maturing 2012, bearing interest at December 31, 2008 of 3.22% and 7.59% at December 31, 2007 . | 167,586 | 169,586 |
| Revolver borrowings, bearing interest at December 31, 2008 of 4.50%  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,928 | — |
| Capitalized lease obligations . . . . . . . . . . . . . . . . . . . . . . . . . | 26 | 69 |
| | 343,950 | 319,941 |
| Current portion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (343,937) | (47) |
| | $      13 | $319,894 |

PANOLAM INDUSTRIES INTERNATIONAL, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006

(In thousands, except share data)

**11. DEBT AND CAPITAL LEASE OBLIGATIONS (Continued)**

Senior Subordinated Notes—As part of the Transaction (see Note 2); the Company issued the Notes on September 30, 2005. Interest is paid semi-annually in arrears on April 1 and October 1; interest payments commenced on April 1, 2006. The Notes will mature on October 1, 2013. The Company capitalized a total of $5,420 of financing fees that are being amortized over the life of the Notes. The Notes are guaranteed by all of the Company's subsidiaries including Nevamar, except Panolam Industries Limited (the Canadian subsidiary). These guarantees are joint and several and full and unconditional.

Senior Secured Term Loan and Revolving Credit Loan—As part of the Transaction (see Note 2), the Company entered into the Senior Secured Term Loan and Loan (the "Credit Facility") which originally provided for an aggregate committed amount of up to $155,000 consisting of two tranches; a $135,000 term loan and a $20,000 revolving loan. The term and revolver borrowings may be designated as base rate or Eurodollar rate borrowings, as defined, plus an applicable interest margin. The applicable interest margin on the revolver is reset quarterly based upon certain ratios as defined in the credit agreement. As of December 31, 2008, the Company had $25,928 in revolver borrowings and no revolver borrowings at December 31, 2007. The outstanding revolver borrowings as of December 31, 2008 reflect a decision by the Company to borrow its remaining availability under the revolving credit facility due to the uncertainty in both the economy and the credit markets and in order to have as much liquidity as possible to respond to further downturns in the business. As of December 31, 2008 and 2007, the Company had letters of credit issued for worker's compensation claims in an aggregate amount of $4,072 outstanding under the Credit Facility. The term loan portion of the Credit Facility is for 7 years and the revolving loan portion is for 5 years.

The original quarterly repayment amount of the term loan facility was $338 with the balance due at September 30, 2012. Subsequent to the amendment of the Credit Facility, the repayment of the principal amount of the amended term loan facility was scheduled to be paid in quarterly installments of $538 beginning March 31, 2006 with the balance of the principal due on September 30, 2012. During the years ended December 31, 2007 and 2006, the Company prepaid $20,000 and $24,539 of its term loan balance, respectively, and during the year ended December 31, 2008, the Company prepaid an additional $2,000 of its term loan balance. As a result of the prepayments, the Company is no longer required to make any repayment of future principal installments until September 30, 2012, the loan maturity date. The interest rate on the term loan facility was 3.22% at December 31, 2008.

The Credit Facility covenants limit, among other things, the Company's ability to incur debt, pay dividends, change its capital structure, make guarantees, assume liens, and dispose of assets. These covenants include requirements for the Company to maintain a maximum total leverage ratio of 5.0 and a minimum interest coverage ratio of 2.0, as well as an annual maximum capital expenditures limitation of $8,000 all as of December 31, 2008. The Credit Facility also contains certain customary events of default, which in some instances are subject to grace periods. As of December 31, 2008, the Company was not in compliance with certain financial and reporting covenants including its leverage and interest coverage covenants under its Credit Facility, which constitutes a default thereunder. Furthermore, the Company does not expect to be in compliance with the financial covenants as of March 31, 2009, the next compliance measurement date. As a result, the lenders under the Credit Facility have the ability to accelerate the Company's obligations to make payments under the Credit Facility and, in the event there was availability under revolver, the Company would not be permitted to borrow funds until the noncompliance is cured or waived by the lenders.

PANOLAM INDUSTRIES INTERNATIONAL, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006

(In thousands, except share data)

### 11. DEBT AND CAPITAL LEASE OBLIGATIONS (Continued)

On February 27, 2009, the Company received a notice of default from the agent for the lenders under its Credit Facility due to the Company's failure to comply with certain financial and reporting covenants. On March 31, 2009, the Company entered into a forbearance agreement with its lenders pursuant to which they have agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate the Company's payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The terms of the Forbearance Agreement prohibit the Company from, among other things, paying the April 1, 2009 interest payment on the Notes. Failure to make such interest payment is a default under the indenture governing the Notes and entitles the holders of the Notes (after a thirty day grace period) to accelerate the Company's obligations under the Notes. In addition, if the Company is unable to restructure or refinance the Credit Facility, its lenders could accelerate its payment obligations under the Credit Facility and, because of cross default provisions, the holders of our Notes would have the right to accelerate the Company's obligations under the Notes. Based on these acceleration rights, the Company has reclassified approximately $343.9 million from long-term debt to current debt as of December 31, 2008.

In the event that most or all of the Company's obligations under the Credit Facility and Notes become due and payable, the Company would be unable to fund its payment obligations. The Company is in active discussions with its lenders to restructure its debt obligations; however, given the current negative conditions in its industry and the economy generally and the credit markets in particular, the Company cannot give any assurance that it will be successful in restructuring its debt or finding alternative financing arrangements. The Company has engaged financial and legal advisors to assist them in these discussions, but if the Company is not able to find a timely solution, it may be compelled to file for bankruptcy protection.

The indenture governing the Company's Notes also contains a number of covenants that restrict the Company's ability to incur or guarantee additional indebtedness or issue disqualified or preferred stock, pay dividends or make other equity distributions, repurchase or redeem capital stock, make investments or other restricted payments, sell assets, engage in transactions with affiliates, create liens or consolidate or merge with or into other companies, and the ability of the Company's restricted subsidiaries to make dividends or distributions to the Company. Future principal debt payments are expected to be paid with cash flow generated by operations. On March 30, 2009, the agent for the lenders under the Credit Agreement provided the Company with a "blockage notice" directing the Company not to make an April 1, 2009 interest payment on the Notes.

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

**11. DEBT AND CAPITAL LEASE OBLIGATIONS (Continued)**

The Company has used the funds under the Credit Facility, together with the proceeds from the Notes and the capital contribution (see Note 2), to fund the retirement of the Company's previously outstanding first and second lien loans, to repay the shareholders of the Predecessor Company and for working capital requirements, permitted encumbrances, capital expenditures, the Nevamar acquisition and other general corporate purposes.

At December 31, 2008, the Company's future debt principal payments are scheduled as follows and are based on the original terms and conditions of the Company's Credit Facility and Notes. This schedule does not reflect the condition that if the debt holders chose to accelerate the obligations, all amounts shown below would be due and payable in 2009:

| | |
|---|---:|
| 2009 | $ — |
| 2010 | 25,928 |
| 2011 | — |
| 2012 | 167,586 |
| 2013 | 150,410 |
| | $343,924 |

The future principal payments on the Notes due in 2013 are net of the unamortized discount of $590.

At December 31, 2008, future capital lease payments, including an immaterial amount of interest, are as follows:

| | |
|---|---:|
| 2009 | $13 |
| 2010 | 13 |
| | $26 |

**12. EMPLOYEE BENEFIT PLANS**

***Nevamar Pension Plan***—Nevamar established the Retirement Plan of Nevamar Company, LLC (the "U.S. Plan"), a noncontributory defined benefit plan, on July 1, 2002. The U.S. Plan was established as a result of the spin-off of Nevamar from International Paper Company ("IP"). The U.S. Plan covers only employees covered under the collective bargaining agreements maintained and negotiated at facilities in Odenton, MD; Hampton, SC; Franklin, VA; and Waverly, VA.

All participants in the U.S. Plan immediately preceding the spin-off from IP were credited with service under the IP Pension Plan as of June 30, 2002 for the following purposes: eligibility to participate, vesting, benefit accrual and eligibility for early retirement and other subsidies. However, the benefit payable to each participant under the U.S. Plan was offset by the amount of benefit payable under the IP Pension Plan. For all other participants eligibility begins after reaching age 21 and the completion of a year of service except for employees at the Franklin location who were eligible immediately upon hire. Normal retirement age is 65. Benefits for each of the applicable locations are based on a formula, as defined in the U.S. Plan, and length of service. The funding policy is to make

F-20

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 12. EMPLOYEE BENEFIT PLANS (Continued)

the minimum annual contributions required by applicable regulations. This plan was curtailed on May 24, 2004.

*Canadian Pension Plan*—Through October 1998, the Company maintained a defined benefit pension plan covering certain Canadian employees (the "International Plan") at which time the Company transferred certain participants into a defined contribution plan. The participants remaining in the defined benefit plan subsequent to October 1998 continue to participate in such plan. This plan covers certain Canadian employees; the participants remaining in the defined benefit plan subsequent to October 1998 continue to participate in the plan.

*Other Postretirement Benefit Plan*—The Company maintains noncontributory life insurance and medical plans that cover all Canadian employees with over 20 years of service.

The following table shows the changes in the benefit obligations and the plan assets for the above plans and their funded status. The pension and post-retirement liabilities are included in Other Liabilities on the Consolidated Balance Sheets.

|  | Pension Plans | | Other Post-Retirement Benefits | |
|---|---|---|---|---|
|  | 2008 | 2007 | 2008 | 2007 |
| **Changes in benefit obligation:** |  |  |  |  |
| Benefit obligations—beginning of year | $15,788 | $14,793 | $ 2,741 | $ 2,531 |
| Service cost | 269 | 289 | 51 | 60 |
| Member contributions | 52 | 51 | — | — |
| Interest cost | 816 | 779 | 133 | 129 |
| Actuarial gain | (2,345) | (1,505) | (584) | (358) |
| Foreign exchange translation | (2,079) | 1,874 | (471) | 434 |
| Benefits paid | (515) | (493) | (54) | (55) |
| Benefit obligations—end of year | $11,986 | $15,788 | $ 1,816 | $ 2,741 |
| **Changes in plan assets:** |  |  |  |  |
| Fair value of plan assets—beginning of year | $14,450 | $12,051 | $ — | $ — |
| Actual loss on assets | (2,456) | (310) | — | — |
| Contributions | 1,059 | 1,439 | — | — |
| Member contributions | 52 | 51 | — | — |
| Foreign exchange translation | (2,034) | 1,712 | — | — |
| Benefits paid | (515) | (493) | — | — |
| Fair value of plan assets—end of year | $10,556 | $14,450 | $ — | $ — |
| Funded status recognized in financial statements | $(1,430) | $(1,338) | $(1,816) | $(2,741) |

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 12. EMPLOYEE BENEFIT PLANS (Continued)

Weigted-average assumptions used to determine benefit obligations at December 31, 2008 and 2007 are as follows:

| | Pension Plans | | Other Post-Retirement Benefits | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| Weighted average assumptions: | | | | |
| Discount rate—U.S. Plan | 6.29% | 6.41% | N/A | N/A |
| Discount rate—International Plan | 7.25% | 5.30% | 7.25% | 5.30% |
| Expected return on plan assets—U.S. Plan | 7.00% | 7.00% | N/A | N/A |
| Expected return on plan assets—International Plan | 6.75% | 7.00% | N/A | N/A |
| Rate of compensation increase—U.S. Plan | N/A | N/A | N/A | N/A |
| Rate of compensation increase—International Plan | 3.00% | 3.00% | N/A | N/A |

Components of net periodic benefit cost follow:

| | Pension Plans | | | Other Post-Retirement Benefits | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Year Ended December 31, 2007 | Year Ended December 31, 2006 | Year Ended December 31, 2008 | Year Ended December 31, 2007 | Year Ended December 31, 2006 |
| Service cost | $ 269 | $ 289 | $ 302 | $ 51 | $ 60 | $ 57 |
| Interest cost | 816 | 779 | 648 | 133 | 129 | 115 |
| Expected return on plan assets | (955) | (938) | (640) | — | — | — |
| Amortization | 78 | 150 | 111 | (4) | — | — |
| Net periodic benefit cost | $ 208 | $ 280 | $ 421 | $180 | $189 | $172 |

The pension expense for U.S. and International plans (the "Plans") is calculated based upon a number of actuarial assumptions established on January 1 of the applicable year, detailed in the table above, including a weighted-average discount rate, rate of increase in future compensation levels and an expected long-term rate of return on the Plans assets. The discount rate used by the Company for valuing pension liabilities is based on a review of high quality corporate bond yields with maturities approximating the remaining life of the projected benefit obligations.

The expected long-term rate of return on the U.S. Plan assets is based on an asset allocation assumption of 53% with equity securities and 47% with debt securities. At December 31, 2008, the asset allocation was 49% with equity securities and 51% with debt securities.

The expected long-term rate of return on the International Plan assets is based on the asset allocation guidelines and the return expectation stipulated in the pension plan investment policy statement, as well as the target asset mix of each fund manager comprised in the plan investment portfolio. The expected long-term rate of return on the International Plan assets is based on an asset allocation assumption of 30-70% with equity securities, 20-65% with debt securities, and 0-40% with

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

**12. EMPLOYEE BENEFIT PLANS (Continued)**

cash and short term investments. At December 31, 2008 and 2007, the assets were 100% invested in balanced pooled funds, consisting of equity and debt securities. The Company's investment strategy includes diversification to minimize interest and market risks, and generally does not involve the use of derivative financial instruments. Plan assets are rebalanced periodically to maintain target asset allocations. Maturities of investments are not necessarily related to the timing of expected future benefit payments, but adequate liquidity to make immediate and medium term benefit payments is ensured.

The Company made cash contributions to the U.S. Plan of $286 in 2008 and $527 in 2007, and the U.S. Plan made benefit payments of $112 and $106 in 2008 and 2007, respectively. The Company made cash contributions to the International Plan of $773 and $912 in 2008 and 2007, respectively. The liability for accrued pension and post employment benefit obligations under all the Company's pension and post-retirement benefit plans (the "Plans") decreased in 2008 to $3,246 from $4,079 in 2007 primarily due to a significant reduction in plan assets in the U.S. Plan offset by the cash contributions made to the Plans in 2008 and by the foreign currency translation effect of the foreign pension plans. The Company estimates that, based on current actuarial calculations, it will make a cash contribution to the Plans in 2009 of approximately $1,092. Cash contributions in subsequent years will depend on a number of factors, including the investment performance of the plan assets and the impact of the Pension Protection Act of 2006, which was signed into law in August 2006. The Pension Protection Act is effective for plan years beginning in 2008 and did not have a material impact on the Company's consolidated financial condition or results of operations.

For measurement purposes, the annual rate of increase in the per capita cost of covered health care and dental benefits was assumed to be 8.5% for both 2008 and 2007, respectively. The rate is assumed to trend down to 5% by 2015 and then stay at 5% per year thereafter. Assumed health care cost trend rates may have a significant effect on the amounts reported for the health care plan. A 1% change in assumed health care cost trend rates would have the following effects:

|  | 1% Increase | 1% Decrease |
|---|---|---|
| Effect on total service and interest cost components | $ 10 | $ (9) |
| Effect on post retirement benefit obligation | 140 | (124) |

The Company expects to contribute approximately $63 to its other postretirement benefit plan in 2009.

F-23

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 12. EMPLOYEE BENEFIT PLANS (Continued)

*Estimated Future Benefit Payments*—The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid:

|  | Pension Plans | Other Post-Retirement Benefits |
|---|---|---|
| 2009 | $ 558 | $ 63 |
| 2010 | 706 | 70 |
| 2011 | 753 | 75 |
| 2012 | 801 | 92 |
| 2013 | 910 | 112 |
| 2014-2018 | 5,642 | 776 |
| Total payments | 9,370 | 1,188 |
| Less discount for interest | (1,941) | (393) |
| Benefit obligations | $ 7,429 | $ 795 |

*Defined Contribution Plans*—The Company also sponsors defined contribution plans that are available to substantially all employees. The Company contributes cash amounts, based upon a percentage of employee contributions, ranging from 1% to 3% of the employees' pay. The amount expensed for the Company match was $1,565, $1,429 and $1,484 for the years ended December 31, 2008, 2007 and 2006.

## 13. INCOME TAXES

The provision for income tax (benefit) expense consists of:

|  | Year Ended December 31, 2008 | Year Ended December 31, 2007 | Year Ended December 31, 2006 |
|---|---|---|---|
| Current: |  |  |  |
| Federal | $ (1,501) | $(3,372) | $ 4,036 |
| State and local | 521 | 105 | 1,159 |
| Foreign | (19) | 1,052 | 3,907 |
| Total current | (999) | (2,215) | 9,102 |
| Deferred: |  |  |  |
| Federal | (14,794) | 4,527 | (908) |
| State and local | (3,268) | 25 | (625) |
| Foreign | (2,264) | (5,343) | (3,610) |
| Total deferred | (20,326) | (791) | (5,143) |
| Total income tax (benefit) expense | $(21,325) | $(3,006) | $ 3,959 |

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

**13. INCOME TAXES (Continued)**

Components of deferred income taxes consist of:

| | December 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| Current deferred income tax assets (liabilities): | | |
| Accounts receivable | $ 1,653 | $ 1,665 |
| Inventories | 2,788 | 2,773 |
| Payroll and employee benefits | 817 | 1,734 |
| Other liabilities and credits | (530) | (2,966) |
| Total current deferred income tax assets (liabilities) (See Note 6) | 4,728 | 3,206 |
| Non-current deferred income tax assets (liabilities): | | |
| Loss carryforwards | 9,192 | 7,024 |
| Tax credits | 2,837 | 1,382 |
| Pension and retiree benefits | 476 | 617 |
| Property, plant and equipment | (51,669) | (60,562) |
| Intangibles | (10,305) | (24,712) |
| Other | — | 3,029 |
| Total non-current deferred income tax assets (liabilities) | (49,469) | (73,222) |
| Less valuation allowance | 12,029 | 8,007 |
| Total non-current deferred income liability, net | $(61,498) | $(81,229) |
| Net deferred income liability | $(56,770) | $(78,023) |

Based on projections of future taxable income and the expectation that a significant portion of these deferred income tax assets are to be realized by offsetting them against temporary items, the Company believes that it is more likely than not that all deferred income tax assets except for federal and state net operating losses and tax credits will be realized.

A reconciliation of the Company's effective tax rate to the U.S. federal statutory rate follows:

| | Year Ended December 31, 2008 | Year Ended December 31, 2007 | Year Ended December 31, 2006 |
| --- | --- | --- | --- |
| U.S. statutory rate | 34% | 34% | 34% |
| Increases (decreases) resulting from: | | | |
| Goodwill impairment | (17) | — | — |
| Valuation allowance | (3) | — | — |
| Tax receivable | — | (52) | — |
| Foreign tax | 1 | (36) | (5) |
| State income taxes, net of federal benefit | — | 2 | 3 |
| Other net, including Transaction costs | — | (5) | (5) |
| Effective tax rate | 15% | (57)% | 27% |

PANOLAM INDUSTRIES INTERNATIONAL, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006

(In thousands, except share data)

### 13. INCOME TAXES (Continued)

The Company has historically reinvested any earnings generated by its Canadian subsidiary. As of December 31, 2008, the Company's Canadian subsidiary had an accumulated deficit. The Company's effective rate in 2008 was primarily impacted by the portion of the goodwill impairment recorded for financial reporting purposes (refer to Note 8) which was permanent in nature as a tax deduction for such impairment will never be realized. The Company's effective rate in 2007 was impacted by a reduction of the deferred tax liability on the books of its Canadian subsidiary, related to a phased-in tax rate reduction established in Canada, as well as the recording of an income tax receivable related to the Company's decision to seek competent authority with respect to an ongoing audit of the results of its Canadian subsidiary (refer to "Uncertain Tax Positions" below).

The Company has a foreign tax credit carryover of $1,433 at December 31, 2008 which will expire between 2009 and 2017. The Company has fully offset the foreign tax credit carryover with a valuation allowance. Additionally, the Company has AMT credits which do not expire totaling $1,404 which are also fully offset by a valuation allowance. The Company also has U.S. Federal net operating loss carryover of $3,449 which will expire in 2024. The Company has total state net operating loss carryovers, primarily in the state of Connecticut, of $101,998. Such carryovers generally expire in 2020 and 2028 with the substantial majority expiring between 2020 and 2022. A full valuation allowance against these carryovers has been provided due to uncertainty about the Company's ability to generate sufficient future income.

*Uncertain Tax Positions*

In June 2006, the FASB issued FASB Interpretation No. 48, Accounting for Uncertainty in Income Taxes, ("FIN 48"), which is a comprehensive model for recognition, measurement and disclosure of uncertain tax positions in a company's financial statements. FIN 48 applies to all tax positions accounted for in accordance with FASB Statement No. 109, Accounting for Income Taxes. FIN 48 permits the recognition of tax benefits from uncertain tax positions only if it is more likely than not that the tax position will be sustained and is measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement.

The Company adopted FIN 48 on January 1, 2007. Upon adoption, the total unrecognized tax benefit excluding interest was $2,186, which primarily related to transfer pricing considerations with the Company's wholly owned Canadian subsidiary. As of the years ended December 31, 2008 and 2007, the Company had total unrecognized tax benefits excluding interest and penalties of $2,789 and $2,305,

PANOLAM INDUSTRIES INTERNATIONAL, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006

(In thousands, except share data)

### 13. INCOME TAXES (Continued)

respectively. A reconciliation of the beginning and ending amounts of unrecognized tax benefits for the years ended December 31, 2008 and 2007, is as follows:

|  | 2008 | 2007 |
|---|---|---|
| Unrecognized Tax Benefits: | | |
| Balance as of January 1,. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,305 | $2,186 |
| Increase as a result of tax positions taken during a prior year . . . | 620 | 699 |
| Decrease as a result of tax positions taken during a prior year . . | — | (200) |
| Increase as a result of positions taken during the current year. . . | — | 258 |
| Decrease relating to settlements with taxing authorities . . . . . . . | (136) | (450) |
| Reduction as a result of a lapse of the statute of limitations . . . . | — | (188) |
| Balance as of December 31, . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,789 | $2,305 |

The entire unrecognized tax liability at December 31, 2008, if recognized, would reduce our annual effective tax rate. However, if recognized, the Company believes a significant portion of this liability would be offset as a result of the competent authority process allowed by the U.S. tax treaty with Canada. The Company is presently under audit in Canada for amounts included in the above reconciliation, however, the Company does not anticipate this audit being resolved in the short-term. Furthermore, the Company does not believe that the total amount of unrecognized tax benefits will significantly change within 12 months of the reporting date.

The Company classifies interest relating to tax matters and tax penalties as a component of income tax expense in its statement of operations. The total amount of accrued interest and penalties as of December 31, 2008 and 2007 related to FIN 48 was approximately $1,174 and $771, respectively.

The Company and its subsidiaries file a U.S. federal income tax return and various state filings. Our Canadian subsidiary also files a return in Canada. The U.S. and Canada generally have a 3 year statute of limitations on tax filings. As a result, the Company has open tax years for U.S. federal and Canadian purposes from 2005 through 2008. With few exceptions, state statutes follow the open period federally. The Company does have net operating losses (NOLs) for state purposes in some jurisdictions. These NOLs are subject to review based on the year in which they are utilized. For transfer pricing issues, the US-Canada treaty permits a review of transfer pricing considerations for a 6 year period (as opposed to the general 3 year stated previously for income tax purposes).

### 14. RELATED PARTY TRANSACTIONS

The Company pays an annual management fee of $1,500 and reimbursement of out of pocket expenses to the Sponsors. During the years ended December 31, 2008 and 2007, $1,875 and $1,312 was paid and zero and $375 was accrued for management fees, respectively.

At December 31, 2007, the Company had an intercompany payable to its ultimate parent company, Panolam Holdings Co. of $5,619, which represented principal and interest related to the junior subordinated notes that were issued by Panolam Holdings to the sellers of Nevamar. In January 2008, the Company settled the subordinated notes with the sellers for $2,377 and as part of the settlement

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**
**(In thousands, except share data)**

**14. RELATED PARTY TRANSACTIONS (Continued)**

agreement, the Company will no longer be indemnified by the sellers for certain claims. As a result of the settlement, the intercompany payable to the Company's parent, Panolam Holdings Co. was no longer outstanding as of December 31, 2008 and the Company recorded liabilities in accrued liabilities and other liabilities in anticipation of such unindemnified claims. In addition, the Company incurred $105 in legal and bank fees during the year ended December 31, 2008 related to this settlement.

**15. STOCK OPTIONS**

On September 30, 2005, the Company instituted the Panolam Holdings Co. 2005 Equity Incentive Plan ("Plan"). The compensation committee of the Board of Directors administers this Plan, and at least two non-employee directors must be on the committee. The purpose of the Plan is to attract, retain and motivate the Company's executives and its management employees. The Committee is authorized to approve the grant of any one or combination of stock options, stock appreciation rights, restricted stock, stock units and cash. On September 30, 2005, the Company granted stock options to an executive officer and management personnel to purchase 15,556 shares of the Company's common stock, exercisable at a price of $500 per share. Through December 31, 2008, 3,111 of these stock options have been forfeited. These options vest ratably over 5 years. The Company's policy is to issue shares to satisfy stock option exercises.

On October 1, 2005, the Company adopted SFAS No. 123(R), using fair-value based measurement of accounting. Upon adoption, the Company selected the modified prospective method. As a result of adopting SFAS No. 123(R), the Company recognized compensation expense for the years ended December 31, 2008, 2007, and 2006 of $490, $483 and $487, respectively. Such compensation expense is included in selling, general and administrative expense in the statement of operations. The tax benefit related to this expense was $186, $181 and $185 for the years ended December 31, 2008, 2007 and 2006, respectively. As of December 31, 2008 and 2007, there was $965 and $1,451 respectively, of unrecognized compensation expense relating to outstanding options. The amount at December 31, 2008 will be amortized over the remaining vesting period associated with each grant, and the weighted average expected amortization period is approximately 1.9 years.

F-28

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 15. STOCK OPTIONS (Continued)

Stock option activity and the related changes that occurred for the years ended December 31, 2007 and 2008 is summarized as follows:

| | Outstanding | | Exercisable | |
| --- | --- | --- | --- | --- |
| | Stock Options Outstanding | Weighted Average Exercise Price | Stock Options Outstanding | Weighted Average Exercise Price |
| Outstanding, December 31, 2006 | 14,528 | 500 | 2,756 | 500 |
| Granted | 800 | 750 | — | — |
| Forfeited | (1,383) | 509 | (267) | 500 |
| Vested | — | — | 2,639 | 500 |
| Outstanding, December 31, 2007 | 13,945 | 513 | 5,128 | 500 |
| Granted | — | — | — | — |
| Forfeited | — | — | — | — |
| Vested | — | — | 2,789 | 513 |
| Outstanding, December 31, 2008 | 13,945 | $513 | 7,917 | $505 |

The Company uses the Black-Scholes Merton option-pricing model to calculate the fair value of share-based awards. The key assumptions for this valuation method include the expected term of the option, stock price volatility, risk-free interest rate, dividend yield, exercise price and forfeiture rate. In determining the fair value of its share-based awards, the Company has assumed no forfeitures and as a result expects the awards to vest ratably over the five-year vesting period. Many of these assumptions are judgmental and highly sensitive in the determination of compensation expense. During the year ended December 31, 2007, the Company granted 800 stock options at an exercise price of $750 that vest ratably over five years and have a weighted average fair value of $332. The Company did not grant any stock options during the year ended December 31, 2008. At December 31, 2008, the Company's outstanding stock options and the outstanding stock options that are exercisable had weighted average remaining contractual terms of 6.9 years and 6.8 years, respectively. The following table provides the assumptions used in determining the weighted average fair value for the options granted during each of the respective periods presented, followed by definitions of those terms:

| | Year Ended December 31, 2008 | Year Ended December 31, 2007 | Year Ended December 31, 2006 |
| --- | --- | --- | --- |
| Risk-free interest rate | — | 4.52% | 5.01% |
| Dividend yield | — | — | — |
| Volatility factor | — | 35% | 36% |
| Expected term of options | — | 6.5 years | 6.5 years |
| Weighted average fair value of options | — | $ 332 | $ 417 |

Term—This is the period of time over which the options granted are expected to remain outstanding. Options granted have a maximum term of 10 years. The Company utilizes the simplified

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**
**(In thousands, except share data)**

### 15. STOCK OPTIONS (Continued)

method to calculate expected term. An increase in the expected term will increase compensation expense.

Volatility—This is a measure of the amount by which a price has fluctuated or is expected to fluctuate. Volatilities are based on implied volatilities from traded options of a company's shares, historical volatility of a company's shares, and other factors, such as expected changes in volatility arising from planned changes in a company's business operations. An increase in the expected volatility will increase compensation expense. As the Company does not have a history of trading from which to determine its volatility, the historical stock price volatility of 14 public companies whose lines of business are considered similar to the Company were analyzed, focusing on the stock price trading history of those 14 companies for the years prior to grant date.

Risk-Free Interest Rate—This is the U.S. Treasury rate in effect at the time of the grant having a term equal to the expected term of the option. An increase in the risk-free interest rate will increase compensation expense.

Dividend Yield—The Company has no plans to pay dividends in the foreseeable future. An increase in the dividend yield would decrease compensation expense.

### 16. COMMITMENTS AND CONTINGENCIES

During 2006, the Company's wholly-owned subsidiary, Nevamar Company LLC was named a defendant in numerous workers compensation claims filed on behalf of current and former employees at the Hampton, South Carolina facility alleging injury in the course of employment due to alleged exposure to asbestos and unidentified chemicals. Under the ownership of Westinghouse Electric Corporation, the Hampton, South Carolina facility manufactured asbestos-based products until approximately 1975. In 2004 and 2005, Nevamar, Westinghouse and International Paper settled 10 workers' compensation claims related to alleged asbestos exposure. Under a 2005 agreement with International Paper, Nevamar's liability for workers compensation claims related to alleged exposure to asbestos brought by employees hired before July 1, 2002, was capped at 15% of any damages it shares with International Paper until Nevamar has paid an aggregate of $700 at which point the Company would have no responsibility for any additional shared damages.

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 16. COMMITMENTS AND CONTINGENCIES (Continued)

On November 21, 2008, the Company entered into a settlement agreement with IP to settle all of these workers' compensation claims for a cash sum including any related claims that are filed by any person who was previously employed, is currently employed or becomes employed by Nevamar on or before December 31, 2008 for a cash payment in an amount that had been fully reserved for by the Company. Employees hired by Nevamar after December 31, 2008 and who file claims related to alleged exposure to asbestos are not covered by this settlement agreement. The Company paid the settlement amount in November 2008.

The Company's Auburn, Maine, facility is subject to a Compliance Order by Consent ("COC") dated May 5, 1993, issued by the State of Maine Department of Environmental Protection ("DEP") with regard to unauthorized discharges of hazardous substances into the environment. The Company and the previous owners, named in the COC, are required to investigate and, as necessary, remediate the environmental contamination at the site. Because the unauthorized discharges occurred during the previous ownership, the previous owners have agreed to be responsible for compliance with the COC. The previous owners have completed and submitted to the State for its review a risk assessment. The financial obligation of the previous owners to investigate and or remediate is unlimited except with regard to a portion of the land at the Company's Auburn, Maine, facility, which is capped at $10,000. The Company has recorded a liability of $710 and $717 at December 31, 2008 and 2007, respectively, for site remediation costs in excess of costs assumed by the previous owners. The Company could incur additional obligations in excess of the amount accrued and the Company's recorded estimate may change over time. The Company expects this environmental issue to be resolved within the next five to ten years.

We are party to other litigation matters involving ordinary and routine claims incidental to our business. We cannot estimate with certainty our ultimate legal and financial liability with respect to such pending litigation matters. However, we believe, based on our examination of such matters, our ultimate costs with respect to such matters, if any, will not have a material adverse effect on our business, financial condition, results of operations or cash flows.

Lease Commitments—Minimum future rental payments under operating leases, determined at December 31, 2008, are as follows:

| | |
|---|---:|
| 2009 | $ 3,260 |
| 2010 | 3,221 |
| 2011 | 3,217 |
| 2012 | 2,868 |
| 2013 | 2,035 |
| Thereafter | 4,246 |
| Total amounts due | 18,847 |
| Less: Sublease payments to be received | (1,523) |
| | $17,324 |

Rental expense was $3,550, $3,548 and $3,904 for the years ended December 31, 2008, 2007 and 2006, respectively.

PANOLAM INDUSTRIES INTERNATIONAL, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006

(In thousands, except share data)

## 17. SEGMENT INFORMATION

The Company has determined its operating segments in a manner that reflects how the chief operating decision maker currently reviews the results of the Company's business. The Company has two reportable segments, decorative laminates and other. Decorative laminates manufactures and distributes decorative laminates, primarily TFM and HPL, for use in a wide variety of residential and commercial indoor surfacing applications. This segment accounted for approximately 87%, 89% and 89% of the Company's total revenue for the years ended December 31, 2008, 2007 and 2006, respectively. The Company's other segment includes the production and marketing of a variety of specialty resins for industrial uses, custom treated and chemically prepared decorative overly papers and a variety of other industrial laminates including the Company's fiber reinforced plastic product known as FRP. The other segment, net of corporate/eliminations, accounted for 13%, 11% and 11% of the Company's total revenue for the years ended December 31, 2008, 2007 and 2006, respectively. The amount of net sales reflected in the corporate/eliminations column in the tables below primarily represents the elimination of the intercompany sales of the other segment to the decorative laminates segment. The other amounts reflected in this column related to expenses, capital expenditures and total assets associated with the Company's Corporate office. Certain corporate expenses are generally not allocated to specific operating segments and are accordingly reflected in the Corporate/Eliminations column in the tables below.

The Company uses the following key information in evaluating the performance of each segment:

| | As of December 31, 2008 and for the Year Ended December 31, 2008 | | | |
| | Decorative Laminates | Other | Corporate/ Eliminations | Total |
|---|---|---|---|---|
| Net sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $317,929 | $54,338 | $ (5,558) | $ 366,709 |
| Gross profit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 51,698 | 4,829 | — | 56,527 |
| Loss from operations . . . . . . . . . . . . . . . . . . . . . . . | (87,717) | (773) | (25,542) | (114,028) |
| Depreciation and amortization expense . . . . . . . . . . . . . | 24,560 | 3,620 | 3,125 | 31,305 |
| Fixed asset impairment charge . . . . . . . . . . . . . . . . . . . | 5,165 | — | — | 5,165 |
| Goodwill and other indefinite lived intangible asset impairment charges . . . . . . . . . . . . . . . . . . . . . . . . . | 118,043 | 3,569 | — | 121,612 |
| Capital expenditures . . . . . . . . . . . . . . . . . . . . . . . . . | 2,243 | 728 | 436 | 3,407 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 266,864 | 47,860 | 97,559 | 412,283 |

| | As of December 31, 2007 and for the Year Ended December 31, 2007 | | | |
| | Decorative Laminates | Other | Corporate/ Eliminations | Total |
|---|---|---|---|---|
| Net sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $375,627 | $57,349 | $ (8,579) | $424,397 |
| Gross profit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 84,582 | 6,286 | — | 90,868 |
| Income (loss) from operations . . . . . . . . . . . . . . . . . . | 59,272 | 4,513 | (24,188) | 39,597 |
| Depreciation and amortization expense . . . . . . . . . . . . . | 24,100 | 3,090 | 3,040 | 30,230 |
| Capital expenditures . . . . . . . . . . . . . . . . . . . . . . . . . | 3,406 | 5,250 | 182 | 8,838 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 391,465 | 55,497 | 119,397 | 566,359 |

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 17. SEGMENT INFORMATION (Continued)

| | As of December 31, 2006 and for the Year Ended December 31, 2006 | | | |
| --- | --- | --- | --- | --- |
| | Decorative Laminates | Other | Corporate/ Eliminations | Total |
| Net sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $411,561 | $57,043 | $ (8,526) | $460,078 |
| Gross profit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 93,750 | 8,834 | — | 102,584 |
| Income (loss) from operations . . . . . . . . . . . . . . . . . | 70,936 | 4,838 | (25,973) | 49,801 |
| Depreciation and amortization expense . . . . . . . . . . . . | 20,554 | 1,908 | 2,946 | 25,408 |
| Capital expenditures . . . . . . . . . . . . . . . . . . . . . . . . | 3,613 | 8,770 | 236 | 12,619 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 397,584 | 51,436 | 122,722 | 571,742 |

Net sales by geographic area were:

| | Year Ended December 31, 2008 | Year Ended December 31, 2007 | Year Ended December 31, 2006 |
| --- | --- | --- | --- |
| United States . . . . . . . . . . . . . | $299,078 | $352,884 | $384,627 |
| Canada . . . . . . . . . . . . . . . . . . | 62,253 | 66,009 | 70,348 |
| Other . . . . . . . . . . . . . . . . . . | 5,378 | 5,504 | 5,103 |
| | $366,709 | $424,397 | $460,078 |

No single customer accounted for more than 10% of the Company's consolidated net sales for any of the above periods.

Long-lived assets by geographic area were as follows:

| | December 31, 2008 | December 31, 2007 |
| --- | --- | --- |
| United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $210,464 | $328,484 |
| Canada . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 70,463 | 130,791 |
| | $280,927 | $459,275 |

## 18. SUPPLEMENTAL CONSOLIDATING CONDENSED FINANCIAL STATEMENTS

The Notes issued September 30, 2005 by Panolam Industries International, Inc. are guaranteed by Panolam Industries, Inc., Pioneer Plastics Corporation and Nevamar Holding Corp. Supplemental consolidating condensed financial statements for the parent company, subsidiary guarantors and the non-guarantor are presented below. Investments in subsidiaries are accounted for using the equity method for purposes of the consolidating presentation. The principal elimination entries eliminate investments in subsidiaries, intercompany balances and intercompany transactions. The income tax expense (benefit) that is reflected in the Parent Company column on the consolidating condensed

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

**18. SUPPLEMENTAL CONSOLIDATING CONDENSED FINANCIAL STATEMENTS (Continued)**

statements of operations for the periods presented also includes the income tax expense (benefit) that pertains to the Subsidiary Guarantors.

| | Panolam Industries International, Inc. and Subsidiaries Consolidating Condensed Balance Sheets December 31, 2008 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents . . . . . . . . . | $ 41,684 | $ (1,093) | $ 2,861 | $ — | $ 43,452 |
| Accounts receivable, net . . . . . . . . . . | 568 | 12,113 | 1,512 | — | 14,193 |
| Inventories . . . . . . . . . . . . . . . . . . . . | — | 50,142 | 4,994 | — | 55,136 |
| Other current assets . . . . . . . . . . . . . | 10,559 | 3,533 | 4,483 | — | 18,575 |
| Total current assets . . . . . . . . . . . . . | 52,811 | 64,695 | 13,850 | — | 131,356 |
| Property, plant and equipment, net . . . . | 1,471 | 148,839 | 68,020 | — | 218,330 |
| Intangible assets, net . . . . . . . . . . . . . | 31,753 | 17,924 | 2,406 | — | 52,083 |
| Debt acquisition costs, net . . . . . . . . . | 7,057 | — | — | — | 7,057 |
| Other assets  . . . . . . . . . . . . . . . . . . . | 3,420 | — | 37 | — | 3,457 |
| Intercompany receivables . . . . . . . . . . | — | 199,219 | 23,534 | (222,753) | — |
| Investment in subsidiaries . . . . . . . . . . | 501,151 | — | — | (501,151)(a) | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | $597,663 | $430,677 | $107,847 | $ (723,904) | $412,283 |
| **LIABILITIES AND STOCKHOLDER'S (DEFICIT) EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable . . . . . . . . . . . . . . . | $ 169 | $ 5,594 | $ 1,150 | $ — | $ 6,913 |
| Accrued liabilities . . . . . . . . . . . . . . . | 12,223 | 6,063 | 1,299 | — | 19,585 |
| Current portion of long-term debt . . . | 343,926 | 11 | — | — | 343,937 |
| Total current liabilities . . . . . . . . . . | 356,318 | 11,668 | 2,449 | — | 370,435 |
| Long-term debt, less current portion . . . | — | 13 | — | — | 13 |
| Deferred income taxes . . . . . . . . . . . . . | 46,471 | — | 15,027 | — | 61,498 |
| Other liabilities . . . . . . . . . . . . . . . . . . | — | 2,509 | 5,707 | — | 8,216 |
| Intercompany payables . . . . . . . . . . . . . | 222,753 | — | — | (222,753) | — |
| Total liabilities . . . . . . . . . . . . . . . . | 625,542 | 14,190 | 23,183 | (222,753) | 440,162 |
| Total stockholder's (deficit) equity . . . | (27,879) | 416,487 | 84,664 | (501,151)(a) | (27,879) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | $597,663 | $430,677 | $107,847 | $ (723,904) | $412,283 |

(a)  Elimination of investment in subsidiaries.

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

### 18. SUPPLEMENTAL CONSOLIDATING CONDENSED FINANCIAL STATEMENTS (Continued)

|  | Panolam Industries International, Inc. and Subsidiaries Consolidating Condensed Balance Sheets December 31, 2007 | | | | |
|---|---|---|---|---|---|
|  | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents . . . . . . . . . | $ 9,202 | $ (2,553) | $ 4,095 | $ — | $ 10,744 |
| Accounts receivable, net . . . . . . . . . . | 1,445 | 15,664 | 2,160 | — | 19,269 |
| Inventories . . . . . . . . . . . . . . . . . . . . | — | 52,056 | 6,095 | — | 58,151 |
| Other current assets . . . . . . . . . . . . . | 12,217 | 4,262 | 2,441 | — | 18,920 |
| Total current assets . . . . . . . . . . . . . . | 22,864 | 69,429 | 14,791 | — | 107,084 |
| Property, plant and equipment, net . . . . | 1,561 | 171,251 | 92,233 | — | 265,045 |
| Goodwill . . . . . . . . . . . . . . . . . . . . . . | 12,060 | 61,494 | 28,906 | — | 102,460 |
| Intangible assets, net . . . . . . . . . . . . . | 39,067 | 34,202 | 9,652 | — | 82,921 |
| Debt acquisition costs, net . . . . . . . . . | 8,814 | — | — | — | 8,814 |
| Other assets . . . . . . . . . . . . . . . . . . . | 35 | — | — | — | 35 |
| Intercompany receivables . . . . . . . . . . | — | 155,385 | 20,993 | (176,378) | — |
| Investment in subsidiaries . . . . . . . . . . | 607,811 | — | — | (607,811)(a) | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | $692,212 | $491,761 | $166,575 | $ (784,189) | $566,359 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable . . . . . . . . . . . . . . . | $ 230 | $ 7,763 | $ 3,787 | $ — | $ 11,780 |
| Accrued liabilities . . . . . . . . . . . . . . . | 13,979 | 9,987 | 1,701 | — | 25,667 |
| Current portion of long-term debt . . . | 30 | 17 | — | — | 47 |
| Other current liabilities . . . . . . . . . . . | — | — | 1,313 | — | 1,313 |
| Total current liabilities . . . . . . . . . . . | 14,239 | 17,767 | 6,801 | — | 38,807 |
| Long-term debt . . . . . . . . . . . . . . . . . . | 319,872 | 22 | — | — | 319,894 |
| Deferred income taxes . . . . . . . . . . . . . | 60,142 | — | 21,087 | — | 81,229 |
| Due to Panolam Holdings Co. . . . . . . . | 5,619 | — | — | — | 5,619 |
| Other liabilities . . . . . . . . . . . . . . . . . . | — | 1,476 | 3,372 | — | 4,848 |
| Intercompany payables . . . . . . . . . . . . | 176,378 | — | — | (176,378) | — |
| Total liabilities . . . . . . . . . . . . . . . . | 576,250 | 19,265 | 31,260 | (176,378) | 450,397 |
| Total stockholder's equity . . . . . . . . . | 115,962 | 472,496 | 135,315 | (607,811)(a) | 115,962 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | $692,212 | $491,761 | $166,575 | $ (784,189) | $566,359 |

(a) Elimination of investment in subsidiaries.

F-35

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 18. SUPPLEMENTAL CONSOLIDATING CONDENSED FINANCIAL STATEMENTS (Continued)

Panolam Industries International, Inc. and Subsidiaries
Consolidating Condensed Statements of Operations
For the Year Ended December 31, 2008

|  | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| Net sales | $ — | $296,285 | $ 72,209 | $(1,785) | $ 366,709 |
| Cost of goods sold | — | 234,036 | 72,766 | (1,785) | 305,017 |
| Fixed asset impairment charge | — | 5,165 | — | — | 5,165 |
| Gross profit (loss) | — | 57,084 | (557) | — | 56,527 |
| Selling, general and administrative expenses | 26,019 | 20,995 | 1,929 | — | 48,943 |
| Goodwill and other indefinite lived intangible asset impairment charges | 16,787 | 76,369 | 28,456 | — | 121,612 |
| Loss from operations | (42,806) | (40,280) | (30,942) | — | (114,028) |
| Interest expense | 29,434 | 4 | — | — | 29,438 |
| Interest income | (439) | (3) | (43) | — | (485) |
| Loss before income tax benefit and equity in net loss of subsidiaries | (71,801) | (40,281) | (30,899) | — | (142,981) |
| Income tax benefit | (19,041) | — | (2,284) | — | (21,325) |
| Loss before equity in net loss of subsidiaries | (52,760) | (40,281) | (28,615) | — | (121,656) |
| Equity in net loss of subsidiaries | (68,896) | — | — | 68,896 | — |
| Net loss | $(121,656) | $(40,281) | $(28,615) | $68,896 | $(121,656) |

Panolam Industries International, Inc. and Subsidiaries
Consolidating Condensed Statements of Operations
For the Year Ended December 31, 2007

|  | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| Net sales | $ — | $344,621 | $83,728 | $ (3,952) | $424,397 |
| Cost of goods sold | — | 259,633 | 77,848 | (3,952) | 333,529 |
| Gross profit | — | 84,988 | 5,880 | — | 90,868 |
| Selling, general and administrative expenses | 22,290 | 24,456 | 4,525 | — | 51,271 |
| Income (loss) from operations | (22,290) | 60,532 | 1,355 | — | 39,597 |
| Interest expense | 34,888 | 3 | — | — | 34,891 |
| Interest income | (464) | — | (148) | — | (612) |
| Income (loss) before income taxes and equity in net income of subsidiaries | (56,714) | 60,529 | 1,503 | — | 5,318 |
| Income taxes (benefit) | 1,291 | — | (4,297) | — | (3,006) |
| Income (loss) before equity in net income of subsidiaries | (58,005) | 60,529 | 5,800 | — | 8,324 |
| Equity in net income of subsidiaries | 66,329 | — | — | (66,329) | — |
| Net income | $ 8,324 | $ 60,529 | $ 5,800 | $(66,329) | $ 8,324 |

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

### 18. SUPPLEMENTAL CONSOLIDATING CONDENSED FINANCIAL STATEMENTS (Continued)

Panolam Industries International, Inc. and Subsidiaries
Consolidating Condensed Statements of Operations
For the Year Ended December 31, 2006

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| Net sales | $ — | $367,486 | $98,287 | $ (5,695) | $460,078 |
| Cost of goods sold | — | 280,793 | 82,396 | (5,695) | 357,494 |
| Gross profit | — | 86,693 | 15,891 | — | 102,584 |
| Selling, general and administrative expenses | 25,973 | 24,405 | 2,405 | — | 52,783 |
| Income (loss) from operations | (25,973) | 62,288 | 13,486 | — | 49,801 |
| Interest expense | 35,574 | 3 | — | — | 35,577 |
| Interest income | (388) | (17) | (223) | — | (628) |
| Income (loss) before income taxes and equity in net income of subsidiaries | (61,159) | 62,302 | 13,709 | — | 14,852 |
| Income taxes | 2,920 | — | 1,039 | — | 3,959 |
| Income (loss) before equity in net income of subsidiaries | (64,079) | 62,302 | 12,670 | — | 10,893 |
| Equity in net income of subsidiaries | 74,972 | — | — | (74,972) | — |
| Net income | $ 10,893 | $ 62,302 | $12,670 | $(74,972) | $ 10,893 |

F-37

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 18. SUPPLEMENTAL CONSOLIDATING CONDENSED FINANCIAL STATEMENTS (Continued)

|  | Panolam Industries International, Inc. and Subsidiaries Consolidating Condensed Statements of Cash Flows Year Ended December 31, 2008 | | | | |
|---|---|---|---|---|---|
|  | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
| **Cash flows from operating activities:** | | | | | |
| Net loss | $(121,656) | $(40,281) | $(28,615) | $ 68,896 | $(121,656) |
| Adjustments to reconcile net (loss) income to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | 2,980 | 20,286 | 8,039 | — | 31,305 |
| Fixed asset impairment charge | — | 5,165 | — | — | 5,165 |
| Goodwill and other indefinite lived intangible asset impairment charges | 16,787 | 76,369 | 28,456 | — | 121,612 |
| Deferred income tax benefit | (17,513) | — | (2,262) | — | (19,775) |
| Amortization of debt acquisition costs | 1,757 | — | — | — | 1,757 |
| Stock based compensation expense | 490 | — | — | — | 490 |
| Equity in net income (loss) of subsidiaries | 68,896 | — | — | (68,896) | — |
| Other | (366) | 463 | 402 | — | 499 |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable | 877 | 3,551 | 231 | — | 4,659 |
| Inventories | — | 1,914 | (76) | — | 1,838 |
| Other current assets | 467 | 729 | (133) | — | 1,063 |
| Accounts payable and accrued liabilities | (2,954) | (7,619) | (1,979) | — | (12,552) |
| Income taxes payable/receivable | 2,648 | — | (836) | — | 1,812 |
| Other | — | (199) | (515) | — | (714) |
| Net cash provided by (used in) operating activities | (47,587) | 60,378 | 2,712 | — | 15,503 |
| **Cash flows from investing activities:** | | | | | |
| Intercompany receivable/payable, net | 59,087 | — | — | (59,087) | — |
| Purchases of property, plant and equipment | (436) | (2,357) | (614) | — | (3,407) |
| Net cash (used in) provided by investing activities | 58,651 | (2,357) | (614) | (59,087) | (3,407) |
| **Cash flows from financing activities:** | | | | | |
| Repayment of long-term debt | (2,028) | (15) | — | — | (2,043) |
| Settlement of amount due to Panolam Holding Co. | (2,482) | — | — | — | (2,482) |
| Borrowings under revolving credit facility | 25,928 | — | — | — | 25,928 |
| Intercompany receivable/payable, net | — | (56,546) | (2,541) | 59,087 | — |
| Net cash provided by (used in) financing activities | 21,418 | (56,561) | (2,541) | 59,087 | 21,403 |
| Effect of exchange rate changes on cash | — | — | (791) | — | (791) |
| Net change in cash and cash equivalents | 32,482 | 1,460 | (1,234) | — | 32,708 |
| Cash and cash equivalents—beginning of period | 9,202 | (2,553) | 4,095 | — | 10,744 |
| Cash and cash equivalents—end of period | $ 41,684 | $ (1,093) | $ 2,861 | $ — | $ 43,452 |

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 18. SUPPLEMENTAL CONSOLIDATING CONDENSED FINANCIAL STATEMENTS (Continued)

|  | Panolam Industries International, Inc. and Subsidiaries Consolidating Condensed Statements of Cash Flows Year Ended December 31, 2007 | | | | |
| --- | --- | --- | --- | --- | --- |
|  | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
| **Cash flows from operating activities:** | | | | | |
| Net income | $ 8,324 | $ 60,529 | $ 5,800 | $(66,329) | $ 8,324 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | 2,896 | 17,846 | 9,488 | — | 30,230 |
| Deferred income tax benefit | 7,222 | — | (7,714) | — | (492) |
| Amortization of debt acquisition costs | 2,341 | — | — | — | 2,341 |
| Stock option expense | 483 | — | — | — | 483 |
| Equity in net income of subsidiaries | (66,329) | — | — | 66,329 | — |
| Other | 857 | (1,059) | 200 | — | (2) |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable | (14) | 3,387 | (282) | — | 3,091 |
| Inventories | — | (673) | (1,092) | — | (1,765) |
| Other current assets | 298 | (1,387) | 180 | — | (909) |
| Accounts payable and accrued liabilities | (2,582) | (6,388) | 1,859 | — | (7,111) |
| Income taxes payable/receivable | (5,887) | 410 | 466 | — | (5,011) |
| Other | — | (341) | (753) | — | (1,094) |
| Net cash (used in) provided by operating activities | (52,391) | 72,324 | 8,152 | — | 28,085 |
| **Cash flows from investing activities:** | | | | | |
| Intercompany receivable/payable, net | 73,606 | — | — | (73,606) | — |
| Purchases of property, plant and equipment | (182) | (7,959) | (697) | — | (8,838) |
| Net cash provided by (used in) investing activities | 73,424 | (7,959) | (697) | (73,606) | (8,838) |
| **Cash flows from financing activities:** | | | | | |
| Repayment of long-term debt | (20,000) | — | — | — | (20,000) |
| Proceeds from long-term debt | 30 | (27) | — | — | 3 |
| Proceeds from revolving credit | — | — | — | — | — |
| Payment of debt acquisition costs | (405) | — | — | — | (405) |
| Intercompany receivable/payable, net | — | (63,341) | (10,265) | 73,606 | — |
| Repurchase and cancellation of common stock | — | — | — | — | — |
| Repayment of revolving credit | — | — | — | — | — |
| Net cash (used in) provided by financing activities | (20,375) | (63,368) | (10,265) | 73,606 | (20,402) |
| Effect of exchange rate changes on cash | — | — | 1,050 | — | 1,050 |
| Net change in cash and cash equivalents | 658 | 997 | (1,760) | — | (105) |
| Cash and cash equivalents—beginning of period | 8,544 | (3,550) | 5,855 | — | 10,849 |
| Cash and cash equivalents—end of period | $ 9,202 | $ (2,553) | $ 4,095 | $ — | $ 10,744 |

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**YEARS ENDED DECEMBER 31, 2008, 2007 AND 2006**

**(In thousands, except share data)**

## 18. SUPPLEMENTAL CONSOLIDATING CONDENSED FINANCIAL STATEMENTS (Continued)

Panolam Industries International, Inc. and Subsidiaries
Consolidating Condensed Statements of Cash Flows
Year Ended December 31, 2006

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | |
| Net income | $ 10,893 | $ 62,302 | $ 12,670 | $(74,972) | $ 10,893 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | 2,944 | 15,024 | 7,440 | — | 25,408 |
| Deferred income tax benefit | (3,871) | (273) | (999) | — | (5,143) |
| Amortization of debt acquisition costs | 3,247 | — | — | — | 3,247 |
| Stock option expense | 487 | — | — | — | 487 |
| Equity in net income of subsidiaries | (74,972) | — | — | 74,972 | — |
| Other | (204) | 458 | (73) | — | 181 |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable | 204 | 11,747 | 1,312 | — | 13,263 |
| Inventories | — | 5,194 | 318 | — | 5,512 |
| Other current assets | (3,044) | 1,251 | (58) | — | (1,851) |
| Accounts payable and accrued liabilities | 2,801 | (14,236) | (1,716) | — | (13,151) |
| Income taxes payable/receivable | 2,049 | 455 | 1,760 | — | 4,264 |
| Other | 391 | (219) | (974) | — | (802) |
| Net cash (used in) provided by operating activities | (59,075) | 81,703 | 19,680 | — | 42,308 |
| **Cash flows from investing activities:** | | | | | |
| Acquisition, net of acquired cash | (77,801) | — | — | — | (77,801) |
| Intercompany receivable/payable, net | 83,398 | — | — | (83,398) | — |
| Purchases of property, plant and equipment | (236) | (11,508) | (875) | — | (12,619) |
| Net cash provided by (used in) investing activities | 5,361 | (11,508) | (875) | (83,398) | (90,420) |
| **Cash flows from financing activities:** | | | | | |
| Repayment of long-term debt | (25,077) | (12) | (9) | — | (25,098) |
| Proceeds from long-term debt | 80,000 | — | — | — | 80,000 |
| Proceeds from revolving credit | 5,000 | — | — | — | 5,000 |
| Payment of debt acquisition costs | (2,764) | — | — | — | (2,764) |
| Intercompany receivable/payable, net | — | (69,757) | (13,641) | 83,398 | — |
| Repurchase and cancellation of common stock | (50) | — | — | — | (50) |
| Repayment of revolving credit | (5,000) | — | — | — | (5,000) |
| Net cash provided by (used in) financing activities | 52,109 | (69,769) | (13,650) | 83,398 | 52,088 |
| Net change in cash and cash equivalents | (1,605) | 426 | 5,155 | — | 3,976 |
| Cash and cash equivalents—beginning of period | 10,149 | (3,976) | 700 | — | 6,873 |
| Cash and cash equivalents—end of period | $ 8,544 | $ (3,550) | $ 5,855 | $ — | $ 10,849 |

*    *    *    *    *

Exhibit 31.1

**Panolam Industries International, Inc.**
**Certification pursuant to Section 302**
**of the Sarbanes-Oxley Act of 2002**
**Certification**

I, Robert J. Muller, as the principal executive officer of the registrant, certify that:

1.   I have reviewed this annual report on Form 10-K of Panolam Industries International, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2009

/s/  ROBERT J. MULLER
_____
Robert J. Muller
*Chairman, President and*
*Chief Executive Officer*
*(Principal Executive Officer)*

Exhibit 31.2

**Panolam Industries International, Inc.**
**Certification pursuant to Section 302**
**of the Sarbanes-Oxley Act of 2002**
**Certification**

I, Vincent S. Miceli, as the principal financial officer of the registrant, certify that:

1.    I have reviewed this annual report on Form 10-K of Panolam Industries International, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2009

/s/  VINCENT S. MICELI
_____

Vincent S. Miceli
*Vice President and Chief Financial Officer*
*(Principal Financial and Accounting Officer)*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the annual report of Panolam Industries International, Inc. (the "Company") on Form 10-K , as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert J. Muller, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934: and

2.  The information contained in the Report fairly represents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 31, 2009

/s/  ROBERT J. MULLER
_____

Robert J. Muller
*Chairman, President and*
*Chief Executive Officer*
*(Principal Executive Officer)*

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the annual report of Panolam Industries International, Inc. (the "Company") on Form 10-K , as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Vincent S. Miceli, Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934: and

2.  The information contained in the Report fairly represents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 31, 2009

/s/  VINCENT S. MICELI
_____
Vincent S. Miceli
*Vice President and Chief Financial Officer*
*(Principal Financial and Accounting Officer)*

Book Page 305

**<u>Exhibit C to Disclosure Statement</u>**

**Panolam's Form 10-Q for the period ended March 31, 2009, filed with the SEC on May 20, 2009**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2009**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**

**Commission file number 333-78569**

# PANOLAM INDUSTRIES INTERNATIONAL, INC.

(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **52-2064043** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

**20 Progress Drive**
**Shelton, Connecticut 06484**
(Address of Principal Executive Offices)

**(203) 925-1556**
(Registrant's Telephone Number, Including Area Code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes  ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☐ Yes  ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☐ |
| (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company in Rule 12b-2 of the Exchange Act. ☐ Yes  ☒ No

The number of shares outstanding of the registrant's common stock as of May 15, 2009, was 200.

**Panolam Industries International, Inc.**
**Index to Quarterly Report on**
**Form 10-Q**

|  |  |  | Page No. |
|---|---|---|---|
| PART I. | FINANCIAL INFORMATION | | |
| | Item 1. | Financial Statements: | |
| | | Condensed Consolidated Balance Sheets at March 31, 2009 and December 31, 2008 (unaudited) | 3 |
| | | Condensed Consolidated Statements of Operations for the three months ended March 31, 2009 and 2008 (unaudited) | 4 |
| | | Condensed Consolidated Statements of Cash Flows for the three months ended March 31, 2009 and 2008 (unaudited) | 5 |
| | | Notes to Condensed Consolidated Financial Statements (unaudited) | 6 |
| | Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| | Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 34 |
| | Item 4T. | Controls and Procedures | 35 |
| PART II. | OTHER INFORMATION | | |
| | Item 1. | Legal Proceedings | 35 |
| | Item 1A. | Risk Factors | 35 |
| | Item 3. | Defaults Upon Senior Securities | 35 |
| | Item 6. | Exhibits | 36 |

PART I - FINANCIAL INFORMATION

Item 1. Financial Statements

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
Condensed Consolidated Balance Sheets
(Amounts in thousands, except share data)
(Unaudited)

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| ASSETS | | |
| CURRENT ASSETS: | | |
| Cash and cash equivalents | $ 43,630 | $ 43,452 |
| Accounts receivable, less allowances of $5,211 at March 31, 2009 and $5,978 at December 31, 2008 | 17,051 | 14,193 |
| Inventories | 53,138 | 55,136 |
| Other current assets | 18,288 | 18,575 |
| Total current assets | 132,107 | 131,356 |
| PROPERTY, PLANT AND EQUIPMENT – Net | 210,117 | 218,330 |
| INTANGIBLE ASSETS – Net | 49,481 | 52,083 |
| DEBT ACQUISITION COSTS – Net | 6,633 | 7,057 |
| OTHER ASSETS | 1,696 | 3,457 |
| TOTAL | $ 400,034 | $ 412,283 |
| LIABILITIES AND STOCKHOLDER'S DEFICIT | | |
| CURRENT LIABILITIES: | | |
| Accounts payable | $ 9,089 | $ 6,913 |
| Accrued liabilities | 21,863 | 19,585 |
| Current portion of long-term debt | 343,967 | 343,937 |
| Total current liabilities | 374,919 | 370,435 |
| LONG-TERM DEBT, LESS CURRENT PORTION | 11 | 13 |
| DEFERRED INCOME TAXES | 56,151 | 61,498 |
| OTHER LIABILITIES | 8,482 | 8,216 |
| Total liabilities | 439,563 | 440,162 |
| COMMITMENTS AND CONTINGENCIES (Note 15) | | |
| STOCKHOLDER'S DEFICIT: | | |
| Common stock, $0.01 par value – 200 authorized, 200 issued and outstanding | — | — |
| Additional paid-in capital | 81,637 | 81,528 |
| Accumulated deficit | (114,476) | (104,434) |
| Accumulated other comprehensive loss | (6,690) | (4,973) |
| Total stockholder's deficit | (39,529) | (27,879) |
| TOTAL | $ 400,034 | $ 412,283 |

See notes to unaudited condensed consolidated financial statements.

3

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**Condensed Consolidated Statements of Operations**
**(Amounts in thousands, except share data)**
**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| NET SALES | $ 63,911 | $ 101,182 |
| COST OF GOODS SOLD | 56,155 | 81,739 |
| GROSS PROFIT | 7,756 | 19,443 |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 10,390 | 12,745 |
| INDEFINITE LIVED INTANGIBLE ASSET IMPAIRMENT CHARGE | 1,589 | — |
| OTHER EXPENSES | 2,087 | — |
| (LOSS) INCOME FROM OPERATIONS | (6,310) | 6,698 |
| INTEREST EXPENSE | 6,233 | 7,877 |
| INTEREST INCOME | (82) | (86) |
| LOSS BEFORE INCOME TAX BENEFIT | (12,461) | (1,093) |
| INCOME TAX BENEFIT | (2,419) | (634) |
| NET LOSS | $ (10,042) | $ (459) |

See notes to unaudited condensed consolidated financial statements.

4

## PANOLAM INDUSTRIES INTERNATIONAL, INC.
### Condensed Consolidated Statements of Cash Flows
### (Amounts in thousands, except share data)
### (Unaudited)

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss | $ (10,042) | $ (459) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation and amortization | 7,458 | 7,263 |
| Indefinite lived intangible asset impairment charge | 1,589 | — |
| Deferred income tax benefit | (2,735) | (720) |
| Amortization of debt acquisition costs | 424 | 482 |
| Stock based compensation expense | 109 | 123 |
| Other | (43) | (19) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (2,901) | (5,588) |
| Inventories | 1,857 | (1,420) |
| Other current assets | 222 | 969 |
| Accounts payable and accrued liabilities | 4,483 | 8,646 |
| Income taxes payable/receivable | 147 | (41) |
| Other | (101) | (169) |
| Net cash provided by operating activities | 467 | 9,067 |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchases of property, plant and equipment | (204) | (1,188) |
| Net cash used in investing activities | (204) | (1,188) |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Repayment of long-term debt | (4) | (2,017) |
| Borrowings under revolving credit facility | — | 5,000 |
| Payment of amount due to Panolam Holdings Co. | — | (2,482) |
| Net cash (used in) provided by financing activities | (4) | 501 |
| | | |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | (81) | (159) |
| NET CHANGE IN CASH AND CASH EQUIVALENTS | 178 | 8,221 |
| CASH AND CASH EQUIVALENTS - Beginning of period | 43,452 | 10,744 |
| CASH AND CASH EQUIVALENTS - End of period | $ 43,630 | $ 18,965 |
| | | |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION: | | |
| Cash payments for interest | $ 1,692 | $ 3,499 |
| Cash payments for income taxes, net of refunds | 167 | 127 |

See notes to unaudited condensed consolidated financial statements.

5

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(Amounts in thousands, except share data)
(Unaudited)

## 1. BUSINESS

Panolam Industries International, Inc. (the "Company") designs, manufactures and distributes decorative laminates, primarily thermally fused melamine panels ("TFMs") and high-pressure laminate sheets ("HPLs"), throughout the United States and Canada. The Company markets its products through independent distributors and directly to kitchen and bathroom cabinet, furniture, store fixtures and original equipment manufacturers ("OEMs"). The Company wholly-owns the following companies:

- Panolam Industries, Ltd.

- Panolam Industries, Inc.

- Pioneer Plastics Corporation ("Pioneer")

- Nevamar Holding Corp. ("Nevamar")

The unaudited condensed consolidated balance sheet at March 31, 2009 and the condensed consolidated balance sheet at December 31, 2008, the unaudited condensed consolidated statements of operations and the unaudited condensed consolidated statements of cash flows for the three months ended March 31, 2009 and 2008 include the accounts of the Company and its subsidiaries. In the opinion of management, all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the interim financial statements included herein have been included. The results of operations for the three months ended March 31, 2009 are not necessarily indicative of the results to be expected for the full year. These financial statements and the related notes should be read in conjunction with the financial statements and notes included in the Company's Annual Report on Form 10-K for the year ended December 31, 2008.

The Company's condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these condensed consolidated financial statements requires the Company to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, and expenses, and related disclosures at the date of the Company's condensed consolidated financial statements. On an on-going basis, management evaluates its estimates and judgments, including those related to bad debts, discounts and rebates, inventories, income taxes, and long-lived assets. Management bases its estimates and judgments on historical experience and current market conditions and on various other factors that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions. Management considers the Company's policies on revenue recognition, adjustments for slow moving and obsolete inventories, potentially uncollectible accounts receivable, accruals for customer rebates, income taxes, intangible assets and long-lived assets to be critical accounting policies due to estimates, assumptions, and application of judgment involved in each.

The accompanying condensed consolidated financial statements have been prepared assuming the Company will continue as a going concern and do not include any adjustments that might result from the outcome of the uncertainty regarding its ability to continue as a going concern. This assumes a continuation of operations and the realization of assets and liabilities in the ordinary course of business. The Company had net losses for the three months ended March 31, 2009, and the year ended December 31, 2008 of $10,042 and $121,656, respectively. The net loss for the three months ended March 31, 2009 resulted primarily from reduced sales volume given the current economic conditions and also included a $1,589 trade name impairment charge and $2,087 in other expenses related primarily to legal and financial advisor fees incurred in connection with the Company's efforts to restructure its debt obligations. The net loss for the year ended December 31, 2008 was principally attributable to $96,691 of goodwill impairment and $24,921 of trade name impairments taken during the year as well as a high ratio of fixed costs, including the interest costs on its debt and depreciation expense. The Company also

6

had a stockholder's deficit of $39,529 at March 31, 2009 and $27,879 at December 31, 2008. As discussed in Note 9, "Debt and Capital Lease Obligations," as of March 31, 2009 and as of December 31, 2008, the Company was not in compliance with all of its financial and reporting covenants under its senior credit facility, or Credit Facility, which constitutes a default. As a result, the lenders have the ability to accelerate the Company's obligations to make payments under the Credit Facility and, in the event there was availability under the revolver, the Company would not be permitted to borrow funds until its noncompliance is cured or waived by the lenders.

On February 27, 2009, the Company received a notice of default from the agent for the lenders under its Credit Facility due to the Company's failure to comply with certain financial and reporting covenants. On March 31, 2009, the Company entered into a forbearance agreement (the "Forbearance Agreement") with its lenders pursuant to which the lenders agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate the Company's payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The terms of the Forbearance Agreement prohibited the Company from, among other things, paying the April 1, 2009 interest payment on its 10.75% Senior Subordinated Notes due 2013 (the "Notes"). Its failure to make that interest payment is a default under the indenture governing the Notes and entitles the indenture trustee or the holders of 25% of the Notes, after a thirty-day grace period that ended on May 1, 2009 and upon delivery of proper notice to the Company, to accelerate the Company's payment obligations under the Notes. The indenture trustee informed the holders of the Notes of the payment default and of the event of default by letters dated April 9, 2009 and May 7, 2009, respectively. Furthermore, if the Company is unable to restructure or refinance the Credit Facility or its payment obligations under the Notes are accelerated, its lenders could accelerate its payment obligations under the Credit Facility. Based on these acceleration rights under the Credit Facility and the Notes, the Company reclassified $343,937 from long-term debt to current debt as of December 31, 2008. The current portion of long-term debt was $343,967 as of March 31, 2009. As such, the Company has a working capital deficiency of $242,812 as of March 31, 2009 and $239,079 as of December 31, 2008.

In the event that most or all of the Company's obligations under the Credit Facility and Notes become due and payable, the Company would be unable to fund its payment obligations. The Company is in active discussions with its lenders and an ad hoc group representing a substantial majority of the holders of its Notes to restructure its debt obligations, and has not received any acceleration notice related to these financing arrangements; however, given the current negative conditions in its industry and the economy generally and the credit markets in particular, the Company cannot give any assurance that it will be successful in restructuring its debt or finding alternative financing arrangements. The Company has engaged financial and legal advisors to provide assistance in these discussions, but if the Company is not able to find a timely solution, it may be compelled to file for bankruptcy protection.

As a result of these factors, there is substantial doubt about the Company's ability to continue as a going concern.

## 2.  NEW ACCOUNTING PRONOUNCEMENTS

New Accounting Pronouncements—In March 2008, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standard No. 161, Disclosures about Derivative Instruments and Hedging Activities—an amendment of FASB Statement No. 133, Accounting for Derivative Instruments and Hedging Activities ("SFAS No. 161"). SFAS No. 161 expands the current disclosure requirements of SFAS No. 133, such that entities must now provide enhanced disclosures on a quarterly basis regarding how and why the entity uses derivatives; how derivatives and related hedged items are accounted for under SFAS No. 133 and how derivatives and related hedged items affect the entity's financial position, performance and cash flow. Pursuant to the transition provisions of this statement, the Company adopted SFAS No. 161 on January 1, 2009 and the statement did not impact the Company's consolidated financial statements.

In December 2008, the FASB issued FASB Staff Position ("FSP") FAS No. 132(R)-1, Employers' Disclosure about Postretirement Benefit Plan Assets ("FSP FAS No. 132(R)-1") which amends SFAS No. 132 (revised 2003) Employers' Disclosures about Pensions and Other Postretirement Benefits — an Amendment of FASB Statements No. 87, 88, and 106. FSP FAS no. 132(R)-1 requires more detailed disclosures about the assets of a defined benefit pension or other postretirement plan and is effective for fiscal years ending after December 15, 2009. The Company is in the process of evaluating FSP FAS No. 132(R)-1 and will adopt the required disclosures for the year ending December 31, 2009.

In December 2007, the FASB issued SFAS No. 160, Noncontrolling Interests in Consolidated Financial Statements including an amendment of Accounting Research Bulletin ("ARB") No. 51, ("SFAS No. 160"), which establishes accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. The Company adopted SFAS No. 160 on January 1, 2009 and it did not have a material impact on the Company's consolidated financial statements.

In December 2007, the FASB issued SFAS No. 141(R), Business Combinations, ("SFAS No. 141(R)"), which addresses the information that a reporting entity provides in its financial reports about a business combination and its effects. To accomplish this, this Statement establishes principles and requirements for how the acquirer recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, any noncontrolling interest in the acquiree, the goodwill acquired in the business combination or a gain from a bargain purchase and how the acquirer determines what information to disclose to enable users of the financial statements to evaluate the nature and financial effects of the business combination. The Company is required to apply SFAS No. 141(R) to any acquisition made after January 1, 2009.

In September 2006, the FASB issued SFAS No. 157, Fair Value Measurements, ("SFAS No. 157"). SFAS No. 157 defines fair value, establishes a framework for measuring fair value in accordance with generally accepted accounting principles, and expands disclosures about fair value measurements. On February 12, 2008, the FASB issued FASB Staff Position 157-2 ("FSP 157-2") that partially deferred the effective date of SFAS No. 157 for one year for non-financial assets and non-financial liabilities that are recognized or disclosed at fair value in the financial statements on a nonrecurring basis. Other than this deferred portion, the Company adopted SFAS No. 157 in 2008 and it did not have a material impact on its consolidated financial statements. The Company adopted the deferral of FSP 157-2 on January 1, 2009, and such adoption did not have a material impact on its consolidated financial statements.

## 3.  INVENTORIES

Inventories consist of:

|  | March 31, 2009 | | December 31, 2008 |
|---|---|---|---|
| Raw materials | $ | 24,534 | $ | 23,798 |
| Work in process |  | 5,335 |  | 5,557 |
| Finished goods |  | 23,269 |  | 25,781 |
|  | $ | 53,138 | $ | 55,136 |

## 4.  OTHER CURRENT ASSETS

Other current assets consist of:

|  | March 31, 2009 | | December 31, 2008 |
|---|---|---|---|
| Income taxes receivable | $ | 5,116 | $ | 5,327 |
| Deferred income taxes – current (see Note 11) |  | 4,927 |  | 4,728 |
| Prepaid insurance |  | 1,817 |  | 2,557 |
| Other current assets |  | 6,428 |  | 5,963 |
|  | $ | 18,288 | $ | 18,575 |

## 5.  PROPERTY, PLANT AND EQUIPMENT, NET

Property, plant and equipment, net consists of:

|  | March 31, 2009 | | December 31, 2008 |
|---|---|---|---|
| Land | $ | 4,898 | $ | 4,896 |
| Buildings and improvements |  | 60,935 |  | 61,552 |
| Machinery and equipment |  | 224,501 |  | 226,087 |
| Construction in process |  | 2,149 |  | 2,334 |
|  |  | 292,483 |  | 294,869 |
| Accumulated depreciation |  | (82,366) |  | (76,539) |
|  | $ | 210,117 | $ | 218,330 |

Depreciation expense was $6,515 for the first quarter ended March 31, 2009 and $6,243 for the first quarter ended March 31, 2008. Depreciation expense related to the Company's manufacturing processes and administrative functions is included in the consolidated statement of operations in cost of goods sold and selling, general and administrative expenses, respectively. Capital leases of $22 and $15 at March 31, 2009 and December 31, 2008, respectively, are included in machinery and equipment. As a result of testing for recoverability during the fourth quarter of 2008, the Company recorded an impairment charge of $5,165 related to its fixed assets located at the Norcross, Georgia facility. There were no fixed asset impairment charges recorded in the first quarter of 2009.

## 6. GOODWILL AND INTANGIBLE ASSETS, NET

The Company adopted SFAS No. 142, "Goodwill and Other Intangible Assets", ("SFAS No. 142") on January 1, 2002. SFAS No. 142 requires that goodwill and other indefinite-lived intangible assets be tested for impairment at least on an annual basis. The Company's previously recorded goodwill was fully impaired during the quarter ended December 31, 2008. The Company performs an annual impairment test related to its indefinite lived intangible assets at December 31, or more frequently should conditions that could affect fair value change significantly. Due to continued weakness in the economy, the Company determined that the indefinite lived tradenames should be tested for impairment during the three months ended March 31, 2009. As a result of such interim test, the Company recorded an impairment charge of $1,589. The remaining fair value of the indefinite lived tradenames immediately following the impairment was $9,600, which serves as the new cost basis for the asset. The Company adopted FSP 157-2 as disclosed in Note 2, and as a result applied the measurement of fair value under SFAS No. 157 to the tradename. The Company considered all relevant valuation techniques that could be employed without incurring undue cost and effort, and concluded that a discounted relief of royalty approach provided the most reliable measure of fair value. The Company used three inputs in applying approach (i) projected future sales; (ii) assumed royalty rate; and (iii) discount rate. As a result, the measurement is based significantly on internal projections, and the Company considers this fair value measurement to be Level 3 within the fair value hierarchy under SFAS 157.

The Company accounts for finite lived intangible assets under SFAS No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets ("SFAS No. 144"). These assets are grouped with other long-lived assets and are reviewed for impairment whenever events or changes in circumstances indicate that their respective carrying amounts may not be recoverable. Assessment for possible impairment is based on the Company's ability to recover the carrying value of the long lived asset group from the expected future pre-tax cash flows (undiscounted and without interest charges). If the expected future cash flows are less than the carrying value of such assets, an impairment loss is recognized for the difference between estimated fair value and carrying value. No impairment charges related to finite lived intangible assets were recorded in the three months ended March 31, 2009.

Intangible assets, net include the following:

|  | March 31, 2009 | | | December 31, 2008 | | |
|  | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) |
|---|---|---|---|---|---|---|
| Patents and trademarks | $ 9,407 | $ 3,045 | 3, 12, 14 | $ 9,407 | $ 2,829 | 3, 12, 14 |
| Key customer lists | 43,574 | 9,997 | 15 | 43,574 | 9,270 | 15 |
| Other | 1,207 | 1,207 | 3, 10 | 1,220 | 1,220 | 3, 10 |
| Trademarks and tradenames with indefinite useful lives | 9,542 | — | — | 11,201 | — | — |
|  | $ 63,730 | $ 14,249 | | $ 65,402 | $ 13,319 | |

Amortization expense was $943 for the first quarter ended March 31, 2009 and $1,020 for the first quarter ended March 31, 2008. Expected amortization expense for the remainder of 2009 through 2013 is as follows:

9

| | |
|---|---|
| 2009 | $ 2,745 |
| 2010 | 3,660 |
| 2011 | 3,660 |
| 2012 | 3,660 |
| 2013 | 3,660 |

## 7. DEBT ACQUISITION COSTS

At March 31, 2009 and December 31, 2008, the debt acquisition costs and accumulated amortization were as follows:

| | March 31, 2009 | | | December 31, 2008 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) |
| Debt acquisition costs | $ 14,967 | $ 8,334 | 7 | $ 14,967 | $ 7,910 | 7 |

Amortization of debt acquisition costs for the first quarter ended March 31, 2009 and 2008 were $424 and $482, respectively. The amortization of debt acquisition costs is included in interest expense.

## 8. ACCRUED LIABILITIES

Accrued liabilities consists of:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| Salaries, wages and employee benefits | $ 5,558 | $ 5,635 |
| Interest | 8,143 | 4,058 |
| Customer rebates | 2,240 | 2,240 |
| Insurance | 1,252 | 2,026 |
| Freight | 603 | 827 |
| Other | 4,067 | 4,799 |
| | $ 21,863 | $ 19,585 |

## 9. DEBT AND CAPITAL LEASE OBLIGATIONS

Long-term debt consists of:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| Senior Subordinated Notes, due 2013, face amount $151,000 less discount of $558 at March 31, 2009 and $590 at December 31, 2008, bearing interest at 10.75% | $ 150,442 | $ 150,410 |
| Senior Secured Term Loan, maturing 2012, bearing interest at March 31, 2009 of 5.00% and 3.22% at December 31, 2008 | 167,586 | 167,586 |
| Revolver borrowings, bearing interest at March 31, 2009 of 4.50% | 25,928 | 25,928 |
| Capitalized lease obligations and other | 22 | 26 |
| | 343,978 | 343,950 |
| Current portion | (343,967) | (343,937) |
| | $ 11 | $ 13 |

Senior Subordinated Notes ("the Notes")—The Company issued the Notes on September 30, 2005. Interest is paid semi-annually in arrears on April 1 and October 1; interest payments commenced on April 1, 2006. The Notes will mature on October 1, 2013. The Company capitalized a total of $5,420 of financing fees that are being amortized over the life of the Notes. The Notes are guaranteed by all of the Company's subsidiaries including Nevamar, except Panolam Industries, Ltd. (the Canadian subsidiary). These guarantees are joint and several and full and unconditional.

Senior Secured Term Loan and Revolving Credit Loan—In September 2005, the Company entered into the Credit Facility, which originally provided for an aggregate committed amount of up to $155,000 consisting of two tranches; a $135,000 term loan and a $20,000 revolving loan. In March 2006, the term loan was increased to $215,000 and the revolving Credit Facility was increased to $30,000. The term and revolver borrowings may be designated as base rate or Eurodollar rate borrowings, as defined, plus an applicable interest margin. The applicable interest margin on the revolver is reset quarterly based upon certain ratios as defined in the Credit Facility. As of March 31, 2009 and December 31, 2008, the Company had $25,928 in revolver borrowings. The outstanding revolver borrowings as of March 31, 2009 and December 31, 2008 reflect a decision made by the Company in the fourth quarter of 2008 to borrow its remaining availability under the revolving credit facility due to the uncertainty in both the economy and the credit markets and in order to have as much liquidity as possible to respond to further downturns in the business. As of March 31, 2009 and December 31, 2008, the Company had letters of credit issued for workers' compensation claims in an aggregate amount of $4,072 outstanding under the Credit Facility. The term loan portion of the Credit Facility is for 7 years and the revolving loan portion is for 5 years.

The original quarterly repayment amount of the term loan facility was $338 with the balance due at September 30, 2012. Subsequent to the March 2006 amendment of the Credit Facility, the repayment of the principal amount of the amended term loan facility was scheduled to be paid in quarterly installments of $538 beginning March 31, 2006 with the balance of the principal due on September 30, 2012. During the years ended December 31, 2007 and 2006, the Company prepaid $20,000 and $24,539 of its term loan balance, respectively, and during the year ended December 31, 2008, the Company prepaid an additional $2,000 of its term loan balance. The Company has not made any prepayments in the three months ended March 31, 2009. As a result of the prepayments, and assuming no acceleration of its payment obligations, the Company is no longer required to make any repayment of future principal installments until September 30, 2012, the loan maturity date. Under the terms of the Forbearance Agreement, an excess cash flow payment related to the year ended December 31, 2008 and calculated in accordance with the terms of the Credit Facility, is due on or before June 30, 2009. The interest rate on the term loan facility was 5.00% at March 31, 2009. In accordance with the terms of the credit agreement, effective July 1, 2009, the Company will be required to pay interest on its Credit Facility borrowings at a default interest rate equivalent to a rate that is 2% per annum in excess of the rate that would otherwise be payable.

The Credit Facility covenants limit, among other things, the Company's ability to incur debt, pay dividends, change its capital structure, make guarantees, assume liens, and dispose of assets. These covenants include requirements for the Company to maintain a maximum total leverage ratio of 4.5 and a minimum interest coverage ratio of 2.25 as of March 31, 2009, as well as an annual maximum capital expenditures limitation of $8,000 for 2009. The Credit Facility also contains certain customary events of default, which in some instances are subject to grace periods. As of March 31, 2009, the Company was not in compliance with certain financial and reporting covenants including its leverage and interest coverage covenants under its Credit Facility, which constitutes a default. As a result, the lenders under the Credit Facility have the ability to accelerate the Company's obligations to make payments under the Credit Facility and, in the event there was availability under the revolver, the Company would not be permitted to borrow funds until the noncompliance is cured or waived by the lenders.

On February 27, 2009, the Company received a notice of default from the agent for the lenders under its Credit Facility due to the Company's failure to comply with certain financial and reporting covenants. On March 31, 2009, the Company entered into the Forbearance Agreement with its lenders pursuant to which the lenders agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate the Company's payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The terms of the Forbearance Agreement prohibited the Company from, among other things, paying the April 1, 2009 interest payment on the Notes. Its failure to make that interest payment is a default under the indenture governing the Notes and entitles the indenture trustee or the holders of 25% of the Notes, after a thirty-day grace period that ended on May 1, 2009 and upon delivery of proper notice to the Company, to accelerate the Company's payment obligations under the Notes. The indenture trustee informed the holders of the Notes of the payment default and of the event of default by letters dated April 9, 2009 and May 7, 2009, respectively. Furthermore, if the Company is unable to restructure or refinance the Credit Facility or its payment obligations under the Notes are accelerated, the lenders could accelerate its payment obligations under the Credit Facility. Based on these acceleration rights under the Credit Facility and the Notes, the Company reclassified $343,937 from long-term debt to current debt as of December 31, 2008. The current portion of long-term debt was $343,967 as of March 31, 2009. As such, the Company had a working capital deficiency of $242,812 as of March 31, 2009 and $239,079 as of December 31, 2008.

The indenture governing the Company's Notes also contains a number of covenants that restrict the Company's ability to incur or guarantee additional indebtedness or issue disqualified or preferred stock, pay dividends or make other equity distributions, repurchase or redeem capital stock, make investments or other restricted payments, sell assets, engage in transactions with affiliates, create liens or consolidate or merge with or

into other companies, and the ability of the Company's restricted subsidiaries to make dividends or distributions to the Company. Future principal debt payments are expected to be paid with cash flow generated by operations. On March 30, 2009, the agent for the lenders under the Credit Facility provided the Company with a "blockage notice" directing the Company not to make an April 1, 2009 interest payment on the Notes. The Company did not make that payment, which is a default under the Notes, and, as a result, the holders of the Notes currently have the right to accelerate the Company's payment obligations under the Notes.

In the event that most or all of the Company's obligations under the Credit Facility and Notes become due and payable, the Company would be unable to fund its payment obligations. The Company is in active discussions with its lenders and an ad hoc group representing a substantial majority of the holders of its Notes to restructure its debt obligations, and has not received any acceleration notice related to these financing arrangements; however, given the current negative conditions in its industry and the economy generally and the credit markets in particular, the Company cannot give any assurance that it will be successful in restructuring its debt or finding alternative financing arrangements. The Company has engaged financial and legal advisors to provide assistance in these discussions, but if the Company is not able to find a timely solution, it may be compelled to file for bankruptcy protection.

The Company has used the funds under the Credit Facility, together with the proceeds from the Notes and capital contribution, to fund the retirement of the Company's previously outstanding first and second lien loans, to repay the shareholders of its predecessor company and for working capital requirements, permitted encumbrances, capital expenditures, its acquisition of Nevamar and other general corporate purposes.

At March 31, 2009, the Company's future debt principal payments are scheduled as follows and are based on the original terms and conditions of the Company's Credit Facility and Notes. This schedule does not reflect the condition that if the debt holders chose to accelerate the obligations, all amounts shown below would be due and payable in 2009:

| | | |
|------|---|--------:|
| 2009 | $ | — |
| 2010 | | 25,928 |
| 2011 | | — |
| 2012 | | 167,586 |
| 2013 | | 150,442 |
| | $ | 343,956 |

The future principal payments on the Notes due in 2013 are net of the unamortized discount of $558.

At March 31, 2009, future capital lease payments, including an immaterial amount of interest, are as follows:

| | | |
|------|---|-----:|
| 2009 | $ | 11 |
| 2010 | | 11 |
| | $ | 22 |

## 10. EMPLOYEE BENEFIT PLANS

*Nevamar Pension Plan*—Nevamar established the Retirement Plan of Nevamar Company, LLC (the "U.S. Plan"), a noncontributory defined benefit plan, on July 1, 2002. The U.S. Plan was established as a result of the spin-off of Nevamar from International Paper Company ("IP"). The U.S. Plan covers only employees covered under the collective bargaining agreements maintained and negotiated at facilities in Odenton, Maryland; Hampton, South Carolina; Franklin, Virginia; and Waverly, Virginia.

All participants in the U.S. Plan immediately preceding the spin-off from IP were credited with service under the IP Pension Plan as of June 30, 2002 for the following purposes: eligibility to participate, vesting, benefit accrual and eligibility for early retirement and other subsidies. However, the benefit payable to each participant under the U.S. Plan was offset by the amount of benefit payable under the IP Pension Plan. For all other participants eligibility begins after reaching age 21 and the completion of a year of service except for employees at the Franklin location who were eligible immediately upon hire. Normal retirement age is 65. Benefits for each of the applicable locations

12

are based on a formula, as defined in the U.S. Plan, and length of service. The funding policy is to make the minimum annual contributions required by applicable regulations. This plan was curtailed on May 24, 2004.

**Canadian Pension Plan**—Through October 1998, the Company maintained a defined benefit pension plan covering certain Canadian employees (the "International Plan") at which time the Company transferred certain participants into a defined contribution plan. The participants remaining in the defined benefit plan subsequent to October 1998 continue to participate in such plan. This plan covers certain Canadian employees; the participants remaining in the defined benefit plan subsequent to October 1998 continue to participate in the plan.

**Other Postretirement Benefit Plan**—The Company maintains noncontributory life insurance and medical plans that cover all Canadian employees with over 20 years of service.

The following is a summary, based on the most recent actuarial valuations, of the Company's net cost for pension benefits and other benefits for the first quarter ended March 31, 2009 and 2008:

|  | Pension Plans | | | | Other Post-Retirement Benefits | | | |
|  | First Quarter Ended March 31, | | | | First Quarter Ended March 31, | | | |
|  | 2009 | | 2008 | | 2009 | | 2008 | |
|---|---|---|---|---|---|---|---|---|
| Service cost | $ | 63 | $ | 78 | $ | 8 | $ | 10 |
| Interest cost | | 199 | | 181 | | 19 | | 20 |
| Expected return on plan assets | | (234) | | (223) | | — | | — |
| Amortization and foreign currency translation | | 25 | | 17 | | — | | — |
| Net periodic benefit cost | $ | 53 | $ | 53 | $ | 27 | $ | 30 |

The Company's investment strategy for pension plan assets includes diversification to minimize interest and market risks, and generally does not involve the use of derivative financial instruments. Plan assets are rebalanced periodically to maintain target asset allocations. Maturities of investments are not necessarily related to the timing of expected future benefit payments, but adequate liquidity to make immediate and medium term benefit payments is ensured.

For the year ended December 31, 2008, 49% of the pension plan assets of the U.S. Plan were invested in equity securities and 51% were invested in debt securities.

Contributions—The Company's funding policy for its defined benefit plans is to contribute amounts determined annually on an actuarial basis to provide for current and future benefits in accordance with federal law and other regulations. The Company expects to contribute approximately $1,092 to its pension plans and $63 to its other postretirement benefit plan in 2009.

Defined Contribution Plans—The Company also sponsors defined contribution plans that are available to substantially all employees. The Company contributes cash amounts, based upon a percentage of employee contributions, ranging from 1% to 3% of the employees' pay. The amount expensed for the Company match was $187 for the first quarter ended March 31, 2009 and $322 for the first quarter ended March 31, 2008. In March 2009, the Company suspended the funding of the Company's matching portion of the cash contribution due to its current budgetary constraints.

## 11. INCOME TAXES

The Company's provision for income taxes is comprised of a current and deferred portion. The current income tax provision is calculated based on estimates as if tax returns for the current year are being filed. The Company provides for deferred income taxes resulting from temporary differences between financial and taxable income. These differences arise primarily from depreciation, amortization, reserves and accruals. In determining future taxable

income, the Company is responsible for assumptions utilized including the amount of state, federal and international pre-tax operating income, and the reversal of temporary differences and the implementation of tax planning strategies. These assumptions require significant judgment about forecasts of future taxable income and are consistent with the plans and estimates the Company is using to manage its businesses.

Income taxes are provided during interim periods based on the estimated effective tax rate for the full fiscal year. The Company records a cumulative adjustment to the tax provision in an interim period in which a change in the estimated annual effective tax rate is determined.

The Company has not provided for U.S. income taxes on the undistributed earnings of its Canadian subsidiary, as the Company's present intent is to permanently reinvest these amounts.

The Company regularly assesses the potential outcomes of both ongoing examinations and future examinations for the current and prior years in order to ensure the Company's provision for income taxes is adequate. The Company believes that adequate accruals have been provided for all years in which the statutes of limitations is still open.

The Company's income tax returns are subject to examination by the Internal Revenue Service ("IRS") as well as other state and international taxing authorities. The IRS has completed its examinations of the Company's federal income tax returns for all years through 2004. With few exceptions, the Company is no longer subject to U.S., state and local or non-U.S. income tax examinations by taxing authorities for years before 2002. At this time, the Company is currently under audit by various state and non-U.S. taxing authorities. The Company is reasonably certain that its unrecognized tax benefits will not decrease within the next twelve months.

The income tax benefit for the first quarter of 2009 and 2008 was at an effective tax rate of 19.4% and 58.0%, respectively. The decrease in the effective rate for the first three months of 2009 as compared to the rate for the first three months of 2008 is primarily the result of the Company's application of a full valuation allowance against the U.S. tax benefit generated in the first quarter of 2009 due to the uncertainty about the Company's ability to generate sufficient income in the future to realize the benefit. The higher effective tax rate for the three months ended March 31, 2008 included the effect of tax expense on projected U.S. taxable income being recorded at a higher statutory rate than the tax benefit on the projected taxable loss for the Company's Canadian subsidiary.

In June 2006, the FASB issued FASB Interpretation No. 48, Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109, ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, Accounting for Income Taxes, ("SFAS No. 109") and provides guidance on classification and disclosure requirements for tax contingencies. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a return. The Company adopted FIN 48 on January 1, 2007 and did not recognize a change in its liability for unrecognized tax benefits as a result of implementing FIN 48. The total amount of unrecognized tax benefits including interest at March 31, 2009 was approximately $4,248.

The Company includes accrued interest related to unrecognized tax benefits and statutory income tax penalties in its provision (benefit) for income taxes. The total amount of accrued interest reflected in the Company's condensed consolidated balance sheet as of the first quarter ended March 31, 2009 was approximately $1,533.

## 12. COMPREHENSIVE LOSS

Total comprehensive loss for the first quarter ended March 31, 2009 and 2008 is summarized as follows:

|  | First Quarter Ended March 31, | |
| --- | --- | --- |
|  | 2009 | 2008 |
| Net loss | $ (10,042) | $ (459) |
| Foreign currency translation adjustment | (1,717) | (4,520) |
|  | $ (11,759) | $ (4,979) |

14

### 13.  RELATED PARTY TRANSACTIONS

The Company pays an annual management fee of $1,500 and reimbursement of out of pocket expenses to Genstar Capital LLC and The Sterling Group, which control the Company's parent, Panolam Holdings II Co. For the first quarter ended March 31, 2009, no management fees were paid and $375 was accrued for management fees. For the first quarter ended March 31, 2008, $375 was paid and $375 was accrued for management fees.

On March 31, 2009, the Company entered into the Forbearance Agreement with its lenders pursuant to which the lenders agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate the Company's payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The terms of the Forbearance Agreement prohibit the Company from, among other things, paying Genstar Capital LLC and The Sterling Group the management fee.

### 14.  STOCK OPTIONS

On September 30, 2005, the Company instituted the Panolam Holdings Co. 2005 Equity Incentive Plan ("Plan"). The compensation committee of the Board of Directors administers this Plan, and at least two non-employee directors must be on the committee. The purpose of the Plan is to attract, retain and motivate the Company's executives and its management employees. The Committee is authorized to approve the grant of any one or combination of stock options, stock appreciation rights, restricted share, stock units and cash. On September 30, 2005, the Company granted stock options to an executive officer and management personnel to purchase 15,556 shares of the Company's common stock, exercisable at a price of $500 per share. Through March 31, 2009, 4,889 of these stock options have been forfeited. These options vest ratably over 5 years. The Company's policy is to issue shares to satisfy stock option exercises.

On October 1, 2005, the Company adopted SFAS No. 123(R), Share-Based Payments ("SFAS No. 123(R)"), using fair-value based measurement of accounting. Upon adoption, the Company selected the modified prospective method. As a result of adopting SFAS No. 123(R), the Company recognized compensation expense $109 for the first quarter ended March 31, 2009 and $123 for the first quarter ended March 31, 2008. Such compensation expense is included in selling, general and administrative expense in the statement of operations. The tax benefit related to this expense was $42 for the first quarter ended March 31, 2009 and $47 for the first quarter ended March 31, 2008. As of March 31, 2009 and December 31, 2008, there was $762 and $965 respectively, of unrecognized compensation expense relating to outstanding options. The amount at March 31, 2009 will be amortized over the remaining vesting period associated with each grant, and the weighted average expected amortization period is approximately 1.6 years.

Stock option activity and the related changes that occurred during the three months ended March 31, 2009 is summarized as follows:

| | Outstanding | | Exercisable | |
| --- | --- | --- | --- | --- |
| | Number of Options | Weighted Average Exercise Price | Number of Options | Weighted Average Exercise Price |
| Outstanding, December 31, 2008 | 13,945 | $   513 | 7,917 | $   505 |
| Granted | — | — | — | — |
| Exercised | — | — | — | — |
| Forfeited | (1,788) | 500 | (1,067) | 500 |
| Vested | N/A | — | 150 | 750 |
| Outstanding, March 31, 2009 | 12,157 | $   515 | 7,000 | $   511 |

The Company uses the Black-Scholes Merton option-pricing model to calculate the fair value of share-based awards. The key assumptions for this valuation method include the expected term of the option, stock price

15

volatility, risk-free interest rate, dividend yield, exercise price and forfeiture rate.  In determining the fair value of its share-based awards, the Company has assumed no forfeitures and as a result expects the awards to vest ratably over the five year vesting period. Many of these assumptions are judgmental and highly sensitive in the determination of compensation expense. The Company did not grant any stock options during the first quarter of 2009. At March 31, 2009, the Company's outstanding stock options had weighted average remaining contractual terms of 6.6 years and the outstanding stock options that are exercisable had weighted average remaining contractual terms of 6.8 years.

Term — This is the period of time over which the options granted are expected to remain outstanding.  Options granted have a maximum term of 10 years. The Company utilizes the simplified method to calculate expected term. An increase in the expected term will increase compensation expense.

Volatility — This is a measure of the amount by which a price has fluctuated or is expected to fluctuate.  Volatilities are based on implied volatilities from traded options of a company's shares, historical volatility of a company's shares, and other factors, such as expected changes in volatility arising from planned changes in a company's business operations. An increase in the expected volatility will increase compensation expense. As the Company does not have a history of trading from which to determine its volatility, the historical stock price volatility of 14 public companies whose lines of business are considered similar to the Company were analyzed, focusing on the stock price trading history of those 14 companies for the years prior to the grant date.

Risk-Free Interest Rate — This is the U.S. Treasury rate in effect at the time of the grant having a term equal to the expected term of the option.  An increase in the risk-free interest rate will increase compensation expense.

Dividend Yield — The Company has no plans to pay dividends in the foreseeable future.  An increase in the dividend yield would decrease compensation expense.

## 15.  COMMITMENTS AND CONTINGENCIES

During 2006, the Company's wholly-owned subsidiary, Nevamar was named a defendant in numerous workers compensation claims filed on behalf of current and former employees at the Hampton, South Carolina facility alleging injury in the course of employment due to alleged exposure to asbestos and unidentified chemicals. Under the ownership of Westinghouse Electric Corporation, the Hampton, South Carolina facility manufactured asbestos-based products until approximately 1975. In 2004 and 2005, Nevamar, Westinghouse and IP settled 10 workers' compensation claims related to alleged asbestos exposure. Under a 2005 agreement with IP, Nevamar's liability for workers compensation claims related to alleged exposure to asbestos brought by employees hired before July 1, 2002, was capped at 15% of any damages it shares with IP until Nevamar has paid an aggregate of $700 at which point the Company would have no responsibility for any additional shared damages.

On November 21, 2008, the Company entered into a settlement agreement with IP to settle all of these workers' compensation claims for a cash sum including any related claims that are filed by any person who was previously employed, is currently employed or becomes employed by Nevamar on or before December 31, 2008 for a cash payment in an amount that had been fully reserved for by the Company. Employees hired by Nevamar after December 31, 2008 and who file claims related to alleged exposure to asbestos are not covered by this settlement agreement. The Company paid the settlement amount in November 2008.

The Company's Auburn, Maine, facility is subject to a Compliance Order by Consent ("COC") dated May 5, 1993, issued by the State of Maine Department of Environmental Protection ("DEP") with regard to unauthorized discharges of hazardous substances into the environment. The Company and the previous owners, named in the COC, are required to investigate and, as necessary, remediate the environmental contamination at the site. Because the unauthorized discharges occurred during the previous ownership, the previous owners have agreed to be responsible for compliance with the COC. The previous owners have completed and submitted to the State for its review a risk assessment. The financial obligation of the previous owners to investigate and/or remediate is unlimited except with regard to a portion of the land at the Company's Auburn, Maine, facility, which is capped at $10,000. The Company has recorded a liability of $709 and $710 at March 31, 2009 and December 31, 2008, respectively, for site remediation costs in excess of costs assumed by the previous owners. The Company could incur additional obligations in excess of the amount accrued and the Company's recorded estimate may change over time. The Company expects this environmental issue to be resolved within the next five to ten years.

The Company is party to other litigation matters involving ordinary and routine claims incidental to its business. The Company cannot estimate with certainty its ultimate legal and financial liability with respect to such pending litigation matters. However, the Company believes, based on its examination of such matters, its ultimate costs with respect to such matters, if any, will not have a material adverse effect on its business, financial condition, results of operations or cash flows.

## 16. SEGMENT INFORMATION

The Company has determined its operating segments in a manner that reflects how the chief operating decision maker currently reviews the results of the Company's business. The Company has two reportable segments, decorative laminates and other. Decorative laminates manufactures and distributes decorative laminates, primarily TFM and HPL, for use in a wide variety of residential and commercial indoor surfacing applications. This segment accounted for approximately 82% of the Company's total revenue for the first quarter ended March 31, 2009 and approximately 87% for the first quarter ended March 31, 2008. The Company's other segment includes the production and marketing of a variety of specialty resins for industrial uses, custom treated and chemically prepared decorative overly papers and a variety of other industrial laminates including the Company's fiber reinforced plastic product known as FRP. The other segment, net of the corporate/eliminations accounted for approximately 18% of the Company's total revenue for the first quarter ended March 31, 2009 and 13% for the first quarter ended March 31, 2008. The amount of net sales reflected in the corporate/eliminations column in the tables below primarily represents the elimination of the intercompany sales of the other segment to the decorative laminates segment. The other amounts reflected in this column related to expenses, capital expenditures and total assets associated with the Company's Corporate office. Certain corporate expenses are generally not allocated to specific operating segments and are accordingly reflected in the Corporate/Eliminations column in the tables below.

The Company uses the following key information in evaluating the performance of each segment:

| | As of March 31, 2009 and for the First Quarter Ended March 31, 2009 | | | |
| | Decorative Laminates | Other | Corporate/ Eliminations | Total |
|---|---|---|---|---|
| Net sales | $ 52,690 | $ 11,438 | $ (217) | $ 63,911 |
| Gross profit | 6,268 | 1,488 | | 7,756 |
| Income (loss) from operations | 1,027 | 1,024 | (8,361) | (6,310) |
| Depreciation and amortization expense | 5,792 | 923 | 743 | 7,458 |
| Indefinite lived intangible asset impairment charge | 1,249 | 37 | 303 | 1,589 |
| Other expenses | — | — | 2,087 | 2,087 |
| Capital expenditures | 151 | 35 | 18 | 204 |
| Total assets | 251,404 | 47,692 | 100,938 | 400,034 |

| | First Quarter Ended March 31, 2008 | | | |
| | Decorative Laminates | Other | Corporate/ Eliminations | Total |
|---|---|---|---|---|
| Net sales | $ 87,667 | $ 15,262 | $ (1,747) | $ 101,182 |
| Gross profit | 17,634 | 1,809 | — | 19,443 |
| Income (loss) from operations | 11,844 | 1,355 | (6,501) | 6,698 |
| Depreciation and amortization expense | 5,614 | 870 | 779 | 7,263 |
| Capital expenditures | 712 | 341 | 135 | 1,188 |

Net sales by geographic area for the first quarter ended March 31, 2009 and 2008 were as follows:

17

| | For the First Quarter Ended March 31, | |
|---|---|---|
| | 2009 | 2008 |
| United States | $ 51,378 | $ 82,969 |
| Canada | 10,603 | 16,594 |
| Other | 1,930 | 1,619 |
| | $ 63,911 | $ 101,182 |

No single customer accounted for more than 10% of the Company's consolidated net sales for any of the above periods.

Long-lived assets by geographic area were as follows:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| United States | $ 201,090 | $ 210,464 |
| Canada | 66,837 | 70,463 |
| | $ 267,927 | $ 280,927 |

18

## 17. SUPPLEMENTAL CONSOLIDATING CONDENSED FINANCIAL STATEMENTS

The Notes issued September 30, 2005 by the Company are guaranteed by Panolam Industries, Inc., Pioneer Plastics Corporation and Nevamar Holding Corp. Supplemental consolidating condensed financial statements for the parent company, subsidiary guarantors and the non-guarantor company are presented below. Investments in subsidiaries are accounted for using the equity method for purposes of the consolidating presentation. The principal elimination entries eliminate investments in subsidiaries, intercompany balances and intercompany transactions. The income tax expense (benefit) that is reflected in the Parent Company column on the consolidating condensed statements of operations for the periods presented also includes the income tax expense (benefit) that pertains to the Subsidiary Guarantors.

|  | Panolam Industries International, Inc. and Subsidiaries Consolidating Condensed Balance Sheets March 31, 2009 | | | | |
|  | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash and cash equivalents | $ 44,425 | $ (1,560) | $ 765 | $ — | $ 43,630 |
| Accounts receivable, net | 1,013 | 14,515 | 1,523 | — | 17,051 |
| Inventories | — | 47,606 | 5,532 | — | 53,138 |
| Other current assets | 10,707 | 3,221 | 4,360 | — | 18,288 |
| Total current assets | 56,145 | 63,782 | 12,180 | — | 132,107 |
| Property, plant and equipment, net | 1,381 | 144,169 | 64,567 | — | 210,117 |
| Intangible assets, net | 30,817 | 16,660 | 2,004 | — | 49,481 |
| Debt acquisition costs, net | 6,633 | — | — | — | 6,633 |
| Other assets | 1,431 | — | 265 | — | 1,696 |
| Intercompany receivables | — | 208,799 | 26,208 | (235,007) | — |
| Investment in subsidiaries | 501,781 | — | — | (501,781)(a) | — |
| Total | $ 598,188 | $ 433,410 | $ 105,224 | $ (736,788) | $ 400,034 |
| **LIABILITIES AND STOCKHOLDER'S (DEFICIT) EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 1,327 | $ 6,241 | $ 1,521 | $ — | $ 9,089 |
| Accrued liabilities | 15,156 | 5,614 | 1,093 | — | 21,863 |
| Current portion of long-term debt | 343,956 | 11 | — | — | 343,967 |
| Total current liabilities | 360,439 | 11,866 | 2,614 | — | 374,919 |
| Long-term debt, less current portion | — | 11 | — | — | 11 |
| Deferred income taxes | 42,271 | — | 13,880 | — | 56,151 |
| Other liabilities | — | 2,504 | 5,978 | — | 8,482 |
| Intercompany payables | 235,007 | — | — | (235,007) | — |
| Total liabilities | 637,717 | 14,381 | 22,472 | (235,007) | 439,563 |
| Total stockholder's (deficit) equity | (39,529) | 419,029 | 82,752 | (501,781)(a) | (39,529) |
| Total | $ 598,188 | $ 433,410 | $ 105,224 | $ (736,788) | $ 400,034 |

(a) Elimination of investment in subsidiaries.

19

**Panolam Industries International, Inc. and Subsidiaries**
**Consolidating Condensed Balance Sheets**
**December 31, 2008**

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash and cash equivalents | $ 41,684 | $ (1,093) | $ 2,861 | $ — | $ 43,452 |
| Accounts receivable, net | 568 | 12,113 | 1,512 | — | 14,193 |
| Inventories | — | 50,142 | 4,994 | — | 55,136 |
| Other current assets | 10,559 | 3,533 | 4,483 | — | 18,575 |
| Total current assets | 52,811 | 64,695 | 13,850 | — | 131,356 |
| Property, plant and equipment, net | 1,471 | 148,839 | 68,020 | — | 218,330 |
| Intangible assets, net | 31,753 | 17,924 | 2,406 | — | 52,083 |
| Debt acquisition costs, net | 7,057 | — | — | — | 7,057 |
| Other assets | 3,420 | — | 37 | — | 3,457 |
| Intercompany receivables | — | 199,219 | 23,534 | (222,753) | — |
| Investment in subsidiaries | 501,151 | — | — | (501,151)(a) | — |
| Total | $ 597,663 | $ 430,677 | $ 107,847 | $ (723,904) | $ 412,283 |
| **LIABILITIES AND STOCKHOLDER'S (DEFICIT) EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 169 | $ 5,594 | $ 1,150 | $ — | $ 6,913 |
| Accrued liabilities | 12,223 | 6,063 | 1,299 | — | 19,585 |
| Current portion of long-term debt | 343,926 | 11 | — | — | 343,937 |
| Total current liabilities | 356,318 | 11,668 | 2,449 | — | 370,435 |
| Long-term debt, less current portion | — | 13 | — | — | 13 |
| Deferred income taxes | 46,471 | — | 15,027 | — | 61,498 |
| Other liabilities | — | 2,509 | 5,707 | — | 8,216 |
| Intercompany payables | 222,753 | — | — | (222,753) | — |
| Total liabilities | 625,542 | 14,190 | 23,183 | (222,753) | 440,162 |
| Total stockholder's (deficit) equity | (27,879) | 416,487 | 84,664 | (501,151)(a) | (27,879) |
| Total | $ 597,663 | $ 430,677 | $ 107,847 | $ (723,904) | $ 412,283 |

(a)  Elimination of investment in subsidiaries.

20

**Panolam Industries International, Inc. and Subsidiaries**
**Consolidating Condensed Statements of Operations**
**For the Three Months Ended March 31, 2009**

|  | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| Net sales | $    — | $   52,422 | $   11,856 | $   (367) | $   63,911 |
| Cost of goods sold | — | 44,881 | 11,641 | (367) | 56,155 |
| Gross profit | — | 7,541 | 215 | — | 7,756 |
| Selling, general and administrative expenses | 5,952 | 4,085 | 353 |  | 10,390 |
| Indefinite lived intangible asset impairment charge | 303 | 953 | 333 |  | 1,589 |
| Other expenses | 2,087 | — | — | — | 2,087 |
| Income (loss) from operations | (8,342) | 2,503 | (471) | — | (6,310) |
| Interest expense | 6,233 | — | — | — | 6,233 |
| Interest income | (81) | — | (1) | — | (82) |
| Income (loss) before income taxes (benefit) and equity in net income of subsidiaries | (14,494) | 2,503 | (470) | — | (12,461) |
| Income taxes (benefit) | (2,143) | — | (276) | — | (2,419) |
| Income (loss) before equity in net income of subsidiaries | (12,351) | 2,503 | (194) | — | (10,042) |
| Equity in net income (loss) of subsidiaries | 2,309 | — | — | (2,309) | — |
| Net income (loss) | $   (10,042) | $   2,503 | $   (194) | $   (2,309) | $   (10,042) |

21

**Panolam Industries International, Inc. and Subsidiaries**
**Consolidating Condensed Statements of Operations**
**For the Three Months Ended March 31, 2008**

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| Net sales | $ — | $ 79,601 | $ 22,101 | $ (520) | $ 101,182 |
| Cost of goods sold | — | 60,727 | 21,532 | (520) | 81,739 |
| Gross profit | — | 18,874 | 569 | — | 19,443 |
| Selling, general and administrative expenses | 6,467 | 5,321 | 957 | — | 12,745 |
| Income (loss) from operations | (6,467) | 13,553 | (388) | — | 6,698 |
| Interest expense | 7,876 | 1 | — | — | 7,877 |
| Interest income | (71) | — | (15) | — | (86) |
| Income (loss) before income taxes (benefit) and equity in net income of subsidiaries | (14,272) | 13,552 | (373) | — | (1,093) |
| Income taxes (benefit) | 68 | — | (702) | — | (634) |
| Income (loss) before equity in net income of subsidiaries | (14,340) | 13,552 | 329 | — | (459) |
| Equity in net income (loss) of subsidiaries | 13,881 | — | — | (13,881) | — |
| Net income (loss) | $ (459) | $ 13,552 | $ 329 | $ (13,881) | $ (459) |

22

**Panolam Industries International, Inc. and Subsidiaries**
**Consolidating Condensed Statements of Cash Flows**
**For the Three Months Ended March 31, 2009**

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | |
| Net loss | $ (10,042) | $ 2,503 | $ (194) | $ (2,309) | $ (10,042) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | 723 | 5,040 | 1,695 | | 7,458 |
| Indefinite lived intangible asset impairment charge | 303 | 953 | 333 | | 1,589 |
| Deferred income tax benefit | (2,816) | — | 81 | | (2,735) |
| Amortization of debt acquisition costs | 424 | — | — | | 424 |
| Stock based compensation expense | 109 | — | — | | 109 |
| Equity in net income of subsidiaries | (2,309) | — | — | 2,309 | |
| Other | 48 | (16) | (75) | | (43) |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable | (445) | (2,402) | (54) | | (2,901) |
| Inventories | — | 2,536 | (679) | | 1,857 |
| Other current assets | (61) | 312 | (29) | | 222 |
| Accounts payable and accrued liabilities | 4,091 | 165 | 227 | | 4,483 |
| Income taxes payable/receivable | 164 | — | (17) | | 147 |
| Other | — | 28 | (129) | | (101) |
| Net cash (used in) provided by operating activities | (9,811) | 9,119 | 1,159 | — | 467 |
| **Cash flows from investing activities:** | | | | | |
| Intercompany receivable/payable, net | 12,572 | — | — | (12,572) | — |
| Purchases of property, plant and equipment | (18) | (42) | (144) | | (204) |
| Net cash provided by (used in) investing activities | 12,554 | (42) | (144) | (12,572) | (204) |
| **Cash flows from financing activities:** | | | | | |
| Repayment of long-term debt | (2) | (2) | | | (4) |
| Intercompany receivable/payable, net | — | (9,542) | (3,030) | 12,572 | — |
| Net cash (used in) provided by financing activities | (2) | (9,544) | (3,030) | 12,572 | (4) |
| Effect of exchange rate changes on cash | — | — | (81) | — | (81) |
| Net change in cash and cash equivalents | 2,741 | (467) | (2,096) | — | 178 |
| Cash and cash equivalents—beginning of period | 41,684 | (1,093) | 2,861 | — | 43,452 |
| Cash and cash equivalents—end of period | $ 44,425 | $ (1,560) | $ 765 | $ — | $ 43,630 |

23

Book Page 330

Panolam Industries International, Inc. and Subsidiaries
Consolidating Condensed Statements of Cash Flows
For the Three Months Ended March 31, 2008

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | |
| Net income (loss) | $ (459) | $ 13,552 | $ 329 | $ (13,881) | $ (459) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | 744 | 4,461 | 2,058 | | 7,263 |
| Deferred income tax benefit | (43) | — | (677) | | (720) |
| Amortization of debt acquisition costs | 482 | — | — | | 482 |
| Stock option expense | 123 | — | — | | 123 |
| Equity in net income of subsidiaries | (13,881) | — | — | 13,881 | — |
| Other | 31 | (190) | 140 | | (19) |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable | 80 | (4,554) | (1,114) | | (5,588) |
| Inventories | — | (899) | (521) | | (1,420) |
| Other current assets | 592 | 287 | 90 | | 969 |
| Accounts payable and accrued liabilities | 5,041 | 2,116 | 1,489 | | 8,646 |
| Income taxes payable/receivable | 393 | — | (434) | | (41) |
| Other | 185 | (247) | (107) | | (169) |
| Net cash (used in) provided by operating activities | (6,712) | 14,526 | 1,253 | — | 9,067 |
| **Cash flows from investing activities:** | | | | | |
| Intercompany receivable/payable, net | 14,539 | — | — | (14,539) | |
| Purchases of property, plant and equipment | (135) | (840) | (213) | | (1,188) |
| Net cash provided by (used in) investing activities | 14,404 | (840) | (213) | (14,539) | (1,188) |
| **Cash flows from financing activities:** | | | | | |
| Repayment of long-term debt | (2,012) | (5) | — | | (2,017) |
| Proceeds from revolving credit facility | 5,000 | — | — | | 5,000 |
| Settlement of amount due to Panolam Holdings Co | (2,482) | — | — | | (2,482) |
| Intercompany receivable/payable, net | — | (12,476) | (2,063) | 14,539 | — |
| Net cash (used in) provided by financing activities | 506 | (12,481) | (2,063) | 14,539 | 501 |
| Effect of exchange rate changes on cash | — | — | (159) | — | (159) |
| Net change in cash and cash equivalents | 8,198 | 1,205 | (1,182) | — | 8,221 |
| Cash and cash equivalents—beginning of period | 9,202 | (2,553) | 4,095 | — | 10,744 |
| Cash and cash equivalents—end of period | $ 17,400 | $ (1,348) | $ 2,913 | $ — | $ 18,965 |

\*   \*   \*   \*   \*

24

## Item 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this discussion and analysis in conjunction with our unaudited condensed consolidated financial statements as of March 31, 2009 and the notes to those condensed consolidated financial statements included elsewhere in this Form 10-Q. In addition, the following discussion may be understood more fully by reference to our consolidated financial statements and management's discussion and analysis contained in our Annual Report on Form 10-K for the year ended December 31, 2008, as filed with the Securities and Exchange Commission on March 31, 2009. The statements in the discussion and analysis regarding our expectations for the performance of our business, our liquidity and capital resources and the other non-historical statements in the discussion and analysis are forward looking statements. Our actual results may differ from those contained in or implied by the forward-looking statements. Please see "Forward Looking Statements" at the end of this Item 2 for a discussion of important factors that could cause results to differ materially from the results described in or implied by the forward looking statements contained herein.*

### Overview

We are a leading designer, manufacturer and distributor of decorative laminates in the United States and Canada. Our products, which are marketed under the Panolam, Pluswood, Nevamar and Pionite brand names, are used in a wide variety of commercial and residential indoor surfacing applications, including kitchen and bath cabinets, furniture, store fixtures and displays, and other specialty applications. Our decorative laminate product offerings also include a fiber reinforced laminate product ("FRL"). In addition to decorative laminates, we manufacture and distribute industrial laminate products, including Conolite and Panolam FRP ("FRP"). We produce and market a selection of specialty resins for industrial uses, such as powdered paint, adhesives and melamine resins for decorative laminate production, custom treated and chemically prepared decorative overlay papers for HPL and TFM, and a variety of other industrial laminate products such as aircraft cargo liners and bowling lanes.

We are the only vertically integrated North American manufacturer of both HPL and TFM (with the exception of particle board production in our TFM business where we purchase approximately 50% of our needs), and we design, manufacture and distribute our products throughout our principal markets. For the year ended December 31, 2008 and for the three months ended March 31, 2009 we generated net sales of $366.7 million and $63.9 million, respectively. During each of these periods, our decorative laminate products comprised approximately 87% and 82% of our net sales, respectively. For additional information regarding our results of operations by segment for the three months ended March 31, 2009 and 2008, please see note 16 to our unaudited condensed consolidated financial statements.

We offer an array of decorative and industrial laminate products from premium to commodity grades at a broad range of prices. HPL, TFM, FRL, Leatherlam, FRP, and our engineered laminates are utilized as durable and economical look-alike substitutes for natural surfacing materials such as wood, stone and ceramic tile. HPL is used in surfacing applications requiring greater surface wear and impact resistance than applications using TFM. FRL, a proprietary product, is used in surfacing applications requiring greater surface wear, impact resistance and fire prevention than applications using HPL. FRP is used in the building, trucking and recreational, or RV, markets. A typical customer or end user of decorative overlays might utilize HPL, TFM, FRL, FRP or Leatherlam for different surfaces of the same project. Our TFM products consist of a standard palette of over 150 colors, patterns and wood grains. Our HPL products consist of a standard palette of approximately 500 colors, patterns and wood grains.

We market and distribute our decorative laminate products through a geographically diverse network of approximately 300 independently owned and operated distributors. For many of our distributors, we are their exclusive supplier of HPL, TFM or other decorative laminates. In addition, we sell to approximately 700 national and regional original equipment manufacturers, or OEMs, who buy proprietary designs and customized versions of our products directly. Our products are supported by a dedicated in-house sales force and customer service team.

We suffered net losses for the three months ended March 31, 2009 and the year ended December 31, 2008 of approximately $10.0 million and $121.7 million, respectively.  The net loss for the three months ended March 31, 2009 resulted primarily from reduced sales volume given the current economic conditions and also included a $1.6 million trade name impairment charge and $2.1 million in other expenses related primarily to legal and financial advisor fees incurred in connection with our efforts to restructure our debt obligations.  The net loss for the year ended December 31, 2008 was principally attributable to impairment charges related to

25

goodwill and trade names taken during the year as well as our high ratio of fixed costs, including the interest costs on our debt and our depreciation expense. We also had a stockholder's deficit of approximately $39.5 million at March 31, 2009 and approximately $27.9 million at December 31, 2008. During the fourth quarter of 2008, in light of the weakening economy and our concerns about the troubled credit markets, we borrowed the full amount available under the revolver tranche of the Credit Facility. As a result, we had approximately $43.6 million in cash and cash equivalents and approximately $193.5 million in principal and interest outstanding under the Credit Facility as of March 31, 2009.

On February 27, 2009, we received a notice of default from the agent for the lenders under our Credit Facility due to our failure to comply with certain financial and reporting covenants. On March 31, 2009, we entered into the Forbearance Agreement with our lenders pursuant to which the lenders agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate our payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The terms of the Forbearance Agreement prohibited us from, among other things, paying the April 1, 2009 interest payment on the Notes. Our failure to make that interest payment is a default under the indenture governing the Notes and entitles the indenture trustee or the holders of 25% of the Notes, after a thirty-day grace period that ended on May 1, 2009 and upon delivery of proper notice to us, to accelerate our payment obligations under the Notes. The indenture trustee informed the holders of the Notes of the payment default and of the event of default by letters dated April 9, 2009 and May 7, 2009, respectively. Furthermore, if we are unable to restructure or refinance the Credit Facility or our payment obligations under the Notes are accelerated, our lenders could accelerate our payment obligations under the Credit Facility. Based on these acceleration rights under the Credit Facility and the Notes, we reclassified approximately $343.9 million from long-term debt to current debt as of December 31, 2008. The current portion of long-term debt was approximately $344.0 million as of March 31, 2009.

In the event that most or all of our obligations under the Credit Facility and Notes become due and payable, we would be unable to fund our payment obligations. We believe that the consummation of a successful restructuring is critical to our continued viability, and we are in active discussions with our lenders and an ad hoc group representing a substantial majority of the holders of our Notes to restructure our debt obligations, and have not received any acceleration notice related to these financing arrangements; however, given the current negative conditions in the economy generally and the credit markets in particular, we cannot give any assurance that we will be successful in restructuring our debt or finding alternative financing arrangements. We have engaged financial and legal advisors to provide assistance in these discussions, but if we are unable to find a timely solution, we may be compelled to file for bankruptcy protection.

## Factors Affecting Our Results

### Revenue

We generate our revenue primarily from the sale of our decorative laminates and, to a lesser extent, specialty resins, industrial laminates and decorative overlay papers in the United States and Canada. In recent periods, consistent with our continuing strategy, we have concentrated on selling finished laminated end products for their proprietary designs rather than marketing treated papers that could ultimately be used to compete against our own finished laminated products. Our focus is on high-end premium grades, such as abstract and wood grain patterned laminates that command higher prices and generate higher profit margins. For the three months ended March 31, 2009, approximately 90% of our HPL sales and 63% of our TFM sales were premium grade.

We have historically experienced higher sales in the second and third quarters of each year compared with the first and fourth quarters due primarily to seasonal fluctuations in demand. However, in 2008 the second, third and fourth quarter sales were lower than first quarter sales due primarily to soft market conditions resulting from the deteriorating general economy. We expect this slowdown in sales to continue during 2009. Also, from time to time, we have curtailed manufacturing operations to make necessary repairs and to maintain efficiencies during slowdowns in order flow.

Changes in our revenues from sales of our decorative laminates and industrial laminate products from period to period are affected by the following, among other factors:

- changes in general economic conditions and the availability of financing that affect the construction industry, since reductions in construction activity can materially reduce the demand for decorative laminates, as it has in recent quarters;

- changes in the design preferences and the discretionary spending power of commercial and residential consumers who ultimately purchase our products primarily in connection with renovations, expansions and upgrades;

- changes in prices, including those resulting from cost increases, which may be on a delayed basis following any cost increases, and those changes implemented for competitive reasons; and

- our ability to successfully develop and launch new designs and products.

### Cost of Goods Sold

Our cost of goods sold consists primarily of raw materials, most of which is paper, raw particle board and resin, and energy costs for oil, natural gas and electricity, which generally are variable, and to a lesser extent, direct labor and overhead. Our costs of sales are directly affected by changes in prices for these raw materials, as well as by changes in energy costs and oil prices which affect the price of the petroleum based products that we use to manufacture resins. Recently, the prices of these raw materials have increased and may continue to increase in the future. While we generally attempt to pass along increased raw material prices to our customers in the form of price increases, there may be a time delay between the increased raw material prices and our ability to increase the selling prices of our products, or we may be unable to increase the prices of our products due to pricing pressure, decreased demand or other factors, particularly in our TFM product line where we have been unable to pass all of the price increases through to our customers for competitive reasons. Similarly, we have instituted certain surcharges on our customers from time to time to reflect increases in our transportation or distribution costs.

### Gross Profit

Our gross profit has decreased in the three months ended March 31, 2009 in comparison to the three months ended March 31, 2008. The decrease in gross profit is primarily the result of the decreased sales volume experienced in the three months ended March 31, 2009 as a result of weakened economic conditions. The decreased sales volume in the three months ended March 31, 2009 had the effect of increasing the ratio of fixed overhead expenses to sales and as a result negatively impacted the gross profit margin. In addition, certain raw material costs, especially for chemicals, were higher on average during the three months ended March 31, 2009 than in the same period in 2008. The negative impact on gross profit in the three months ended March 31, 2009 resulting from lower sales volume and higher raw material costs was partially offset by aggressive cost containment measures, including significant headcount reductions. We include certain costs such as distribution costs in our selling, general and administrative expenses. Accordingly, our gross profit may not be comparable to other companies that include such costs in their costs of goods sold.

### Selling, General and Administrative Expenses

Selling, general and administrative expenses consist of all costs incurred in connection with the sales and marketing of our products, including distribution and warehousing costs and all administrative costs. The major items included in sales and marketing expenses are:

- costs associated with employees in our sales, marketing and customer service departments, including both fixed salaries and bonuses typically based on agreed targets;

- advertising costs; and

- warehousing costs related to our distribution centers.

Changes in sales and marketing expenses as a percentage of our revenue may be affected by a number of factors, including changes in sales prices and / or volumes, as higher sales prices and / or volumes enable us to spread the fixed portion of our sales and marketing expenses over higher sales revenue. Sales and marketing expenses may increase from time to time due to advertising or marketing expenses associated with new product or enhanced product introductions and promotions and higher commissions paid to our sales force for achieving certain targets.

Administrative expenses include management salary, payroll and benefit costs, stock based compensation expense, rent, legal and environmental compliance fees and other administrative and overhead costs. Administrative expenses also include management fees to Genstar Capital LLC and The Sterling Group.

*Depreciation and Amortization*

Depreciation costs relate to the depreciation of property, plant and equipment. For financial reporting purposes, we calculate depreciation on a straight-line basis over the expected useful life of each class of asset. Depreciation expense related to our manufacturing processes and administrative functions is included in the consolidated statement of operations in cost of goods sold and selling, general and administrative expenses, respectively.

Amortization costs relate to the amortization of intangible assets, which consist primarily of key customer lists, patents and trademarks. We calculate amortization on a straight-line basis over the expected useful life of the asset, with each identifiable asset assessed individually. Key customer lists, patents and trademarks are amortized over their respective estimated useful lives to their estimated residual values. These useful lives generally range from three to fifteen years.

*Interest Expense/Interest Income*

Interest expense consists of interest on our outstanding indebtedness and the amortization of debt acquisition costs and other financial income and expenses. Interest income consists primarily of interest earned on cash balances in our bank accounts.

*Income Tax Expense (Benefit)*

Income tax expense is incurred at the U.S. federal, foreign and state levels. We are subject to taxation primarily in two jurisdictions, the United States and Canada. The effective tax rate in the first three months of 2009 was 19.4% compared to 58.0% for the first three months of 2008. The decrease in the effective rate for the first three months of 2009 as compared to the rate for the first three months of 2008 is primarily the result of our application of a full valuation allowance against the U.S. tax benefit generated in the first quarter of 2009 due to the uncertainty about our ability to generate sufficient income in the future to realize the benefit. The higher effective tax rate for the three months ended March 31, 2008 included the effect of tax expense on projected U.S. taxable income being recorded at a higher statutory rate than the tax benefit on the projected taxable loss for our Canadian subsidiary.

**Critical Accounting Policies**

Critical accounting policies are those that require the application of management's most difficult, subjective, or complex judgments, often because of the need to make estimates about the effect of matters that are inherently uncertain and that may change in subsequent periods. The preparation of our condensed consolidated financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, and expenses, and related disclosures at the date of our condensed consolidated financial statements. Management bases its estimates and judgments on historical experience and current market conditions and on various other factors that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Estimates, however, routinely require adjustment based on changing circumstances and the receipt of new or better information, and actual results may differ from these estimates under different assumptions or conditions. Management considers our policies on revenue recognition, adjustments for slow moving and obsolete inventories, potentially uncollectible accounts receivable, accruals for customer rebates, income taxes, intangible assets and long-lived assets and stock options to be critical accounting policies due to estimates, assumptions, and application of judgment involved in each.

Actual results may differ from management's estimates. In addition, other companies may utilize different estimates, which may impact the comparability of our results of operations to those of companies in similar businesses.

**Results of Operations**

*Three months ended March 31, 2009 compared to the three months ended March 31, 2008*

*Net Sales*

Net sales were $63.9 million in the three months ended March 31, 2009 compared to $101.2 million for the three months ended March 31, 2008, a decrease of approximately 37% in U.S. dollars and approximately 34% in local

currencies. The decrease in sales in the three months ended March 31, 2009 as compared to the three months ended March 31, 2008 is primarily attributable to lower high pressure laminate, or HPL and thermally-fused melamine, or TFM sales, which declined approximately 36% and 42%, respectively. The decline in HPL and TFM sales resulted primarily from the continued slowdown in the residential housing and credit markets as well as the decline in the overall general economy. Currency translation as it relates to our Canadian operation had the effect of decreasing sales in the first quarter of 2009 by approximately $2.8 million when compared to foreign exchange rates for the first quarter of 2008. In addition to decreases in demand, we continue to experience increased pricing pressure with respect to certain of our TFM and HPL products.

Sales of decorative laminates were $52.7 million in the three months ended March 31, 2009 compared to $87.7 million for the same period in 2008. Sales of decorative laminates, which includes both TFM and HPL (approximately 82% of net sales), decreased approximately 40% in the three months ended March 31, 2009 as compared to 2008.

Sales of other products, net of the intercompany sales eliminations, principally specialty resins, decorative overlay papers and industrial laminates, were $11.2 million in the three months ended March 31, 2009 compared to $13.5 million for the three months ended March 31, 2008. Other product sales (approximately 18% of net sales) decreased approximately 17% in the three months ended March 31, 2009. For the three months ended March 31, 2009, specialty resins accounted for approximately 4.2% of our total sales, while industrial and other specialty laminates, and decorative overlay papers accounted for approximately 8.8% and 1% of our sales, respectively.

Our net sales for the three months ended March 31, 2009 were adversely impacted by weakness in the U.S. economy generally and by the sharp slowdown in residential and commercial construction, particularly the residential housing and credit markets that occurred in 2008 and has continued during 2009. Our products are incorporated into new buildings and homes, as well as buildings and homes being refurnished or remodeled. As the construction and housing industries are extremely weak, we have experienced less demand for our products. Our HPL and TFM products are most affected by these adverse market conditions. We believe that economic conditions will remain extremely challenging in the near term, and that demand for our products will likely continue to decline as a result, which would negatively impact our net sales, profitability and cash flows as well as our ability to comply with the covenants set forth in our Credit Facility or covenants in any replacement financing. In addition to decreases in demand, we have experienced increased pressure on pricing from our competitors, particularly our more vertically integrated TFM competitors. If this trend continues, our net sales and profitability could continue to decline.

*Gross Profit*

The gross profit margin as a percentage of net sales declined to approximately 12% in the three months ended March 31, 2009 from approximately 19% in the three months ended March 31, 2008. The decrease in our gross profit margin for the three months ended March 31, 2009 was primarily attributable to the decreased sales volume of our HPL and TFM products resulting from weakened economic conditions. The decreased sales volume in the three months ended March 31, 2009 had the effect of increasing the ratio of fixed overhead expenses to sales which negatively impacted the gross profit margin. In addition, certain raw material costs, especially for chemicals, were higher on average during in the three months ended March 31, 2009 than in the same period in 2008. The negative impact on gross profit in the three months ended March 31, 2009 resulting from lower sales volume and higher raw material costs was partially offset by aggressive cost containment measures, including significant headcount reductions. We include certain costs such as distribution costs in our selling, general and administrative expenses. Accordingly, our gross profit may not be comparable to other companies that include such costs in their costs of goods sold.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses, which primarily consist of sales and marketing expenses, were $10.4 million in the three months ended March 31, 2009 compared to $12.7 million for the three months ended March 31, 2008. The decrease in selling, general and administrative expenses in the three months ended March 31, 2009 is primarily attributable to aggressive cost containment including headcount reductions, and consolidation of the sales and marketing functions and other synergies realized through the consolidation of the operations of Panolam and Nevamar. As a percentage of net sales, selling, general and administrative expenses were approximately 16% and 13% for the three months ended March 31, 2009 and 2008, respectively.

*Interest Expense*

Interest expense, which includes the amortization of debt acquisition costs, was $6.2 million for the three months ended March 31, 2009 compared to $7.9 million for the same period in 2008. The decrease in interest expense in the

three months ended March 31, 2009 as compared to the same period in 2008 is primarily attributable to lower average interest rates offset in part by higher average debt levels resulting from the borrowings under the revolver portion of our Credit Facility made in October 2008.

*Income Taxes*

Income tax provision in the three months ended March 31, 2009 was a benefit of $2.4 million as compared to a benefit of $0.6 million for the three months ended March 31, 2008. The effective tax rate in the first three months of 2009 was 19.4% compared to 58.0% for the first three months of 2008. The decrease in the effective rate for the first three months of 2009 as compared to the rate for the first three months of 2008 is primarily the result of our application of a full valuation allowance against the U.S. tax benefit generated in the first quarter of 2009 due to the uncertainty about our ability to generate sufficient income in the future to realize the benefit. The higher effective tax rate for the three months ended March 31, 2008 included the effect of tax expense on projected U.S. taxable income being recorded at a higher statutory rate than the tax benefit on the projected taxable loss for our Canadian subsidiary.

*Net Loss*

Net loss for the three months ended March 31, 2009 was $10.0 million compared to $0.5 million for the three months ended March 31, 2008, an increase of approximately $9.5 million. The increase in net loss is primarily attributable to lower net sales, which were partially offset by decreases in the cost of goods sold due to lower sales volume, in the three months ended March 31, 2009 compared to the three months ended March 31, 2008, as well as a trade name impairment charge and other administrative expenses related to our efforts to restructure our debt in the three months ended March 31, 2009, which were also partially offset by decreases in selling, general and administrative expenses, interest expense and income taxes.

**Liquidity and Capital Resources**

We require working capital to reinvest in our business and to repay or continue prepaying our indebtedness. Our total capital expenditures were approximately $3.4 million in 2008 and assuming we can restructure our indebtedness and continue operations, we anticipate total capital expenditures to approximate $4.0 million in 2009, of which $0.2 million was incurred in the first quarter and approximately $3.8 million is expected to be incurred during the remainder of 2009.

The principal sources of cash to fund our liquidity needs are cash provided by operating activities and cash provided by borrowings under our Credit Facility. Restrictive covenants in our debt agreements restrict our ability to pay dividends and make other distributions. Specifically, the Credit Facility restricts us from making payments of dividends or distributions, including to Panolam Holdings Co., subject to certain exceptions. Under certain circumstances we are permitted to pay dividends or distributions from our consolidated excess cash flow provided that, after giving effect to the dividend or distribution, we have a consolidated leverage ratio (calculated as a ratio of consolidated total debt to consolidated adjusted EBITDA (as defined in the Credit Facility) as of the last day of any fiscal quarter) not exceeding 3.75 to 1.00. Our Credit Facility also requires us to maintain a maximum consolidated leverage ratio (4.50 to 1.00 as of the end of each quarter ending during fiscal year 2009) that decreases over time and to limit the amount of our capital expenditures in any fiscal year. As of March 31, 2009, our consolidated leverage ratio was in excess of the permitted maximum amount at 8.05 to 1.00. The Credit Facility further requires us to maintain a minimum interest coverage ratio (2.25 to 1.00 as of the end of each quarter during fiscal year 2009) that increases over time. As of March 31, 2009, our minimum interest coverage ratio was below the required minimum at 1.46 to 1.00. For a discussion of the potential acceleration and restructuring of our indebtedness, see "Overview."

The indenture governing our Notes also restricts us from making payments of dividends or distributions, subject to certain exceptions, unless, among other things, all such payments are less than 50% of our consolidated net income for the period from October 1, 2005 to the most recently ended fiscal quarter at the time of the payment. On March 30, 2009, the agent for the Credit Facility lenders provided us with a "blockage notice" directing us not to make an April 1, 2009 interest payment on the Notes. We did not make that payment, which is a default under the Notes, and, as a result, the holders of the Notes currently have the right to accelerate our payment obligations under the Notes.

When cash generated from our operations is sufficient, we may apply portions of our excess cash towards the repayment of our long-term debt. During the year ended December 31, 2008, we prepaid long-term debt of approximately $2.0 million, but we did not make any prepayments during the three months ended March 31, 2009. Under the terms of the Forbearance Agreement, an excess cash flow payment related to the year ended December 31, 2008 and calculated in accordance with the terms of the Credit Facility, is due on or before June 30, 2009.

*Analysis of Cash Flows and Working Capital*

Cash provided by operating activities was $0.5 million in the first three months ended March 31, 2009 compared to $9.1 million in the three months ended March 31, 2008. The decrease in cash flow for the three months ended March 31, 2009 as compared to the three months ended March 31, 2008 primarily reflects an increase of $9.5 million in net loss and a net decrease of $0.3 million in the add back of non-cash expenses, including depreciation and amortization, the indefinite lived intangible asset impairment charge, amortization of debt acquisition costs, stock-based compensation expense and deferred taxes, all of which was partially offset by a $1.2 million decrease in the non-cash components of working capital. The increase in net loss of $9.5 million included approximately $2.1 million in other expenses that were paid in the first quarter of 2009 related to legal and financial advisor fees incurred in connection with our efforts to restructure our debt obligations that were paid in the first quarter of 2009. The net change in non-cash components of working capital decreased approximately $1.2 million in the first three months of 2009 as compared to the first three months of 2008, primarily due to decreases in accounts receivable and inventories of $2.7 million and $3.3 million, respectively, which were offset in part by a decrease in current assets of $0.7 million and a decrease of $4.2 million in accounts payable and accrued liabilities. The decrease in current assets is primarily attributable to retainer fees paid to both legal and financial advisors related to our debt restructuring efforts. The slower growth in net working capital assets in 2009 is primarily attributable to the weaker business environment described above and improved working capital management.

Cash used in investing activities was $0.2 million for the three months ended March 31, 2009 compared to $1.2 million in the three months ended March 31, 2008. The decrease in cash used in investing activities in the three months ended March 31, 2009 as compared to the three months ended March 31, 2008 is related to a decrease in capital spending of $1.0 million for the three months ended March 31, 2009 as compared to the three months ended March 31, 2008.

Cash used in financing activities was four thousand dollars for the three months ended March 31, 2009 compared to a cash inflow of $0.5 million in the three months ended March 31, 2008. During the three months ended March 31, 2008, the net cash provided by financing activities resulted primarily from a $5.0 million draw down under our revolving credit facility offset in part by $2.0 million in term debt prepayments and the settlement of the subordinated notes with the former owners of Nevamar for $2.5 million, which included approximately $0.1 million in legal and bank fees.

Our Credit Facility, which became effective on September 30, 2005, initially consisted of a $135.0 million senior secured single draw seven-year term loan facility, and a $20.0 million senior secured five-year revolving credit facility. In March 2006, the term loan was increased to $215.0 million and the revolving credit facility was increased to $30.0 million. We prepaid $2.0 million, $20.0 million and $24.5 million of the term loan in 2008, 2007 and 2006, respectively, but made no prepayments during the three months ended March 31, 2009. We had $25.9 million outstanding under the revolving credit facility at March 31, 2009 and December 31, 2008. Our outstanding revolver borrowings as of March 31, 2009 and December 31, 2008 reflect a decision in December 2008 to borrow our remaining availability under the revolving loan tranche of our Credit Facility due to the weakening economy and our concerns about the troubled credit markets. At March 31, 2009, the interest rate on the revolver borrowings was at an annual rate of 4.50%. In addition, we had letters of credit issued in respect of workers' compensation claims in an aggregate amount of $4.1 million, which also reduces our availability under the revolving portion of our Credit Facility.

Borrowings under our Credit Facility bear interest at our option at either adjusted LIBOR plus an applicable margin or the alternate base rate plus an applicable margin. The interest rates on borrowings under our revolving credit facility are subject to adjustment based on our leverage. At March 31, 2009 and at December 31, 2008, the interest rate on the term loan facility was at annual rates of 5.00% and 3.22%, respectively. In accordance with the terms of the Credit Agreement, effective July 1, 2009, we will be required to pay interest on our Credit Facility borrowings at a default interest rate equivalent to a rate that is 2% per annum in excess of the rate that would otherwise be payable. Our Credit Facility requires us to meet a maximum total leverage ratio of 4.50 and a minimum interest coverage ratio of 2.25 as of March 31, 2009 and an annual maximum expenditures limitation of $8.0 million for 2009. In addition, the Credit Facility contains certain restrictive covenants that, among other things, limit our ability to incur additional indebtedness, pay dividends, prepay subordinated debt and engage in certain other activities customarily restricted in such agreements. The Credit Facility also contains customary events of default, some of which are subject to grace periods. As of March 31, 2009, we were not in compliance with certain financial and reporting covenants under our Credit Facility, which constitutes a default. As a result, the lenders under the Credit Facility have the ability to accelerate our obligations to make payments under the Credit Facility, and, in the event there was availability under the revolver, we would not be permitted to borrow funds until the noncompliance is cured or waived by the lenders.

On February 27, 2009, we received a notice of default from the agent for our lenders under our Credit Facility due to our failure to comply with certain financial and reporting covenants. On March 31, 2009, we entered into the Forbearance Agreement with our lenders pursuant to which the lenders have agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate our payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The terms of the Forbearance Agreement prohibited us from, among other things, paying the April 1, 2009 interest payment on the Notes. Our failure to make that interest

payment is a default under the indenture governing the Notes and entitles the indenture trustee or the holders of 25% of the Notes, after a thirty-day grace period that ended on May 1, 2009 and upon delivery of proper notice to us, to accelerate the our payment obligations under the Notes.  The indenture trustee informed the holders of the Notes of the payment default and of the event of default by letters dated April 9, 2009 and May 7, 2009, respectively.  Furthermore, if we are unable to restructure or refinance the Credit Facility or our payment obligations under the Notes are accelerated, our lenders could accelerate our payment obligations under the Credit Facility.  Based on these acceleration rights under the Credit Facility and the Notes, we reclassified approximately $343.9 million from long-term debt to current debt as of December 31, 2008. The current portion of long-term debt was approximately $344.0 million as of March 31, 2009. As such, we had a working capital deficiency of approximately $242.8 million as of March 31, 2009 and approximately $239.1 million as of December 31, 2008.

The indenture governing our Notes also contains a number of covenants that restrict our ability to incur or guarantee additional indebtedness or issue disqualified or preferred stock, pay dividends or make other equity distributions, repurchase or redeem capital stock, make investments or other restricted payments, sell assets, engage in transactions with affiliates, create liens or consolidate or merge with or into other companies, and the ability of our restricted subsidiaries to make dividends or distributions to us.  On March 30, 2009, the agent for the lenders under the Credit Facility provided us with a "blockage notice" directing us not to make an April 1, 2009 interest payment on the Notes.  We did not make that payment, which is a default under the Notes, and, as a result, the holders of the Notes currently have the right to accelerate our payment obligations under the Notes.

In the event that most or all of our obligations under the Credit Facility and Notes become due and payable, we would be unable to fund our payment obligations.  We are in active discussions with our lenders and an ad hoc group representing a substantial majority of the holders of our Notes to restructure our debt obligations, and have not received any acceleration notice related to these financing arrangements; however, given the current negative conditions in our industry and the economy generally and the credit markets in particular, we cannot give any assurance that we will be successful in restructuring our debt or finding alternative financing arrangements.  We have engaged financial and legal advisors to provide assistance in these discussions, but if we are not able to find a timely solution, we may be compelled to file for bankruptcy protection.

### Off Balance Sheet Obligations

We have no off-balance sheet arrangements that have or are reasonably likely to have a material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

### Regulatory Compliance

We are subject to federal, state, local and foreign (Canadian) laws, regulations and ordinances pertaining, among other things, to the quality and the protection of the environment and human health and safety and that require us to devote substantial time and resources in an effort to maintain continued compliance. There can be no assurance that judicial or administrative proceedings seeking penalties or injunctive relief will not be brought against us for alleged non-compliance with applicable environmental laws and regulations relating to matters as to which we are currently unaware. In addition, changes to such regulations or the enactment of new regulations in the future could require us to undertake capital improvement projects or to cease or curtail certain operations or could otherwise substantially increase the capital requirements, operating expenses and other costs associated with compliance. We believe we have adequately provided for costs related to our ongoing obligations with respect to known environmental liabilities. Expenditures related to environmental liabilities during the three months ended March 31, 2009 and the year ended December 31, 2008 did not have a material effect on our financial condition or cash flows. Such expenditures are related to the costs to maintain general compliance at our facilities. The majority of the costs include staffing and training expenses, permitting and emission based fees, testing and analytical fees and waste disposal fees.

Our Auburn, Maine facility is subject to a COC, dated May 5, 1993, issued by the State of Maine DEP, with regard to unauthorized discharges of hazardous substances into the environment. We, along with the previous owners, are named in the COC, and are required to investigate and, as necessary, remediate the environmental contamination at the site. Because the unauthorized discharges occurred during the previous ownership, the previous owners have agreed to be responsible for compliance with the COC. The nature and extent of remediation has not yet been determined. The financial obligation of the previous owners to investigate and/or remediate is unlimited except with regard to a portion of the land known as "area 2" at our Auburn, Maine facility, which is capped at $10.0 million. We have recorded a liability of $0.7 million at March 31, 2009 and December 31, 2008 for site remediation costs in excess of costs assumed by the previous owners. We could incur additional obligations in

excess of the amount accrued and our recorded estimate may change over time. We expect this environmental issue to be resolved within the next five to ten years.

## Legal Proceedings

We are party to certain litigation matters involving ordinary and routine claims incidental to the business. We cannot estimate with certainty our ultimate legal and financial liability with respect to such pending litigation matters. However, we believe, based on our examination of such matters, our ultimate costs with respect to such matters, if any, will not have a material adverse effect on our business, financial condition, results of operations or cash flows.

## Forward-Looking Statements

This Quarterly Report on Form 10-Q contains forward-looking statements, including, without limitation, statements concerning the conditions in our industry and our operations, economic performance and financial condition, including, in particular, statements relating to our business and strategy . The words "may," "might," "should," "estimate," "project," "plan," "anticipate," "expect," "intend," "outlook," "believe" and other similar expressions are intended to identify forward-looking statements and information although not all forward-looking statements include these identifying words. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of their dates. These forward-looking statements are based on estimates and assumptions by our management that, although we believe to be reasonable, are inherently uncertain and subject to a number of risks and uncertainties.

In particular, our business might be affected by uncertainties affecting the decorative overlay industry and the construction industry generally as well as the following, among other factors:

- general economic, financial and political conditions, including downturns affecting the decorative overlay or construction industries or the residential housing and credit markets;

- our ability to comply with financial covenants contained in our Credit Facility, our ability to obtain waivers to cure any noncompliance and our ability to refinance or replace our Credit Facility (or other indebtedness) on favorable terms or at all;

- our ability to obtain necessary financing to continue operations;

- limitations and restrictions on the operation of our business contained in the documents governing our indebtedness;

- changes in consumer preferences and discretionary spending;

- increases in raw material costs, including oil prices, which in some instances may not be passed on to customers;

- availability of raw materials and other commodities used to produce our products;

- competitive pressures, including new product developments or changes in competitors' pricing;

- our ability to manage our growth and expansion, including recent acquisitions and any acquisitions we might undertake in the future;

- our ability to develop innovative new products;

- our ability to generate cash flows to service our substantial indebtedness and invest in the operation of our business;

- our dependence upon our key executives and other key employees;

33

- possible environmental liabilities resulting from our use of toxic or hazardous materials in connection with our manufacturing operations;

- our ability to protect our intellectual property rights, brands and proprietary technology;

- fluctuations in exchange rates between the U.S. and Canada; and

- our ability to effectively and efficiently maintain internal control procedures that are compliant with Section 404 of the Sarbanes Oxley Act of 2002 in a timely fashion and the possibility of increased operating costs associated with making any necessary changes.

Additional factors that might cause future events, achievements or results to differ materially from those expressed or implied by our forward-looking statements include those discussed under "Risk Factors" included in our 2008 Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 31, 2009. All forward-looking statements are based upon information available to us on the date of this report, and we undertake no obligation to update or revise any forward-looking statements to reflect new information, future events or otherwise.

## Item 3. Quantitative and Qualitative Disclosures About Market Risk

Market risks relating to our operations result primarily from changes in general economic conditions and interest rate fluctuations. In the normal course of business, we also have foreign currency risks associated with our Canadian operations. There is also risk related to commodity price changes for items such as particleboard, medium density fiber-board, or MDF, and raw paper. In addition, we have exposure to changes in energy related costs for natural gas, heating oil and electricity. Many of the resins and chemicals used to produce our resins are petroleum based and therefore subject to the same market fluctuations as energy costs. We are also subject to surcharges by trucking companies due to the increased fuel costs. We employ established purchasing policies and procedures to manage our exposure to these risks. We do not utilize derivative financial instruments for trading, speculative or other purposes.

### Interest Rate Risk

Our interest rate risk management objective is to limit the impact of interest rate changes on net income and cash flow and to lower overall borrowing cost.

Amounts outstanding under our Credit Facility bear interest at our option at LIBOR plus an applicable margin or at an alternate base rate plus an applicable margin. These interest rates can fluctuate based on market rates. Based on the outstanding amount of our variable rate indebtedness at March 31, 2009, a 10% change in the interest rates at March 31, 2009 would have the effect of increasing or decreasing interest expense by approximately $1.0 million. Potential interest rate impact would also be affected by utilization of the revolving loan.

The net amounts paid or received and net amounts accrued through the end of the accounting period are included in interest expense. Interest expense also includes the amortization of debt acquisition costs.

### Foreign Currency Exchange Risk

We have a Canadian subsidiary, Panolam Industries, Ltd., that has a manufacturing facility in Canada that sells to both Canadian and U.S. customers and purchases from both Canadian and U.S. suppliers. Our Canadian subsidiary operates within its local economic environment and utilizes its own operating cash flow to fund its operation. The Canadian subsidiary's sales tend to be evenly split between U.S. and Canadian customers but shift depending on market demand; however, a greater percentage of raw materials purchases are in local currency. As a result, when the Canadian dollar strengthens, expenses increase as a percent of sales when reported in U.S. dollars. Conversely, when the Canadian dollar weakens it has the opposite effect. At the same time the Canadian foreign exchange rate fluctuations require revaluation of the Canadian subsidiary's balance sheet resulting in foreign currency translation exchange gains or losses being charged or credited to other comprehensive income or (loss) on the balance sheet. We do not enter into any derivative financial instruments to reduce our exposure to foreign currency exchange rate risk.

During the three months ended March 31, 2009, we recorded $0.1 million of income related to net foreign exchange transaction and revaluation adjustments, a decrease of $0.3 million over the same period last year. At December 31, 2008, we had approximately $5.1 million of unfavorable foreign currency translation adjustments and at March 31, 2009 we had approximately $6.8 million of unfavorable foreign currency translation adjustments included in stockholder's deficit. There can be no assurances that the Canadian foreign exchange rate will not fluctuate adversely in the future and the potential risk for translation losses is not quantifiable.

### Commodity Pricing Risk

We purchase commodities for our products such as paper, resins (and the chemicals used in making resins), wood furnish (used in the production of particleboard), raw particleboard and MDF. We also purchase other commodities, such as natural gas, heating oil and electricity. These commodities are generally purchased pursuant to contracts or at market prices established with the vendor, and we are subject to risks on the pricing of these commodities. We do not engage in hedging activities for these commodities.

### Credit Concentration Risk

We sell HPLs and TFMs to various distributors and OEMs, and we extend credit to our customers based on an evaluation of their financial condition. We review our trade accounts receivable balances for collectibility whenever events and circumstances indicate that the carrying amount may not be collectible and provide currently for any unrealizable amounts. At March 31, 2009, we had uncollateralized accounts receivable from five nonaffiliated customers approximating 11% of total gross accounts receivable balances.  Sales to these five nonaffiliated customers were approximately 7% of consolidated net sales for the three months ended March 31, 2009. As of March 31, 2009, no single customer represented more than 10% of our sales or accounts receivable.

### Item 4T. Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Vice President and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of March 31, 2009.  Based on this evaluation, our Chief Executive Officer and Vice President and Chief Financial Officer concluded that, as of March 31, 2009, our disclosure controls and procedures were effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934.

We continually seek ways to improve the effectiveness and efficiency of our internal controls over financial reporting, resulting in frequent process refinement.  However, there have been no changes in our internal control over financial reporting that occurred during our last fiscal period to which this Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 relates that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## PART II — OTHER INFORMATION

### Item 1.        Legal Proceedings

None

### Item 1A.        Risk Factors

There have been no material changes to our risk factors as disclosed in Part I, Item 1A of our 2008 Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 31, 2009.

### Item 3.        Defaults Upon Senior Securities

As of March 31, 2009, we were not in compliance with certain financial and reporting covenants including our leverage and interest coverage covenants under our Credit Facility, which constitutes a default.  For further

information, please see Note 9 ("Debt and Capital Lease Obligations") to our unaudited condensed consolidated financial statements.

We did not make the April 1, 2009 interest payment on our Notes. Our failure to make that interest payment is a default under the indenture governing the Notes and entitles the indenture trustee or the holders of 25% of the Notes, after a thirty-day grace period that ended on May 1, 2009 and upon delivery of proper notice to us, to accelerate our obligations under the Notes. The amount of the payment due was $8.1 million and there is, as of the date of this filing, a total arrearage of $10.4 million. For further information, please see Note 9 ("Debt and Capital Lease Obligations") to our unaudited condensed consolidated financial statements.

**Item 6.        Exhibits**

| EXHIBIT NUMBER | EXHIBIT TITLE |
| --- | --- |
| 10.1 | Forbearance Agreement by and between Panolam Holdings II Co, Panolam Industries International, Inc., the Requisite Lenders and Credit Suisse, Cayman Islands Branch, as administrative agent, dated March 31, 2009.* |
| 31.1 | Certification pursuant to Exchange Act Rules 13a-14 and 15d-14; as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification pursuant to Exchange Act Rules 13a-14 and 15d-14; as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of Sarbanes-Oxley Act of 2002. |

* Incorporated herein by reference to Panolam Industries International, Inc. Current Report on Form 8-K filed on April 3, 2009.

36

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

PANOLAM INDUSTRIES INTERNATIONAL, INC.

By: /s/ Vincent S. Miceli
Vincent S. Miceli
Vice President and Chief Financial Officer
(Authorized Signatory, Principal Financial Officer and
Principal Accounting Officer)

Date:   May 20, 2009

37

(This page has been left blank intentionally.)

**Panolam Industries International, Inc.**
**Certification pursuant to Section 302**
**of the Sarbanes-Oxley Act of 2002**
**Certification**

I, Robert J. Muller, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 of Panolam Industries International, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 20, 2009

/s/ Robert J. Muller
_____
Robert J. Muller
Chairman, President and Chief Executive Officer
(Principal Executive Officer)

**Panolam Industries International, Inc.**
**Certification pursuant to Section 302**
**of the Sarbanes-Oxley Act of 2002**
**Certification**

I, Vincent S. Miceli, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 of Panolam Industries International, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 20, 2009

/s/ Vincent S. Miceli
_____
Vincent S. Miceli
Vice President and Chief Financial Officer
(Principal Financial and Accounting Officer)

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Panolam Industries International, Inc. (the "Company") on Form 10-Q for the quarter ended March 31, 2009, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert J. Muller, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: May 20, 2009

/s/ Robert J. Muller
_____
Robert J. Muller
Chairman, President and Chief Executive Officer
(Principal Executive Officer)

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Panolam Industries International, Inc. (the "Company") on Form 10-Q for the quarter ended March 31, 2009, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Vincent S. Miceli, Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: May 20, 2009

/s/ Vincent S. Miceli
_____
Vincent S. Miceli
Vice President and Chief Financial Officer
(Principal Financial and Accounting Officer)

**<u>Exhibit D to Disclosure Statement</u>**

**Panolam's Form 10-Q for the period ended June 30, 2009, filed with the SEC on August 10, 2009**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2009**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from              to**

**Commission file number  333-78569**

# PANOLAM INDUSTRIES INTERNATIONAL, INC.
(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **52-2064043** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

**20 Progress Drive**
**Shelton, Connecticut 06484**
(Address of Principal Executive Offices)

**(203) 925-1556**
(Registrant's Telephone Number, Including Area Code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  ☒ Yes  ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  ☐ Yes  ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☐ |
| (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company in Rule 12b-2 of the Exchange Act.  ☐ Yes  ☒ No

The number of shares outstanding of the registrant's common stock as of August 10, 2009 was 200.

**Panolam Industries International, Inc.**
**Index to Quarterly Report on**
**Form 10-Q**

|  |  | Page No. |
|---|---|---|
| PART I. | FINANCIAL INFORMATION | |
| Item 1. | Financial Statements: | |
| | Condensed Consolidated Balance Sheets at June 30, 2009 and December 31, 2008 (unaudited) | 3 |
| | Condensed Consolidated Statements of Operations for the three and six months ended June 30, 2009 and 2008 (unaudited) | 4 |
| | Condensed Consolidated Statements of Cash Flows for the six months ended June 30, 2009 and 2008 (unaudited) | 5 |
| | Notes to Condensed Consolidated Financial Statements (unaudited) | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 39 |
| Item 4T. | Controls and Procedures | 40 |
| PART II. | OTHER INFORMATION | |
| Item 1. | Legal Proceedings | 41 |
| Item 1A. | Risk Factors | 41 |
| Item 3. | Defaults Upon Senior Securities | 41 |
| Item 6. | Exhibits | 41 |

2

PART I - FINANCIAL INFORMATION

Item 1. Financial Statements

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
Condensed Consolidated Balance Sheets
(Amounts in thousands, except share data)
(Unaudited)

| | June 30, 2009 | December 31, 2008 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 45,347 | $ 43,452 |
| Accounts receivable, less allowances of $4,918 at June 30, 2009 and $5,978 at December 31, 2008 | 19,139 | 14,193 |
| Inventories | 50,025 | 55,136 |
| Other current assets | 18,887 | 18,575 |
| Total current assets | 133,398 | 131,356 |
| PROPERTY, PLANT AND EQUIPMENT – Net | 208,942 | 218,330 |
| INTANGIBLE ASSETS – Net | 48,735 | 52,083 |
| DEBT ACQUISITION COSTS – Net | 6,208 | 7,057 |
| OTHER ASSETS | 1,401 | 3,457 |
| TOTAL | $ 398,684 | $ 412,283 |
| **LIABILITIES AND STOCKHOLDER'S DEFICIT** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $ 6,774 | $ 6,913 |
| Accrued liabilities | 26,680 | 19,585 |
| Current portion of long-term debt | 343,997 | 343,937 |
| Total current liabilities | 377,451 | 370,435 |
| LONG-TERM DEBT, LESS CURRENT PORTION | 9 | 13 |
| DEFERRED INCOME TAXES | 55,839 | 61,498 |
| OTHER LIABILITIES | 7,428 | 8,216 |
| Total liabilities | 440,727 | 440,162 |
| COMMITMENTS AND CONTINGENCIES (Note 15) | | |
| **STOCKHOLDER'S DEFICIT:** | | |
| Common stock, $0.01 par value – 200 authorized, 200 issued and outstanding | — | — |
| Additional paid-in capital | 81,746 | 81,528 |
| Accumulated deficit | (121,856) | (104,434) |
| Accumulated other comprehensive loss | (1,933) | (4,973) |
| Total stockholder's deficit | (42,043) | (27,879) |
| TOTAL | $ 398,684 | $ 412,283 |

See notes to unaudited condensed consolidated financial statements.

3

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**Condensed Consolidated Statements of Operations**
**(Amounts in thousands)**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2009 | 2008 | 2009 | 2008 |
| NET SALES | $ 67,018 | $ 99,331 | $ 130,929 | $ 200,513 |
| COST OF GOODS SOLD | 57,142 | 79,285 | 113,297 | 161,024 |
| GROSS PROFIT | 9,876 | 20,046 | 17,632 | 39,489 |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 10,151 | 13,282 | 20,541 | 26,027 |
| INDEFINITE LIVED INTANGIBLE ASSET IMPAIRMENT CHARGE | — | — | 1,589 | — |
| OTHER EXPENSES | 2,273 | — | 4,360 | — |
| (LOSS) INCOME FROM OPERATIONS | (2,548) | 6,764 | (8,858) | 13,462 |
| INTEREST EXPENSE | 6,955 | 6,922 | 13,188 | 14,799 |
| INTEREST INCOME | (34) | (86) | (116) | (172) |
| LOSS BEFORE INCOME TAX (BENEFIT) EXPENSE | (9,469) | (72) | (21,930) | (1,165) |
| INCOME TAX (BENEFIT) EXPENSE | (2,089) | 342 | (4,508) | (292) |
| NET LOSS | $ (7,380) | $ (414) | $ (17,422) | $ (873) |

See notes to unaudited condensed consolidated financial statements.

4

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**Condensed Consolidated Statements of Cash Flows**
**(Amounts in thousands)**
**(Unaudited)**

| | For the Six Months Ended June 30, | |
| --- | --- | --- |
| | 2009 | 2008 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss | $ (17,422) | $ (873) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation and amortization | 15,247 | 14,977 |
| Indefinite lived intangible asset impairment charge | 1,589 | — |
| Deferred income tax benefit | (4,089) | (1,158) |
| Amortization of debt acquisition costs | 849 | 907 |
| Stock based compensation expense | 218 | 245 |
| Other | (735) | 66 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (4,862) | (5,212) |
| Inventories | 5,378 | (2,898) |
| Other current assets | 446 | 1,864 |
| Accounts payable and accrued liabilities | 6,672 | 263 |
| Income taxes payable/receivable | (653) | 3,371 |
| Other | (401) | (398) |
| Net cash provided by operating activities | 2,237 | 11,154 |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchases of property, plant and equipment | (489) | (2,190) |
| Net cash used in investing activities | (489) | (2,190) |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Repayment of long-term debt | (6) | (2,024) |
| Borrowings under revolving credit facility | — | 5,000 |
| Payment of amount due to Panolam Holdings Co. | — | (2,482) |
| Net cash (used in) provided by financing activities | (6) | 494 |
| | | |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | 153 | (122) |
| NET CHANGE IN CASH AND CASH EQUIVALENTS | 1,895 | 9,336 |
| CASH AND CASH EQUIVALENTS - Beginning of period | 43,452 | 10,744 |
| CASH AND CASH EQUIVALENTS - End of period | $ 45,347 | $ 20,080 |
| | | |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION: | | |
| Cash payments for interest | $ 3,235 | $ 14,049 |
| Cash payments for income taxes, net of refunds | 234 | (2,534) |

See notes to unaudited condensed consolidated financial statements.

5

**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(Amounts in thousands, except share data)
(Unaudited)

## 1. BUSINESS

Panolam Industries International, Inc. (the "Company") designs, manufactures and distributes decorative laminates, primarily thermally fused melamine panels ("TFMs") and high-pressure laminate sheets ("HPLs"), throughout the United States and Canada. The Company markets its products through independent distributors and directly to kitchen and bathroom cabinet, furniture, store fixtures and original equipment manufacturers ("OEMs"). The Company wholly-owns the following companies:

- Panolam Industries, Ltd.

- Panolam Industries, Inc.

- Pioneer Plastics Corporation ("Pioneer")

- Nevamar Holding Corp. ("Nevamar")

The unaudited condensed consolidated balance sheet at June 30, 2009 and the condensed consolidated balance sheet at December 31, 2008, the unaudited condensed consolidated statements of operations for the three and six months ended June 30, 2009 and 2008 and the unaudited condensed consolidated statements of cash flows for the six months ended June 30, 2009 and 2008 include the accounts of the Company and its subsidiaries. In the opinion of management, all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the interim financial statements included herein have been included. The results of operations for the three and six months ended June 30, 2009 are not necessarily indicative of the results to be expected for the full year. These financial statements and the related notes should be read in conjunction with the financial statements and notes included in the Company's Annual Report on Form 10-K for the year ended December 31, 2008.

The Company's condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these condensed consolidated financial statements requires the Company to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, and expenses, and related disclosures at the date of the Company's condensed consolidated financial statements. On an on-going basis, management evaluates its estimates and judgments, including those related to bad debts, discounts and rebates, inventories, income taxes and long-lived assets. Management bases its estimates and judgments on historical experience and current market conditions and on various other factors that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions. Management considers the Company's policies on revenue recognition, adjustments for slow moving and obsolete inventories, potentially uncollectible accounts receivable, accruals for customer rebates, income taxes, intangible assets and long-lived assets to be critical accounting policies due to estimates, assumptions, and application of judgment involved in each. The Company has evaluated subsequent events for recognition or disclosure through August 14, 2009, which was the date the Company filed this Form 10-Q with the SEC.

The accompanying condensed consolidated financial statements have been prepared assuming the Company will continue as a going concern and do not include any adjustments that might result from the outcome of the uncertainty regarding its ability to continue as a going concern. This assumes a continuation of operations and the realization of assets and liabilities in the ordinary course of business. The Company had net losses for the six months ended June 30, 2009 and the year ended December 31, 2008 of $17,422 and $121,656, respectively. The net loss for

6

the six months ended June 30, 2009 resulted primarily from a reduction in sales volume given the current economic conditions, coupled with continuing fixed costs, and also included a $1,589 trade name impairment charge and $4,360 in other expenses related primarily to legal and financial advisor fees incurred in connection with the Company's efforts to restructure its debt obligations. The net loss for the year ended December 31, 2008 was principally attributable to $96,691 of goodwill impairment and $24,921 of trade name impairments taken during the year as well as a high ratio of fixed costs, including the interest costs on its debt and depreciation expense. The Company also had a stockholder's deficit of $42,043 at June 30, 2009 and $27,879 at December 31, 2008. As discussed in Note 9, "Debt and Capital Lease Obligations," as of June 30, 2009 and as of December 31, 2008, the Company was not in compliance with all of its financial and reporting covenants under its senior credit facility, (the "Credit Facility"), which constitutes a default. As a result, the lenders have the ability to accelerate the Company's obligations to make payments under the Credit Facility and, in the event there was availability under the revolver, the Company would not be permitted to borrow funds until its noncompliance is cured or waived by the lenders.

On February 27, 2009, the Company received a notice of default from the agent for the lenders under its Credit Facility due to the Company's failure to comply with certain financial and reporting covenants. On March 31, 2009, the Company entered into a forbearance agreement (the "Forbearance Agreement") with its lenders pursuant to which the lenders agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate the Company's payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The Forbearance Agreement, which expired by its terms on June 30, 2009, required the Company to deliver to the lenders under the Credit Facility, on or before June 30, 2009, an excess cash flow payment related to the year ended December 31, 2008. The Company did not make that excess cash flow payment and, furthermore, did not make the regularly-scheduled June interest payment on either the term loan or the revolver portions of the Credit Facility, which non-payments constitute defaults under the Forbearance Agreement. On July 1, 2009, the Company received a letter from the agent under the Credit Facility notifying the Company of its defaults under the Forbearance Agreement and reserving the lenders' rights related to all defaults. As a result of the termination of the Forbearance Agreement, the lenders under the Credit Facility again have the ability to accelerate all of the Company's payment obligations under the Credit Facility, which amount to $194,440 as of June 30, 2009.

The terms of the Forbearance Agreement prohibited the Company from, among other things, paying the April 1, 2009 interest payment on its 10.75% Senior Subordinated Notes due 2013 (the "Notes") and the Company did not make that payment. Its failure to make that interest payment is a default under the indenture governing the Notes and entitles the indenture trustee or the holders of 25% of the Notes, after a thirty-day grace period that ended on May 1, 2009 and upon delivery of proper notice to the Company, to accelerate the Company's payment obligations under the Notes. The indenture trustee informed the holders of the Notes of the payment default and of the event of default by letters dated April 9, 2009 and May 7, 2009, respectively. Acceleration of the Company's payment obligations under the Notes would be an additional event of default under the Credit Facility. Based on these acceleration rights under the Credit Facility and the Notes, the Company reclassified $343,937 from long-term debt to current debt as of December 31, 2008. The current portion of long-term debt was $343,997 as of June 30, 2009. As such, the Company had a working capital deficiency of $244,053 as of June 30, 2009 and $239,079 as of December 31, 2008.

On July 27, 2009, the Company reached a tentative agreement with lenders holding approximately seventy-three percent (73%) of the aggregate principal amount of indebtedness under the Credit Facility and noteholders holding two-thirds in principal amount of the Notes (collectively, the "Consenting Holders") with respect to a restructuring of the Company's indebtedness. The Company is in active discussions with the Consenting Holders regarding the process for implementing the proposed restructuring, which remains subject to final documentation. The Company expects to continue to operate its business in the ordinary course during and following the proposed restructuring.

In the event that the proposed restructuring is not completed and most or all of the Company's obligations under the Credit Facility and Notes become due and payable, the Company would be unable to fund its payment obligations. The Company has not received any acceleration notice related to these financing arrangements; however, given the current negative conditions in its industry and the economy generally and the credit markets in particular, the Company cannot give any assurance that it will be successful in reaching a definitive agreement on the proposed restructuring or finding alternative financing arrangements. The Company has engaged financial and legal advisors to provide assistance in these discussions, but the Company may be compelled to file for bankruptcy protection.

As a result of these factors, there is substantial doubt about the Company's ability to continue as a going concern.

## 2.  NEW ACCOUNTING PRONOUNCEMENTS

In June 2009, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 168, The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles, a replacement of FASB Statement No. 162 ("SFAS No. 168"). Upon adoption, the FASB Accounting Standards Codification ("ASC") established by SFAS No. 168 will become the source of authoritative generally accepted accounting principles in the United States, and will supersede all then-existing non-SEC accounting and reporting standards.  All other non-grandfathered non-SEC accounting literature not included in the ASC will become non-authoritative.  SFAS No. 168 is effective for interim and annual financial periods beginning after September 15, 2009.  The Company is in the process of evaluating SFAS No. 168 and does not expect it will have a significant impact on its Condensed Consolidated Financial Statements.

In May 2009, the FASB issued SFAS No. 165, Subsequent Events ("SFAS No. 165"). SFAS No. 165 seeks to establish general standards of accounting for and disclosure of events that occur after the balance sheet date but before financial statements are issued or are available to be issued. SFAS No. 165 introduces the concept of financial statements being "available to be issued", and requires the disclosure of the date through which an entity has evaluated subsequent events and the basis for that date, that is, whether that date represents the date the financial statements were issued or were available to be issued.  SFAS No. 165 is effective for interim or annual financial periods ending after June 15, 2009, and shall be applied prospectively. The Company adopted SFAS No. 165 during the second quarter of Fiscal 2009. See Note 1 for the disclosure required under SFAS No. 165.

In April 2009, the FASB issued FASB Staff Position ("FSP") FAS 107-1 and Accounting Principles Board ("APB") opinion 28-1, Interim Disclosures about Fair Value of Financial Instruments ("FSP FAS 107-1 and APB 28-1"), which requires an entity to provide interim disclosures about the fair value of all financial instruments within the scope of SFAS 107 and to include disclosures related to the methods and significant assumptions used in estimating those instruments. The Company adopted this FSP during the second quarter of 2009. The impact of this FSP related only to disclosures regarding the fair value of the Company's debt and did not have a material impact on the Company's financial condition, results of operations and cash flows.

In March 2008, the FASB issued SFAS No. 161, Disclosures about Derivative Instruments and Hedging Activities—an amendment of FASB Statement No. 133, Accounting for Derivative Instruments and Hedging Activities ("SFAS No. 161"). SFAS No. 161 expands the current disclosure requirements of SFAS No. 133, such that entities must now provide enhanced disclosures on a quarterly basis regarding how and why the entity uses derivatives; how derivatives and related hedged items are accounted for under SFAS No. 133 and how derivatives and related hedged items affect the entity's financial position, performance and cash flow. Pursuant to the transition provisions of this statement, the Company adopted SFAS No. 161 on January 1, 2009 and the statement did not impact the Company's consolidated financial statements.

In December 2008, the FASB issued FSP FAS No. 132(R)-1, Employers' Disclosure about Postretirement Benefit Plan Assets ("FSP FAS No. 132(R)-1") which amends SFAS No. 132 (revised 2003) Employers' Disclosures about Pensions and Other Postretirement Benefits — an Amendment of FASB Statements No. 87, 88, and 106. FSP FAS no. 132(R)-1 requires more detailed disclosures about the assets of a defined benefit pension or other postretirement plan and is effective for fiscal years ending after December 15, 2009. The Company is in the process of evaluating FSP FAS No. 132(R)-1 and will adopt the required disclosures for the year ending December 31, 2009.

In December 2007, the FASB issued SFAS No. 160, Noncontrolling Interests in Consolidated Financial Statements ("SFAS No. 160") including an amendment of Accounting Research Bulletin ("ARB") No. 51, which establishes accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. The Company adopted SFAS No. 160 on January 1, 2009 and it did not have a material impact on the Company's consolidated financial statements.

In December 2007, the FASB issued SFAS No. 141(R), Business Combinations ("SFAS No. 141(R)"), which addresses the information that a reporting entity provides in its financial reports about a business combination and its effects. To accomplish this, this Statement establishes principles and requirements for how the acquirer recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, any noncontrolling interest in the acquiree, the goodwill acquired in the business combination or a gain from a bargain purchase and how the acquirer determines what information to disclose to enable users of the financial statements to evaluate the nature and financial effects of the business combination. The Company is required to apply SFAS No. 141(R) to any acquisition made after January 1, 2009.

In September 2006, the FASB issued SFAS No. 157, Fair Value Measurements ("SFAS No. 157"). SFAS No. 157 defines fair value, establishes a framework for measuring fair value in accordance with generally accepted accounting principles, and expands disclosures about fair value measurements. On February 12, 2008, the FASB issued FASB Staff Position 157-2 ("FSP 157-2") that partially deferred the effective date of SFAS No. 157 for one year for non-financial assets and non-financial liabilities that are recognized or disclosed at fair value in the financial statements on a nonrecurring basis. Other than this deferred portion, the Company adopted SFAS No. 157 in 2008 and it did not have a material impact on its consolidated financial statements. The Company adopted the deferral of FSP 157-2 on January 1, 2009, and such adoption did not have a material impact on its consolidated financial statements.

## 3.  INVENTORIES

Inventories consist of:

| | June 30, 2009 | | December 31, 2008 |
|---|---|---|---|
| Raw materials | $ 22,917 | $ | 23,798 |
| Work in process | 5,418 | | 5,557 |
| Finished goods | 21,690 | | 25,781 |
| | $ 50,025 | $ | 55,136 |

## 4.  OTHER CURRENT ASSETS

Other current assets consist of:

| | June 30, 2009 | | December 31, 2008 |
|---|---|---|---|
| Income taxes receivable | $ 6,101 | $ | 5,327 |
| Deferred income taxes – current (see note 11) | 4,613 | | 4,728 |
| Prepaid insurance | 1,076 | | 2,557 |
| Other current assets | 7,097 | | 5,963 |
| | $ 18,887 | $ | 18,575 |

## 5.  PROPERTY, PLANT AND EQUIPMENT, NET

Property, plant and equipment, net consists of:

| | June 30, 2009 | | December 31, 2008 |
|---|---|---|---|
| Land | $ 4,941 | $ | 4,896 |
| Buildings and improvements | 62,670 | | 61,552 |
| Machinery and equipment | 227,178 | | 226,087 |
| Construction in process | 2,324 | | 2,334 |
| | 297,113 | | 294,869 |
| Accumulated depreciation | (88,171) | | (76,539) |
| | $ 208,942 | $ | 218,330 |

Depreciation expense was $6,874 and $13,389 for the three and six months ended June 30, 2009, respectively, versus $6,696 and $12,939 for the comparable prior year periods. Depreciation expense related to the Company's manufacturing processes and administrative functions is included in the condensed consolidated statements of operations in cost of goods sold and selling, general and administrative expenses, respectively. Capital leases of $20 and $15 at June 30, 2009 and December 31, 2008, respectively, are included in machinery and equipment. As a result of testing for recoverability during the fourth quarter of 2008, the Company recorded an

9

impairment charge of $5,165 related to its fixed assets located at the Norcross, Georgia facility. There were no fixed asset impairment charges recorded in the first six months of 2009.

## 6.  GOODWILL AND INTANGIBLE ASSETS, NET

The Company adopted SFAS No. 142, "Goodwill and Other Intangible Assets", ("SFAS No. 142") on January 1, 2002. SFAS No. 142 requires that goodwill and other indefinite-lived intangible assets be tested for impairment at least on an annual basis. The Company's previously recorded goodwill was fully impaired during the quarter ended December 31, 2008. The Company performs an annual impairment test related to its indefinite lived intangible assets, which consist primarily of trademarks and tradenames at December 31, or more frequently should conditions that could affect fair value change significantly. Due to continued weakness in the economy, the Company determined that the indefinite lived tradenames should be tested for impairment during the three months ended March 31, 2009. As a result of such interim test, the Company recorded an impairment charge of $1,589. The remaining fair value of the indefinite lived tradenames immediately following the impairment was $9,600, which serves as the new cost basis for the asset. A portion of the Company's tradenames are recorded on the books and records of its Canadian subsidiary and as a result of the fluctuation in the foreign exchange rates used to translate the Canadian balance sheet into U.S. dollars, the consolidated value of the indefinite lived tradenames was $9,712 at June 30, 2009. The Company has determined that, following the guidance of EITF Issue No. 02-7, "Unit of Accounting for Testing Impairment of Indefinite Lived Intangible Assets," all of the indefinite-lived tradenames should be tested for impairment as a single unit because they were acquired in a single acquisition and are used together in the Company's marketing, sales and branding efforts. The Company adopted FSP 157-2 as disclosed in Note 2, and as a result applied the measurement of fair value under SFAS No. 157 to the tradename. The Company considered all relevant valuation techniques that could be obtained without incurring undue cost and effort, and concluded that a discounted relief-from-royalty approach provided the most reliable measure of fair value. The relief-from-royalty method involves determining the present value of the royalty savings associated with the ownership or possession, as opposed to licensing, of the trademarks. The Company used three inputs in applying approach (i) projected future sales; (ii) assumed royalty rate; and (iii) discount rate. As a result, the measurement is based significantly on internal projections, and the Company considered this fair value to be Level 3 within the fair value hierarchy under FAS 157. There were no tradename impairment charges recorded in the second quarter of 2009.

The Company accounts for finite-lived intangible assets under SFAS No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets ("SFAS No. 144"). These assets are grouped with other long-lived assets and are reviewed for impairment whenever events or changes in circumstances indicate that their respective carrying amounts may not be recoverable. The Company groups these assets for testing, with other assets and liabilities, at their lowest level of identifiable cash flows. Assessment for possible impairment is based on the Company's ability to recover the carrying value of the long-lived asset group from the expected future pre-tax cash flows (undiscounted and without interest charges). If the expected future cash flows are less than the carrying value of such assets, an impairment loss is recognized for the difference between estimated fair value and carrying value. No impairment charges related to finite lived intangible assets were recorded in the six months ended June 30, 2009.

Intangible assets, net include the following:

|  | June 30, 2009 | | | December 31, 2008 | | |
|  | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) |
|---|---|---|---|---|---|---|
| Patents and trademarks | $    9,134 | $    3,144 | 3, 12, 14 | $    9,134 | $    2,752 | 3, 12, 14 |
| Key customer lists | 43,574 | 10,723 | 15 | 43,574 | 9,270 | 15 |
| Other | 1,517 | 1,335 | 3, 10 | 1,493 | 1,297 | 3, 10 |
| Trademarks and tradenames with indefinite useful lives | 9,712 | — | — | 11,201 | — | — |
|  | $  63,937 | $  15,202 | | $  65,402 | $  13,319 | |

Amortization expense was $915 and $1,858 for the three and six months ended June 30, 2009, respectively, and $1,018 and $2,038 for the comparable prior year periods. Expected amortization expense for the remainder of 2009 through 2013 is as follows:

| | | |
|---|---|---|
| 2009 | $ | 1,830 |
| 2010 | | 3,660 |
| 2011 | | 3,660 |
| 2012 | | 3,660 |
| 2013 | | 3,660 |

## 7. DEBT ACQUISITION COSTS

At June 30, 2009 and December 31, 2008, the debt acquisition costs and accumulated amortization were as follows:

| | June 30, 2009 | | | December 31, 2008 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) | Gross Carrying Value | Accumulated Amortization | Amortization Lives (Years) |
| Debt acquisition costs | $ 14,967 | $ 8,759 | 7 | $ 14,967 | $ 7,910 | 7 |

Amortization of debt acquisition costs was $425 and $849 for the three and six months ended June 30, 2009, respectively, versus $425 and $907 for the comparable prior year periods. The amortization of debt acquisition costs is included in interest expense.

## 8. ACCRUED LIABILITIES

Accrued liabilities consist of:

| | June 30, 2009 | December 31, 2008 |
|---|---|---|
| Salaries, wages and employee benefits | $ 6,347 | $ 5,635 |
| Interest | 13,100 | 4,058 |
| Customer rebates | 1,590 | 2,240 |
| Insurance | 494 | 2,026 |
| Freight | 640 | 827 |
| Other | 4,509 | 4,799 |
| | $ 26,680 | $ 19,585 |

## 9. DEBT AND CAPITAL LEASE OBLIGATIONS

Long-term debt consists of:

| | June 30, 2009 | December 31, 2008 |
|---|---|---|
| Senior Subordinated Notes, due 2013, face amount $151,000 less discount of $528 at June 30, 2009 and $590 at December 31, 2008, bearing interest at 10.75% | $ 150,472 | $ 150,410 |
| Senior Secured Term Loan, maturing 2012, bearing interest at June 30, 2009 of 5.00% and 3.22% at December 31, 2008 | 167,586 | 167,586 |
| Revolver borrowings, bearing interest at June 30, 2009 of 4.50% | 25,928 | 25,928 |
| Capitalized lease obligations and other | 20 | 26 |
| | 344,006 | 343,950 |
| Current portion | (343,997) | (343,937) |
| | $ 9 | $ 13 |

Senior Subordinated Notes—The Company issued the Notes on September 30, 2005.  Interest is paid semi-annually in arrears on April 1 and October 1; interest payments commenced on April 1, 2006.  The Notes will mature on October 1, 2013.  The Company capitalized a total of $5,420 of financing fees that are being amortized over the life of the Notes.  The Notes are guaranteed by all of the Company's subsidiaries including Nevamar, but

11

not including Panolam Industries, Ltd. (the Canadian subsidiary). These guarantees are joint and several and full and unconditional.

Senior Secured Term Loan and Revolving Credit Loan—In September 2005, the Company entered into the Credit Facility, which originally provided for an aggregate committed amount of up to $155,000 consisting of two tranches; a $135,000 term loan and a $20,000 revolving loan. In March 2006, the term loan was increased to $215,000 and the revolving Credit Facility was increased to $30,000. The term and revolver borrowings may be designated as base rate or Eurodollar rate borrowings, as defined, plus an applicable interest margin. The applicable interest margin on the revolver is reset quarterly based upon certain ratios as defined in the Credit Facility. As of June 30, 2009 and December 31, 2008, the Company had $25,928 in revolver borrowings. The outstanding revolver borrowings as of June 30, 2009 and December 31, 2008 reflect a decision made by the Company in the fourth quarter of 2008 to borrow its remaining availability under the revolving credit facility due to the uncertainty in both the economy and the credit markets and in order to have as much liquidity as possible to respond to further downturns in the business. As of June 30, 2009 and December 31, 2008, the Company had letters of credit issued for workers' compensation claims in an aggregate amount of $4,072 outstanding under the Credit Facility. The term loan portion of the Credit Facility is for 7 years and the revolving loan portion is for 5 years. It is not practicable to estimate the fair value of the Company's term and revolving credit loans at June 30, 2009, without undue cost and effort.

The original quarterly repayment amount of the term loan facility was $338 with the balance due at September 30, 2012. Subsequent to the March 2006 amendment of the Credit Facility, the repayment of the principal amount of the amended term loan facility was scheduled to be paid in quarterly installments of $538 beginning March 31, 2006 with the balance of the principal due on September 30, 2012. During the years ended December 31, 2007 and 2006, the Company prepaid $20,000 and $24,539 of its term loan balance, respectively, and during the year ended December 31, 2008, the Company prepaid an additional $2,000 of its term loan balance. The Company has not made any prepayments in the six months ended June 30, 2009. As a result of the prepayments, and assuming no acceleration of its payment obligations, the Company is no longer required to make any repayment of future principal installments until September 30, 2012, the loan maturity date. Under the terms of the Forbearance Agreement, which expired on June 30, 2009, an excess cash flow payment related to the year ended December 31, 2008 and calculated in accordance with the terms of the Credit Facility was due on or before June 30, 2009. The Company did not deliver the excess cash flow payment and, furthermore, did not make the regularly-scheduled June interest payments on either the term loan or the revolver portions of the Credit Facility. The interest rate on the term loan facility was 5.00% at June 30, 2009. In accordance with the terms of the Credit Facility, effective July 1, 2009, the Company will be required to pay interest on its Credit Facility borrowings at a default interest rate equivalent to a rate that is 2.00% per annum in excess of the rate that would otherwise be payable.

The Credit Facility covenants limit, among other things, the Company's ability to incur debt, pay dividends, change its capital structure, make guarantees, assume liens, and dispose of assets. These covenants include requirements for the Company to maintain a maximum total leverage ratio of 4.5 and a minimum interest coverage ratio of 2.25 as of June 30, 2009, as well as an annual maximum capital expenditures limitation of $8,000 for 2009. The Credit Facility also contains certain customary events of default, which in some instances are subject to grace periods. As of June 30, 2009, the Company was not in compliance with certain financial and reporting covenants including its leverage and interest coverage covenants under its Credit Facility, which constitutes a default. As a result, the lenders under the Credit Facility have the ability to accelerate the Company's obligations to make payments under the Credit Facility and, in the event there was availability under the revolver, the Company would not be permitted to borrow funds until the noncompliance is cured or waived by the lenders.

On February 27, 2009, the Company received a notice of default from the agent for the lenders under its Credit Facility due to the Company's failure to comply with certain financial and reporting covenants. On March 31, 2009, the Company entered into the Forbearance Agreement with its lenders pursuant to which the lenders agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate the Company's payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The Forbearance Agreement, which expired by its terms on June 30, 2009, required the Company to deliver to the lenders under the Credit Facility, on or before June 30, 2009, an excess cash flow payment related to the year ended December 31, 2008. The Company did not make that excess cash flow payment and, furthermore, did not make the regularly-scheduled June interest payment on either the term loan or the revolver portions of the Credit Facility, which non-payments constitute defaults under the Forbearance Agreement. On July 1, 2009, the Company received a letter

from the agent under the Credit Facility notifying the Company of its defaults under the Forbearance Agreement and reserving the lenders' rights related to all defaults.  As a result of the termination of the Forbearance Agreement, the lenders under the Credit Facility again have the ability to accelerate all of the Company's payment obligations under the Credit Facility, which amount to $194,440 as of June 30, 2009.

The terms of the Forbearance Agreement prohibited the Company from, among other things, paying the April 1, 2009 interest payment on the Notes and the Company did not make that payment. Its failure to make that interest payment is a default under the indenture governing the Notes and entitles the indenture trustee or the holders of 25% of the Notes, after a thirty-day grace period that ended on May 1, 2009 and upon delivery of proper notice to the Company, to accelerate the Company's payment obligations under the Notes.  The indenture trustee informed the holders of the Notes of the Company's payment default and of the event of default by letters dated April 9, 2009 and May 7, 2009, respectively. Acceleration of the Company's payment obligations under the Notes would be an additional event of default under the Credit Facility. Based on these acceleration rights under the Credit Facility and the Notes, the Company reclassified $343,937 from long-term debt to current debt as of December 31, 2008. The current portion of long-term debt was $343,997 as of June 30, 2009. As such, the Company had a working capital deficiency of $244,053 as of June 30, 2009 and $239,079 as of December 31, 2008.

The indenture governing the Company's Notes also contains a number of covenants that restrict the Company's ability to incur or guarantee additional indebtedness or issue disqualified or preferred stock, pay dividends or make other equity distributions, repurchase or redeem capital stock, make investments or other restricted payments, sell assets, engage in transactions with affiliates, create liens or consolidate or merge with or into other companies, and the ability of the Company's restricted subsidiaries to make dividends or distributions to the Company. Future principal debt payments are expected to be paid with cash flow generated by operations. On March 30, 2009, the agent for the lenders under the Credit Facility provided the Company with a "blockage notice" directing the Company not to make an April 1, 2009 interest payment on the Notes. The Company did not make that payment, which is a default under the Notes, and, as a result, the indenture trustee and the holders of 25% of the Notes currently have, upon delivery of proper notice, the right to accelerate the Company's payment obligations under the Notes. It is not practicable to estimate the fair value of the Company's Senior Subordinated Notes at June 30, 2009, without undue cost and effort.

On July 27, 2009, the Company reached a tentative agreement with the Consenting Holders with respect to a restructuring of the Company's indebtedness.  The Company is in active discussions with the Consenting Holders regarding the process for implementing the proposed restructuring, which remains subject to final documentation.  The Company expects to continue to operate its business in the ordinary course during and following the proposed restructuring.

In the event that the proposed restructuring is not completed and most or all of the Company's obligations under the Credit Facility and Notes become due and payable, the Company would be unable to fund its payment obligations. The Company has not received any acceleration notice related to these financing arrangements; however, given the current negative conditions in its industry and the economy generally and the credit markets in particular, the Company cannot give any assurance that it will be successful in reaching a definitive agreement on the proposed restructuring or finding alternative financing arrangements. The Company has engaged financial and legal advisors to provide assistance in these discussions, but the Company may be compelled to file for bankruptcy protection.

The Company has used the funds under the Credit Facility, together with the proceeds from the Notes and capital contribution, to fund the retirement of the Company's previously outstanding first and second lien loans, to repay the shareholders of its predecessor company and for working capital requirements, permitted encumbrances, capital expenditures, its acquisition of Nevamar and other general corporate purposes.

At June 30, 2009, the Company's future debt principal payments are scheduled as follows and are based on the original terms and conditions of the Company's Credit Facility and Notes. This schedule does not reflect the condition that if the debt holders chose to accelerate the obligations, all amounts shown below would be due and payable in 2009:

| | | |
|---|---|---|
| 2009 | $ | — |
| 2010 | | 25,928 |
| 2011 | | — |
| 2012 | | 167,586 |
| 2013 | | 150,472 |
| | $ | 343,986 |

The future principal payments on the Notes due in 2013 are net of the unamortized discount of $528.

13

At June 30, 2009, future capital lease payments, including an immaterial amount of interest, are as follows:

| | |
|---|---:|
| 2009 | $ 11 |
| 2010 | 9 |
| | $ 20 |

## 10.  EMPLOYEE BENEFIT PLANS

*Nevamar Pension Plan*—Nevamar established the Retirement Plan of Nevamar Company, LLC (the "U.S. Plan"), a noncontributory defined benefit plan, on July 1, 2002. The U.S. Plan was established as a result of the spin-off of Nevamar from International Paper Company ("IP"). The U.S. Plan covers only employees covered under the collective bargaining agreements maintained and negotiated at facilities in Odenton, Maryland; Hampton, South Carolina; Franklin, Virginia; and Waverly, Virginia.

All participants in the U.S. Plan immediately preceding the spin-off from IP were credited with service under the IP Pension Plan as of June 30, 2002 for the following purposes: eligibility to participate, vesting, benefit accrual and eligibility for early retirement and other subsidies. However, the benefit payable to each participant under the U.S. Plan was offset by the amount of benefit payable under the IP Pension Plan. For all other participants eligibility begins after reaching age 21 and the completion of a year of service except for employees at the Franklin location who were eligible immediately upon hire. Normal retirement age is 65. Benefits for each of the applicable locations are based on a formula, as defined in the U.S. Plan, and length of service. The funding policy is to make the minimum annual contributions required by applicable regulations. This plan was curtailed on May 24, 2004.

*Canadian Pension Plan*—Through October 1998, the Company maintained a defined benefit pension plan covering certain Canadian employees (the "International Plan") at which time the Company transferred certain participants into a defined contribution plan. The participants remaining in the defined benefit plan subsequent to October 1998 continue to participate in such plan. This plan covers certain Canadian employees; the participants remaining in the defined benefit plan subsequent to October 1998 continue to participate in the plan.

*Other Postretirement Benefit Plan*—The Company maintains noncontributory life insurance and medical plans that cover all Canadian employees with over 20 years of service.

The following is a summary, based on the most recent actuarial valuations, of the Company's net cost for pension benefits and other benefits for the three months ended June 30, 2009 and 2008:

| | Pension Plans | | Other Post-Retirement Benefits | |
|---|---|---|---|---|
| | Three months ended June 30, | | | |
| | 2009 | 2008 | 2009 | 2008 |
| Service cost | $ 67 | $ 78 | $ 8 | $ 9 |
| Interest cost | 209 | 182 | 21 | 28 |
| Expected return on plan assets | (246) | (225) | — | — |
| Amortization and foreign currency translation | 24 | 18 | — | — |
| Net periodic benefit cost | $ 54 | $ 53 | $ 29 | $ 37 |

The following is a summary, based on the most recent actuarial valuations, of the Company's net cost for pension benefits and other benefits for the six months ended June 30, 2009 and 2008:

14

| | Pension Plans | | Other Post-Retirement Benefits | |
|---|---|---|---|---|
| | Six months ended June 30, | | | |
| | 2009 | 2008 | 2009 | 2008 |
| Service cost | $ 130 | $ 156 | $ 16 | $ 19 |
| Interest cost | 408 | 363 | 40 | 48 |
| Expected return on plan assets | (480) | (448) | — | — |
| Amortization and foreign currency translation | 49 | 35 | — | — |
| Net periodic benefit cost | $ 107 | $ 106 | $ 56 | $ 67 |

The Company's investment strategy for pension plan assets includes diversification to minimize interest and market risks, and generally does not involve the use of derivative financial instruments. Plan assets are rebalanced periodically to maintain target asset allocations. Maturities of investments are not necessarily related to the timing of expected future benefit payments, but adequate liquidity to make immediate and medium term benefit payments is ensured.

For the year ended December 31, 2008, 49% of the pension plan assets of the U.S. Plan were invested in equity securities and 51% were invested debt securities.

Contributions—The Company's funding policy for its defined benefit plans is to contribute amounts determined annually on an actuarial basis to provide for current and future benefits in accordance with federal law and other regulations. The Company expects to contribute approximately $1,092 to its pension plans and $63 to its other postretirement benefit plans in 2009.

Defined Contribution Plans—The Company also sponsors defined contribution plans that are available to substantially all employees. The Company contributes cash amounts, based upon a percentage of employee contributions, ranging from 1% to 3% of the employees' pay. The amount expensed for the Company match was zero and $187 for the three and six months ended June 30, 2009, respectively, versus $329 and $651 for the comparable prior year periods. In March 2009, the Company suspended the funding of the Company's matching portion of the cash contribution due to its current budgetary constraints.

## 11. INCOME TAXES

The Company's provision for income taxes is comprised of a current and deferred portion. The current income tax provision is calculated based on estimates as if tax returns for the current year are being filed. The Company provides for deferred income taxes resulting from temporary differences between financial and taxable income. These differences arise primarily from depreciation, amortization, reserves and accruals. In determining future taxable income, the Company is responsible for assumptions utilized including the amount of state, federal and international pre-tax operating income, and the reversal of temporary differences and the implementation of tax planning strategies. These assumptions require significant judgment about forecasts of future taxable income and are consistent with the plans and estimates the Company is using to manage its businesses.

Income taxes are provided during interim periods based on the estimated effective tax rate for the full fiscal year. The Company records a cumulative adjustment to the tax provision in an interim period in which a change in the estimated annual effective tax rate is determined.

The Company has not provided for U.S. income taxes on the undistributed earnings of its Canadian subsidiary, as the Company's present intent is to permanently reinvest these amounts.

The Company regularly assesses the potential outcomes of both ongoing examinations and future examinations for the current and prior years in order to ensure the Company's provision for income taxes is adequate. The Company believes that adequate accruals have been provided for all years in which the statutes of limitations is still open.

The Company's income tax returns are subject to examination by the Internal Revenue Service ("IRS") as well as other state and international taxing authorities. The IRS has completed its examinations of the Company's

federal income tax returns for all years through 2004. With few exceptions, the Company is no longer subject to U.S., state and local or non-U.S. income tax examinations by taxing authorities for years before 2002. At this time, the Company is currently under audit by various state taxing authorities and in addition, the Company is currently undergoing an IRS exam for the 2007 tax year. The Company is reasonably certain that its unrecognized tax benefits will not decrease within the next twelve months.

The income tax benefit for the first six months of 2009 and 2008 was at an effective tax rate of 20.6% and 25.0%, respectively. The decrease in the effective tax rate for the first six months of 2009 as compared to the rate for the first six months of 2008 is primarily the result of the Company's application of a full valuation allowance against the U.S. tax benefit generated in the first six months of 2009 due to the uncertainty about the Company's ability to generate sufficient income in the future to realize the benefit. The Company's effective tax rate for the six months ended June 30, 2009 is lower than the U.S. statutory rate primarily as a result of the full valuation allowance applied against the U.S. tax benefit generated and the losses generated by the Company's Canadian subsidiary being taxed at a rate lower than the U.S. statutory rate.

In June 2006, the FASB issued FASB Interpretation No. 48, Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109, ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, Accounting for Income Taxes, ("SFAS No. 109") and provides guidance on classification and disclosure requirements for tax contingencies. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a return. The Company adopted FIN 48 on January 1, 2007 and did not recognize a change in its liability for unrecognized tax benefits as a result of implementing FIN 48. The total amount of unrecognized tax benefits including interest at June 30, 2009 was approximately $3,155.

The Company includes accrued interest related to unrecognized tax benefits and statutory income tax penalties in its provision (benefit) for income taxes. The total amount of accrued interest reflected in the Company's condensed consolidated balance sheet as of the first six months ended June 30, 2009 was approximately $1,533.

## 12.  COMPREHENSIVE (LOSS) INCOME

Total comprehensive (loss) income for the three and six months ended June 30, 2009 and 2008 is summarized as follows:

| | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Net loss | $ (7,380) | $ (414) | $ (17,422) | $ (873) |
| Foreign currency translation adjustment | 4,757 | 1,034 | 3,040 | (3,486) |
| | $ (2,623) | $ 620 | $ (14,382) | $ (4,359) |

## 13.  RELATED PARTY TRANSACTIONS

The Company pays an annual management fee of $1,500 and reimbursement of out of pocket expenses to Genstar Capital LLC and The Sterling Group, which control the Company's parent, Panolam Holdings II Co. For the six months ended June 30, 2009, no management fees were paid and $750 was accrued for management fees. For the six months ended June 30, 2008, $937 was paid and $188 was accrued for management fees.

On March 31, 2009, the Company entered into the Forbearance Agreement with its lenders pursuant to which the lenders agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate the Company's payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The terms of the Forbearance Agreement, which expired on June 30, 2009, prohibited the Company from, among other things, paying Genstar Capital LLC and The Sterling Group the management fee.  The Company has no plans to pay the accrued management fees to Genstar Capital LLC or The Sterling Group in the forseeable future.

16

## 14. STOCK OPTIONS

On September 30, 2005, the Company instituted the Panolam Holdings Co. 2005 Equity Incentive Plan ("Plan"). The compensation committee of the Board of Directors administers this Plan, and at least two non-employee directors must be on the committee. The purpose of the Plan is to attract, retain and motivate the Company's executives and its management employees. The Committee is authorized to approve the grant of any one or combination of stock options, stock appreciation rights, restricted stock, stock units and cash. On September 30, 2005, the Company granted stock options to an executive officer and management personnel to purchase 15,556 shares of the Company's common stock, exercisable at a price of $500 per share. Through June 30, 2009, 4,889 of these stock options have been forfeited. These options vest ratably over 5 years. The Company's policy is to issue shares to satisfy stock option exercises.

On October 1, 2005, the Company adopted SFAS No. 123(R), Share-Based Payments ("SFAS No. 123(R)"), using fair-value based measurement of accounting. Upon adoption, the Company selected the modified prospective method. As a result of adopting SFAS No. 123(R), the Company recognized compensation expense of $218 for the six months ended June 30, 2009 and $245 for the six months ended June 30, 2008. Such compensation expense is included in selling, general and administrative expenses in the condensed consolidated statements of operations. The tax benefit related to this expense was $84 and $93, respectively, for the six months ended June 30, 2009 and 2008. As of June 30, 2009 and December 31, 2008, there was $653 and $965 respectively, of unrecognized compensation expense relating to outstanding options. The amount at June 30, 2009 will be amortized over the remaining vesting period associated with each grant, and the weighted average expected amortization period is approximately 1.4 years.

Stock option activity and the related changes that occurred during the six months ended June 30, 2009 is summarized as follows:

|  | Outstanding | | Exercisable | |
| --- | --- | --- | --- | --- |
|  | Number of Options | Weighted Average Exercise Price | Number of Options | Weighted Average Exercise Price |
| Outstanding, December 31, 2008 | 13,945 | $ 513 | 7,917 | $ 505 |
| Granted | — | — | — | — |
| Exercised | — | — | — | — |
| Forfeited | (1,778) | 500 | (1,067) | 500 |
| Vested | N/A | — | 300 | 625 |
| Outstanding, June 30, 2009 | 12,167 | $ 515 | 7,150 | $ 510 |

The Company uses the Black-Scholes Merton option-pricing model to calculate the fair value of share-based awards. The key assumptions for this valuation method include the expected term of the option, stock price volatility, risk-free interest rate, dividend yield, exercise price and forfeiture rate.  In determining the fair value of its share-based awards, the Company has assumed no forfeitures and as a result expects the awards to vest ratably over the five year vesting period.  Many of these assumptions are judgmental and highly sensitive in the determination of compensation expense. The Company did not grant any stock options during the first six months of 2009. At June 30, 2009, the Company's outstanding stock options had weighted average remaining contractual terms of 6.4 years and the outstanding stock options that are exercisable had weighted average remaining contractual terms of 6.3 years.

Term — This is the period of time over which the options granted are expected to remain outstanding.  Options granted have a maximum term of 10 years. The Company utilizes the simplified method to calculate expected term. An increase in the expected term will increase compensation expense.

Volatility — This is a measure of the amount by which a price has fluctuated or is expected to fluctuate.  Volatilities are based on implied volatilities from traded options of a company's shares, historical volatility of a company's shares, and other factors, such as expected changes in volatility arising from planned changes in a company's business operations. An increase in the expected volatility will increase compensation expense. As the Company does not have a history of trading from which to determine its volatility, the historical stock price volatility of 14

17

public companies whose lines of business are considered similar to the Company were analyzed, focusing on the stock price trading history of those 14 companies for the years prior to the grant date.

Risk-Free Interest Rate — This is the U.S. Treasury rate in effect at the time of the grant having a term equal to the expected term of the option.  An increase in the risk-free interest rate will increase compensation expense.

Dividend Yield — The Company has no plans to pay dividends in the foreseeable future.  An increase in the dividend yield would decrease compensation expense.

## 15.  COMMITMENTS AND CONTINGENCIES

During 2006, the Company's wholly-owned subsidiary, Nevamar, was named a defendant in numerous workers' compensation claims filed on behalf of current and former employees at the Hampton, South Carolina facility alleging injury in the course of employment due to alleged exposure to asbestos and unidentified chemicals. Under the ownership of Westinghouse Electric Corporation, the Hampton, South Carolina facility manufactured asbestos-based products until approximately 1975. In 2004 and 2005, Nevamar, Westinghouse and IP settled 10 workers' compensation claims related to alleged asbestos exposure. Under a 2005 agreement with IP, Nevamar's liability for workers compensation claims related to alleged exposure to asbestos brought by employees hired before July 1, 2002, was capped at 15% of any damages it shares with IP until Nevamar has paid an aggregate of $700 at which point the Company would have no responsibility for any additional shared damages.

On November 21, 2008, the Company entered into a settlement agreement with IP to settle all of these workers' compensation claims for a cash sum including any related claims that are filed by any person who was previously employed, was currently employed or became employed by Nevamar on or before December 31, 2008 for a cash payment in an amount that had been fully reserved for by the Company. Employees hired by Nevamar after December 31, 2008 and who file claims related to alleged exposure to asbestos are not covered by this settlement agreement. The Company paid the settlement amount in November 2008.

The Company's Auburn, Maine, facility is subject to a Compliance Order by Consent ("COC") dated May 5, 1993, issued by the State of Maine Department of Environmental Protection ("DEP") with regard to unauthorized discharges of hazardous substances into the environment. The Company and the previous owners, named in the COC, are required to investigate and, as necessary, remediate the environmental contamination at the site. Because the unauthorized discharges occurred during the previous ownership, the previous owners have agreed to be responsible for compliance with the COC. The previous owners have completed and submitted to the State for its review a risk assessment. The financial obligation of the previous owners to investigate and or remediate is unlimited except with regard to a portion of the land at the Company's Auburn, Maine, facility, which is capped at $10,000. The Company has recorded a liability of $709 and $710 at June 30, 2009 and December 31, 2008, respectively, for site remediation costs in excess of costs assumed by the previous owners. The Company could incur additional obligations in excess of the amount accrued and the Company's recorded estimate may change over time. The Company expects this environmental issue to be resolved within the next five to ten years.

The Company is party to other litigation matters involving ordinary and routine claims incidental to its business. The Company cannot estimate with certainty its ultimate legal and financial liability with respect to such pending litigation matters. However, the Company believes, based on its examination of such matters, its ultimate costs with respect to such matters, if any, will not have a material adverse effect on its business, financial condition, results of operations or cash flows.

## 16.  SEGMENT INFORMATION

The Company has determined its operating segments in a manner that reflects how the chief operating decision maker currently reviews the results of the Company's business. The Company has two reportable segments, decorative laminates and other. Decorative laminates manufactures and distributes decorative laminates, primarily TFM and HPL, for use in a wide variety of residential and commercial indoor surfacing applications.  This segment accounted for approximately 84% of the Company's total revenue for the six months ended June 30, 2009 and approximately 87% for the six months ended June 30, 2008. The Company's other segment includes the production and marketing of a variety of specialty resins for industrial uses, custom treated and chemically prepared decorative

18

overlay papers and a variety of other industrial laminates including the Company's fiber reinforced plastic product known as FRP. The other segment, net of the corporate/eliminations accounted for approximately 16% of the Company's total revenue for the six months ended June 30, 2009 and 13% for the six months ended June 30, 2008. The amount of net sales reflected in the corporate/eliminations column in the tables below primarily represents the elimination of the intercompany sales of the other segment to the decorative laminate segment. The other amounts reflected in this column related to expenses, capital expenditures, impairment charges and total assets are associated with the Company's corporate office. Certain corporate expenses are generally not allocated to specific operating segments and are accordingly reflected in the corporate/eliminations column in the tables below.

The Company uses the following key information in evaluating the performance of each segment:

|  | As of June 30, 2009 and for the Three Months Ended June 30, 2009 | | | |
|  | Decorative Laminates | Other | Corporate/ Eliminations | Total |
|---|---|---|---|---|
| Net sales | $ 56,431 | $ 12,173 | $ (1,586) | $ 67,018 |
| Gross profit | 8,201 | 1,675 | — | 9,876 |
| Income (loss) from operations | 4,269 | 1,258 | (8,075) | (2,548) |
| Depreciation and amortization expense | 6,086 | 934 | 769 | 7,789 |
| Other expenses | — | — | 2,273 | 2,273 |
| Capital expenditures | 155 | 2 | 128 | 285 |
| Total assets | 252,870 | 47,655 | 98,159 | 398,684 |

|  | Three Months Ended June 30, 2008 | | | |
|  | Decorative Laminates | Other | Corporate/ Eliminations | Total |
|---|---|---|---|---|
| Net sales | $ 86,192 | $ 14,774 | $ (1,635) | $ 99,331 |
| Gross profit | 18,744 | 1,302 | — | 20,046 |
| Income (loss) from operations | 13,423 | 799 | (7,458) | 6,764 |
| Depreciation and amortization expense | 6,061 | 857 | 796 | 7,714 |
| Capital expenditures | 715 | 262 | 25 | 1,002 |

|  | As of June 30, 2009 and for the Six Months Ended June 30, 2009 | | | |
|  | Decorative Laminates | Other | Corporate/ Eliminations | Total |
|---|---|---|---|---|
| Net sales | $ 110,155 | $ 23,611 | $ (2,837) | $ 130,929 |
| Gross profit | 14,469 | 3,163 | — | 17,632 |
| Income (loss) from operations | 5,296 | 2,282 | (16,436) | (8,858) |
| Depreciation and amortization expense | 11,878 | 1,857 | 1,512 | 15,247 |
| Indefinite lived intangible asset impairment charge | 1,249 | 37 | 303 | 1,589 |
| Other expenses | — | — | 4,360 | 4,360 |
| Capital expenditures | 306 | 37 | 146 | 489 |
| Total assets | 252,870 | 47,655 | 98,159 | 398,684 |

|  | Six Months Ended June 30, 2008 | | | |
|  | Decorative Laminates | Other | Corporate/ Eliminations | Total |
|---|---|---|---|---|
| Net sales | $ 173,859 | $ 30,036 | $ (3,382) | $ 200,513 |
| Gross profit | 36,378 | 3,111 | — | 39,489 |
| Income (loss) from operations | 25,267 | 2,154 | (13,959) | 13,462 |
| Depreciation and amortization expense | 11,675 | 1,727 | 1,575 | 14,977 |
| Capital expenditures | 1,427 | 603 | 160 | 2,190 |

Net sales by geographic area for the three and six months ended June 30, 2009 and 2008 were as follows:

| | Three months ended June 30, | | | | Six months ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2009 | | 2008 | | 2009 | | 2008 | |
| United States | $ | 55,428 | $ | 81,271 | $ | 107,724 | $ | 164,240 |
| Canada | | 10,651 | | 17,052 | | 21,443 | | 33,646 |
| Other | | 939 | | 1,008 | | 1,762 | | 2,627 |
| | $ | 67,018 | $ | 99,331 | $ | 130,929 | $ | 200,513 |

No single customer accounted for more than 10% of the Company's consolidated net sales for any of the above periods.

Long-lived assets by geographic area were as follows:

| | June 30, 2009 | | December 31, 2008 | |
|---|---|---|---|---|
| United States | $ | 194,683 | $ | 210,464 |
| Canada | | 70,603 | | 70,463 |
| | $ | 265,286 | $ | 280,927 |

20

## 17. SUPPLEMENTAL CONSOLIDATING CONDENSED FINANCIAL STATEMENTS

The Notes issued September 30, 2005 by the Company are guaranteed by Panolam Industries, Inc., Pioneer Plastics Corporation and Nevamar Holding Corp. Supplemental consolidating condensed financial statements for the parent company, subsidiary guarantors and the non-guarantor company are presented below. Investments in subsidiaries are accounted for using the equity method for purposes of the consolidating presentation. The principal elimination entries eliminate investments in subsidiaries, intercompany balances and intercompany transactions. The income tax expense (benefit) that is reflected in the Parent Company column on the consolidating condensed statements of operations for the periods presented also includes the income tax expense (benefit) that pertains to the Subsidiary Guarantors.

| | Panolam Industries International, Inc. and Subsidiaries Consolidating Condensed Balance Sheets June 30, 2009 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash and cash equivalents | $ 46,189 | $ (1,645) | $ 803 | $ — | $ 45,347 |
| Accounts receivable, net | — | 16,711 | 2,428 | — | 19,139 |
| Inventories | — | 44,527 | 5,498 | — | 50,025 |
| Other current assets | 10,284 | 2,826 | 5,777 | — | 18,887 |
| Total current assets | 56,473 | 62,419 | 14,506 | — | 133,398 |
| Property, plant and equipment, net | 1,418 | 139,617 | 67,907 | — | 208,942 |
| Intangible assets, net | 30,185 | 16,378 | 2,172 | — | 48,735 |
| Debt acquisition costs, net | 6,208 | — | — | — | 6,208 |
| Other assets | 877 | — | 524 | — | 1,401 |
| Intercompany receivables | — | 221,841 | 25,764 | (247,605) | — |
| Investment in subsidiaries | 513,321 | — | — | (513,321)(a) | — |
| Total | $ 608,482 | $ 440,255 | $ 110,873 | $ (760,926) | $ 398,684 |
| **LIABILITIES AND STOCKHOLDER'S (DEFICIT) EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 477 | $ 4,666 | $ 1,631 | $ — | $ 6,774 |
| Accrued liabilities | 17,704 | 7,417 | 1,559 | — | 26,680 |
| Current portion of long-term debt | 343,986 | 11 | — | — | 343,997 |
| Total current liabilities | 362,167 | 12,094 | 3,190 | — | 377,451 |
| Long-term debt, less current portion | — | 9 | — | — | 9 |
| Deferred income taxes | 40,753 | — | 15,086 | — | 55,839 |
| Other liabilities | — | 2,368 | 5,060 | — | 7,428 |
| Intercompany payables | 247,605 | — | — | (247,605) | — |
| Total liabilities | 650,525 | 14,471 | 23,336 | (247,605) | 440,727 |
| Total stockholder's (deficit) equity | (42,043) | 425,784 | 87,537 | (513,321)(a) | (42,043) |
| Total | $ 608,482 | $ 440,255 | $ 110,873 | $ (760,926) | $ 398,684 |

(a) Elimination of investment in subsidiaries.

21

**Panolam Industries International, Inc. and Subsidiaries**
**Consolidating Condensed Balance Sheets**
**December 31, 2008**

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash and cash equivalents | $ 41,684 | $ (1,093) | $ 2,861 | $ — | $ 43,452 |
| Accounts receivable, net | 568 | 12,113 | 1,512 | — | 14,193 |
| Inventories | — | 50,142 | 4,994 | — | 55,136 |
| Other current assets | 10,559 | 3,533 | 4,483 | — | 18,575 |
| Total current assets | 52,811 | 64,695 | 13,850 | — | 131,356 |
| Property, plant and equipment, net | 1,471 | 148,839 | 68,020 | — | 218,330 |
| Intangible assets, net | 31,753 | 17,924 | 2,406 | — | 52,083 |
| Debt acquisition costs, net | 7,057 | — | — | — | 7,057 |
| Other assets | 3,420 | — | 37 | — | 3,457 |
| Intercompany receivables | — | 199,219 | 23,534 | (222,753) | — |
| Investment in subsidiaries | 501,151 | — | — | (501,151)(a) | — |
| Total | $ 597,663 | $ 430,677 | $ 107,847 | $ (723,904) | $ 412,283 |
| **LIABILITIES AND STOCKHOLDER'S (DEFICIT) EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 169 | $ 5,594 | $ 1,150 | $ — | $ 6,913 |
| Accrued liabilities | 12,223 | 6,063 | 1,299 | — | 19,585 |
| Current portion of long-term debt | 343,926 | 11 | — | — | 343,937 |
| Total current liabilities | 356,318 | 11,668 | 2,449 | — | 370,435 |
| Long-term debt, less current portion | — | 13 | — | — | 13 |
| Deferred income taxes | 46,471 | — | 15,027 | — | 61,498 |
| Other liabilities | — | 2,509 | 5,707 | — | 8,216 |
| Intercompany payables | 222,753 | — | — | (222,753) | — |
| Total liabilities | 625,542 | 14,190 | 23,183 | (222,753) | 440,162 |
| Total stockholder's (deficit) equity | (27,879) | 416,487 | 84,664 | (501,151)(a) | (27,879) |
| Total | $ 597,663 | $ 430,677 | $ 107,847 | $ (723,904) | $ 412,283 |

(a) Elimination of investment in subsidiaries.

22

**Panolam Industries International, Inc. and Subsidiaries**
**Consolidating Condensed Statements of Operations**
**For the Three Months Ended June 30, 2009**

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| Net sales | $ — | $ 55,779 | $ 12,037 | $ (798) | $ 67,018 |
| Cost of goods sold | — | 45,050 | 12,890 | (798) | 57,142 |
| Gross profit (loss) | — | 10,729 | (853) | — | 9,876 |
| Selling, general and administrative expenses | 5,515 | 3,982 | 654 | | 10,151 |
| Other expenses | 2,273 | — | — | — | 2,273 |
| Income (loss) from operations | (7,788) | 6,747 | (1,507) | — | (2,548) |
| Interest expense | 6,954 | 1 | — | — | 6,955 |
| Interest income | (33) | — | (1) | — | (34) |
| Income (loss) before income tax benefit and equity in net income (loss) of subsidiaries | (14,709) | 6,746 | (1,506) | — | (9,469) |
| Income tax benefit | (557) | — | (1,532) | | (2,089) |
| Income (loss) before equity in net income (loss) of subsidiaries | (14,152) | 6,746 | 26 | — | (7,380) |
| Equity in net income (loss) of subsidiaries | 6,772 | — | — | (6,772) | — |
| Net income (loss) | $ (7,380) | $ 6,746 | $ 26 | $ (6,772) | $ (7,380) |

**Panolam Industries International, Inc. and Subsidiaries**
**Consolidating Condensed Statements of Operations**
**For the Three Months Ended June 30, 2008**

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| Net sales | $ — | $ 79,275 | $ 20,570 | $ (514) | $ 99,331 |
| Cost of goods sold | — | 59,668 | 20,131 | (514) | 79,285 |
| Gross profit | — | 19,607 | 439 | — | 20,046 |
| Selling, general and administrative expenses | 7,170 | 5,152 | 960 | | 13,282 |
| Income (loss) from operations | (7,170) | 14,455 | (521) | — | 6,764 |
| Interest expense | 6,922 | — | — | — | 6,922 |
| Interest income | (76) | — | (10) | — | (86) |
| Income (loss) before income taxes and equity in net income (loss) of subsidiaries | (14,016) | 14,455 | (511) | — | (72) |
| Income taxes | 249 | — | 93 | — | 342 |
| Income (loss) before equity in net income of subsidiaries | (14,265) | 14,455 | (604) | — | (414) |
| Equity in net income (loss) of subsidiaries | 13,851 | — | — | (13,851) | — |
| Net income (loss) | $ (414) | $ 14,455 | $ (604) | $ (13,851) | $ (414) |

23

**Panolam Industries International, Inc. and Subsidiaries**
**Consolidating Condensed Statements of Operations**
**For the Six Months Ended June 30, 2009**

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| Net sales | $ — | $ 108,201 | $ 23,893 | $ (1,165) | $ 130,929 |
| Cost of goods sold | — | 89,931 | 24,531 | (1,165) | 113,297 |
| Gross profit | — | 18,270 | (638) | — | 17,632 |
| Selling, general and administrative expenses | 11,467 | 8,067 | 1,007 | | 20,541 |
| Indefinite lived intangible asset impairment charge | 303 | 953 | 333 | | 1,589 |
| Other expenses | 4,360 | — | — | — | 4,360 |
| Income (loss) from operations | (16,130) | 9,250 | (1,978) | — | (8,858) |
| Interest expense | 13,187 | 1 | — | — | 13,188 |
| Interest income | (114) | — | (2) | — | (116) |
| Income (loss) before income tax benefit and equity in net income (loss) of subsidiaries | (29,203) | 9,249 | (1,976) | — | (21,930) |
| Income tax benefit | (2,700) | — | (1,808) | — | (4,508) |
| Income (loss) before equity in net income (loss) of subsidiaries | (26,503) | 9,249 | (168) | — | (17,422) |
| Equity in net income (loss) of subsidiaries | 9,081 | — | — | (9,081) | — |
| Net income (loss) | $ (17,422) | $ 9,249 | $ (168) | $ (9,081) | $ (17,422) |

**Panolam Industries International, Inc. and Subsidiaries**
**Consolidating Condensed Statements of Operations**
**For the Six Months Ended June 30, 2008**

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| Net sales | $ — | $ 158,876 | $ 42,671 | $ (1,034) | $ 200,513 |
| Cost of goods sold | — | 120,395 | 41,663 | (1,034) | 161,024 |
| Gross profit | — | 38,481 | 1,008 | — | 39,489 |
| Selling, general and administrative expenses | 13,637 | 10,473 | 1,917 | — | 26,027 |
| Income (loss) from operations | (13,637) | 28,008 | (909) | — | 13,462 |
| Interest expense | 14,798 | 1 | — | — | 14,799 |
| Interest income | (147) | — | (25) | — | (172) |
| Income (loss) before income taxes and equity in net income (loss) of subsidiaries | (28,288) | 28,007 | (884) | — | (1,165) |
| Income taxes (benefit) | 317 | — | (609) | — | (292) |
| Income (loss) before equity in net income (loss) of subsidiaries | (28,605) | 28,007 | (275) | — | (873) |
| Equity in net income (loss) of subsidiaries | 27,732 | — | — | (27,732) | — |
| Net income (loss) | $ (873) | $ 28,007 | $ (275) | $ (27,732) | $ (873) |

24

**Panolam Industries International, Inc. and Subsidiaries**
**Consolidating Condensed Statements of Cash Flows**
**For the Six Months Ended June 30, 2009**

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | |
| Net income (loss) | $ (17,422) | $ 9,249 | $ (168) | $ (9,081) | $ (17,422) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | 1,457 | 9,952 | 3,838 | | 15,247 |
| Indefinite lived intangible asset impairment charge | 303 | 953 | 333 | | 1,589 |
| Deferred income tax benefit | (2,968) | — | (1,121) | | (4,089) |
| Amortization of debt acquisition costs | 849 | — | — | | 849 |
| Stock based compensation expense | 218 | — | — | | 218 |
| Equity in net income of subsidiaries | (9,081) | — | — | 9,081 | — |
| Other | 19 | (4) | (750) | | (735) |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable | 568 | (4,598) | (832) | | (4,862) |
| Inventories | — | 5,615 | (237) | | 5,378 |
| Other current assets | 121 | 707 | (382) | | 446 |
| Accounts payable and accrued liabilities | 5,789 | 259 | 624 | | 6,672 |
| Income taxes payable | (2) | — | (651) | | (653) |
| Other | — | 26 | (427) | | (401) |
| Net cash provided by (used in) operating activities | (20,149) | 22,159 | 227 | — | 2,237 |
| **Cash flows from investing activities:** | | | | | |
| Intercompany receivable/payable, net | 24,803 | — | — | (24,803) | — |
| Purchases of property, plant and equipment | (147) | (133) | (209) | | (489) |
| Net cash (used in) provided by investing activities | 24,656 | (133) | (209) | (24,803) | (489) |
| **Cash flows from financing activities:** | | | | | |
| Repayment of long-term debt | (2) | (4) | — | | (6) |
| Intercompany receivable/payable, net | — | (22,574) | (2,229) | 24,803 | — |
| Net cash provided by (used in) financing activities | (2) | (22,578) | (2,229) | 24,803 | (6) |
| Effect of exchange rate changes on cash | — | — | 153 | — | 153 |
| Net change in cash and cash equivalents | 4,505 | (552) | (2,058) | — | 1,895 |
| Cash and cash equivalents–beginning of period | 41,684 | (1,093) | 2,861 | — | 43,452 |
| Cash and cash equivalents–end of period | $ 46,189 | $ (1,645) | $ 803 | $ — | $ 45,347 |

25

**Panolam Industries International, Inc. and Subsidiaries**
**Consolidating Condensed Statements of Cash Flows**
**For the Six Months Ended June 30, 2008**

| | Parent Company | Subsidiary Guarantors | Non-Guarantor Company | Eliminations | Total |
|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | |
| Net income (loss) | $ (873) | $ 28,007 | $ (275) | $ (27,732) | $ (873) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | 1,505 | 9,368 | 4,104 | | 14,977 |
| Deferred income tax benefit | (71) | — | (1,087) | | (1,158) |
| Amortization of debt acquisition costs | 907 | — | — | | 907 |
| Stock based compensation expense | 245 | — | — | | 245 |
| Equity in net income of subsidiaries | (27,732) | — | — | 27,732 | — |
| Other | (129) | (43) | 238 | | 66 |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable | 1,230 | (5,278) | (1,164) | | (5,212) |
| Inventories | — | (2,469) | (429) | | (2,898) |
| Other current assets | 1,441 | 417 | 6 | | 1,864 |
| Accounts payable and accrued liabilities | (2,429) | 2,629 | 63 | | 263 |
| Income taxes payable | 3,735 | — | (364) | | 3,371 |
| Other | — | (141) | (257) | | (398) |
| Net cash provided by (used in) operating activities | (22,171) | 32,490 | 835 | — | 11,154 |
| **Cash flows from investing activities:** | | | | | |
| Intercompany receivable/payable, net | 30,844 | — | — | (30,844) | — |
| Purchases of property, plant and equipment | (160) | (1,657) | (373) | | (2,190) |
| Net cash (used in) provided by investing activities | 30,684 | (1,657) | (373) | (30,844) | (2,190) |
| **Cash flows from financing activities:** | | | | | |
| Repayment of long-term debt | (2,015) | (9) | — | | (2,024) |
| Borrowings under revolving credit facility | 5,000 | — | — | | 5,000 |
| Payment of amount due to Panolam Holdings Co. | (2,482) | — | — | | (2,482) |
| Intercompany receivable/payable, net | — | (30,824) | (20) | 30,844 | — |
| Net cash provided by (used in) financing activities | 503 | (30,833) | (20) | 30,844 | 494 |
| Effect of exchange rate changes on cash | — | — | (122) | | (122) |
| Net change in cash and cash equivalents | 9,016 | — | 320 | — | 9,336 |
| Cash and cash equivalents–beginning of period | 9,202 | (2,553) | 4,095 | | 10,744 |
| Cash and cash equivalents–end of period | $ 18,218 | $ (2,553) | $ 4,415 | $ — | $ 20,080 |

\*    \*    \*    \*    \*

26

## Item 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this discussion and analysis in conjunction with our unaudited condensed consolidated financial statements as of June 30, 2009 and the notes to those condensed consolidated financial statements included elsewhere in this Form 10-Q. In addition, the following discussion may be understood more fully by reference to our consolidated financial statements and management's discussion and analysis contained in our Annual Report on Form 10-K for the year ended December 31, 2008, as filed with the Securities and Exchange Commission on March 31, 2009. The statements in the discussion and analysis regarding our expectations for the performance of our business, our liquidity and capital resources and the other non-historical statements in the discussion and analysis are forward looking statements. Our actual results may differ from those contained in or implied by the forward-looking statements. Please see "Forward Looking Statements" at the end of this Item 2 for a discussion of important factors that could cause results to differ materially from the results described in or implied by the forward looking statements contained herein.*

### Overview

We are a leading designer, manufacturer and distributor of decorative laminates in the United States and Canada. Our products, which are marketed under the Panolam, Pluswood, Nevamar and Pionite brand names, are used in a wide variety of commercial and residential indoor surfacing applications, including kitchen and bath cabinets, furniture, store fixtures and displays, and other specialty applications. Our decorative laminate product offerings also include a fiber reinforced laminate product ("FRL"). In addition to decorative laminates, we manufacture and distribute industrial laminate products, including Conolite and Panolam FRP ("FRP"). We produce and market a selection of specialty resins for industrial uses, such as powdered paint, adhesives and melamine resins for decorative laminate production, custom treated and chemically prepared decorative overlay papers for HPL and TFM, and a variety of other industrial laminate products such as aircraft cargo liners and bowling lanes.

We are the only vertically integrated North American manufacturer of both HPL and TFM (with the exception of particle board production in our TFM business where we purchase approximately 50% of our needs), and we design, manufacture and distribute our products throughout our principal markets. For the year ended December 31, 2008 and for the six months ended June 30, 2009 we generated net sales of $366.7 million and $130.9 million, respectively. During each of these periods, our decorative laminate products comprised approximately 87% and 84% of our net sales, respectively. For additional information regarding our results of operations by segment for the six months ended June 30, 2009 and 2008, please see note 16 to our unaudited condensed consolidated financial statements.

We offer an array of decorative and industrial laminate products from premium to commodity grades at a broad range of prices. HPL, TFM, FRL, Leatherlam, FRP, and our engineered laminates are utilized as durable and economical look-alike substitutes for natural surfacing materials such as wood, stone and ceramic tile. HPL is used in surfacing applications requiring greater surface wear and impact resistance than applications using TFM. FRL, a proprietary product, is used in surfacing applications requiring greater surface wear, impact resistance and fire prevention than applications using HPL. FRP is used in the building, trucking and recreational, or RV, markets. A typical customer or end user of decorative overlays might utilize HPL, TFM, FRL, FRP or Leatherlam for different surfaces of the same project. Our TFM products consist of a standard palette of over 150 colors, patterns and wood grains. Our HPL products consist of a standard palette of approximately 500 colors, patterns and wood grains.

We market and distribute our decorative laminate products through a geographically diverse network of approximately 300 independently owned and operated distributors. For many of our distributors, we are their exclusive supplier of HPL, TFM or other decorative laminates. In addition, we sell to approximately 700 national and regional original equipment manufacturers, or OEMs, who buy proprietary designs and customized versions of our products directly. Our products are supported by a dedicated in-house sales force and customer service team.

We suffered net losses for the six months ended June 30, 2009 and the year ended December 31, 2008 of approximately $17.4 million and $121.7 million, respectively.  The net loss for the six months ended June 30, 2009 resulted primarily from a reduction in sales volume given the current economic conditions, coupled with continuing fixed costs, and also included a trade name impairment charge of $1.6 million and $4.4 million in other expenses related primarily to legal and financial advisor fees incurred in connection with the Company's efforts to restructure

27

its debt obligations. The net loss for the year ended December 31, 2008 was principally attributable to impairment charges related to goodwill and trade names taken during the year as well as our high ratio of fixed costs, including the interest costs on our debt and our depreciation expense. We also had a stockholder's deficit of approximately $42.0 million at June 30, 2009 and approximately $27.9 million at December 31, 2008. During the fourth quarter of 2008, in light of the weakening economy and our concerns about the troubled credit markets, we borrowed the full amount available under the revolver tranche of the Credit Facility. As a result, we had approximately $45.3 million in cash and cash equivalents and approximately $194.4 million in principal and interest outstanding under the Credit Facility as of June 30, 2009.

On February 27, 2009, we received a notice of default from the agent for the lenders under our Credit Facility due to our failure to comply with certain financial and reporting covenants. On March 31, 2009, we entered into the Forbearance Agreement with our lenders pursuant to which the lenders agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate our payment obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The Forbearance Agreement, which expired by its terms on June 30, 2009, required us to deliver to the lenders under the Credit Facility, on or before June 30, 2009, an excess cash flow payment related to the year ended December 31, 2008. We did not make that excess cash flow payment and, furthermore, we did not make the regularly-scheduled June interest payment on either the term loan or the revolver portions of the Credit Facility, which non-payments constitute defaults under the Forbearance Agreement. On July 1, 2009, we received a letter from the agent under the Credit Facility notifying us of the defaults under the Forbearance Agreement and reserving the lenders' rights related to all defaults. As a result of the termination of the Forbearance Agreement, the lenders under the Credit Facility again have the ability to accelerate all of our payment obligations under the Credit Facility, which amount to $194.4 million as of June 30, 2009.

The terms of the Forbearance Agreement prohibited us from, among other things, paying the April 1, 2009 interest payment on the Notes and we did not make that payment. Our failure to make that interest payment is a default under the indenture governing the Notes and entitles the holders of 25% of the Notes, after a thirty-day grace period that ended on May 1, 2009 and upon delivery of proper notice to us, to accelerate the our payment obligations under the Notes. The indenture trustee informed the holders of the Notes of the payment default and of the event of default by letters dated April 9, 2009 and May 7, 2009, respectively. Acceleration of our payment obligations under the Notes would be an additional event of default under the Credit Facility. Based on these acceleration rights under the Credit Facility and the Notes, we reclassified approximately $343.9 million from long-term debt to current debt as of December 31, 2008. The current portion of long-term debt was approximately $344.0 million as of June 30, 2009. As such, we had a working capital deficiency of $244.1 million as of June 30, 2009 and $239.1 million as of December 31, 2008.

On July 27, 2009, we reached a tentative agreement with the Consenting Holders with respect to a restructuring of our indebtedness. We believe that consummation of a successful restructuring is critical to our continued viability, and we are in active discussions with the Consenting Holders regarding the process for implementing the proposed restructuring, which remains subject to final documentation. We expect to continue to operate our business in the ordinary course during and following the proposed restructuring.

In the event that the proposed restructuring is not completed and most or all of our obligations under the Credit Facility and Notes become due and payable, we would be unable to fund our payment obligations. We have not received any acceleration notice related to these financing arrangements; however, given the current negative conditions in our industry and the economy generally and the credit markets in particular, we cannot give any assurance that we will be successful in reaching a definitive agreement on the proposed restructuring or finding alternative financing arrangements. We have engaged financial and legal advisors to provide assistance in these discussions, but we may be compelled to file for bankruptcy protection.

**Factors Affecting Our Results**

*Revenue*

We generate our revenue primarily from the sale of our decorative laminates and, to a lesser extent, specialty resins, industrial laminates and decorative overlay papers in the United States and Canada. In recent periods, consistent with our continuing strategy, we have concentrated on selling finished laminated end products for their proprietary designs rather than marketing treated papers that could ultimately be used to compete against our own finished laminated products. Our focus is on high-end premium grades, such as abstract and wood grain patterned laminates that command higher prices and generate higher profit margins. For the six months ended June 30, 2009, approximately 91% of our HPL sales and 64% of our TFM sales were premium grade.

We have historically experienced higher sales in the second and third quarters of each year compared with the first and fourth quarters due primarily to seasonal fluctuations in demand. However, in 2008 the second, third and fourth quarter sales were lower than the first quarter sales due primarily to soft market conditions resulting from the deteriorating general economy. This slowdown in sales has continued into 2009 and we expect it to continue during the rest of the year. Also, from time to time, we have curtailed manufacturing operations to make necessary repairs and to maintain efficiencies during slowdowns in order flow.

Changes in our revenues from sales of our decorative laminates and industrial laminate products from period to period are affected by the following, among other factors:

- changes in general economic conditions and the availability of financing that affect the construction industry, since reductions in construction activity can materially reduce the demand for decorative laminates, as it has in recent quarters;

- changes in the design preferences and the discretionary spending power of commercial and residential consumers who ultimately purchase our products primarily in connection with renovations, expansions and upgrades;

- changes in prices, including those resulting from cost increases, which may be on a delayed basis following any cost increases, and those changes implemented for competitive reasons; and

- our ability to successfully develop and launch new designs and products.

### *Cost of Goods Sold*

Our cost of goods sold consists primarily of raw materials, most of which is paper, raw particle board and resin, and energy costs for oil, natural gas and electricity, which generally are variable, and to a lesser extent, direct labor and overhead. Our costs of sales are directly affected by changes in prices for these raw materials, as well as by changes in energy costs and oil prices which affect the price of the petroleum based products that we use to manufacture resins. Recently, the prices of certain of these raw materials have increased and may continue to increase in the future. While we generally attempt to pass along increased raw material prices to our customers in the form of price increases, there may be a time delay between the increased raw material prices and our ability to increase the selling prices of our products, or we may be unable to increase the prices of our products due to pricing pressure, decreased demand or other factors, particularly in our TFM product line where we have been unable to pass all of the price increases through to our customers for competitive reasons. Similarly, we have instituted certain surcharges on our customers from time to time to reflect increases in our transportation or distribution costs.

### *Gross Profit*

Our gross profit has decreased in the six months ended June 30, 2009 in comparison to the six months ended June 30, 2008. The decrease in gross profit is primarily the result of the decreased sales volume experienced in the six months ended June 30, 2009 as a result of weakened economic conditions. The decreased sales volume in the six months ended June 30, 2009 had the effect of increasing the ratio of fixed overhead expenses to sales and as a result negatively impacted the gross profit margin. In addition, certain raw material costs, especially for chemicals, were higher on average during the six months ended June 30, 2009 than in the same period in 2008. The negative impact on gross profit in the six months ended June 30, 2009 resulting from lower sales volume and higher raw material costs was partially offset by aggressive cost containment measures, including significant headcount reductions. We include certain costs such as distribution costs in our selling, general and administrative expenses. Accordingly, our gross profit may not be comparable to other companies that include such costs in their cost of goods sold.

### *Selling, General and Administrative Expenses*

Selling, general and administrative expenses consist of all costs incurred in connection with the sales and marketing of our products, including distribution and warehousing costs and all administrative costs. The major items included in sales and marketing expenses are:

- costs associated with employees in our sales, marketing and customer service departments, including both fixed salaries and bonuses typically based on agreed targets;

- advertising costs; and

- warehousing costs related to our distribution centers.

Changes in sales and marketing expenses as a percentage of our revenue may be affected by a number of factors, including changes in sales prices and / or volumes, as higher sales prices and / or volumes enable us to spread the fixed portion of our sales and marketing expenses over higher sales revenue. Sales and marketing expenses may increase from time to time due to advertising or marketing expenses associated with new product or enhanced product introductions and promotions and higher commissions paid to our sales force for achieving certain targets.

Administrative expenses include management salary, payroll and benefit costs, stock-based compensation expense, rent, legal and environmental compliance fees and other administrative and overhead costs. Administrative expenses also include management fees to Genstar Capital and The Sterling Group.

### Depreciation and Amortization

Depreciation costs relate to the depreciation of property, plant and equipment. For financial reporting purposes, we calculate depreciation on a straight-line basis over the expected useful life of each class of asset. Depreciation expense related to our manufacturing processes and administrative functions is included in the consolidated statement of operations in cost of goods sold and selling, general and administrative expenses, respectively.

Amortization costs relate to the amortization of intangible assets, which consist primarily of key customer lists, patents and trademarks. We calculate amortization on a straight-line basis, over the expected useful life of the asset, with each identifiable asset assessed individually. Key customer lists, patents and trademarks are amortized over their respective estimated useful lives to their estimated residual values. These useful lives generally range from three to fifteen years.

### Interest Expense/Interest Income

Interest expense consists of interest on our outstanding indebtedness and the amortization of debt acquisition costs and other financial income and expenses. Interest income consists primarily of interest earned on cash balances in our bank accounts.

### Income Tax Expense

Income tax expense is incurred at the U.S. federal, foreign and state levels. We are subject to taxation primarily in two jurisdictions, the United States and Canada. The effective tax rate in the first six months of 2009 was approximately 20.6% compared to 25.0% for the first six months of 2008. The decrease in the effective tax rate for the first six months of 2009 as compared to the rate for the first six months of 2008 is primarily the result of our application of a full valuation allowance against the U.S. tax benefit generated in the first six months of 2009 due to the uncertainty about our ability to generate sufficient income in the future to realize the benefit. The Company's effective tax rate for the six months ended June 30, 2009 is lower than the U.S. statutory rate primarily as a result of the full valuation allowance applied against the U.S. tax benefit generated and the losses generated by the Company's Canadian subsidiary being taxed at a rate lower than the U.S. statutory rate.

### Critical Accounting Policies

Critical accounting policies are those that require the application of management's most difficult, subjective, or complex judgments, often because of the need to make estimates about the effect of matters that are inherently uncertain and that may change in subsequent periods. The preparation of our condensed consolidated financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, and expenses, and related disclosures at the date of our condensed consolidated financial statements. Management bases its estimates and judgments on historical experience and current market conditions and on various other factors that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Estimates, however, routinely require adjustment based on changing circumstances and the receipt of new or better information, and actual results may differ from these estimates under different assumptions or conditions. Management considers our policies on revenue recognition, adjustments for slow moving and obsolete inventories,

potentially uncollectible accounts receivable, accruals for customer rebates, income taxes, intangible assets and long-lived assets and stock options to be critical accounting policies due to estimates, assumptions, and application of judgment involved in each.

Actual results may differ from management's estimates. In addition, other companies may utilize different estimates, which may impact the comparability of our results of operations to those of companies in similar businesses.

### Goodwill, Intangible Assets and Long-Lived Assets

Our intangible assets are comprised primarily of trademarks and tradenames with indefinite useful lives, definite lived intangible assets related to patents and trademarks, and key customer lists that are currently being amortized. We account for the impairment of indefinite lived tradenames in accordance with Statement of Financial Accounting Standards No. 142 "Goodwill and Other Intangible Assets," and account for the impairment of finite lived intangibles assets and other long-lived assets in accordance with Statement of Financial Accounting Standards No. 144 "Accounting for the Impairment or Disposal of Long-Lived Assets."

We perform an annual impairment test related to our indefinite lived intangible assets at December 31, or more frequently should conditions that could affect fair value change significantly. We performed impairment testing related to goodwill and indefinite lived tradenames as of December 31, 2008, which led to impairment charges of $96.7 million and $24.9 million for goodwill and other indefinite lived intangible assets, respectively. As a result, goodwill was written down to zero. Due to continued weakness in the economy, we determined that the indefinite lived tradenames should be tested for impairment during the three months ended March 31, 2009 and, as a result, we recorded an impairment charge of $1.6 million. We did not record an impairment charge during the three months ended June 30, 2009.

We have determined that under the guidance of EITF Issue No. 02-7, "Unit of Accounting for Testing Impairment of Indefinite-Lived Intangible Assets," all of the indefinite lived tradenames should be tested for impairment as a single unit because the indefinite lived tradenames were acquired in a single acquisition, and are used together in the our marketing, sales and branding efforts. The impairment test involves comparing the fair value of the assets to the recorded carrying value of the assets. We utilized a variation of the income approach referred to as the "relief-from-royalty" method to determine the estimated fair value of the indefinite lived intangible asset or tradename. The relief-from-royalty method involves determining the present value of the royalty savings associated with the ownership or possession, as opposed to licensing, of the trademarks. The key assumptions used in estimating the royalty savings for impairment testing included the discount rate, royalty rate and future sales projections. The discount rate was determined utilizing a weighted average cost of capital approach based on our industry and peer group, and adjusted for company-specific risk factors. Royalty rates are established by us utilizing independent market research for similar tradename licensing transactions. The rates are periodically updated when facts and circumstances indicate a change. The future sales projections were determined based on current budgets and are reflective of our current expectations as to sales, including the effects of the current economic conditions.

The discount rate used in calculating the impairment charge taken in the first quarter of 2009 was 17%; a one percentage point change in the discount rate would have had the effect of increasing or decreasing the impairment charge by $0.4 million. The average royalty rate used in calculating the impairment charge taken in the first quarter of 2009 was 1%; a 10% change in the royalty rate used would have had the effect of increasing or decreasing the impairment charge by approximately $1.0 million. A 10% change in projected sales would have had the effect of increasing or decreasing the impairment charge by $0.8 million.

We believe that our estimates are appropriate in the circumstances. The relief-from-royalty valuation methodology and calculations used in the 2008 and March 31, 2009 impairment testing are consistent with prior years.

We perform an impairment test of finite lived assets, which consist of amortizing tradenames, customer lists, patents, and plant property and equipment ("PP&E"), when an event occurs or there is a change in circumstances that indicates that the carrying value of the long lived assets may not be recoverable or the useful life of the asset has changed. We recorded a fixed asset impairment charge during the year ended December 31, 2008 of approximately $5.2 million related to our Norcross, Georgia plant, which produces TFM products. We did not record impairment charges related to finite lived fixed or intangible assets during the three months or six months ended June 30, 2009.

We group the finite lived assets for testing, with other assets and liabilities, at their lowest level of identifiable cash flows. For PP&E and patents, the lowest level of cash flows is the operating location, and for customer lists and tradenames, is a group of operating locations that all derive a shared benefit from those intangible assets. We use undiscounted cash flow projections to calculate the recoverable value of long lived assets to determine if the assets are impaired. Our approach is based on the future projected EBITDA results, by operating location, which approximates cash flows. The financial projections include forecasted sales, operating costs and other relevant factors that were determined based on current budgets and include assumptions for the current economic conditions and their impact on our operating locations. A 10% increase or decrease in the projected EBITDA results used during testing would not have resulted in any impairment charge for the six months ended June 30, 2009.

We believe that our estimates are appropriate in the circumstances. The valuation methodologies and calculations used in the 2008 impairment testing of long lived assets are consistent with prior years.

## Results of Operations

### *Three and six months ended June 30, 2009 compared to the three and six months ended June 30, 2008*

*Net Sales*

Net sales were $67.0 million and $130.9 million in the three and six months ended June 30, 2009 compared to $99.3 million and $200.5 million for the three and six months ended June 30, 2008, a decrease of approximately 33% and 35% in the second quarter and six month period, respectively. In local currencies, net sales for 2009 declined approximately 31% and 32% in the second quarter and six month period, respectively. The decrease in sales in the three and six months ended June 30, 2009 as compared to the three and six months ended June 30, 2008 is primarily attributable to lower HPL sales, which declined approximately 33% and 31% during the respective periods and TFM sales, which declined approximately 42% in both respective periods. The decline in HPL and TFM sales resulted primarily from the continued slowdown in the residential housing and credit markets as well as the decline in the overall general economy. Currency translation as it relates to our Canadian operation had the effect of decreasing sales in the first six months of 2009 by approximately $4.7 million when compared to foreign exchange for the six months ended June 30, 2008. In addition to decreases in demand, we continue to experience increased pricing pressure with respect to certain of our TFM and HPL products.

Sales of decorative laminates were $56.4 million and $110.2 million in the three and six months ended June 30, 2009 compared to $86.2 million and $173.9 million for the same periods in 2008. Sales of decorative laminates, which includes both TFM and HPL (approximately 84% of net sales), decreased approximately 35% and 37% in the three and six month periods ended June 30, 2009 as compared to 2008.

Sales of other products, net of the intercompany sales eliminations, principally specialty resins, decorative overlay papers and industrial laminates, were $10.6 million and $20.7 million in the three and six months ended June 30, 2009 compared to $13.1 million and $26.6 million for the three and six months ended June 30, 2008. Other product sales (approximately 16% of net sales) decreased approximately 19% in the three months ended June 30, 2009 and decreased approximately 22% in the six months ended June 30, 2009 as compared to the same periods in 2008. For the six months ended June 30, 2009, specialty resins accounted for approximately 5% of our total sales, while industrial and other specialty laminates, and decorative overlay papers accounted for approximately 8% and 1% of our sales, respectively.

Our net sales for the three and six month periods ended June 30, 2009 were adversely impacted by weakness in the U.S. economy generally and by the sharp slowdown in residential and commercial construction, particularly the residential housing and credit markets that occurred in 2008 and has continued during 2009. Our products are incorporated into new buildings and homes, as well as buildings and homes being refurnished or remodeled. As the construction and housing industries are extremely weak, we have experienced less demand for our products. Our HPL and TFM products are most affected by these adverse market conditions. We believe that economic conditions will remain extremely challenging in the near term, and that demand for our products will likely continue to decline as a result, which would negatively impact our net sales, profitability and cash flows as well as our ability to comply with the covenants set forth in our Credit Facility or covenants in any replacement financing. In addition to decreases in demand, we have experienced increased pressure on pricing from our competitors, particularly our

32

more vertically integrated TFM competitors.  If this trend continues, our net sales and profitability could continue to decline.

*Gross Profit*

The gross profit margin as a percentage of net sales declined to approximately 15% and 13% in the three and six months ended June 30, 2009 from approximately 20% in the three and six months ended June 30, 2008. The decrease in our gross profit margin for the three and six months ended June 30, 2009 was primarily attributable to decreased sales volume of our HPL and TFN products resulting from weakened economic conditions. The decreased sales volume in the three and six months ended June 30, 2009 had the effect of increasing the ratio of fixed overhead expenses to sales, which negatively impacted the gross profit margin. In addition, certain raw material costs, especially for chemicals, were higher on average during the three and six months ended June 30, 2009 than in the comparable 2008 periods. The negative impact on gross profit in the three and six months ended June 30, 2009 resulting from the lower sales volume and higher raw material costs was partially offset by aggressive cost containment measures, including significant headcount reductions. We include certain costs such as distribution costs in our selling, general and administrative expenses. Accordingly, our gross profit may not be comparable to other companies that include such costs in their costs goods sold.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses, which primarily consist of sales and marketing expenses, were $10.2 million and $20.5 million in the three and six months ended June 30, 2009 compared to $13.3 million and $26.0 million for the three and six months ended June 30, 2008. The decrease in selling, general and administrative expenses in the three and six months ended June 30, 2009 is primarily attributable to aggressive cost containment including headcount reductions, and consolidation of the sales and marketing functions and other synergies realized through the consolidation of the operations of Panolam and Nevamar. As a percentage of net sales, selling, general and administrative expenses were approximately 15% and 16% in the three and six months ended June 30, 2009 compared to approximately 13% in the three and six months ended June 30, 2008. The increase in this percentage in the three and six months ended June 30, 2009 was primarily attributable to the lower sales volume in both periods.

*Interest Expense*

Interest expense, which includes the amortization of debt acquisition costs, was $7.0 million and $13.2 million for the three and six months ended June 30, 2009 compared to $6.9 million and $14.8 million for the same periods in 2008. The decrease in interest expense in the six months ended June 30, 2009 as compared to the same periods in 2008 is primarily attributable to lower average interest rates offset in part by higher average debt levels resulting from the borrowings under the revolver portion of our Credit Facility made in the fourth quarter of 2008.

*Income Taxes*

Income tax provision in the six months ended June 30, 2009 was a benefit of $4.5 million as compared to a tax benefit of $0.3 million for the six months ended June 30, 2008. The effective tax rate in the first six months of 2009 was 20.6% compared to 25.0% for the first six months of 2008. The decrease in the effective tax rate for the first six months of 2009 as compared to the rate for the first six months of 2008 is primarily the result of our application of a full valuation allowance against the U.S. tax benefit generated in the first six months of 2009 due to the uncertainty about our ability to generate sufficient income in the future to realize the benefit. The Company's effective tax rate for the six months ended June 30, 2009 is lower than the U.S. statutory rate primarily as a result of the full valuation allowance applied against the U.S. tax benefit generated and the losses generated by the Company's Canadian subsidiary being taxed at a rate lower than the U.S. statutory rate.

*Net Loss*

Net loss for the three months ended June 30, 2009 was $7.4 million compared to net loss of $0.4 million for the three months ended June 30, 2008, an increase of approximately $7.0 million. The increase in net loss is primarily attributable to lower net sales, which were partially offset by decreases in the cost of goods sold due to lower sales volume, in the three months ended June 30, 2009 compared to the three months ended June 30, 2008, as well as to other administrative expenses related to our efforts to restructure our debt in the three months ended June 30, 2009, which were also partially offset by decreases in selling, general and administrative expenses and income taxes.

Net loss for the six months ended June 30, 2009 was $17.4 million compared to net loss of $0.9 million for the six months ended June 30, 2008, an increase of approximately $16.5 million. The increase in net loss is primarily attributable to lower net sales, which were partially offset by decreases in the cost of goods sold due to lower sales volume, in the six months ended June 30, 2009 compared to the six months ended June 30, 2008, as well as to a trade name impairment charge and other administrative expenses related to our efforts to restructure our debt in the six months ended June 30, 2009, which were also partially offset by decreases in selling, general and administrative expenses, interest expense and income taxes.

## Liquidity and Capital Resources

We require working capital to reinvest in our business and to repay or continue prepaying our indebtedness. Our total capital expenditures were approximately $3.4 million in 2008 and, assuming we can restructure our indebtedness and continue operations, we anticipate total capital expenditures to approximate $4.0 million in 2009, of which $0.5 million was incurred in the first six months and approximately $3.5 million is expected to be incurred during the remainder of 2009.

The principal sources of cash to fund our liquidity needs are cash provided by operating activities and cash provided by borrowings under our Credit Facility. Restrictive covenants in our debt agreements restrict our ability to pay dividends and make other distributions. Specifically, the Credit Facility restricts us from making payments of dividends or distributions, including to Panolam Holdings, subject to certain exceptions. Under certain circumstances we are permitted to pay dividends or distributions from our consolidated excess cash flow provided that, after giving effect to the dividend or distribution, we have a consolidated leverage ratio (calculated as a ratio of consolidated total debt to consolidated adjusted EBITDA (as defined in the Credit Facility) as of the last day of any fiscal quarter) not exceeding 3.75 to 1.00. Our Credit Facility also requires us to maintain a maximum consolidated leverage ratio (4.50 to 1.00 as of the end of each quarter ending during fiscal year 2009) that decreases over time and to limit the amount of our capital expenditures in any fiscal year. As of June 30, 2009, our consolidated leverage ratio was in excess of the permitted maximum amount at 9.83 to 1.00. The Credit Facility further requires us to maintain a minimum interest coverage ratio (2.25 to 1.00 as of the end of each quarter during fiscal year 2009) that increases over time. As of June 30, 2009, our minimum interest coverage ratio was below the required minimum at 1.18 to 1.00. For the calculation of these ratios, see "Liquidity and Capital Resources — Debt Covenant Ratios" and for a discussion of the potential acceleration and restructuring of our indebtedness, see "Overview."

The indenture governing our Notes also restricts us from making payments of dividends or distributions, subject to certain exceptions, unless, among other things, all such payments are less than 50% of our consolidated net income for the period from October 1, 2005 to the most recently ended fiscal quarter at the time of the payment. Given the defaults under the Credit Facility and Notes, we have accrued, but not paid, management fees to Genstar Capital LLC and the Sterling Group during 2009. On March 30, 2009, the agent for the lenders under the Credit Facility provided us with a "blockage notice" directing us not to make an April 1, 2009 interest payment on the Notes. We did not make that payment, which is a default under the Notes, and, as a result, the indenture trustee and the holders of 25% of the Notes currently have the right, upon delivery of proper notice, to accelerate our payment obligations under the Notes.

When cash generated from our operations is sufficient, we may apply portions of our excess cash towards the repayment of our long-term debt. During the year ended December 31, 2008, we prepaid long-term debt of approximately $2.0 million, but we did not make any prepayments during the six months ended June 30, 2009.

### *Analysis of Cash Flows and Working Capital*

Cash provided by operating activities was $2.2 million and $11.2 million in the six months ended June 30, 2009 and the six months ended June 30, 2008, respectively. The decrease in cash flow for the six months ended June 30, 2009 as compared to the six months ended June 30, 2008 primarily reflects an increase of $16.5 million in net loss and a net decrease of $2.0 million in the add back of non-cash expenses, including depreciation and amortization, the indefinite lived intangible asset impairment charge, amortization of debt acquisition costs, stock-based compensation expense and deferred taxes , all of which was partially offset by a $9.5 million decrease in the non-cash components of working capital. The increase in net loss of $16.5 million included approximately $4.4 million in other expenses that were paid in the first six months of 2009 related to legal and financial advisor fees incurred in connection with our efforts to restructure our debt obligations. The net change in non-cash components of working capital decreased approximately $9.5 million in the first six months of 2009 as compared to the first six months of

34

2008, primarily due to decreases in accounts receivable and inventories of $0.3 million and $8.3 million, respectively, and an increase of $6.4 million in accounts payable and accrued liabilities, all of which were offset in part by a increase in other current assets of $1.4 million and a decrease of $4.0 million in income taxes payable. The decrease in cash related to other current assets is primarily attributable to retainer fees paid to both legal and financial advisors related to our debt restructuring efforts. The slower growth in net working capital assets in 2009 is primarily attributable to the weaker business environment described above and improved working capital management.

Cash used in investing activities was $0.5 million for the six months ended June 30, 2009 compared to $2.2 million in the six months ended June 30, 2008. The decrease in cash used in investing activities in the six months ended June 30, 2009 as compared to the six months ended June 30, 2008 is related to a decrease in capital spending of $1.7 million for the six months ended June 30, 2009 as compared to the six months ended June 30, 2008.

Cash used in financing activities was six thousand dollars for the six months ended June 30, 2009 compared to a cash inflow of $0.5 million in the six months ended June 30, 2008. During the six months ended June 30, 2008, the net cash provided by financing activities resulted primarily from a $5.0 million draw down under our revolving credit facility offset in part by $2.0 million in term debt prepayments and the settlement of the subordinated notes with the former owners of Nevamar for $2.5 million, which included approximately $0.1 million in legal and bank fees.

Our Credit Facility, which became effective on September 30, 2005, initially consisted of a $135.0 million senior secured single draw seven-year term loan facility, and a $20.0 million senior secured five-year revolving credit facility. In March 2006, the term loan was increased to $215.0 million and the revolving credit facility was increased to $30.0 million. We prepaid $2.0 million, $20.0 million and $24.5 million of the term loan in 2008, 2007 and 2006, respectively, but made no prepayments during the six months ended June 30, 2009. We had $25.9 million outstanding under the revolving credit facility at June 30, 2009 and December 31, 2008. Our outstanding revolver borrowings as of June 30, 2009 and December 31, 2008 reflect a decision in the fourth quarter of 2008 to borrow our remaining availability under the revolving loan tranche of our Credit Facility due to the weakening economy and our concerns about the troubled credit markets. At June 30, 2009, the interest rate on the revolver borrowings was at an annual rate of 4.50%. In addition, we had letters of credit issued in respect of workers' compensation claims in an aggregate amount of $4.1 million, which also reduces our availability under the revolving portion of our Credit Facility.

Borrowings under our Credit Facility bear interest at our option at either adjusted LIBOR plus an applicable margin or the alternate base rate plus an applicable margin.  The interest rates on borrowings under our revolving credit facility are subject to adjustment based on our leverage. At June 30, 2009 and at December 31, 2008, the interest rate on the term loan facility was at annual rates of 5.00% and 3.22%, respectively. In accordance with the terms of the Credit Facility, effective July 1, 2009, we will be required to pay interest on our Credit Facility borrowings at a default interest rate equivalent to a rate that is 2% per annum in excess of the rate that would otherwise be payable. Our Credit Facility requires us to meet a maximum total leverage ratio of 4.50 and a minimum interest coverage ratio of 2.25 as of June 30, 2009 and an annual maximum capital expenditures limitation of $8.0 million for 2009. As of June 30, 2009, our consolidated leverage ratio was in excess of the permitted maximum amount at 9.83 to 1.00; our minimum interest coverage ratio was below the required minimum at 1.18 to 1.00, and our annual capital expenditures were $0.5 million.  For the calculation of our debt covenant ratios, see "Liquidity and Capital Resources — Debt Covenant Ratios." In addition, the Credit Facility contains certain restrictive covenants that, among other things, limit our ability to incur additional indebtedness, pay dividends, prepay subordinated debt and engage in certain other activities customarily restricted in such agreements. The Credit Facility also contains certain customary events of default, some of which are subject to grace periods.  As of June 30, 2009, we were not in compliance with certain financial and reporting covenants including our leverage and interest coverage covenants under our Credit Facility, which constitutes a default.  As a result, the lenders under the Credit Facility have the ability to accelerate our obligations to make payments under the Credit Facility and, in the event there was availability under the revolver, we would not be permitted to borrow funds until the noncompliance is cured or waived by the lenders.

On February 27, 2009, we received a notice of default from the agent for our lenders under our Credit Facility due to our failure to comply with certain financial and reporting covenants.  On March 31, 2009, we entered into the Forbearance Agreement with our lenders pursuant to which the lenders agreed to forbear exercising any rights and remedies under the Credit Facility relating to these defaults, including their right to accelerate our payment

obligations under the Credit Facility, until the earlier of (i) June 30, 2009, (ii) the occurrence of an event of default under the Forbearance Agreement or (iii) the fulfillment of all obligations under the Forbearance Agreement and the Credit Facility and the termination of the Credit Facility. The Forbearance Agreement, which expired by its terms on June 30, 2009, required us to deliver to the lenders under the Credit Facility, on or before June 30, 2009, an excess cash flow payment related to the year ended December 31, 2008.  We did not make that excess cash flow payment and, furthermore, we did not make the regularly-scheduled June interest payment on either the term loan or the revolver portions of the Credit Facility, which non-payments constitute defaults under the Forbearance Agreement.  On July 1, 2009, we received a letter from the agent under the Credit Facility notifying us of the defaults under the Forbearance Agreement and reserving the lenders' rights related to all defaults.  As a result of the termination of the Forbearance Agreement, the lenders under the Credit Facility again have the ability to accelerate all of our payment obligations under the Credit Facility, which amount to $194.4 million as of June 30, 2009.

The terms of the Forbearance Agreement prohibited us from, among other things, paying the April 1, 2009 interest payment on the Notes and we did not make that payment. Our failure to make that interest payment is a default under the indenture governing the Notes and entitles the indenture trustee or the holders of 25% of the Notes, after a thirty-day grace period that ended on May 1, 2009 and upon delivery of proper notice to us, to accelerate our payment obligations under the Notes.  The indenture trustee informed the holders of the Notes of the payment default and of the event of default by letters dated April 9, 2009 and May 7, 2009, respectively. Acceleration of our payment obligations under the Notes would be an additional even of default under the Credit Facility. Based on these acceleration rights under the Credit Facility and the Notes, we reclassified approximately $343.9 million from long-term debt to current debt as of December 31, 2008. The current portion of long-term debt was approximately $344.0 million as of June 30, 2009. As such, we had a working capital deficiency of approximately $244.1 million as of June 30, 2009 and approximately $239.1 million as of December 31, 2008.

The indenture governing our Notes also contains a number of covenants that restrict our ability to incur or guarantee additional indebtedness or issue disqualified or preferred stock, pay dividends or make other equity distributions, repurchase or redeem capital stock, make investments or other restricted payments, sell assets, engage in transactions with affiliates, create liens or consolidate or merge with or into other companies, and the ability of our restricted subsidiaries to make dividends or distributions to us. Given the defaults under the Credit Facility and Notes, we have accrued, but not paid, management fees to Genstar Capital LLC and The Sterling Group during 2009. On March 30, 2009, the agent for the lenders under the Credit Facility provided us with a "blockage notice" directing us not to make an April 1, 2009 interest payment on the Notes. We did not make that payment, which is a default under the Notes, and, as a result, the indenture trustee and the holders of 25% of the Notes currently have the right, upon delivery of proper notice, to accelerate our payment obligations under the Notes.

On July 27, 2009, we reached a tentative agreement with the Consenting Holders with respect to a restructuring of our indebtedness.  We believe that consummation of a successful restructuring is critical to our continued viability, and we are in active discussions with the Consenting Holders regarding the process for implementing the proposed restructuring, which remains subject to final documentation.  We expect to continue to operate our business in the ordinary course during and following the proposed restructuring.

In the event that the proposed restructuring is not completed and most or all of our obligations under the Credit Facility and Notes become due and payable, we would be unable to fund our payment obligations.  We have not received any acceleration notice related to these financing arrangements; however, given the current negative conditions in our industry and the economy generally and the credit markets in particular, we cannot give any assurance that we will be successful in reaching a definitive agreement on the proposed restructuring or finding alternative financing arrangements.  We have engaged financial and legal advisors to provide assistance in these discussions, but we may be compelled to file for bankruptcy protection.

### Debt Covenant Ratios

As previously discussed in "Liquidity and Capital Resources," our Credit Facility requires us to maintain a maximum consolidated leverage ratio that decreases over time and to maintain a minimum interest coverage ratio that increases over time.  We have set forth below the calculations of those ratios as of June 30, 2009.  Certain components of these ratios, Consolidated EBITDA and Consolidated Cash Interest Expense, are non-GAAP measures of operating performance.  We believe the presentation of the calculation of our debt covenant ratios, which impact compliance with our obligations under our Credit Facility, is useful tool for investors to evaluate our performance and liquidity position.  Consolidated EBITDA and Consolidated Cash Interest Expense should be seen as complementary to, and not a substitute for, loss from operations and interest expense, respectively, each in accordance with GAAP.

The "Consolidated Leverage Ratio" is a ratio of (i) total net debt to (ii) Consolidated Adjusted EBITDA for the consecutive four fiscal quarters ending on such day. Total net debt is defined as total debt net of cash. At June 30, 2009,

total net debt was equal to $298.7 million. As of June 30, 2009, our Consolidated Leverage Ratio was 9.83 to 1.00, which is greater than the permitted maximum of 4.50 to 1.00.

"Consolidated EBITDA" is defined under our Credit Facility as earnings before interest expense, income taxes, depreciation, amortization and certain other charges as specified in the Credit Facility. "Consolidated Adjusted EBITDA" is computed by taking the Consolidated EBITDA amount and adding back the amounts recorded for management fee expense related to our sponsors and stock based compensation expense. Below is a reconciliation of net loss to Consolidated EBITDA and to Consolidated Adjusted EBITDA as used in the calculation of our Consolidated Leverage Coverage Ratio as of June 30, 2009:

| | Six months ended June 30, 2009 | Six months ended December 31, 2008 | Twelve months ended June 30, 2009 |
|---|---|---|---|
| Net Loss | $ (17.4) | $ (120.8) | $ (138.2) |
| Addbacks: | | | |
| Income Tax (Benefit) Expense | (4.5) | (21.0) | (25.5) |
| Interest Income | (.1) | (.3) | (.4) |
| Interest Expense | 13.2 | 14.6 | 27.8 |
| Depreciation and Amortization Expense | 15.2 | 16.3 | 31.5 |
| Impairment Charges | 1.6 | 126.8 | 128.4 |
| Other Expenses | 4.4 | .4 | 4.8 |
| | | | |
| Consolidated EBITDA | $ 12.4 | $ 16.0 | 28.4 |
| Management Fee Expense | .4 | 1.1 | 1.5 |
| Stock Based Compensation Expense | .2 | .3 | .5 |
| Consolidated Adjusted EBITDA | $ 13.0 | $ 17.4 | $ 30.4 |

The "Interest Coverage Ratio" is a ratio of (i) Consolidated Adjusted EBITDA to (ii) Consolidated Cash Interest Expense. As of June 30, 2009, our interest coverage ratio was 1.18 to 1.00, which is less than the required minimum of 2.25 to 1.00. "Consolidated Cash Interest Expense" is defined under our Credit Facility as interest expense for the period, excluding interest not payable in cash. Below is reconciliation of interest expense to Consolidated Cash Interest Expense as used in the calculation of our Interest Coverage Ratio as of June 30, 2009:

| | Six months ended June 30, 2009 | Six months ended December 31, 2008 | Twelve months ended June 30, 2009 |
|---|---|---|---|
| Total Interest Expense | $ 13.2 | $ 14.6 | $ 27.8 |
| Less: | | | |
| Interest Expense not Paid in Cash | (.8) | (.9) | (1.7) |
| Interest Income | (.1) | (.3) | (.4) |
| | | | |
| Consolidated Cash Interest Expense | $ 12.3 | $ 13.4 | $ 25.7 |

**Off Balance Sheet Obligations**

We have no off-balance-sheet arrangements that have or are reasonably likely to have a material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Regulatory Compliance**

We are subject to federal, state, local and foreign (Canadian) laws, regulations and ordinances pertaining, among other things, to the quality and the protection of the environment and human health and safety and that require us to devote substantial time and resources in an effort to maintain continued compliance. There can be no assurance that judicial or administrative proceedings seeking penalties or injunctive relief will not be brought against us for alleged non-compliance with applicable environmental laws and regulations relating to matters as to which we are currently unaware. In addition, changes to such regulations or the enactment of new regulations in the future could require us to undertake capital improvement projects or to cease or curtail certain operations or could otherwise substantially increase the capital requirements, operating expenses and other costs associated with compliance. We believe we have adequately provided for costs related to our ongoing obligations with respect to known environmental liabilities. Expenditures related to environmental liabilities during the six months ended June 30, 2009 and the year ended December 31, 2008 did not have a material effect on our financial condition or cash flows. Such expenditures are related to the costs to maintain general compliance at our facilities. The majority of the costs include staffing and training expenses, permitting and emission based fees, testing and analytical fees and waste disposal fees.

Our Auburn, Maine facility is subject to a COC, dated May 5, 1993, issued by the State of Maine DEP, with regard to unauthorized discharges of hazardous substances into the environment. We, along with the previous owners, are named in the COC, and are required to investigate and, as necessary, remediate the environmental contamination at the site. Because the unauthorized discharges occurred during the previous ownership, the previous owners have agreed to be responsible for compliance with the COC. The nature and extent of remediation has not yet been determined. The financial obligation of the previous owners to investigate and/or remediate is unlimited except with regard to a portion of the land known as "area 2" at our Auburn, Maine facility, which is capped at $10.0 million. We have recorded a liability of $0.7 million at June 30, 2009 and December 31, 2008 for site remediation costs in excess of costs assumed by the previous owners. We could incur additional obligations in excess of the amount accrued and our recorded estimate may change over time. We expect this environmental issue to be resolved within the next five to ten years.

**Legal Proceedings**

We are party to certain litigation matters involving ordinary and routine claims incidental to the business. We cannot estimate with certainty our ultimate legal and financial liability with respect to such pending litigation matters. However, we believe, based on our examination of such matters, our ultimate costs with respect to such matters, if any, will not have a material adverse effect on our business, financial condition, results of operations or cash flows.

**Forward-Looking Statements**

This Quarterly Report on Form 10-Q contains forward-looking statements, including, without limitation, statements concerning the conditions in our industry, our operations, our economic performance and financial condition, including, in particular, statements relating to our business and strategy . The words "may," "might," "should," "estimate," "project," "plan," "anticipate," "expect," "intend," "outlook," "believe" and other similar expressions are intended to identify forward-looking statements and information although not all forward-looking statements include these identifying words. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of their dates. These forward-looking statements are based on estimates and assumptions by our management that, although we believe to be reasonable, are inherently uncertain and subject to a number of risks and uncertainties.

In particular, our business might be affected by uncertainties affecting the decorative overlay industry and the construction industry generally as well as the following, among other factors:

- our ability to refinance, replace or restructure our Credit Facility on favorable terms or at all;

- general economic, financial and political conditions, including downturns affecting the decorative overlay or construction industries or the residential housing and credit markets;

- our ability to comply with financial covenants contained in our Credit Facility or any replacement indebtedness and our ability to obtain waivers to cure any noncompliance;

- our ability to obtain necessary financing to continue operations;

- limitations and restrictions on the operation of our business contained in the documents governing our indebtedness;

- changes in consumer preferences and discretionary spending;

- increases in raw material costs, including oil prices, which in some instances may not be passed on to customers;

- availability of raw materials and other commodities used to produce our products;

- competitive pressures, including new product developments or changes in competitors' pricing;

- our ability to manage our growth and expansion, including recent acquisitions and any acquisitions we might undertake in the future;

- our ability to develop innovative new products;

- our ability to generate cash flows to service our substantial indebtedness and invest in the operation of our business;

- our dependence upon our key executives and other key employees;

- possible environmental liabilities resulting from our use of toxic or hazardous materials in connection with our manufacturing operations;

- our ability to protect our intellectual property rights, brands and proprietary technology;

- fluctuations in exchange rates between the U.S. and Canada; and

- our ability to effectively and efficiently maintain internal control procedures that are compliant with Section 404 of the Sarbanes Oxley Act of 2002 in a timely fashion and the possibility of increased operating costs associated with making any necessary changes.

Additional factors that might cause future events, achievements or results to differ materially from those expressed or implied by our forward-looking statements include those discussed under "Risk Factors" included in our 2008 Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 31, 2009. All forward-looking statements are based upon information available to us on the date of this report, and we undertake no obligation to update or revise any forward-looking statements to reflect new information, future events or otherwise.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

Market risks relating to our operations result primarily from changes in general economic conditions and interest rate fluctuations. In the normal course of business, we also have foreign currency risks associated with our Canadian operations. There is also risk related to commodity price changes for items such as particleboard, medium density fiber-board, or MDF, and raw paper. In addition, we have exposure to changes in energy related costs for natural gas, heating oil and electricity. Many of the resins and chemicals used to produce our resins are petroleum based and therefore subject to the same market fluctuations as energy costs. We are also subject to surcharges by trucking companies due to the increased fuel costs. We employ established purchasing policies and procedures to manage our exposure to these risks. We do not utilize derivative financial instruments for trading, speculative or other purposes.

*Interest Rate Risk*

Our interest rate risk management objective is to limit the impact of interest rate changes on net income and cash flow and to lower overall borrowing cost.

Amounts outstanding under our Credit Facility bear interest at our option at LIBOR plus an applicable margin or at an alternate base rate plus an applicable margin. These interest rates can fluctuate based on market rates. Based on the outstanding amount of our variable rate indebtedness at June 30, 2009, a 10% change in the interest rates at June 30, 2009 would have the effect of increasing or decreasing interest expense by approximately $1.0 million. Potential interest rate impact would also be affected by utilization of the revolving loan. In accordance with the terms of the credit agreement, effective July 1, 2009, we will be required to pay interest on our Credit Facility borrowings at a default interest rate equivalent to a rate that is 2.00% per annum in excess of the rate that would otherwise be payable.

The net amounts paid or received and net amounts accrued through the end of the accounting period are included in interest expense. Interest expense also includes the amortization of debt acquisition costs.

### Foreign Currency Exchange Risk

We have a Canadian subsidiary, Panolam Industries, Ltd., that has a manufacturing facility in Canada that sells to both Canadian and U.S. customers and purchases from both Canadian and U.S. suppliers. Our Canadian subsidiary operates within its local economic environment and utilizes its own operating cash flow to fund its operation. The Canadian subsidiary's sales tend to be evenly split between U.S. and Canadian customers but shift depending on market demand; however, a greater percentage of raw materials purchases are in local currency. As a result, when the Canadian dollar strengthens, expenses increase as a percent of sales when reported in U.S. dollars. Conversely, when the Canadian dollar weakens it has the opposite effect. At the same time the Canadian foreign exchange rate fluctuations require revaluation of the Canadian subsidiary's balance sheet resulting in foreign currency translation exchange gains or losses being charged or credited to other comprehensive income or (loss) on the balance sheet. We do not enter into any derivative financial instruments to reduce our exposure to foreign currency exchange rate risk.

During the six months ended June 30, 2009, we recorded $0.2 million of expense related to net foreign exchange transaction and revaluation adjustments, compared to $0.1 million of income recorded in the same period last year. At December 31, 2008, we had approximately $5.1 million of unfavorable foreign currency translation adjustments and at June 30, 2009 we had approximately $2.0 million of unfavorable foreign currency translation adjustments included in stockholder's deficit. There can be no assurances that the Canadian foreign exchange rate will not fluctuate adversely in the future and the potential risk for translation losses is not quantifiable.

### Commodity Pricing Risk

We purchase commodities for our products such as paper, resins (and the chemicals used in making resins), wood furnish (used in the production of particleboard), raw particleboard and MDF. We also purchase other commodities, such as natural gas, heating oil and electricity. These commodities are generally purchased pursuant to contracts or at market prices established with the vendor, and we are subject to risks on the pricing of these commodities. We do not engage in hedging activities for these commodities.

### Credit Concentration Risk

We sell HPLs and TFMs to various distributors and OEMs and we extend credit to our customers based on an evaluation of their financial condition. We review our trade accounts receivable balances for collectibility whenever events and circumstances indicate that the carrying amount may not be collectible and provide currently for any unrealizable amounts. At June 30, 2009, we had uncollateralized accounts receivable from five nonaffiliated customers approximating 14% of total gross accounts receivable balances. Sales to these five nonaffiliated customers were approximately 8% of consolidated net sales for the six months ended June 30, 2009. As of June 30, 2009, no single customer represented more than 10% of our sales or accounts receivable.

## Item 4T. Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Vice President and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of June 30, 2009. Based on this evaluation, our Chief Executive Officer and Vice President and Chief Financial Officer concluded that, as of June 30, 2009, our disclosure controls and

procedures were effective in ensuring that information to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

We continually seek ways to improve the effectiveness and efficiency of our internal controls over financial reporting, resulting in frequent process refinement.  However, there have been no changes in our internal control over financial reporting that occurred during our last fiscal period to which this Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 relates that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## PART II — OTHER INFORMATION

**Item 1.        Legal Proceedings**

> None

**Item 1A.       Risk Factors**

There have been no material changes to our risk factors as disclosed in Part I, Item 1A of our 2008 Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 31, 2009.

**Item 3.        Defaults Upon Senior Securities**

As of June 30, 2009, we were not in compliance with certain financial and reporting covenants including our leverage and interest coverage covenants under our Credit Facility, which constitutes a default. We are also in default of the Forbearance Agreement related to the Credit Facility. For further information, please see Note 9 ("Debt and Capital Lease Obligations") to our unaudited condensed consolidated financial statements.

We did not make the April 1, 2009 interest payment on our Notes. Our failure to make that interest payment is a default under the indenture governing the Notes and entitles the indenture trustee or the holders of 25% of the Notes, after a thirty-day grace period that ended on May 1, 2009 and upon delivery of proper notice to us, to accelerate our obligations under the Notes. The amount of the payment due was $8.1 million and there is, as of the date of this filing, a total arrearage of approximately $12.2 million.  For further information, please see Note 9 ("Debt and Capital Lease Obligations") to our unaudited condensed consolidated financial statements.

**Item 6.        Exhibits —**

| EXHIBIT NUMBER | EXHIBIT TITLE |
| --- | --- |
| 10.1 | Forbearance Agreement by and between Panolam Holdings II Co, Panolam Industries International, Inc., the Requisite Lenders and Credit Suisse, Cayman Islands Branch, as administrative agent, dated March 31, 2009.* |
| 31.1 | Certification pursuant to Exchange Act Rules 13a-14 and 15d-14; as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification pursuant to Exchange Act Rules 13a-14 and 15d-14; as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of Sarbanes-Oxley Act of 2002. |

* Incorporated herein by reference to Panolam Industries International, Inc. Current Report on Form 8-K filed on April 3, 2009.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

PANOLAM INDUSTRIES INTERNATIONAL, INC.

By:  /s/ Vincent S. Miceli
 Vincent S. Miceli
 Vice President and Chief Financial Officer
 (Authorized Signatory, Principal
 Financial Officer and Principal
 Accounting Officer)

Date:  August 14, 2009

42

**Exhibit 31.1**

**Panolam Industries International, Inc.**
**Certification pursuant to Section 302**
**of the Sarbanes-Oxley Act of 2002**
**Certification**

I, Robert J. Muller, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 of Panolam Industries International, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 14, 2009

/s/ Robert J. Muller
_____
Robert J. Muller
Chairman, President and
    Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

**Panolam Industries International, Inc.**
**Certification pursuant to Section 302**
**of the Sarbanes-Oxley Act of 2002**
**Certification**

I, Vincent S. Miceli, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 of Panolam Industries International, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 14, 2009

/s/ Vincent S. Miceli
_____
Vincent S. Miceli
Vice President and Chief Financial Officer
(Principal Financial and Accounting Officer)

1

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Panolam Industries International, Inc. (the "Company") on Form 10-Q for the quarter ended June 30, 2009, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert J. Muller, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 14, 2009

/s/ Robert J. Muller
_____
Robert J. Muller
Chairman, President and
    Chief Executive Officer
(Principal Executive Officer)

1

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Panolam Industries International, Inc. (the "Company") on Form 10-Q for the quarter ended June 30, 2009, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Vincent S. Miceli, Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 14, 2009

/s/ Vincent S. Miceli
_____
Vincent S. Miceli
Vice President and Chief Financial Officer
(Principal Financial and Accounting Officer)

1

**<u>Exhibit E to Disclosure Statement</u>**

**Restructuring Support Agreement**

Book Page 398

# RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (this "***Agreement***"), dated as of September 25, 2009, is entered into by and among Panolam Holdings Co., a Delaware corporation ("***Parent***"), Panolam Holdings II Co., a Delaware corporation ("***Holdings***"), Panolam Industries International, Inc., a Delaware corporation ("***Panolam***"), Panolam Industries, Inc., a Delaware corporation, Pioneer Plastics Corporation, a Delaware corporation, Nevamar Holding Corp., a Delaware corporation, Nevamar Holdco, LLC, a Delaware limited liability company, Nevamar Company, LLC, a Delaware limited liability company (collectively with Parent, Holdings and Panolam, the "***Company***"), Credit Suisse, Cayman Islands Branch, as administrative agent under the Credit Agreement (as defined below) (the "***Agent***"), the undersigned lenders party to the Credit Agreement (the "***Consenting Senior Secured Debt Holders***") and the undersigned holders of Subordinated Notes (as defined below) (the "***Consenting Note Holders***" and, collectively with the Consenting Senior Secured Debt Holders, the "***Consenting Holders***" and each, a "***Consenting Holder***").  The Company, Agent, each Consenting Holder and each person that becomes a party hereto in accordance with the terms hereof are collectively referred to herein as the "***Parties***" and individually as a "***Party.***"

## RECITALS

**WHEREAS**, as of the Effective Date (as defined in <u>Section 9</u>), the Company is a party to (i) that certain Credit Agreement, dated as of September 30, 2005, as amended by (A) that certain First Amendment to Credit Agreement and Waiver, dated as of February 27, 2006, (B) that certain Second Amendment to Credit Agreement, dated as of March 1, 2006, (C) that certain Limited Waiver, dated as of June 14, 2006, and (D) that certain Third Amendment to Credit Agreement and Limited Waiver, dated as of March 30, 2007, by and among Holdings, Panolam, Agent, and the lenders party thereto (the "***Lenders***") (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***") and (ii) that certain Indenture, dated as of September 30, 2005, among Panolam, as issuer, the guarantors party thereto and Wells Fargo Bank, National Association, as trustee (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Indenture***"), governing the 10⅜% Senior Subordinated Notes due 2013 (the "***Subordinated Notes***");

**WHEREAS**, as of the Effective Date, the Consenting Senior Secured Debt Holders hold at least 83% of the aggregate principal amount of indebtedness under the Credit Agreement and the Consenting Note Holders hold at least 66% of the aggregate principal amount of Subordinated Notes issued under the Indenture;

**WHEREAS**, the Company and the Consenting Holders wish to reorganize and recapitalize the Company (the restructuring and recapitalization transactions, collectively, the "***Transactions***") in accordance with (i) a proposed prepackaged Chapter 11 plan of reorganization substantially in the form attached hereto as <u>Exhibit A</u> (the "***Plan***"), (ii) the term sheet attached hereto as <u>Exhibit B</u> (the "***Term Sheet***"), (iii) the New Intercreditor Agreement Term Sheet (as defined in the Plan) attached hereto as <u>Exhibit C</u>, as such Plan, Term Sheet and New Intercreditor Term Sheet may be amended, modified or supplemented as provided herein below;

WHEREAS, it is anticipated that the Transactions will be implemented through a solicitation of votes for the Plan (the "*Solicitation*") pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "*Securities Act*"), and sections 1125, 1126 and 1145 of the Bankruptcy Code (as defined below);

WHEREAS, upon the successful conclusion of the Solicitation, as set forth herein the Company intends to commence voluntary reorganization cases (the "*Chapter 11 Cases*") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") to effect the Transactions pursuant to the Plan;

WHEREAS, the Company intends to file the Plan and related disclosure statement (the "*Disclosure Statement*") and other related documents and motions as set forth herein on the Commencement Date (as defined in <u>Section 5(c)</u>); and

WHEREAS, the Company intends to use its commercially reasonable efforts to obtain Bankruptcy Court approval of the Plan in accordance with the Bankruptcy Code and on terms consistent with this Agreement and each Consenting Holder intends to use its commercially reasonable efforts to cooperate in that regard.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.    <u>Plan</u>.

(a)    The Consenting Holders acknowledge and agree that (i) the Plan is substantially in a form and substance reasonably acceptable in all respects to the Consenting Holders and their counsel and (ii) the terms and conditions set forth in the Term Sheet are reasonably acceptable in all respects to the Consenting Holders and their counsel. The plan related documents (the "*Plan Related Documents*"), which shall include, but not be limited to, (A) the Disclosure Statement, (B) the materials related to the Solicitation, (C) the proposed confirmation order, and (D) any other documents or agreements filed with the Bankruptcy Court by the Company or at the Company's direction that are necessary to implement the Plan, including: (1) any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement; (2) an amended and restated Credit Agreement (the "*Amended and Restated Credit Agreement*") and such other definitive documentation (including without limitation security documents) as is necessary to consummate the Transactions, all on the same economic terms and otherwise in all material respects on the terms set forth in the Term Sheet; (3) the amended certificate of incorporation and bylaws for the Company as reorganized; and (4) any registration rights agreement, shall contain the terms and conditions set forth in the Plan and the Term Sheet, be in form and substance reasonably acceptable in all respects to the Consenting Holders and counsel to the Agent and counsel for the ad hoc noteholder group, and be consistent with this Agreement in all material respects (the Plan Related Documents that contain such terms and conditions, are reasonably acceptable to the Consenting Holders (as defined below) and counsel to the Agent and counsel for the ad hoc

2

noteholder group and are consistent herewith in all material respects are referred to herein collectively as the "**Approved Plan Documents**").

(b)    The Term Sheet may be amended only upon written approval of the (i) Company, (ii) the Consenting Senior Secured Debt Holders owning more than 66 2/3% in aggregate principal amount of the Senior Secured Debt (as defined in Section 3(b)), (iii) the Consenting Note Holders owning more than 50% in aggregate principal amount of the Subordinated Notes, which requisite percentage shall include the principal amount of the Subordinated Notes held by Apollo Capital Management and Eaton Vance Management or any of their respective affiliates (unless Apollo Capital Management or Eaton Vance Management or any of their respective affiliates transfer their Subordinated Notes or Claims (as defined in Section 3(b)) related thereto to third parties in accordance with this Agreement) (the "**Required Consenting Note Holders**"), and (iv) the Agent; provided that the Agent's approval shall be solely with regard amendments to the Term Sheet relating to the provisions in Section 9 of the Credit Agreement and any similar provisions in the Amended and Restated Credit Agreement, including, without limitation, those provisions relating to its appointment, powers and duties, general immunity, indemnity, and other duties in its role as Administrative Agent.

(c)    This Agreement and the Plan may be amended (so long as any such amendment is (y) consistent with the Term Sheet (as it may be amended in accordance with Section 1(b)) and (z) not of the nature that, if the Plan had been confirmed by the Bankruptcy Court, would require a re-solicitation, only upon written approval of (A) the Company, (B) the Agent at the direction of the Consenting Senior Secured Debt Holders owning more than 50% in aggregate principal amount of the Senior Secured Debt (the "**Required Consenting Senior Secured Debt Holders**" and collectively with the Required Consenting Note Holders, the "**Required Consenting Holders**") and (D) the Required Consenting Note Holders.

2.    Bankruptcy Process.  The Company hereby agrees to use commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable in accordance with the Bankruptcy Code, and on terms consistent with this Agreement, and each Consenting Holder shall use its commercially reasonable efforts to cooperate in that regard; provided, however, that the Company, the Agent, at the direction of the Required Consenting Senior Secured Debt Holders and the Required Consenting Note Holders may from time to time mutually agree in writing to further extend any time period or deadline set forth herein.  The Company and each Consenting Holder shall take all commercially reasonable necessary and appropriate actions to achieve confirmation of the Plan.

3.    Support of the Reorganization; Additional Covenants.

(a)    Prior to the Termination Date (as defined in Section 5), no Consenting Holder or the Agent will (i) object to confirmation of the Plan or object to, or otherwise commence any proceeding to oppose or alter, the Plan, the Term Sheet, the Approved Plan Documents, (ii) vote for, consent to, support or participate in the formulation of any plan of reorganization other than the Plan, (iii) directly or indirectly seek, solicit, negotiate, support or engage in any discussions regarding any plan other than the Plan, or any sale or disposition of the Company (or all or substantially all of its assets or equity), or any dissolution, winding up, liquidation, merger, transaction, reorganization or restructuring of the Company, in any case if such action reasonably could be expected to prevent, delay or impede the successful implementation of the Transactions as contemplated by the Plan, the Term Sheet and the

Approved Plan Documents, (iv) object to the Solicitation or support any such objection by a third party, or (v) take any other action not required by law that is inconsistent with, or that would materially delay, the confirmation or consummation of the Plan.

(b)     Prior to the Termination Date, each Consenting Holder (i) so long as its vote has been solicited pursuant to sections 1125 and 1126 of the Bankruptcy Code, including but not limited to its receipt of the Disclosure Statement, agrees to vote (or cause the voting of) its claims arising from (as the case may be) the Subordinated Notes and the indebtedness under the Credit Agreement (the "***Senior Secured Debt***" and, together with the Subordinated Notes, the "***Debt***") and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such Debt (collectively, the "***Claims***") to accept the Plan, and will not change or withdraw (or cause to be changed or withdrawn) such vote, and (ii) consents to the treatment of the Claims as set forth in the Plan and the Term Sheet.  Notwithstanding anything contained herein to the contrary, other than as set forth in the preceding sentence, no Consenting Holder shall be required to file any pleadings or take any other action in support of the Plan which would require it to hire and pay for counsel to represent it.

(c)     Each Consenting Holder agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, assign or otherwise dispose of any of the Debt or Claims, or any option thereon or any right or interest (voting or otherwise) therein, unless the transferee is a Consenting Holder or agrees in writing to be bound by all of the terms of this Agreement by executing the Joinder attached hereto as <u>Exhibit D</u> (such transferee, if any, to also be a "*Consenting Holder*" hereunder).  If a transferee of any of the Debt or Claims is not a Consenting Holder or does not execute a Joinder in substantially the form attached hereto as <u>Exhibit D</u> within five days of the completion of such transfer of the Debt or Claims or otherwise agree to be bound by all of the terms of this Agreement, then such sale, transfer, assignment or other disposition of the Debt, Claims or related option, right or interest shall be deemed void *ab initio*.  This Agreement shall in no way be construed to preclude any Consenting Holder from acquiring additional Debt, Claims or equity interests in the Company; <u>provided</u>, <u>however</u>, that any such additional holdings shall automatically be deemed to be subject to all of the terms of this Agreement and each such Consenting Holder agrees that such additional Debt, Claims or equity interests shall be subject to this Agreement and that it shall vote (or cause to be voted) any such additional Debt, Claims or equity interests entitled to vote on the Plan (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with this <u>Section 3</u>.  Subject to the terms and conditions of any order of the Bankruptcy Court, each Consenting Holder agrees to provide to the Agent and to Company's counsel (i) a copy of any Joinder and (ii) a notice of the acquisition of any additional Debt or Claims, in each case within five (5) business days of the consummation of the transaction disposing of, or acquiring, Debt or Claims.

(d)     Each Consenting Holder agrees that as long as this Agreement has not terminated in accordance with its terms, it shall not (i) pursue any right or remedy under the Credit Agreement, the Subordinated Notes or the Indenture, as applicable, or (ii) initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Debt or Claims other than to enforce this Agreement.

(e)     Notwithstanding the foregoing, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in

4

connection therewith are consistent with this Agreement and the Transactions and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Transactions.

4.      Agreements of the Company.

(a)      Additional Transaction Matters.  The Company hereby agrees (i) to prepare or cause the preparation of the Plan Related Documents and (ii) that it shall, except in an emergency where it is not reasonably practicable, provide draft copies of all motions, including "first day" motions, and applications and other documents the Company intends to file with the Bankruptcy Court to counsel for the Agent and counsel for the ad hoc noteholder group as soon as reasonably practicable, but in no event less than one (1) day before such documents are filed with the Bankruptcy Court, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.

(b)      Commitment of the Company.  Subject to its fiduciary duties (set forth in Section 25 below), the Company agrees to use its commercially reasonable efforts to (i) support and complete the Transactions and all other actions contemplated under the Plan and the Approved Plan Documents, (ii) take any and all necessary and appropriate actions in furtherance of the Transactions and the other actions contemplated under the Plan and the Approved Plan Documents, (iii) obtain any and all required regulatory approvals and material third-party approvals for the Transactions, and (iv) not take any actions inconsistent with this Agreement, the Term Sheet, the Approved Plan Documents, or the confirmation and consummation of the Plan.  Subject to its fiduciary duties (set forth in Section 25 below), the Company shall not, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to, any restructuring, plan of reorganization, dissolution, winding up, liquidation, reorganization, merger, transaction, sale, or disposition of the Company (or all or substantially all of its assets or equity) other than the Plan (as it may be amended, supplemented or otherwise modified as provided herein) or as otherwise set forth in the Term Sheet (as it may be amended, supplemented or otherwise modified as provided herein), nor shall the Company solicit or direct any person or entity, including, without limitation, any member of the Company's board of directors or any holder of equity in the Company, to undertake any of the foregoing; provided, however, that the Company may agree to modifications to the Term Sheet, the Plan and the Plan Related Documents, as provided herein.

(c)      Advisors to the Consenting Holders.  In accordance with the terms of the existing engagement letters, the Company shall pay all fees and expenses of (i) Sidley Austin LLP, counsel to the Agent ("Sidley"), (ii) Conway Del Genio, financial advisors to the Agent ("CDG"), (iii) Akin Gump Strauss Hauer & Feld LLP, counsel to the Consenting Note Holders and (iv) The Blackstone Group L.P., financial advisors to the Consenting Note Holders, which are due and owing prior to the date of termination of this Agreement, plus the fees and expenses of one (1) local counsel retained by each of the Consenting Senior Secured Debt Holders and the Consenting Note Holders, if necessary, which are due and owing prior to the date of termination of this Agreement.

(d)      Interest Payments Under the Credit Agreement.  All Loans (as defined in the Credit Agreement) shall remain Base Rate Loans (as defined in the Credit Agreement) and shall bear interest at a rate determined in accordance with Section 2.2A of the Credit Agreement payable (as of the Effective Day) in arrears on the last business day of each month prior to the

5

Commencement Date (such interest payments, together with the fees and expenses payable pursuant to Sections 4(c)(i) and (ii), the "*Senior Debt Payments*").

        (e)     <u>Reporting</u>.  In addition to complying with all reporting requirements under the Credit Agreement and the Indenture, the Company shall deliver to Agent (for distribution to the Lenders) and to counsel for the Consenting Note Holders (for distribution to the Consenting Note Holders) certain financial reports as follows: (i) on the fourth business day of (1) the week following the Effective Date and (2) every second week thereafter, a rolling thirteen (13) week cash flow forecast and (ii) within thirty (30) days after the end of each month (commencing with the month ended July 31, 2009), an unaudited, consolidated balance sheet, income statement and year-to-date statement of cash flows, each for the fiscal month most recently ended, subject to year-end audit adjustments and the absence of footnotes.

     5.     <u>Termination of Agreement</u>.  This Agreement shall terminate, unless waived or extended by the Company, the Agent and the Required Consenting Holders in writing, upon the earliest to occur of the following (the date and time of such termination, the "*Termination Date*"):

        (a)     at 5:00 P.M. prevailing Eastern Time on the date which is ten (10) calendar days after the Effective Date unless the Company has commenced the Solicitation (the "*Solicitation Commencement Date*");

        (b)     if the Solicitation Commencement Date has occurred, at 5:00 P.M. prevailing Eastern Time on the date that is 31 calendar days after the Solicitation Commencement Date (the "*Solicitation Termination Date*") unless the Company has successfully concluded the Solicitation;

        (c)     if the Company has successfully concluded the Solicitation before the Solicitation Termination Date, at 5:00 P.M. prevailing Eastern Time on the date that is five (5) calendar days after the Solicitation Termination Date unless the Company has commenced the Chapter 11 Cases (the "*Commencement Date*") and has filed, and is pursuing confirmation of, the Plan, and has filed a motion for authority to use cash collateral with a proposed cash collateral order, in form and substance reasonably acceptable to the Required Consenting Holders;

        (d)     at 5:00 P.M. prevailing Eastern Time on the date which is 40 calendar days after the Commencement Date if the Plan has not been confirmed by the Bankruptcy Court on or before such date;

        (e)     at 5:00 P.M. prevailing Eastern Time on the date which is 30 calendar days following entry by the Bankruptcy Court of an order confirming the Plan if there has not occurred substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan on or before such date;

        (f)     the filing by the Company of any motion or other request for relief seeking to (i) dismiss any of the Chapter 11 Cases, (ii) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(g)    the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (iv) making a finding of fraud, dishonesty or misconduct by any officer or director of the Company, regarding or relating to the Company;

(h)    the Company files, proposes or otherwise supports any plan of reorganization other than the Plan or if the Company, in the exercise of its fiduciary duties (set forth in Section 25 below), takes any other action hereunder that is otherwise prohibited or refrains from taking any action that is otherwise required;

(i)    the material breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement, including the Company's obligations under Sections 4(c) and (d), which material breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from either the Required Consenting Senior Secured Debt Holders or the Required Consenting Note Holders;

(j)    the breach by any of the Consenting Holders of any of the undertakings, representations, warranties or covenants of such Consenting Holder(s) set forth in this Agreement that would have a material adverse impact on the Company or the consummation of the Transactions, which breach remains uncured for a period of ten (10) business days after the receipt by the Consenting Holder(s) of notice of such breach from the Company;

(k)    the withdrawal, amendment or modification by the Company of, or the filing by any person of a pleading seeking to amend or modify, the Plan, which withdrawal, amendment, modification or filing is materially inconsistent with the Plan (with such amendments and modifications as have been effected in accordance with the terms hereof) or is materially adverse to the Consenting Holders, in each case in a manner not reasonably acceptable to the Required Consenting Holders, or if the Company files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement or the Plan (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) and such motion or pleading has not been withdrawn prior to the earlier of (i) five (5) business days after the Company receives written notice from the Required Consenting Holders that such motion or pleading is inconsistent with this Agreement or the Plan, as applicable, and (ii) the entry of an order of the Bankruptcy Court approving such motion; provided, that this Section 5(k) shall not apply with respect to any motion or pleading that is inconsistent with this Agreement if such motion or pleading is consistent with the Plan;

(l)    the Company amends or modifies any Approved Plan Document after it is filed with the Bankruptcy Court, which amendment or modification is materially inconsistent with the Plan or the Term Sheet (in each case with such amendments and modifications as have been as have been effected in accordance with the terms hereof) or not reasonably acceptable to the Agent and the Required Consenting Holders;

(m)    the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Plan in any material respect (in each case with such amendments and modifications as have been as have been effected in accordance with the terms hereof); provided that this Section

7

5(m) shall not apply with respect to any relief that is inconsistent with this Agreement if such relief is consistent with the Plan; or

(o)     the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Transactions.

For the avoidance of doubt, the Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agree not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the giving any such notice).

6.     Good Faith Cooperation; Further Assurances; Transaction Documents.  The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Transactions.  Furthermore, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement.  Each Party hereby covenants and agrees (a) to negotiate in good faith the Plan Related Documents, each of which shall (i) contain the same economic terms as, and other terms consistent in all material respects with, the terms set forth in the Plan and the Term Sheet (as amended, supplemented or otherwise modified as provided herein), (ii) be in form and substance reasonably acceptable in all respects to the Parties signatory thereto or beneficiaries thereof and counsel for the Agent and counsel for the ad hoc noteholder group, and (iii) be consistent with this Agreement in all material respects, and (b) to execute the Approved Plan Documents (to the extent such Party is a party thereto).

7.     Representations and Warranties.  Each Party hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a)     Power and Authority; Authorization.  It has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)     No Conflicts.  The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(c)     Governmental Consents.  The execution, delivery and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any Federal, state or governmental authority or regulatory body other than the Bankruptcy Court and pursuant to the

Securities Act (and assuming, as to the Company, the accuracy of the representations and warranties herein of each Consenting Holder).

(d)    <u>Binding Obligation</u>.  This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(e)    <u>Ownership</u>.  If such Party is a Consenting Holder, such Consenting Holder (i) either (A) is the sole legal and beneficial owner of the Debt set forth below its name on the signature page hereof and all related Claims, in each case free and clear of all claims, liens and encumbrances, or (B) has investment or voting discretion with respect to such Debt and Claims and has the power and authority to bind the beneficial owner(s) of such Debt and Claims to the terms of this Agreement and (ii) such Consenting Holder has full power and authority to vote on and consent to such matters concerning such Debt and Claims and to exchange, assign and transfer such Debt and Claims.

(f)    <u>Securities Laws Matters</u>.  If such Party is a Consenting Note Holder:

(i)    it is acquiring the securities to be acquired by it pursuant to the Transaction (the "***New Securities***") for investment purposes, solely for its own account and/or the account of a holder for which it serves as the investment adviser or manager and not with a view to, or for resale in connection with, the distribution thereof and such Consenting Holder will not resell, transfer, assign or distribute the New Securities acquired by it, except in compliance with this Agreement, until this Agreement is validly terminated, and the registration requirements of the Securities Act, and applicable state securities laws or pursuant to an available exemption therefrom;

(ii)    it, or the holder for whom it acts as investment adviser or manager, is an "***Accredited Investor***" (as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act);

(iii)    the financial situation of such Consenting Holder is such that it can afford to bear the economic risk of holding the New Securities;

(iv)    the knowledge and experience of such Consenting Holder in financial and business matters is such that it, together with its advisors, is capable of evaluating the merits and risks of the investment in the securities;

(v)    such Consenting Holder acknowledges that no representations, express or implied, are being made with respect to the Company, the New Securities being acquired hereunder, or otherwise, other than those expressly set forth herein or in the Plan and the Disclosure Statement;

(vi)    such Consenting Holder understands that the New Securities are a speculative investment that involve a high degree of risk of loss of its investment therein, that there may be substantial restrictions on the transferability of the New Securities and, accordingly, it may not be possible to liquidate such Consenting Holder's investment;

9

(vii)    in making its decision to invest in the New Securities hereunder, such Consenting Holder has relied upon independent investigations made by such Consenting Holder and, to the extent believed by such Consenting Holder to be appropriate, such Consenting Holder's representatives, including such Consenting Holder's own professional, tax and other advisors;

(viii)    it has been advised by the Company that (A) the offer and sale of the New Securities has not been registered under the Securities Act, (B) the offering and sale of the New Securities is intended to be exempt from registration under the Securities Act pursuant to Section 4(2) of the Securities Act and Regulation D thereunder and, if issued pursuant to the Plan, section 1145 of the Bankruptcy Code, and (C) there is no established market for the New Securities and such a public market for the New Securities may not be established in the foreseeable future;

(ix)    such Consenting Holder and its representatives have been given the opportunity to examine all documents and to ask questions of, and to receive answers from, the Company, and its representatives concerning the terms and conditions of the investment in the New Securities; and

(x)    it is familiar with Rule 144 promulgated by the Securities and Exchange Commission under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

8.    <u>Amendments and Waivers</u>.  None of this Agreement, the Plan or the Term Sheet may be modified, amended or supplemented except as set forth in Sections 1(b) and 1(c); <u>provided</u>, <u>however</u>, that any modification of, or amendment or supplement to, this Agreement, the Plan or the Term Sheet that materially and adversely affects the Consenting Holders taken as a whole shall require the written consent of all of the Consenting Holders (in addition to the Company and the Agent).

9.    <u>Effectiveness</u>.  Subject to the condition precedent set forth below, this Agreement shall become effective and binding on each Party upon the execution and receipt by the Company of signature pages signed by the Company, the Agent and the Consenting Holders (the "***Effective Date***").  Delivery by telecopier or electronic mail of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart hereof.  Notwithstanding the foregoing, this Agreement shall become binding on the Agent and the Consenting Senior Secured Debt Holders only upon the Company's payment to Agent, for the account and benefit of the Lenders, of an amount equal to (a) all interest on the Loans (as defined in the Credit Agreement) that accrued at the non-default rate of interest during the period beginning June 1, 2009 and ending August 31, 2009, <u>plus</u> (b) all fees and expenses of Sidley and CDG due and owing as of the anticipated Effective Date (which fees and expenses shall be invoiced at least two (2) business days prior to the anticipated Effective Date) pursuant to the terms of their respective engagement letters.

10.    <u>GOVERNING LAW; JURISDICTION; JURY TRIAL WAIVER</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF

ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS
AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND
UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING
AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN
CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT
OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING,
MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF
MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF
THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND
SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT,
GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION,
SUIT OR PROCEEDING.  NOTWITHSTANDING THE FOREGOING CONSENT TO
JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF
THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE
JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN
CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS
CONTEMPLATED HEREBY.  THE PARTIES WAIVE ALL RIGHTS TO TRIAL BY JURY
IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE
BETWEEN THE PARTIES, WHETHER SOUNDING IN CONTRACT, TORT OR
OTHERWISE.

11.     Remedies. All remedies which are available at law or in equity, including specific
performance and injunctive or other equitable relief, to any Party for a breach of this Agreement
by another Party shall be available to the non-breaching Party.   All rights, powers and remedies
provided under this Agreement or otherwise available in respect hereof at law or in equity shall
be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any
Party shall not preclude the simultaneous or later exercise of any other such right, power or
remedy by such Party or any other Party.

12.     Survival.  Notwithstanding (i) any sale of the Debt or Claims in accordance with
Section 3(c) or (ii) the termination of this Agreement in accordance with its terms, the
agreements and obligations of the Parties in Sections 21, 22 and 25 shall survive such sale and/or
termination and shall continue in full force and effect for the benefit of the Consenting Holders
in accordance with the terms hereof.

13.     Headings.  The headings of the Sections, paragraphs and subsections of this
Agreement are inserted for convenience only and shall not affect the interpretation hereof.

14.     Successors and Assigns; Severability; Several Obligations.  This Agreement is
intended to bind and inure to the benefit of the Parties and their respective permitted successors,
assigns, heirs, executors, estates, administrators and representatives.  The invalidity or
unenforceability at any time of any provision hereof in any jurisdiction shall not affect or
diminish in any way the continuing validity and enforceability of the remaining provisions
hereof or the continuing validity and enforceability of such provision in any other jurisdiction.
The agreements, representations and obligations of the Consenting Holders under this Agreement
are, in all respects, several and not joint.

15.     No Third Party Beneficiaries.  Unless otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

16.     Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Plan; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Company and any Consenting Holder(s) shall continue in full force and effect.

17.     Counterparts.  The Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

18.     Consideration.  Other than as provided in the Term Sheet, it is hereby acknowledged by the Parties that, other than the agreements, covenants, representations and warranties of the Parties, as more particularly set forth herein, no payment or additional consideration shall be due or paid to any of the Consenting Holders for their agreement to vote in accordance with, and otherwise comply with the terms and conditions of, this Agreement.

19.     Notices.  All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses and facsimile numbers set forth on Schedule I hereto.

20.     Rule of Interpretation.  Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include (a) votes or voting on a plan of reorganization under the Bankruptcy Code and (b) all means of expressing agreement with, or rejection of, as the case may be, a restructuring or reorganization transaction that is not implemented under the Bankruptcy Code.

21.     Reservation of Rights.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Consenting Holder to protect and preserve its rights, remedies and interests, including its Claims against the Company.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

22.     Publicity.  The Company will submit to counsel for the Agent and counsel for the ad hoc noteholder group all press releases, public filings, public announcements or other communications with any news media relating to this Agreement or the transactions contemplated hereby and any amendments thereof.  The Company shall not (a) use the name of any Consenting Holder in any press release without such Consenting Holder's prior written

12

consent or (b) disclose to any person, other than legal, accounting and financial advisors to the Company, the principal amount or percentage of Debt held by any Consenting Holder or any of its respective subsidiaries; provided, however, that the Company shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of Debt held by the Consenting Holders as a group.  Notwithstanding the foregoing, the Consenting Holders hereby consent to the disclosure by the Company in the Plan, the Disclosure Statement, the Approved Plan Documents and any required filings by the Company with the Bankruptcy Court or the Securities and Exchange Commission, or as otherwise required by law or regulation, of the execution, terms and contents of this Agreement; provided that the Company shall not file a copy of any stockholders agreement acceptable to Apollo Management and Eaton Vance Management that is entered into by Apollo and Eaton Vance in connection with the Transactions (the "**Stockholders' Agreement**"); provided, however, that the Disclosure Statement will contain a paragraph regarding the Stockholders' Agreement (the form of which paragraph has been agreed upon by the Company, Apollo, and Eaton Vance) and the Company may provide a copy of the Stockholders' Agreement (i) to the extent required by applicable law or regulation or by any subpoena or similar legal process, (ii) to its directors, officers, employees and agents, including accountants and legal counsel and other advisors in connection with the Transactions, (iii) to the extent the Stockholders' Agreement becomes publicly available other than as a result of a breach of this Section 22, or (iv) with the written consent of Eaton Vance and Apollo.

23.    Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Plan and consummate the Transactions.

24.    Representation by Counsel.  Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

25.    Fiduciary Duties.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require (a) the Company or any directors or officers of the Company, in such person's capacity as a director or officer of the Company, to take any action, or to refrain from taking any action, to the extent required to comply with its or their fiduciary obligations under applicable law, (b) any Consenting Holder or representative of a Consenting Holder that is also a director or officer of the Company to take any action, or to refrain from taking any action, in such person's capacity as a director or officer of the Company, to the extent required to comply with their fiduciary obligations under applicable law, or (c) any Consenting Holder or representative of a Consenting Holder that is a member of a statutory committee established in the Chapter 11 Cases to take any action, or to refrain from taking any action, in such person's capacity as a statutory committee member, to the extent required to comply with such person's fiduciary obligations applicable under the Bankruptcy Code.

26.     <u>Conflicts Between the Plan, the Term Sheet, the Approved Plan Documents and this Agreement</u>. In the event of any conflict among the terms and provisions in the Plan and the terms and provisions in the Term Sheet and this Agreement, as applicable, the terms and provisions of the Plan shall control. In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Approved Plan Documents, the terms and provisions of the relevant Approved Plan Document, as applicable, shall control and govern. Nothing in this <u>Section 26</u> shall affect, in any way, the requirements set forth herein for the amendment of the Plan, the Term Sheet, any Approved Plan Documents or this Agreement.

27.     <u>Commitments of Revolving Lenders</u>. Those Consenting Senior Secured Debt Holders that hold Senior Lender Agreement Revolver Claims (as defined in the Plan) hereby commit to make the Revolving Loan Commitments as Revolving Lenders under the Amended and Restated Credit Agreement on the terms, and subject to the conditions, set forth in the Term Sheet and the Plan; <u>provided</u>, <u>however</u>, that if either the Term Sheet or the Plan is amended (in accordance with the terms hereof) and such amendment adversely affects such persons holding Senior Lender Agreement Revolver Claims, the commitment of each such person under this <u>Section 27</u> shall be subject to such person's consent to the applicable amendment.

* * * * *

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

**PANOLAM HOLDINGS CO.**
**PANOLAM HOLDINGS II CO.**
**PANOLAM INDUSTRIES INTERNATIONAL, INC.**
**PANOLAM INDUSTRIES, INC.**
**PIONEER PLASTICS CORPORATION**
**NEVAMAR HOLDING CORP.**
**NEVAMAR HOLDCO, LLC**
**NEVAMAR COMPANY, LLC**

By: /s/ Robert J. Muller, Jr.
      Robert J. Muller, Jr.
      President and Chief Executive Officer

## SCHEDULE I

NOTICE ADDRESSES

If to the Company:

Panolam Industries International, Inc.
20 Progress Drive
Shelton, Connecticut 06484
Attn.: Robert Muller, CEO
Facsimile:  203-225-0051
Email: rmuller@panolam.com

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn.: Gary Holtzer, Esq.
Facsimile: 212-310-8007
Email: gary.holtzer@weil.com

If to the Agent or Required Consenting Senior Secured Debt Holders:

Credit Suisse
Eleven Madison Avenue, 5th Floor
New York, New York 10010
Attn.: Didier Siffer, Managing Director – Recovery Management
Facsimile:  917-326-8363
Email: didier.siffer@credit-suisse.com

with a copy to:

Sidley Austin LLP
555 West Fifth Street
Los Angeles, California 90013
Attn.: Jennifer Hagle, Esq.
Facsimile:  213-896-6600
Email: jhagle@sidley.com

If to the Required Consenting Note Holders:

Apollo Capital Management
9 West 57th Street, 14th Floor
New York, New York 10019
Attn.: Jason Perri
Facsimile:  646-417-6615
Email: jperri@apollocapital.com

Eaton Vance Management
255 State Street
Boston, Massachusetts 02109
Attn.:  Tom Huggins
Facsimile:  617-482-2178
Email: thuggins@eatonvance.com

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn.: Lisa Beckerman, Esq.
Facsimile:  212-872-1002
Email: lbeckerman@akingump.com

If to any other Consenting Holder, at the address shown for such Consenting Holder on the applicable signature page hereto, to the attention of the person who has executed this Agreement on behalf of such Consenting Holder.

**Exhibit A to Restructuring Support Agreement**

**Plan**

[See Exhibit "A" to the Disclosure Statement]

Book Page 418

## Exhibit B to Restructuring Support Agreement

## Term Sheet

[See Exhibit "A" to the Joint Prepackaged Plan of Reorganization]

## Exhibit C to Restructuring Support Agreement

**New Intercreditor Term Sheet**

[See Exhibit "B" to the Joint Prepackaged Plan of Reorganization]

Book Page 422

**<u>Exhibit D to Restructuring Support Agreement</u>**

**Joinder**

JOINDER

The undersigned ("*Transferee*") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of September 25, 2009 (the "*Agreement*"), by and among Panolam Holdings Co., a Delaware corporation, Panolam Holdings II Co., a Delaware corporation, Panolam Industries International, Inc., a Delaware corporation, Panolam Industries, Inc., a Delaware corporation, Pioneer Plastics Corporation, a Delaware corporation, Nevamar Holding Corp., a Delaware corporation, Nevamar Holdco, LLC, a Delaware limited liability company, Nevamar Company, LLC, a Delaware limited liability company (collectively, the "*Company*"), **[Transferor's Name]** ("*Transferor*"), and the other holders of claims against the Company signatory thereto, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a "*Consenting Holder*" under the terms of the Agreement.

Date Executed:  _____, 2009


**[Transferee's name]**


By:_____
   Name:_____
   Title:_____


Principal amount of Claims held:
$_____ of **[Senior Secured Debt/Subordinated Notes]**.

Date:  _____


**[Address]**
Attention:
Fax: **[***]
Email:

**<u>Exhibit F to Disclosure Statement</u>**


**Pro Forma Financial Projections**

Book Page 426

# PRO FORMA FINANCIAL PROJECTIONS

The 2009 plan and 2010-2013 forecasts (the "*Financial Projections*") present, to the best of the Debtors' knowledge and belief, the Debtors' expected financial position, results of operations, and cash flows for each of the five years reflected in the projection period. The Financial Projections include a projected income statement, balance sheet and statement of cash flow for the years ending December 31, 2009 through 2013 and projected capital structure at exit. The assumptions disclosed herein are those that the Debtors believe are significant to the Financial Projections. Because events and circumstances do not always occur as expected, there will inevitably be differences between the projected and actual results; some of which may be material to the Financial Projections herein.

**THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS, BUDGETS OR STRATEGIES OR MAKE EXTERNAL PROJECTIONS OR FORECASTS OF THEIR ANTICIPATED FINANCIAL POSITIONS, RESULTS OF OPERATION, CASH FLOW, REVENUE AND GROWTH RATES. ACCORDINGLY, THE DEBTORS DO NOT ANTICIPATE THAT THEY WILL, AND DISCLAIMS ANY OBLIGATION TO, FURNISH UPDATED BUSINESS PLANS, BUDGETS, FINANCIAL CONSEQUENCES OR PROJECTIONS PRIOR TO THE EFFECTIVE DATE OF ANY PLAN OR TO INCLUDE SUCH INFORMATION IN DOCUMENTS REQUIRED TO BE FILED WITH THE SEC OR OTHERWISE MAKE SUCH INFORMATION PUBLICLY AVAILABLE.**

The Debtors' auditor has neither examined nor compiled the accompanying Financial Projections and, accordingly, does not express an opinion or any other form of assurance with respect thereto. These Financial Projections were not prepared with a view toward compliance with published guidelines of the SEC or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information, including, without limitation, the American Institute of Certified Public Accountants' Statement of Position 90-7 ("*SOP 90-7*"), Financial Reporting by Entities in Reorganization Under the Bankruptcy Code. These Financial Projections, unless otherwise noted, are not in compliance with Generally Accepted Accounting Principles ("*GAAP*").

Recurring EBITDA ("*EBITDA*") is measured as earnings (defined as operating income (loss) plus other income less other expenses) before interest, taxes, depreciation and amortization and excluding restructuring and other one-time charges. EBITDA is frequently used by the financial community to provide insight into an organization's operating trends and facilitate comparisons between peer companies, since interest, taxes, depreciation and amortization can differ greatly between organizations as a result of differing capital structures and tax strategies. EBITDA can also be a useful measure of a company's ability to service debt and is one of the measures used for determining the Debtors' debt covenant compliance.

## A.    PROJECTION ASSUMPTIONS

The Financial Projections have been prepared in good faith based upon assumptions believed to be reasonable including assumptions related to the financial accounts of the Debtors, which are based upon the Debtors' estimates and market conditions.

The Debtors, with the assistance of its advisors, prepared the Financial Projections to include the next five years ending December 31 (2009-2013).  The Financial Projections are based on a number of assumptions, and while the Debtors have prepared the Financial Projections in good faith and believe the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will ultimately be realized.  The Financial Projections should be read in conjunction with the assumptions, qualifications and notes contained herein, the risk factors described in Section VIII of the Disclosure Statement, and the historical financial statements filed by the Debtors.  The following summarizes the underlying key assumptions upon which the Financial Projections were based.

The Financial Projections take into account a number of factors pertinent to the current macroeconomic environment, including, among other things, the state of the current building products market and decreased consumer spending.  The Debtors assume the current consumer spending slowdown will last through the end of calendar year 2010, with gradual growth in consumer spending resuming in 2011.

The Financial Projections are based on the assumption that the Plan will be confirmed as stated in the Disclosure Statement and Plan of Reorganization and will become effective October 1, 2009.

## B.  PROJECTED CONSOLIDATED INCOME STATEMENT

*Sales Forecast:*  A detailed 5-year sales forecast was prepared in U.S. dollars.  Sales were derived by applying projected growth rates to previous years' shipments with inputs from industry forecasts and pricing adjustments on a plant-by-plant basis.  Base year (FY 2009) projections were based on a detailed bottoms-up analysis which drives the remaining projections for the outlook period.  The 2010 operating results are projected to be relatively flat as compared to the base year. Long-term, operating performance was expected to trend back toward 2008 levels by 2014.

*Product Cost Assumptions:*  Raw Materials, Direct Labor and Variable Overhead were projected based on historical margins and cost trends (excluding freight).  Raw material prices were assumed to decline in 2009 and 2010, with subsequent increases in 2011 and beyond. Fixed Overhead and Indirect Labor were projected based on growth rates relative to previous years and individually altered based on the Debtors' estimates.

*Operating Expense Assumptions:*  Selling and marketing expenses were projected at rates relative to net sales (excluding freight revenues) and individually altered based on the Debtors' estimates.  General and administrative expenses were projected at growth rates relative to previous years and individually altered based on planned adjustments projected by the Debtors.

*Interest Expense*:  The New Revolving Loan interest is projected based on the LIBOR forward curve (including a 2.5% LIBOR floor) plus 6.0% per annum.  In addition the Revolving Loan has an unused commitment fee of 1.0% of the undrawn amount.  Interest for the First Lien Term Loan is projected based on the LIBOR forward curve (including a 2.5% LIBOR floor) plus 6.0% per annum.  The Second Lien Term loan interest is projected at an interest rate of 12% per annum, 10% of which would be payable in kind and 2% would be payable in cash.  The Debtors have the option to pay the Second Lien Term Loan interest at an all cash rate of 10% per annum, once the First Lien Leverage falls below 4.0x LTM EBITDA.

*Income Tax Expense:*  The Debtors' tax advisors are preparing post-emergence tax estimates, which may vary materially from what is presented in the Financial Projections.

*Fresh Start Accounting*:  The Debtors advisors believe the Debtors' tax attributes will be reduced significantly or eliminated as a result of the reorganization.  Additionally, the tax basis of the Debtors' assets may be reduced as a result of the transaction.

## C.  PROJECTED CONSOLIDATED BALANCE SHEET

*Cash:*  Under the terms of the excess cash flow sweep, at the end of 2009 any liquidity (cash plus availability under the New Revolving Loan) in excess of the sum of $20 million and the Excess Cash Adjustment is applied to reduce the amount of senior debt outstanding.  At the end of each year thereafter, excess cash flow is swept based on a sliding scale compared to senior leverage per the proposed amendments to the Credit Agreement.

*Accounts Receivable*:  The FY 2009 projected Accounts Receivable balances at December 31, were based on the Debtors' historical experience.  For the projected periods, receivable days were projected to remain consistent with historical levels.

*Inventory*:  The FY 2009 projected Inventory balances at December 31, were based on the Debtors' historical experience.  For the projected periods, there was an assumption of a modest improvement in inventory days carried in 2012 and 2013.

*Accounts Payable*:  The FY 2009 projected Accounts Payable balances at December 31, were based on the Debtors' historical experience.  For the projected periods, days were projected to remain consistent with historical levels.

## Projected Income Statement

| (Dollars in 000s) | YTD Actual[1] Aug. 2009 | Plan 2009 | Forecast 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| **TOTAL NET SALES** | | | | | | |
| Revenue (Excl Freight) | $165,762 | $267,800 | $262,100 | $289,014 | $317,971 | $350,940 |
| Other Sales | 6,457 | 7,380 | 11,340 | 12,560 | 14,080 | 15,180 |
| Freight Billed | 2,991 | 4,820 | 4,820 | 5,335 | 5,880 | 6,440 |
| **Total Net Sales** | **$175,210** | **$280,000** | **$278,260** | **$306,909** | **$337,931** | **$372,560** |
| | | | | | | |
| **Total Product Cost** | **$134,248** | **$221,910** | **$218,360** | **$238,067** | **$259,269** | **$282,183** |
| | | | | | | |
| **Gross Profit** | **$40,962** | **$58,090** | **$59,900** | **$68,842** | **$78,662** | **$90,376** |
| *Gross Profit -%-* | *23.4%* | *20.7%* | *21.5%* | *22.4%* | *23.3%* | *24.3%* |
| | | | | | | |
| **SG&A (EXCL D&A)** | | | | | | |
| Selling & Marketing Expense | $12,852 | $19,400 | $19,710 | $20,916 | $22,314 | $23,689 |
| General & Admin Expense | 9,819 | 16,690 | 16,480 | 16,924 | 17,400 | 17,913 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total SG&A** | **$22,671** | **$36,090** | **$36,190** | **$37,839** | **$39,714** | **$41,603** |
| Total SG&A -% | 12.9% | 12.9% | 13.0% | 12.3% | 11.8% | 11.2% |
| | | | | | | |
| **RECURRING EBITDA** | **$18,291** | **$22,000** | **$23,710** | **$31,002** | **$38,948** | **$48,774** |
| *EBITDA -%-* | *10.4%* | *7.9%* | *8.5%* | *10.1%* | *11.5%* | *13.1%* |
| | | | | | | |
| Restructuring Costs[2] | $6,668 | $19,625 | $0 | $0 | $0 | $0 |
| Depreciation | 18,187 | 26,670 | 26,670 | 26,670 | 26,670 | 26,670 |
| Amortization | 2,468 | 3,688 | 3,660 | 3,660 | 3,660 | 3,660 |
| **EBIT** | **($9,032)** | **($27,983)** | **($6,620)** | **$672** | **$8,618** | **$18,444** |
| | | | | | | |
| Interest Expense, Net | 18,413 | 22,916 | 15,434 | 15,187 | 14,387 | 13,552 |
| Other (Income) / Expense | 1,320 | 0 | 0 | 0 | 0 | 0 |
| **EBT** | **($28,765)** | **($50,900)** | **($22,054)** | **($14,515)** | **($5,768)** | **$4,892** |
| | | | | | | |
| Tax Provision / (Benefit) | (5,261) | (1,000) | 0 | 0 | 0 | 2,076 |
| **Net Income** | **($23,504)** | **($49,900)** | **($22,054)** | **($14,515)** | **($5,768)** | **$2,816** |

**Note:** (1) Balances at August 31, 2009 reflect amounts prior to accounting for the reorganization contemplated in the Plan and exclude asset impairment charges
(2) Projected restructuring costs assume $2,000k of fees incurred in Q1 2009; $1,200k per month of legal fees and $500k per month of financial advisory fees in Q2 2009; and $1,200k per month of legal fees, $475k per month of financial advisory fees in Q3 2009; and $4,000k of financial advisory transaction fees and $3,500k in Restructuring Fees at the time of the transaction

## Projected Balance Sheet

| (Dollars in 000s) | Actual[1] 8/31/2009 | Plan 2009 | Forecast 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash & Equivalents | $52,736 | $11,177 | $11,177 | $12,921 | $21,349 | $33,117 |
| Accounts Receivable, Net | 17,273 | 16,578 | 16,438 | 18,746 | 21,245 | 24,034 |
| Inventory | 47,944 | 49,930 | 49,131 | 53,565 | 54,014 | 54,869 |
| Other Current Assets | 19,087 | 17,000 | 17,252 | 17,145 | 17,107 | 17,087 |
| Total Current Assets | $137,040 | $94,685 | $93,998 | $102,376 | $113,715 | $129,107 |
| Net PP&E | $208,776 | $195,660 | $173,490 | $151,820 | $130,650 | $109,980 |
| Intangible Assets, Net | 48,255 | 48,395 | 44,735 | 41,075 | 37,415 | 33,755 |
| Other Assets | 7,482 | 2,640 | 2,623 | 2,893 | 3,186 | 3,512 |
| **Total Assets** | **$401,553** | **$341,379** | **$314,846** | **$298,164** | **$284,966** | **$276,354** |
| **LIABILITIES & SHAREHOLDERS EQUITY** | | | | | | |
| Accounts Payable | $8,033 | $5,468 | $5,381 | $5,867 | $6,389 | $6,954 |
| Accrued Expenses & Other Current Liabs. | 31,780 | 15,543 | 15,543 | 15,543 | 15,543 | 15,543 |
| Total Current Liabilities | $39,813 | $21,011 | $20,924 | $21,410 | $21,932 | $22,497 |
| Total Debt (Including Current) | $344,025 | $170,853 | $166,501 | $163,206 | $154,558 | $141,790 |
| Deferred Income Taxes | 55,992 | 61,498 | 61,498 | 61,498 | 61,498 | 61,498 |
| Other Liabilities | 7,687 | 6,273 | 6,234 | 6,876 | 7,571 | 8,347 |
| Total Liabilities | $447,517 | $259,636 | $255,157 | $252,990 | $245,560 | $234,132 |
| Stockholders' Equity / (Deficit) | ($45,964) | $81,744 | $59,689 | $45,174 | $39,406 | $42,222 |
| **Total Liab. & Equity** | **$401,553** | **$341,379** | **$314,846** | **$298,164** | **$284,966** | **$276,354** |

**Note:  Does not incorporate fresh start accounting changes**

(1) Balances at August 31, 2009 reflect amounts prior to accounting for the reorganization contemplated in the Plan

Book Page 432

## Projected Cash Flow Statement

| (Dollars in 000s) | YTD Actual[(1)] Aug. 2009 | Plan 2009 | Forecast 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| **CASH FROM OPERATIONS** | | | | | | |
| Net Income (Pre Restructuring Fees) | ($16,836) | ($30,275) | ($22,054) | ($14,515) | ($5,768) | $2,816 |
| Less: Restructuring Fees | (6,668) | (19,625) | 0 | 0 | 0 | 0 |
| Plus: Depreciation & Amortization | 20,656 | 30,358 | 30,330 | 30,330 | 30,330 | 30,330 |
| Plus: Post-Reorg PIK Interest | 0 | 625 | 2,660 | 2,936 | 781 | 0 |
| Funds From Operations | ($2,848) | ($18,917) | $10,936 | $18,751 | $25,342 | $33,146 |
| | | | | | | |
| (Increase) / Decrease in Accounts Receivable, Net | ($2,898) | ($2,385) | $140 | ($2,308) | ($2,499) | ($2,790) |
| (Increase) / Decrease in Inventory | 7,774 | 5,206 | 799 | (4,434) | (449) | (855) |
| (Increase) / Decrease in Other Current Assets | 575 | 1,575 | (252) | 108 | 38 | 20 |
| Increase / (Decrease) in Accounts Payable | (1,231) | (1,445) | (87) | 486 | 522 | 565 |
| Increase / (Decrease) in Accrued Interest | 14,069 | 12,127 | 0 | 0 | 0 | 0 |
| Change in Net Working Capital | $18,289 | $15,079 | $599 | ($6,149) | ($2,388) | ($3,059) |
| | | | | | | |
| Other Cash Flows | ($5,113) | ($1,125) | ($23) | $372 | $403 | $449 |
| **Cash Flow From Operating Activities** | **$10,328** | **($4,963)** | **$11,513** | **$12,974** | **$23,357** | **$30,537** |
| | | | | | | |
| **CASH FROM INVESTING ACTIVITIES** | | | | | | |
| Capital Expenditure | ($1,036) | ($4,000) | ($4,500) | ($5,000) | ($5,500) | ($6,000) |
| **Cash Flow From Investing Activities** | **($1,036)** | **($4,000)** | **($4,500)** | **($5,000)** | **($5,500)** | **($6,000)** |
| | | | | | | |
| Free Cash Flow (Cash Available to Service Debt) | $9,292 | ($8,963) | $7,013 | $7,974 | $17,857 | $24,537 |
| | | | | | | |
| **FUNDS FROM FINANCING** | | | | | | |
| Scheduled Borrowings / (Repayments) | ($8) | ($13) | ($513) | ($1,000) | ($1,000) | ($1,000) |
| Revolver Borrowings / (Repayments) | 0 | (2,315) | (3,585) | 0 | 0 | 0 |
| Optional Borrowings / (Repayments) | 0 | 0 | (2,914) | (5,231) | (8,428) | (11,768) |
| **Cash Flow From Financing** | **($8)** | **($2,328)** | **($7,013)** | **($6,231)** | **($9,428)** | **($12,768)** |
| | | | | | | |
| **Change in Cash & Equivalents** | **$9,284** | **($11,291)** | **$0** | **$1,744** | **$8,428** | **$11,768** |

**Note:** (1) Balances at August 31, 2009 reflect amounts prior to accounting for the reorganization contemplated in the Plan and exclude asset impairment charges

**Exhibit G to Disclosure Statement**

**Reorganization Valuation Analysis**

## REORGANIZATION VALUATION ANALYSIS

**THE VALUATION INFORMATION CONTAINED IN THIS EXHIBIT WITH REGARD TO THE REORGANIZED DEBTORS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN**

### A.    OVERVIEW

The Debtors have been advised by Perella Weinberg Partners LP ("***PWP***") regarding estimates of the reorganization value of the Reorganized Debtors on a going concern basis (the "***Valuation***").    PWP has determined the estimated range of reorganization value of the Reorganized Debtors, excluding cash on hand, to be approximately $240 million to $270 million (with a mid-point estimate of approximately $255 million) as of an assumed Effective Date of December 31, 2009.

**The estimated Valuation range as of an assumed Effective Date of December 31, 2009, reflects PWP's analysis of business and asset information provided by the Debtors' management to PWP.    Changes in facts and circumstances between the date hereof and the Effective Date, including, without limitation, a delay in the Effective Date, may result in changes to the Valuation.    PWP will consider any such changes in facts and circumstances and may modify its estimate of the estimated Valuation range prior to the Effective Date.    Notwithstanding the foregoing, neither the Debtors nor PWP have any obligation to update, revise or reaffirm the Valuation range.**

The foregoing Valuation range estimates are based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Reorganized Debtors' Business Plan (the "***Business Plan***"), achievement of the forecasts reflected in the Business Plan, access to adequate exit financing, continuity of a qualified management team, market conditions through the period covered by the Financial Projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed below.

With respect to the Financial Projections, which were prepared by the management of the Debtors, and are included as Exhibit "F" to this Disclosure Statement, PWP has assumed that the Financial Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the Debtors' management as to the future operating and financial performance of the Reorganized Debtors.    PWP's estimate of a range of reorganization values assumes that operating results projected by the Debtors will be achieved by the Reorganized Debtors in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow. Certain of the results forecast by the Debtors' management are materially better than the recent historical results of the Debtors' operations.    The estimate of reorganization values is dependent upon the Reorganized Debtors performing

at the levels set forth in the Financial Projections.    If the business performs at levels above or below those set forth in the Financial Projections, such performance may have a material impact on the Financial Projections and on the estimated range of values derived therefrom.

**In estimating the Valuation range PWP: (1) reviewed certain historical financial information of the Debtors for recent years and interim periods; (2) reviewed certain internal financial and operating data of the Debtors, including the Financial Projections, which were prepared and provided to PWP by the Debtors' management and which relate to the Debtors' business and their prospects; (3) met with certain members of management of the Debtors to discuss the Debtors' operations and future prospects; (4) reviewed publicly available financial data and considered the market value of public companies that PWP deemed generally comparable to the operating businesses of the Debtors; (5) considered certain economic and industry information relevant to the operating businesses; and (6) conducted such other studies, analyses, inquiries, and investigations as it deemed appropriate.    PWP assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors, as well as publicly available information.**

**In addition, PWP did not independently verify management's Financial Projections in connection with such estimates of the reorganization value of the Reorganized Debtors, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith.**

**Estimates of the reorganization value of the Reorganized Debtors do not purport to be appraisals or necessarily reflect the values that may be realized if assets are sold as a going concern, in liquidation or otherwise.**

**In the case of the Reorganized Debtors, the estimates of the reorganization value prepared by PWP represent the hypothetical reorganization value of the Reorganized Debtors.    Such estimates were developed for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to creditors thereunder.    Such estimates reflect computations of the range of the estimated reorganization value of the Reorganized Debtors through the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any Securities issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.**

**The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.    As a result, the estimate of the Valuation range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein.    Because such estimates are inherently**

**subject to uncertainties, none of the Debtors, PWP, the Debtors' other advisors or any other person assumes responsibility for their accuracy.    In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict.    Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors which generally influence the prices of securities.**

## B.    VALUATION METHODOLOGY

PWP performed a variety of analyses and considered a variety of factors in preparing the Valuation range of the Reorganized Debtors.    PWP primarily relied on two widely-recognized methodologies: (i) comparable public company analysis and (ii) discounted cash flow analysis.    PWP made judgments as to the relative significance of each analysis in determining the Reorganized Debtors' Valuation range.    PWP's Valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Reorganized Debtors' Valuation.

The following summary does not purport to be a complete description of the analyses and factors undertaken to support PWP's conclusions.    The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances.    As a result, the process involved in preparing a valuation is more complex than the summary provided below.

## 1.    Comparable Public Company Analysis

A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company.    It establishes a benchmark for asset valuation by deriving the value of "comparable" assets through a standardized approach that uses a common variable such as revenues, earnings, and cash flows.    The analysis includes a detailed financial comparison of each company's income statement, balance sheet, and cash flow statement.    In addition, each company's performance, profitability, margins, leverage and business trends are also examined.    Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company.    Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, target market segments, growth prospects, maturity of businesses, market presence, size, and scale of operations.    The selection of truly

comparable companies is often difficult and subject to interpretation. The underlying concept, however, is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining reorganization value.

While calculating the current trading value for the comparable companies, PWP analyzed the current reorganization value for the comparable companies as a multiple of projected fiscal year end 2009, 2010 and 2011 earnings before interest, taxes, depreciation and amortization ("**EBITDA**"). These multiples were then applied to the Debtors' fiscal year end 2009, 2010 and 2011 forecasted Adjusted EBITDA (as defined below) to determine the range of reorganization values. Adjusted EBITDA ("**Adjusted EBITDA**") is measured as earnings (defined as operating income (loss) plus other income less other expenses) before interest, taxes, depreciation and amortization and excluding restructuring and other one-time charges.

## 2.    Discounted Cash Flow Approach

The discounted cash flow ("**DCF**") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Debtors. The expected future cash flows have two components: (a) the present value of the projected unlevered after-tax free cash flows for a determined period and (b) the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Financial Projections). PWP's discounted cash flow valuation is based on a four-year fiscal year end projection of the Reorganized Debtors' operating results (FY2010E-FY2013E). PWP discounted the projected cash flows using the Debtors' estimated weighted average cost of capital, and calculated the terminal value of the Debtors using EBITDA multiples derived from the comparable companies analysis.

The DCF approach relies on a company's ability to project future cash flows with some degree of accuracy. Because the Financial Projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Financial Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. PWP cannot and does not make any representations or warranties as to the accuracy or completeness of the Financial Projections.

**The foregoing Valuation represents estimated reorganization values and does not reflect values that could be attainable in public or private markets. The Valuation does not purport to be an estimate of the post-reorganized market trading value. Any such trading value may be materially different from the foregoing Valuation.**

**<u>Exhibit H to Disclosure Statement</u>**

**Liquidation Analysis**

Book Page 440

## LIQUIDATION ANALYSIS

### A.    INTRODUCTION

Pursuant to section 1129(a)(7) of the Bankruptcy Code (often called the ***"Best Interests Test"***), holders of Allowed Claims must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Plan's assumed Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code (***"Chapter 7"***).

In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets under Chapter 7.  The Debtors, with the assistance of their financial advisors, have prepared this hypothetical liquidation analysis (the ***"Liquidation Analysis"***) in connection with the Disclosure Statement.  The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs, that would be available to the Debtors' creditors if the Debtors were to be liquidated pursuant to a Chapter 7 liquidation as an alternative to continued operation of the Debtors' business under the Plan. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan.  The Liquidation Analysis is based upon the assumptions discussed herein and in the Disclosure Statement.  All capitalized terms not defined in this Liquidation Analysis have the meanings ascribed to them in the Disclosure Statement.

**UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND THEIR MANAGEMENT.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.**

### B.    SIGNIFICANT ASSUMPTIONS

Hypothetical recoveries to stakeholders of the Debtors in a Chapter 7 liquidation were determined through multiple steps, as set forth below.

The basis of the Liquidation Analysis is the Debtors' unaudited consolidated balance sheet as of June 30, 2009 (except as noted otherwise).  The Liquidation Analysis also assumes that the liquidation of the Debtors would commence under the direction of a court-appointed Chapter 7 trustee.  The Liquidation Analysis reflects the wind-down and liquidation of substantially all of the Debtors' remaining operations over a four to eight month period (the ***"Wind-Down Period"***), during which time all of the Debtors' major assets would be sold and the cash proceeds, net of liquidation-related costs, would be distributed to satisfy Claims.

## C.    ESTIMATE OF NET PROCEEDS

Estimates were made of the cash proceeds that might be received from the liquidation of the Debtors' assets listed on the balance sheet after consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and advisors to such trustee (see below) and (ii) the potential erosion of asset value in a Chapter 7 case because of the expedited liquidation process required under Chapter 7.

In this Liquidation Analysis, liquidation values were assessed for general classes by estimating percentage recoveries of the gross book value of assets that a Chapter 7 trustee might achieve through dispositions. Proceeds are net of holding costs, including insurance, taxes, utility, and security and maintenance, which are assumed to be incurred until a sale is concluded. The Liquidation Analysis does not reflect any potential recoveries that might be realized by the Chapter 7 trustee's potential pursuit of any avoidance actions, as the Debtors believe that any such potential recoveries are highly speculative in light of, among other things, the various defenses that would likely be asserted. Similarly, the Liquidation Analysis does not reflect any recoveries that might be realized from any current or future potential litigation initiated by the Debtors.

## D.    ESTIMATE OF COSTS

Proceeds from a Chapter 7 liquidation would be reduced by administrative costs incurred during the wind-down of the operations, the disposition of assets and the reconciliation of claims. These costs include professional (including attorneys, financial advisors, appraisers and accountants) and trustee fees, commissions, salaries, severance and retention costs, certain occupancy costs, the estimated holding costs for each plant over the relevant period and the estimated costs of shutting down the plants. Actual administrative costs may exceed the estimate included in this Liquidation Analysis, particularly if the wind-down of operations, disposition of assets and reconciliation of claims takes longer than the Wind-Down Period.

## E.    DISTRIBUTION OF NET PROCEEDS UNDER ABSOLUTE PRIORITY

The amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the commencement of their Chapter 7 cases. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. As such, prior to delivering any proceeds to holders of General Unsecured Claims, available cash and asset liquidation proceeds would first be applied to Secured Claims and amounts necessary to satisfy any Chapter 7 Administrative Expense Claims (including any incremental Administrative Expense Claims that may result from the termination of the Debtors' business and the liquidation of the Debtors' assets) and other Priority Claims under section 507 of the Bankruptcy Code as required under section 726 of the Bankruptcy Code. Any remaining cash and asset liquidation proceeds after satisfaction of Secured Claims, Administrative Expense Claims and Priority Claims, to the extent they exist, would be available for distribution to holders of General Unsecured Claims in accordance with the distribution hierarchy established by section 726 of the Bankruptcy Code.

The Senior Lenders have first priority liens on all of the Debtors' assets. Accordingly, the proceeds from the liquidation would be applied to satisfy the claims of the Senior Lenders until such claims are paid in full.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Debtors have determined, as summarized in the charts below, that Debtors' proposed Plan will provide creditors with a recovery that is not less than creditors would receive pursuant to a liquidation of the Debtors' assets under Chapter 7.

The following charts should be reviewed with the accompanying notes.

## Hypothetical Liquidation Analysis

Note: US$ in 000s.

| | | Book Value June 30, 2009 | Low Liquidation Value | | High Liquidation Value | |
|---|---|---|---|---|---|---|
| | | | Hypothetical Percentage Recovery | Estimated Liquidation Value [(a)] | Hypothetical Percentage Recovery | Estimated Liquidation Value [(a)] |
| Cash and Cash Equivalents | (b) | $45,347 | 100.0% | $45,347 | 100.0% | $45,347 |
| Accounts Receivable, Gross | (c) | 24,057 | 60.9% | 14,659 | 84.9% | 20,425 |
| Inventories, Gross | (d) | 60,980 | 25.6% | 15,585 | 50.5% | 30,795 |
| Other Current Assets | (e) | 18,887 | 29.1% | 5,500 | 40.0% | 7,555 |
| Property, Plant & Equipment | (f) | 208,942 | 20.0% | 41,788 | 40.0% | 83,577 |
| Intangible Assets | (g) | 48,735 | 5.0% | 2,437 | 20.0% | 9,747 |
| | | $406,948 | | $125,316 | | $197,446 |
| Less: Fees and Expenses | (h) | | | (35,399) | | (23,563) |
| Net Estimated Liquidation Proceeds | (i) | | | $89,917 | | $173,883 |

## Calculation of Fees and Expenses

Note: US$ in 000s.

| | | | |
|---|---|---|---|
| Chapter 7 Trustee Fees and Expenses | (j) | $2,399 | $4,563 |
| Chapter 7 Professional Fees and Expenses | (k) | 8,000 | 4,000 |
| Employee Expenses/Wind-down Costs | (l) | 25,000 | 15,000 |
| | | $35,399 | $23,563 |

## Distribution Analysis

Note: US$ in 000s.

| | | | |
|---|---|---|---|
| Net Estimated Liquidation Proceeds | (i) | $89,917 | $173,883 |
| | | | |
| Secured Claim | (m) | $197,586 | $197,586 |
| Recovery Amount | | $89,917 | $173,883 |
| % of Claim | | 45.5% | 88.0% |
| | | | |
| Accounts Payable | | $6,774 | $6,774 |
| Senior Subordinated Noteholder Claim | | 167,187 | 167,187 |
| Total General Unsecured Claims | (n) | $173,961 | $173,961 |
| Recovery Amount | | $0 | $0 |
| % of Claim | | 0.0% | 0.0% |

## NOTES

### *Note A – Book Values as of June 30, 2009*

The book values used in the Liquidation Analysis for cash and cash equivalents, accounts receivable, inventories, other current assets, property, plant and equipment and intangible assets, which are used as a reference point for the analysis and are assumed to be representative of the Debtors' assets.

### *Note B – Cash and Cash Equivalents*

Cash and cash equivalents consist of all cash or liquid investments with maturities of three months or less in banks or operating accounts and are assumed to be fully recoverable.

### *Note C – Accounts Receivable, Gross*

Estimated proceeds realizable from short-term and long-term accounts receivable are based on management's assessment of the ability of the Debtors to collect on their accounts, taking into consideration the credit quality and aging of the accounts. The Liquidation Analysis for accounts receivable is based on estimated recoveries of aging receivables using a declining scale of recoveries. These estimates take into account the inevitable difficulty in collecting receivables and any concessions that might be required to facilitate the collection of certain accounts receivable.

### *Note D – Inventory, Gross*

Estimated inventory recoveries are based on the stage of production. This estimate assumes spoilage as well as diminished market demand for product volumes and a general discount for liquidation.

### *Note E – Other Current Assets*

Estimated other current assets' recoveries are based on expected US and Canadian tax refunds.

### *Note F – Property, Plant and Equipment*

Property, plant and equipment includes (x) the sum of (i) land, buildings and improvements (ii) machinery, equipment, and other and (iii) construction in progress less (y) accumulated depreciation. The hypothetical recovery rates across all fixed asset classes was based on recovery rates for *gross* book values.

### *Note G – Intangible Assets*

Intangible Assets includes (x) the sum of (i) goodwill (ii) tradenames (iii) proprietary technology and (iv) customer relationships less (y) accumulated amortization. The hypothetical recovery rates were based on recovery rates for *gross* book values.

### Note H – Fees and Expenses

All fees and expenses are allocated on a pro rata basis.

### Note I – Net Estimated Liquidation Proceeds

The Senior Lenders have first priority liens on all of the Debtors' assets. Accordingly, the proceeds from the liquidation would be applied to satisfy the claims of the Senior Lenders until such claims are paid in full.

### Note J – Trustee Fees & Expenses

Compensation for the Chapter 7 trustee will be limited to fee guidelines in section 326(a) of the Bankruptcy Code. The Debtors' management has assumed trustee fees of 3% of the gross proceeds (excluding cash) in the liquidation.

### Note K – Other Professional Fees & Expenses

Compensation for the Chapter 7 trustee's counsel and other legal, financial and professional services during the Chapter 7 proceedings is estimated to be approximately $1 million per month beginning at the commencement of the liquidation proceedings throughout the Wind-Down Period.

### Note L – Employee Expenses / Wind-Down Costs

Wind-down costs are based on management's best estimates of the costs associated with an orderly liquidation. Corporate payroll and operating costs during liquidation are based on the assumption that certain functions would be required during the liquidation process in order for an orderly wind-down of the business and the plants. Costs would include costs associated with shutting down the production lines as well as salaries of certain operating and maintenance employees, severance and bonus pay that would be incurred during a Chapter 7 liquidation.

### Note M – Secured Claims

The distribution analysis assumes that the lenders under the Credit Agreement would have recovery rights with respect to proceeds from all of the Debtors' assets.

### Note N – Senior Subordinated Noteholder Claims and General Unsecured Claims

These are estimated to be $174.0 million and include (i) $6.8 million in accounts payable and (ii) $167.2 million on account of the Senior Subordinated Notes Claims.

**<u>Exhibit I to Disclosure Statement</u>**

**Hypothetical Distribution of Excess Cash and Hypothetical Recovery Analysis**

Book Page 448

# Hypothetical Distribution of Excess Cash

- Assumes $22,154,000 of Excess Cash

| Step | Remaining Excess Cash Available for Distribution to the Senior Lenders | Implied Distribution of Remaining Excess Cash Available for Distribution to the Senior Lenders | Implied Permanent Cash Distributed as a Percentage of Claim | Issues / Remedies |
|---|---|---|---|---|
| 1. Distribute Excess Cash by Pro Rata Percentage of Total Claim (approximately $172.6 million principal amount) | $22,154,000 | Revolver $3,850,939 17.383%; Term $18,303,061 82.617% | Revolver 0.00%; Term 12.84% | • **Issue**: revolver facility requirement of $15,000,000<br>  – Lenders willing to provide $9,972,000 of drawn revolver facility and letters of credit, plus<br>  – Excess Cash available pursuant to Section 4.2(b)(i) of $3,850,939<br>  – Resulting in additional liquidity requirement of $1,177,061<br>• **Remedy**: $1,177,061 of Excess Cash is left on the balance sheet to meet the liquidity need. |
| 2. $1,177,061 of Excess Cash remains on the balance sheet | $20,976,939 | Revolver $3,850,939 18.358%; Term $17,126,000 81.642% | Revolver 0.00%; Term 12.01% | • **Issue**: revolver distribution of $3,850,939 is not a permanent Cash distribution because it can be drawn upon by the Company.<br>• **Remedy**: Transfer $2,976,942 of remaining Excess Cash (the *"Intercreditor Distribution Adjustment"*) to the revolver in order to equalize Implied Permanent Cash Distributed as a Percentage of Claim. |
| 3. $3,850,939 is not treated as a permanent Cash distribution and the Intercreditor Distribution Adjustment is distributed to the holders of Senior Lender Credit Agreement Revolver Claims | $17,126,000 | Revolver $2,976,942 17.383%; Term $14,149,058 82.617% | Revolver 9.92%; Term 9.92% | |

# Hypothetical Recovery Analysis

## $5,000,000 Senior Lender Credit Agreement Revolver Claim

1. Pro rata share of Total Senior Lender Credit Agreement Revolver Claim = $5,000,000 / $30,000,000 = 16.667%
2. Pro rata share of Excess Cash = 16.667% * 17.383% * $22,154,000 = $641,823 (this is not permanent Cash distributed because it can be drawn upon per the Plan Term She
3. Pro rata share of Amended and Restated Revolver Notes = $641,823 + [16.667% * ($5,900,000 + $4,072,000)] = $2,303,824
4. Pro rata share of Intercreditor Distribution Adjustment = 16.667% * $2,976,942 = $496,157 (this is Permanent Cash Distributed)
5. Pro rata share of Amended and Restated Term Notes Distributable to Senior Lender Credit Agreement Revolver Claims = $5,000,000 - $2,303,824 - $496,157 = $2,200,019



Permanent Cash
Distributed
9.92%

Amended and
Restated Revolver
Exposure
46.08%

Amended and
Restated Term
Exposure
44.00%

## $5,000,000 Senior Lender Credit Agreement Term Claim

1. Pro rata share of Total Senior Lender Credit Agreement Term Claim = $5,000,000 / $142,586,498 = 3.507%
2. Pro rata share of Excess Cash = 3.507% * 82.617% * $22,154,000 = $641,823
3. Pro rata share of Excess Cash left on the balance sheet for liquidity = 3.507% * $1,177,061 = $41,275
4. Pro rata share of Intercreditor Distribution Adjustment = 3.507% * $2,976,942 = $104,389
5. Pro rata share of Permanent Cash Distributed = $641,823 - $41,275 - $104,389 = $496,159
6. Pro rata share of Amended and Restated Term Notes Distributable to Senior Lender Credit Agreement Term Claims = $5,000,000 - $496,159 = $4,503,841



Permanent Cash
Distributed
9.92%

Amended and
Restated Term
Exposure
90.08%

(This page has been left blank intentionally.)

(This page has been left blank intentionally.)